IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNYSLVANIA

STACY S., and JOHN
and MARY ELLEN S.
on behalf of their
daughter, LEIGH ANN
S., a minor,

        Plaintiffs,

    vs.

GIRARD SCHOOL DISTRICT;
ROBERT SNYDER,
Individually and in
his capacity as Principal
of the Rice Avenue
Middle School; and
GREGORY YARBENTE, a
professional employee
of the Girard School
District,

        Defendants.

CIVIL ACTION
C.A. No. 04-150 ERIE

Deposition of:
SARAH CHUZIE

Deposition date:
March 24, 2005

Reported by:
Candance L. Messich

COUNSEL OF RECORD:

For the Plaintiffs:

Edward Olds, Esquire
Carolyn Russ, Esquire
1007 Mt. Royal Boulevard
Pittsburgh, PA  15223

For the Defendants:

Richard Lanzillo, Esquire
KNOX, McLAUGHLIN,
GORNALL & SENNETT
120 West 10th Street
Erie, PA  16501



MINI - TRANSCRIPT
KEY - WORD
INDEXING

# MAXINE JACOBY & ASSOCIATES
### ALLEGHENY BUILDING     SUITE 720
### 429 FORBES AVENUE    PITTSBURGH, PA. 15219
### (412)  765-3133    5la    FAX  (412)  765-2704

Page 12

1 appropriate or improper?
2 A No.
3 Q And you never saw him touch a student?
4 A No.
5 Q He has been described as a hugger. Did you
6   see him hug students?
7 A No, I don't believe I did.
8 Q Did he ever hug you?
9 A No.
10 Q Did you ever see him hug any female faculty?
11 A No.
12 Q When you were in his classroom, did you
13   observe that there was much learning going
14   on?
15 A No.
16 Q Tell me what you observed.
17 A A great deal of chaos. And, again, this is
18   my standard that I'm relating. There wasn't
19   a lot of student-teacher rapport, not a lot
20   of professionalism.
21 Q Can you give any examples of his conduct that
22   you think might show a lack of
23   professionalism? Does anything jump to your
24   mind that you can remember?
25 A One that bothered me is students referring to

Page 13

1   him as Yarb as opposed to Mr. Yarbenet. I
2   thought that was not very respectful, but
3   that was probably the worst. A lot of -- I
4   guess Gregory was just more of a big kid, and
5   that's the way he came across.
6 Q Did you ever observe him exhibiting behavior
7   that you thought was strange?
8 A I guess it would depend on what you would
9   define strange as.
10 Q Well, I'm saying that you thought was
11   strange.
12 A That I thought was strange?
13 Q Right. I mean, that you looked at it and you
14   said this is strange or this is odd or this
15   isn't the way a teacher should be acting.
16   Did you observe that kind of conduct?
17 A Again, just that there wasn't that -- it was
18   like he didn't have the authority of the
19   teacher. I think that's strange.
20 Q Did you ever observe him and Stacy S█████
21   together?
22 A No. I'm assuming this is Stacy here, and I
23   don't know that I have ever -- I know that
24   I've never met her, and I'm not certain that
25   I've ever seen her.

Page 14

1 Q What about Leigh Ann? Did you ever observe
2   Mr. Yarbenet and Leigh Ann together?
3 A Yes. Leigh Ann was involved with the
4   television studio. They did the
5   announcements in the morning, and I saw them
6   together there.
7 Q Did you ever know Leigh Ann to be in his room
8   before the school day began?
9 A Yes.
10 Q How did you know about that?
11 A Leigh Ann was in my homeroom, and there were
12   times that she would come in in the morning
13   and tell me that she was there and that she
14   needed to be getting ready for the
15   announcements in the morning.
16 Q And did you excuse her at that time?
17 A Yes.
18 Q And was that common practice that students
19   would be excused from homeroom or was it
20   because she was involved in the
21   announcements? How did it happen that you
22   excused her?
23      MR. LANZILLO: Objection to form.
24   Go ahead.
25      THE WITNESS: She would be excused

Page 15

1   because I knew that she was giving the
2   announcements in the morning and that she was
3   involved in that.
4 Q What about after school? Did you know her to
5   be in his classroom after school?
6 A There were times after school that I do
7   recall her asking to go over there, but I did
8   not allow it unless she had a pass.
9 Q Where would she get a pass?
10 A From Mr. Yarbenet.
11 Q Were there occasions when she presented a
12   pass?
13 A Yes, there were.
14 Q What did you understand -- explain to me what
15   you understood, you know, passes were and how
16   students would get them and what they would
17   be used for.
18 A Passes are given by teachers to come and get
19   homework, to get extra help, to maybe do
20   things for the teachers. It wasn't up to me
21   to question why she had a pass. It was just
22   up to me to see that she had one so that she
23   could be excused.
24 Q Now, when she had a pass and you excused her,
25   were you excusing her from your class?



52a

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNYSLVANIA

| | |
|---|---|
| STACY S., and JOHN and MARY ELLEN S. on behalf of their daughter, LEIGH ANN S., a minor, | CIVIL ACTION<br>C.A. No. 04-150 ERIE<br><br>Deposition of:<br>DEBBIE KARWOSKI |
| Plaintiffs, | Deposition date:<br>March 24, 2005 |
| vs. | Reported by:<br>Candance L. Messich |
| GIRARD SCHOOL DISTRICT; ROBERT SNYDER, Individually and in his capacity as Principal of the Rice Avenue Middle School; and GREGORY YARBENTE, a professional employee of the Girard School District, | COUNSEL OF RECORD:<br><br>For the Plaintiffs:<br><br>Edward Olds, Esquire<br>Carolyn Russ, Esquire<br>1007 Mt. Royal Boulevard<br>Pittsburgh, PA 15223 |
| Defendants. | For the Defendants:<br><br>Richard Lanzillo, Esquire<br>KNOX, McLAUGHLIN,<br>GORNALL & SENNETT<br>120 West 10th Street<br>Erie, PA 16501 |



MINI - TRANSCRIPT
KEY - WORD INDEXING

# MAXINE JACOBY & ASSOCIATES

## ALLEGHENY BUILDING     SUITE 720
### 429 FORBES AVENUE     PITTSBURGH, PA. 15219

(412)  765-3133    FAX (412) 765-2704

Page 24

1 A  Correct, I would not know that.
2 Q  He would hug students in the hall?
3 A  Correct. He usually was in the hall when the
4     kids were being dismissed from one class to
5     another, and most people -- I mean, when
6     you're coming and going from class to class,
7     if you're passing his room, it would be very
8     common for him to greet people with a hug.
9 Q  And this is faculty and students?
10 A  Correct.
11 Q  Did you ever see him hug Mr. Manross?
12 A  No.
13 Q  I think one of the other gym teachers you
14     mentioned was Bill McNally?
15 A  Correct.
16 Q  Did you ever see him hug Bill?
17 A  No.
18 Q  And you don't recall -- you can't recall a
19     particular male student that he hugged?
20 A  No.
21 Q  In a given week, how many times would he hug
22     you?
23 A  Well, initially when I transferred into the
24     building, 15, 16 years ago, he would -- he
25     constantly tried to greet you with a hug.

Page 25

1     That is a how he greeted people. As he got
2     to know me, he did not do that. He would
3     come up, say good morning. So I'm sure I had
4     a sense or I said enough to him that, you
5     know, please don't do that. He stopped.
6 Q  Did he ever disrupt any of your gym classes?
7 A  Yes.
8 Q  And in this time frame, 1997 to 2002, did he
9     disrupt your gym classes?
10 A  Yes.
11 Q  How would he disrupt your gym classes?
12 A  If he was there, he was a disruption.
13 Q  Well, I guess my first question is what
14     business would he have being there?
15 A  None.
16 Q  When would he come there?
17 A  Sometimes if he would have a planned period
18     and I would have a gym class during that
19     period, sometimes he would pop in, and his
20     presence would wild the kids up and would wild
21     them up that you had to pull them back and
22     calm them down to continue with whatever you
23     were doing.
24 Q  Did you ever talk to Principal Snyder about
25     the fact that Yarbenet disrupted your gym

Page 26

1     class?
2 A  Yes, I did.
3 Q  On how many cases?
4 A  I talked to him one specific time in his
5     office with the door shut. It happened to
6     the beginning of the year when Leigh Ann was
7     a 7th grader.
8 Q  Tell me what you said in that conversation.
9 A  In Mr. Snyder's conversation?
10 Q  Yes.
11 A  I asked him to get Mr. Yarbenet off my class
12     list and out of my 8th period class jokingly,
13     and Mr. Snyder said what do you mean? I said
14     he is constantly cutting through the gym or
15     appears in the gym, and he needs to not do
16     that because it's disruptive.
17 Q  Was Leigh Ann in your 8th period that year?
18 A  Yes.
19 Q  Did you observe him giving her attention when
20     he was -- when he disrupted your 8th period
21     gym class?
22 A  When he would come in the beginning, he would
23     go to the end where she was standing, so to
24     me he was in there looking for her. He
25     wasn't ever at the other end at the beginning

Page 27

1     of the alphabet. He was always down at her
2     end. A few times if the kids were playing a
3     game and they would be doing a worksheet in
4     the back, he would go to her group and sit.
5     When I noticed that, I would ask him to
6     leave.
7          Usually I didn't start class -- if
8     he would appear at the beginning, I would
9     say, you know, as soon as you leave, we can
10     start. Then the kids would be like, oh, come
11     on, Yarb, please leave, we want to have
12     class. We learned to play the game with him
13     to get him out of there. After I talked to
14     Mr. Snyder, he did not appear as often.
15 Q  When you told -- I try not to repeat myself,
16     but sometimes I'm not like the most careful
17     listener. So could you again -- I won't do
18     this too often. Would you repeat what you
19     told to Mr. Snyder?
20 A  Yes. I asked him to please get Yarb off my
21     class list because he was constantly in my
22     8th period class, which was Leigh Ann's
23     class, and when we were in the health room, I
24     assumed that he was cutting through the
25     health lab to get health materials when the



Page 36

1    thought -- I'm not asking you to --
2 A  I thought that he was immature as far as not
3    being on time, staying in his room. I
4    thought he was a nuisance because he would
5    filter down into my area to go out and maybe
6    use the field I'm trying to teach in. I
7    thought that he was inconsiderate because if
8    he was doing some fun, cool thing, he
9    wouldn't care that I would be trying to teach
10   in that same space. So I thought that he was
11   a nuisance.
12 Q Now, did you ever have any conversations with
13   any other faculty members about Gregory
14   Yarbenet's conduct?
15 A I think it was a common understanding that he
16   was a nuisance to everybody, and sure,
17   comments were made, oh, Yarb is doing this
18   today and his kids are all over the hall. I
19   think that was pretty common.
20 Q When you say his kids were all over the hall,
21   what does that mean?
22 A He might be doing some kind of science
23   project in the hall. Not that that's a bad
24   thing because Lee Manross and other people do
25   other things in the hall, but when it's so

Page 37

1    disruptive it filters into your classroom,
2    then it's not fair to the people around you.
3 Q  Did you know that on occasion he locked his
4    classroom door?
5 A  I did not know that.
6 Q  Did you ever hear any teachers talk about
7    that?
8 A  I have seen kids not be able to get back, but
9    that's true with most classrooms.
10 Q When you say you have seen see kids not be
11   able to get back, what do you mean?
12 A If I was coming back to the health room,
13   their kids would be out in the hall. They
14   would be knocking on the door to get in
15   because the door was locked.
16 Q His classroom kids?
17 A Correct. They might have gone down to go to
18   the bathroom or get a drink and now they are
19   trying to get back into class or maybe they
20   came in late.
21 Q Would it be a group of kids or just one or
22   two?
23 A Groups.
24 Q Groups of kids were locked out of his
25   classroom?

Page 38

1 A  Three or four.
2 Q  Where was the administration's office
3    relative to your --
4 A  At the opposite end of the building.
5 Q  How many floors is the building?
6 A  Three.
7 Q  Three floors?
8 A  They are on the bottom floor of the north
9    end, and he is on the second floor on the
10   south end.
11 Q Was Mr. Snyder in the hallway frequently?
12 A Yes.
13 Q And would you see the assistant principals in
14   the hallway frequently?
15 A Yes.
16 Q So you personally observed the fact that
17   groups of students would be locked out of his
18   classroom?
19 A A couple of times. I would say, guys, what
20   are you doing? Oh, we can't get back in.
21   They came from the bathroom or the drinks,
22   but, like I said, we're supposed to keep our
23   doors locked when it is shut. Some people
24   leave them unlocked and some would lock
25   them. So from time to time, my health room

Page 39

1    would be locked, and I would have to open it
2    for somebody trying to visit or somebody
3    trying to get back in the room.
4 Q  You say you're supposed to keep the doors
5    locked?
6 A  Well, when we have a Code 10 or a fire drill,
7    we are to shut the doors and lock them. I
8    mean, we have certain procedures we do for
9    certain drills, so it wouldn't be uncommon
10   for somebody to forget to move the little
11   switch that goes from lock to unlock. You
12   know, people have locked themselves out of
13   their own room and have to go get a janitor
14   to get in. So the way the doors locked, it
15   was not an uncommon thing if the door would
16   have been locked or unlocked.
17 Q But you don't know, for instance, that the
18   days when you observed groups of students
19   outside his classroom, you don't know whether
20   those days followed a Code 10 practice?
21 A I would have no knowledge or recollection of
22   that.
23 Q And during the course of a given day, most of
24   your time is spent in your classroom, right?
25 A Correct.

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2

 3   STACY S; and JOHN and       :
     MARY ELLEN S., on behalf    :
 4   of their daughter, LEIGH    :
     ANN S., a minor,            :
 5              Plaintiffs       :
                                 :
 6              vs.              :   Civil Action No. 04-150E
                                 :
 7   GIRARD SCHOOL DISTRICT;     :
     ROBERT SNYDER,              :   HONORABLE SEAN J. MCLAUGHLIN
 8   Individually and in his     :
     capacity as Principal of    :
 9   the Rice Avenue Middle      :
     School; and GREGORY         :
10   YARBENET, a professional    :
     employee of the Girard      :
11   School District,            :
                Defendants       :   Jury Trial Demanded
12

13

14            Deposition of ROBERT SNYDER, taken before and
         by Carol A. Holdnack, RPR, Notary Public in and for
15       the Commonwealth of Pennsylvania, on Friday,
         April 8, 2005, commencing at 10:00 a.m., at the
16       offices of Knox McLaughlin Gornall & Sennett, P.C.,
         120 West Tenth Street, Erie, PA 16501.
17

18   For the Plaintiffs:
         Edward A. Olds, Esquire
19       Carolyn Spicer Russ, Esquire
         1007 Mount Royal Boulevard
20       Pittsburgh, PA 15223

21

22   For the Defendants:
         Richard A. Lanzillo, Esquire
         Knox McLaughlin Gornall & Sennett, P.C.
23       120 West Tenth Street
         Erie, PA 16501

24

25            Reported by Carol A. Holdnack, RPR
              Ferguson & Holdnack Reporting, Inc.
```

Page 22

1  they were there with Yarbenet.
2      Q.  Okay.  And how many times did Mrs. Seneta make
3  that report?
4      A.  Once.
5      Q.  When did she make that report?
6      A.  I do not remember.
7      Q.  What do you recall of Mrs. Seneta's report to you
8  concerning the students in that room?
9      A.  That there was a bar put up across the cabinets in
10  the top or in the room, and that she had found students in
11  there doing chin-ups on the bar.
12      Q.  Do you have any idea how Ms. Werling knew that
13  Yarbenet took Stacy into that room, and Leigh Ann, and you
14  didn't know?
15      MR. LANZILLO:  Objection to the form.  First of
16      all, I don't think there's any reference to Leigh
17      Ann in that statement.
18      Q.  Okay.  So you can answer the question.
19      A.  Could you repeat it for me.
20      Q.  Do you have any idea how Mrs. Werling knew that
21  Yarbenet had Stacy in that room and how he could have Leigh
22  Ann in that room and you not know?
23      MR. LANZILLO:  Objection to form.
24      A.  No, I do not know.
25      Q.  Did the police tell you that Ms. Werling had

Page 23

1  indicated that she suspected that there was another victim
2  of Yarbenet in the school?
3      A.  No.
4      Q.  Did Mrs. Werling tell you that?
5      A.  No.
6      Q.  Did you have a conversation with Ms. Werling about
7  Gregory Yarbenet after he was taken from the school by the
8  police?
9      A.  Not that I recall.
10      Q.  Did you say -- make a statement to her to the
11  effect, 30 years down the drain?
12      A.  Not that I recall.
13      Q.  Did you talk to any of the teachers about Yarbenet
14  after the police removed him from the school?
15      A.  No.
16      Q.  You never talked to one teacher?
17      A.  No.
18      Q.  There's an assistant principal McClelland; is that
19  right?
20      A.  Yes.
21      Q.  And there's an assistant principal Hahesy?
22      A.  He would have been before Mr. McClelland.
23      Q.  Did Hahesy serve under your -- while you were
24  principal?
25      A.  Yes.

Page 24

1      Q.  And where is he now?
2      A.  I believe at Edinboro University.
3      Q.  And did you talk to Gregg McClelland about
4  Yarbenet after the police took him from the building?
5      A.  Only when we had to make arrangements for the two
6  of us to get Mr. Yarbenet's personal things out of the
7  classroom.
8      Q.  What did you and Mr. McClelland talk about?
9      A.  Just making those arrangements.  Mr. Blucas asked
10  us to go in and get things that appeared to be of a personal
11  nature out of the room.
12      Q.  Apparently, Mary Werling -- at least this report
13  indicates that Mary Werling said that Yarbenet is a goofy
14  kind of guy.  Would you agree with that?
15      A.  Greg liked to be silly, yes.
16      Q.  By the way, did he recently send you a letter?
17      A.  Not recently.
18      Q.  Did he send you a letter since he's been
19  incarcerated?
20      A.  Yes.
21      Q.  Where is that letter?
22      A.  I gave it to the superintendent.
23      Q.  And what did that letter say?
24      A.  I just -- I read it very quickly when it first
25  came, and turned it over.  It indicated information about

Page 25

1  his relationship with Mrs. S██████.  It -- as I recall, that
2  pretty much was the basis of the entire letter, was
3  information about him and Mrs. S██████.
4      Q.  Was that letter addressed to you?
5      A.  Yes.
6      Q.  And do you remember when you got that letter?
7      A.  It was June of some -- you know, it was after
8  school was out this past year.  But before I left for summer
9  break, so June sometime.
10      MR. LANZILLO:  Ed, I have possession of a copy of
11      that letter today.  It's not within the scope of
12      your discovery request, but I'll be happy to
13      provide you with a copy of that over the break.
14      MR. OLDS:  Okay.  Appreciate that.
15      Q.  Now, you were in the room, you say, when
16  Mrs. Seneta was interviewed?
17      A.  Correct.
18      Q.  Okay.  Do you recall saying that -- do you recall
19  Mrs. Seneta telling the police that Yarbenet was in that
20  closet or that storage area between her room and his room
21  with Stacy S██████ often?
22      A.  I do not recall her saying that, no.
23      Q.  Do you recall her saying that the two were very
24  close?
25      A.  I do not recall that wordage, no.

FERGUSON & HOLDNACK REPORTING, INC.
814-452-4556

57a

f1764f69-7b7d-4d62-a4e3-a58575d4f410

Case 1:04-cv-00150-SJM    Document 30-3    Filed 08/18/2005    Page 8 of 49
Stacy S. v. Girard School District, et al.
Robert Snyder

Page 34

1  telephone operations.
2     Q.  Okay.  What do you recall her saying to you about
3  Yarbenet and Stacy?
4     A.  That she saw Yarbenet and Stacy walking home
5  together.
6     Q.  What else do you recall her saying to you about
7  Stacy and Yarbenet?
8     A.  I think that's it.
9     Q.  Did she ever talk to you about Leigh Ann and
10  Yarbenet?
11        MR. LANZILLO:  Karen Kwiatkowski?
12        MR. OLDS:  Yes.
13     Q.  Did Karen Kwiatkowski ever talk to you about Leigh
14  Ann and Yarbenet?
15     A.  Not that I recall.
16     Q.  Did you ever see -- did you ever observe Yarbenet
17  interact with female students in a way that you thought was
18  inappropriate?
19     A.  No.
20     Q.  If a -- did you ever see him walk down the hall
21  with a crowd of girls around him?
22     A.  No.
23     Q.  Did you ever see him -- I think you testified that
24  you never saw him hug a female student.
25     A.  Correct.

Page 35

1     Q.  Did you ever see him tickle a female student or in
2  any way touch a female student?
3        MR. LANZILLO:  I take it the otherwise touch kind
4        of subsumes the tickle.
5        MR. OLDS:  I guess, yeah.
6     A.  I mean, there were times where I would see him
7  when he's at his door during class changing, and kids are
8  coming into his room, and he would pat them on the back or
9  put his arm around them and "how you doing," that sort of
10  thing, so.
11     Q.  Females?
12     A.  And males.
13     Q.  You saw him hug males?
14        MR. LANZILLO:  Objection to form.  He didn't say
15        anything about hugging anybody.
16     A.  Pat on the back.
17     Q.  Oh, I'm sorry.
18     A.  Arm on his shoulder, you know.
19     Q.  Put his arm around them, and I converted that to a
20  hug.  But did you ever see him put his arm around a male
21  student?
22     A.  Yes.
23     Q.  And when he would pat them, where would he pat
24  them?
25     A.  On the shoulder.

Page 36

1     Q.  Did you ever see him joking with students?
2     A.  Yes.
3     Q.  And when he joked with students, what would --
4  what kind of activity was it?  Verbal jokes?
5     A.  Verbal jokes.
6     Q.  Did other teachers ever come to you and complain
7  about Yarbenet's inability to maintain control of his class?
8     A.  No, not inability to control.
9     Q.  What do you recall them complaining about?
10     A.  That his teaching style was different than theirs,
11  and that it was more relaxed.
12     Q.  And who were those teachers?
13     A.  Mrs. Seneta and Mrs. Chuzie.
14     Q.  Did Karen Kwiatkowski, going back to her, did she
15  tell you that she observed Yarbenet kiss Stacy on the head?
16     A.  No, I do not recall that.
17     Q.  Did she tell you that she observed him with his
18  arms around Leigh Ann and kissing Leigh Ann on the head?
19     A.  No, I do not recall that.
20     Q.  Did you ever -- there was an elevator at the
21  school?
22     A.  There's two elevators.
23     Q.  Did she -- did Ms. Kwiatkowski ever tell you that
24  she observed Yarbenet giving rides to female students on the
25  elevators?

Page 37

1     A.  No, I do not recall that at all.
2     Q.  Did she tell you that she found Yarbenet in his
3  classroom, with the lights out, with girls in his classroom?
4     A.  With students in his classroom, yes.
5     Q.  With the lights out?
6     A.  Correct.
7     Q.  And did she tell you that among the students that
8  she found in his classroom with the lights out was Stacy
9  S_____ or Leigh Ann S_____?
10     A.  I don't remember any specific students being
11  identified.
12     Q.  What did she say to you about Yarbenet being in
13  his classroom with students with the lights out?
14     A.  That there were times when she was doing the hall
15  monitoring in the morning before homeroom, when -- as she
16  would go by, because she was in charge of the second floor
17  hall, that there were times when she would find that
18  students were in Yarbenet's room, in there with him, but the
19  lights were not on.
20     Q.  And this would be before class?
21     A.  Before homeroom.
22     Q.  Before homeroom.
23     A.  Um-hum.
24     Q.  How many times did she tell you that?
25     A.  I can recall two specific instances.

10 (Pages 34 to 37)

Case 1:04-cv-00150-SJM    Document 30-3    Filed 08/18/2005    Page 9 of 49
Stacy S. v. Girard School District, et al.
Robert Snyder

Page 82

1    A.  Okay.

2    Q.  And maybe put a time frame to those.

3    A.  Sure.  Well, the first several years when I was a
4  math teacher, I really had no real interaction with him at
5  all.  Everything that -- every interaction that the faculty
6  had was pretty much done, at that time, on a departmental
7  level.  So I didn't really have much interaction at all.

8         Then in my years as guidance counselor, the
9  involvement that I would have with him at that point is if
10  there were students in his room having academic difficulty
11  or if we were having a parent team meeting for a student, of
12  all the parents there.  At that time my impression was that
13  he was a teacher that the students enjoyed being in class
14  with.  That the parents seemed to have a rapport with.  That
15  they, you know, always greet him and speak with him
16  positively and that.

17         Obviously, then, when I became principal, my
18  interactions with him changed, because now I was his
19  supervisor.  He was a very intelligent teacher.  Very highly
20  regarded in the community.  Well-known nationally for his
21  work with NASA and that sort of thing.  But at the same time
22  unconventional, in that for a secondary teacher his
23  approaches were more of an elementary style, which fit a
24  sixth grade program in the middle school.

25         An example of that is on test day, he would always

Page 83

1  wear his bright Hawaiian shirt, and that's how the kids knew
2  that it was test day, and that sort of thing.  Very kind of
3  easy going.  And yet whenever the things as building
4  principal that we would require of him on a timely basis,
5  you know, report card grades, any of that, he was always
6  diligent about getting his duties completed as expected.

7    Q.  What was his -- what did he do with NASA?

8    A.  I'm not exactly sure.  But it had to do with
9  design of parachutes, as regarding their space craft
10  re-landing and the parachute aeronautics that were involved
11  in that.

12    Q.  Now, do you know that he had involvement with
13  NASA, or is that just something that he said?  I think you
14  said he had a national reputation?

15    A.  Yes.

16    Q.  Where do you get that he had a national reputation
17  from?

18    A.  He had had articles published.  I can't begin to
19  give you the names of it.  Some scientific publications.  He
20  would periodically take leaves of absence to go do work,
21  subcontracted work with NASA.  He would usually go there
22  also each summer.  I'm not going to come up with the name
23  now.  But as one of the speakers at our academic assemblies,
24  a NASA astronaut came in, and Greg knew him, and the
25  astronaut knew Greg.  And I was in with them as they talked

Page 84

1  NASA stuff.  So, I, you know, could ascertain from that,
2  that, yes, he really had done work for NASA.

3    Q.  And when you say he went there every summer, are
4  you talking Florida?

5    A.  He usually went to Florida, yes, at least for some
6  time.  And sometimes to Houston.

7    Q.  Okay.  What was your -- tell me what your reaction
8  was to the way he dealt with students.  I mean, I'm sure you
9  saw him interact with students.  Tell me what you -- your
10  impression of that was.

11    A.  As a teacher, he was one who tried to help the
12  kids understand things as best they could.  He worked well
13  with learning support and lower-functioning students; he
14  would help them as well.  He just seemed generally
15  interested in and was excited about earth/space science, and
16  wanted to convey that to his students.

17    Q.  Did you ever see him act in what you would
18  consider juvenile fashion?  I guess what you've described
19  how he had his picture taken.

20    A.  Right.

21    Q.  Would you --

22    A.  That was definitely juvenile behavior.

23    Q.  Did you ever observe any other juvenile behavior
24  on his part?

25    A.  Not what I would consider juvenile.  Some

Page 85

1  secondary teachers might have considered wearing even the
2  Hawaiian shirt on test day juvenile.  But from an elementary
3  perspective, that wasn't.

4    Q.  Okay.  And is that what -- when you say that it
5  was he had an elementary style, give me some other
6  illustrations of that.

7    A.  Where it was -- it was more hands-on learning as
8  opposed to strict lecture.  Letting the children work
9  together in groups.  Having much more project-based
10  learning, making the kites, flying the kites.  You do this
11  project where you dropped the eggs and do the velocity of.
12  Just a lot more hands-on learning, which is typically more
13  of an elementary style than secondary.

14    Q.  What was the community reaction to his arrest?

15    MR. LANZILLO:  Objection to form.  Go ahead.

16    Q.  And these charges?  Let me put it like this.  Did
17  you learn of any community reaction?

18    A.  I mean, not specifically.

19    Q.  Did parents come to you?

20    A.  No.

21    Q.  Did other faculty -- did anyone talk to you?

22    A.  About?

23    Q.  Yarbenet.

24    A.  About Yarbenet?

25    Q.  Yeah.

22 (Pages 82 to 85)



IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNYSLVANIA

STACY S., and JOHN
and MARY ELLEN S.
on behalf of their
daughter, LEIGH ANN
S., a minor,

            Plaintiffs,

    vs.

GIRARD SCHOOL DISTRICT;
ROBERT SNYDER,
Individually and in
his capacity as Principal
of the Rice Avenue
Middle School; and
GREGORY YARBENTE, a
professional employee
of the Girard School
District,

          Defendants.

CIVIL ACTION
C.A. No. 04-150 ERIE

Deposition of:
MARY WERLING

Deposition date:
March 24, 2005

Reported by:
Candance L. Messich

COUNSEL OF RECORD:

For the Plaintiffs:

Edward Olds, Esquire
Carolyn Russ, Esquire
1007 Mt. Royal Boulevard
Pittsburgh, PA  15223

For the Defendants:

Richard Lanzillo, Esquire
KNOX, McLAUGHLIN,
GORNALL & SENNETT
120 West 10th Street
Erie, PA  16501





# MAXINE JACOBY & ASSOCIATES
## ALLEGHENY BUILDING    SUITE 720
### 429 FORBES AVENUE    PITTSBURGH, PA. 15219
(412)  765-3133    60a    FAX  (412)  765-2704

**Page 16**

1  classroom?
2  A  Afterwards I knew, and I think it was -- I
3  don't know if it was shortly after or a while
4  after that, but...
5  Q  And how did you learn that?
6  A  It was secondhand information, and I'm not
7  sure who told me that.
8  Q  What else did you learn?  What else did you
9  learn afterwards about his conduct?
10  A  Well, I'm not still not sure exactly what
11  happened, but I learned that it was not
12  consensual.
13  Q  Did you learn anything else?
14  A  No, not factual.
15  Q  Going back to Bill McNally's statements.  Was
16  he joking when he said that?
17  A  He was being sarcastic, yes.
18  Q  Was that --
19  A  But it was true that he was always happy.
20  Q  When he said that, like did you guys laugh?
21  I mean, was it seen as a joke?
22  A  No, because we were upset with him because he
23  made us all look bad.
24  Q  Were you the individual who advised the
25  police that maybe they should talk to

**Page 17**

1  Leigh Ann S_____?
2  A  Yes.  No, to her mother.
3  Q  Tell me how that happened.
4  A  Well, they asked me if I thought there might
5  be any other people in danger.
6  Q  Who asked you that?
7  A  Mr. Blucas or -- I'm trying to think of the
8  police chief's name now.
9  Q  VanDamia?
10  A  No, the police chief at the time who came
11  in.  Maybe it was VanDamia.  I don't
12  remember.
13  Q  Let's go back to -- how did you happen to be
14  talking to Mr. Blucas about this?
15  A  Because I was called down to the office, and
16  they asked me what I knew about it.
17  Q  And do you know why they called you down?
18  A  Yes, because I was called the night before by
19  Stacy's mother.
20  Q  And what night was that?
21  A  The night before Mr. Yarbenet was fired.
22  Q  And that was really the day that he was
23  arrested, right?  He wasn't fired until later
24  on, right?
25  A  I don't know.

**Page 18**

1  Q  So Mrs. S_____ called you up.  What did she
2  say to you?
3  A  She said if I would come to Pam's house,
4  which is her sister's house, and she was my
5  friend, and I knew where she lived.  If I
6  would come there, Stacy was starting to talk,
7  and that's why I was called.
8  Q  So did you go?
9  A  So I went right away, yes.
10  Q  And who was there?
11  A  Stacy and her mother and Pam and her husband,
12  and I think that's all.
13  Q  Was Amy Mulligan there?
14  A  No.
15  Q  Tell me what was going on when you arrived at
16  Pam's house.
17  A  It's a big blur.  It was very emotional, a
18  lot of crying, and I didn't know exactly what
19  was going to happen, but when I did know, it
20  was very, very traumatic for me, so I'm not
21  even sure what was said.
22  Q  How was Stacy acting?
23  A  You know, she was quiet, and other than that,
24  I know that she talked to me a little bit,
25  but mostly she was just talking and said a

**Page 19**

1  few facts about what had happened, and I do
2  not recall what she said.  I was just shaken
3  to the core.  So then we decided that from
4  then on, I do remember, that I would leave,
5  and they were calling children's services.
6  Q  Why did they decide that you should leave?
7  A  Well, they didn't.  I just -- it was like I
8  was the first step, and then this was
9  going -- we agreed that that should be next,
10  and that if I would be needed, I would have
11  been glad to talk to them.
12  Q  After you were there, did you call Mr. Snyder
13  or Mr. Blucas or anything?
14  A  No, because they said that they were going to
15  call children's services, and I was not to
16  talk to anybody, and that the police would be
17  involved, and they would notify the
18  superintendent, and it would go that way.
19  Q  And then you were called to a meeting with
20  the police officer?
21  A  First I believe I just went down and talked
22  to Mr. Blucas, and then afterwards, after
23  that, then he decided what to do.  He might
24  have talked to somebody else, and then I was
25  called down about an hour later again, and



Page 20

```
 1      then the police officer was there. I'm
 2      thinking it was Chief Bucho, but it might
 3      have been VanDamia.
 4  Q   So do you have any recollection of what was
 5      said to you by Mr. Blucas?
 6  A   Yes. He said what do you know about this,
 7      and I'll never forget it, and then I said
 8      about what, and he said about this Yarbenet
 9      thing, and so I told him exactly what had
10      happened the night before.
11  Q   Did he ask you what your impressions were or
12      what you --
13  A   He said that he wanted to know if I thought
14      that this had actually happened, and I said,
15      yes, I thought it did.
16  Q   And do you think he summoned you because he
17      knew that you had been at the S█████house?
18  A   Yes.
19            MR. LANZILLO: Objection to form.
20      Go ahead.
21            THE WITNESS: I think that they
22      told him.
23  Q   Did he tell you why he summoned you?
24  A   No, I don't think so.
25  Q   You wrote a statement, I believe?
```

Page 21

```
 1  A   Yes.
 2            MR. OLDS: Let's mark that as
 3      Exhibit 6.
 4            (Whereupon, Deposition Exhibit No.
 5      6 was marked for identification.)
 6  Q   And it indicates that you wrote the statement
 7      on 3-28-02, is that right?
 8  A   Yes.
 9  Q   And why did you write this statement?
10  A   Because the police asked me to write it.
11  Q   You indicated that Stacy would often leave
12      the library on Wednesday to go to
13      Mr. Yarbenet's room to use the computer?
14  A   Yes.
15  Q   Mr. Yarb would come to the library to say
16      hello, but only when Stacy was there or
17      looking for Stacy, is that accurate?
18  A   Yes.
19  Q   How long had that conduct been going on?
20  A   I cannot be sure.
21  Q   Why was Stacy in the library on Wednesdays?
22  A   Every Wednesday we went to the library to
23      work on our independent studies.
24  Q   Was that part of the gifted program?
25  A   Yes.
```

Page 22

```
 1  Q   And so were there computers in the library?
 2  A   Yes.
 3  Q   Would she have to get your permission to go
 4      to Mr. Yarbenet's room?
 5  A   Yes.
 6  Q   Who suggested that?
 7            MR. LANZILLO: Objection.
 8  Q   How did that come up?
 9  A   The permission?
10  Q   Yes, that she would leave the library.
11  A   Oh, she had been working on the computer in
12      Mr. Yarbenet's classroom in developing her
13      thesis at another time. It wasn't just
14      during independent studies. Like they were
15      encouraged to work on them outside of class,
16      not just once a week. I told them that would
17      not be enough.
18            So she had been working on it, and
19      as I recall, it was on a topic that he had
20      thought of. So he was giving her input, and
21      they were working on it before school after
22      the television station work.
23  Q   Who told you that?
24  A   I'm not sure, Stacy or Yarb.
25  Q   And when was Stacy in the library? What time
```

Page 23

```
 1      of day?
 2  A   I think it was midmorning because I believe I
 3      left then to go to Elk Valley.
 4  Q   You say that Yarbenet, the only time he would
 5      come to the library was when Stacy was there?
 6  A   When I was there it was about the only time
 7      he came to the library, yes.
 8  Q   What did you think about -- before he was
 9      arrested, what did you think about the way he
10      interacted with Stacy?
11  A   I trusted him because he did a lot of
12      networking. He made sure that he spoke to
13      everybody, and if a teacher comes to get a
14      student for a legitimate reason and the
15      student is working hard and they're helping
16      them with a project, I wouldn't have a reason
17      to not trust them.
18  Q   Well, what other teachers took students out
19      of the library?
20  A   Sometimes they would come and get them if
21      they hadn't finished tests or something like
22      that.
23  Q   What other teachers were working with gifted
24      students to write their thesis?
25  A   None, except the librarian. Mrs. Ross would
```



Page 32

1 A  Mr. Blucas said what do you know about this,
2     and I said what, and he said the Yarbenet
3     thing, and then I knew what he meant.
4 Q  And then the police officer was there, right,
5     or was that just a meeting between you and --
6 A  The first time there was no policemen.  The
7     first time there was Mr. Blucas.
8 Q  And then later that day or was it another day
9     that you met with the police officer?
10 A  No, about an hour later, then the police were
11     there.
12 Q  And at that first meeting, you just told
13     Mr. Blucas what you had observed or what you
14     had learned the day before, right?
15 A  He asked me at one of these meetings if I
16     believed that one that could have happened, and I
17     said yes, and so there was some conversation
18     with that.  So I may have said more than
19     that.
20 Q  And tell me as much of that conversation as
21     you can recall.
22 A  Well, I see in here that I said that he was
23     goofy.
24 Q  Well, that was with the police officer.  Is
25     that the conversation that you're recalling?

Page 33

1 A  Maybe, but I might have told the same thing
2     to Mr. Blucas.
3 Q  So the police officer writes, and I'm quoting
4     from the report, the police officer writes
5     that you, quote, advised that the doors were
6     always locked to the rooms in the school, end
7     quote.
8 A  Yes.
9 Q  And what did you mean by that?
10 A  Well, we had a Code 10 that we were learning,
11     and we had to have the doors locked, and some
12     of us were still getting used to that because
13     we never had to do that.  So sometimes I
14     would not -- I would forget to lock my door,
15     and I would be reminded that if I didn't do
16     that, then I would be in violation of the
17     code, because if we had an incident in the
18     school where the doors needed to be locked
19     and mine weren't locked, I might not be able
20     to get over there and lock them fast enough,
21     so we were just supposed to keep them
22     locked.  But it was annoying if you locked
23     yourself out or if you were trying to get
24     into a room to retrieve something and the
25     door was locked.  So sometimes it was

Page 34

1     annoying.
2 Q  Was there always a Code 10?
3 A  No.
4 Q  So that was just -- Code 10s are a practice,
5     right?
6 A  Yes, but we were supposed to be having our
7     doors locked in case there would be an
8     emergency.
9 Q  Okay.  So when you talked about the doors
10     always being locked, what you're trying to do
11     is describe your understanding of a new
12     district policy that required doors to be
13     locked?  Is that what you were trying to do?
14 A  No, I was describing my frustration that when
15     I would go to try to check on Stacy I
16     couldn't get in the door.
17 Q  At Yarbenet's?
18 A  Yes.
19 Q  So why would you go to check on her?
20 A  Because I tried to make sure that she was
21     working on her topic because she wasn't
22     making a lot of progress on it.
23 Q  So the door would be locked?
24 A  Yes.
25 Q  The window would be covered?

Page 35

1 A  Yes.
2 Q  Would you knock on the door?
3 A  Yes.
4 Q  And what would happen?
5 A  Nothing.  Nothing.  And so I think if she's
6     upstairs in that TV studio, I can't leave my
7     class and go up there, but I could run across
8     the hall, which I wasn't even supposed to be
9     doing, so I couldn't spend any time trying to
10     find out where she was.
11 Q  Did you tell anyone about this?
12 A  Just Stacy, and then I would yell at
13     Yarbenet.
14 Q  Tell me what you would say to Yarbenet.
15 A  Well, why does she have to work over there on
16     the computer, and he would say, well, she's
17     got it all on disk and/or she's got it on the
18     hard drive, and I don't know what excuse he
19     gave, but it was something that -- I don't
20     know that much about computers, so it was
21     something that I believed.
22 Q  So you believed him?
23 A  Yes, I did.  See, I also had kids who would
24     go down to the computer lab on the first
25     floor sometimes and work on computers if we

63a

Page 36

1 didn't have enough available, because at that
2 time we didn't have a lot of computers as
3 there are now in the library. We were just
4 starting to get them in there. So we might
5 have like six of them in the library, and if
6 there weren't enough available, then some
7 kids could go to the computer lab downstairs.
8 Q The police officer quotes you as saying,
9 quote, she advised that there is a room
10 between Yarbenet's room and Mrs. Seneta's
11 room. Yarbenet would often have the victim
12 in this room, end quote.
13    MR. LANZILLO: Objection. It's not
14 quoted. That's the narrative from the
15 report.
16    MR. OLDS: Well, yes, I'm quoting
17 the report.
18    MR. LANZILLO: Okay, but you're
19 purporting to say that the report quotes the
20 witness.
21    MR. OLDS: No, I quoted the
22 report. Let the record show that I quoted
23 the report, and then I'm going to ask the
24 witness whether or not she made that
25 statement.

Page 37

1 Q Is it an accurate depiction of what you said?
2 A I'm not sure that I stated that they were in
3 that room.
4 Q Okay.
5 A They had asked me if there was any other
6 place that she could have been, and I know
7 that I knew that there was a room there,
8 another room, but I wouldn't have known if
9 anyone were in the room because I couldn't
10 get to that room from either side.
11 Q Well, you couldn't even get into his
12 classroom, right?
13 A No.
14 Q And this was during the school day?
15 A Yes.
16 Q So did you tell the police that you would
17 release her to Yarbenet, that you would go
18 look for her, and that you couldn't find her?
19 A Correct.
20 Q Is that what you told the police?
21 A Correct.
22 Q Did you ever tell Mr. Snyder that before
23 Yarbenet was arrested?
24 A No, and that's one of the things that made me
25 feel very bad.

Page 38

1 Q And why didn't you tell Snyder?
2 A Because I trusted Yarbenet. Actually, I was
3 looking for Stacy to see if she was working.
4 It didn't even occur to me that he would be
5 trying to hurt her or I would have broken the
6 window.
7 Q And the rooms weren't supposed to always be
8 locked, were they?
9 A Yes.
10 Q Even if there wasn't a Code 10?
11 A Yes, and if you didn't want to have your --
12 Q If there was not a Code 10, were the rooms
13 supposed to be locked?
14 A Yes, and if you wanted to leave your door
15 open, you could, but if your class was in
16 session, in regular session, then you were to
17 have the door locked. And it was annoying,
18 as I said, because if kids would go to the
19 bathroom, then somebody would have to open
20 the door for them.
21 Q When did the policy come into effect that the
22 rooms were always to be locked?
23 A I don't know.
24 Q Now, why were you concerned about Leigh Ann?
25 A Because Leigh Ann had come from St. John's,

Page 39

1 and Yarbenet had taken her under his wing to
2 help her catch up in science I think was the
3 excuse.
4 Q And how did you know that?
5 A Oh, I don't know. I drove the girls to
6 school, and sometimes Leigh Ann came with us
7 and sometimes she was late, and her mom had
8 to bring her, but I took the older girls.
9 Q Did you ever see Yarbenet with Leigh Ann?
10 A Oh, yes.
11 Q On what occasions?
12 A Oh, I can't be sure, just anytime at school
13 that I would see that she had to come early
14 or come to school late. She may have stopped
15 in his classroom, I don't know.
16 Q But you saw her with --
17 A Oh, yes.
18 Q Did you see the two of them alone?
19 A No.
20 Q Did you know that she was in his room alone
21 with him?
22 A One time she came to school, and I brought
23 her, and she had been sick or some long
24 vacation happened or something, and I don't
25 know if she was still sick or whatever, but

**Page 40**

1  she had a lot of work to make up, and I even
2  took her to his room.
3 Q  Were the two of them alone?
4 A  Yes, it was before school.
5 Q  Do you remember how she was acting that day?
6 A  Yes, she was acting sick.
7 Q  Did you ever hear teachers talking that
8  Yarbenet had odd relationships with female
9  students?
10 A  No, I just remember people saying Yarbenet
11  was odd.
12 Q  And do you recall whether anyone said why
13  they thought he was odd?
14 A  I hate to say that we were bigots, but none
15  of us really liked the fact that he was a
16  Jehovah Witness, I think, mostly.
17 Q  How did you know that?  I mean, how did that
18  come out?
19 A  It's a small town.  Somebody had known his
20  history and that he had been in a Catholic
21  seminary when he was -- I don't know if it
22  was high school or beginning of college.  The
23  story went that -- the secondhand story went
24  that he had been in a group of young
25  seminarians with his first wife, and they

**Page 41**

1  invited some Jehovah Witnesses in for a
2  discussion, and at that time he had accepted
3  that faith.
4 Q  Did he talk about that faith with you?
5 A  If so, it was regarding pledging the flag,
6  that he did not have his class pledge the
7  flag, and that was another annoyance to
8  everyone.
9 Q  After talked to the police, did you talk to
10  Leigh Ann's mother?
11 A  No, I didn't.  They said that they would
12  contact her, and I should not talk about
13  anything.
14 Q  Eventually did you talk to her?
15 A  Leigh Ann's mother and I are friends, so we
16  go back and forth to each other's houses, and
17  we may have -- it was so much involved with
18  the police that we didn't have much to say
19  about that, other than we just didn't like
20  Yarbenet.  So we talked about him, but not
21  much more than that.
22 Q  Did you ever hear that any teacher had gone
23  to Snyder to talk about Yarbenet and the way
24  he related to female students?
25 A  I don't recall.

**Page 42**

1 Q  Did any teacher tell you that they had?
2 A  I think Mrs. Kwiatkowski told me that she was
3  going to go down and tell him when the girls
4  were -- there's so many girls around his door
5  that we had to walk around the girls
6  to get through the hall, and one of
7  Mrs. Kwiatkowski's rules that she enforced is
8  that we were to keep the center of the hall
9  clear and the kids were to walk down on one
10  side, the right side, and stay to that side
11  as much as they could.
12 Q  But you don't recall any teacher telling you
13  she was going to do that?
14 A  No.  I only heard about that after the fact.
15 Q  Did you have suspicions that Yarbenet
16  molested other girls besides Stacy and Leigh
17  Ann?
18 A  No.  I would have said something at the time.
19 Q  Now looking back, can you think of other
20  girls that he molested?
21 A  No.  My daughter was in his class, and I
22  called her right way after I knew this, and
23  she said that she was in the class for a
24  year, and she would never have believed it,
25  that he was one of the most friendly

**Page 43**

1  teachers.  I said, yeah, he was friendly.
2 Q  Aside from the two instances where you met
3  with Mr. Blucas, one with the police and
4  one with just him, did you ever talk
5  to Mr. Snyder at all about what Yarbenet had
6  done?
7 A  Yes.  I remember one thing in the office.  I
8  mostly remember profound things, like what
9  Mr. McNally said.  After school, I think the
10  same day of the firing, we were just standing
11  in the office, and I'm not sure who all was
12  there except Mr. Snyder and the secretary,
13  Mrs. Mumford, and he said -- there was a long
14  quiet, and we all knew what we knew, what
15  each other knew, and he said 30 years wasted,
16  30 years.
17 Q  What did you think he meant?
18 A  That after 30 years of being a teacher, we
19  thought that he would be losing his
20  retirement money, and it turns out that he
21  was not.
22 Q  So Mr. Snyder was concerned about him losing
23  his retirement money?
24      MR. LANZILLO:  Objection to form.
25 Q  Is that what you thought he meant?

```
 1            IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2
   STACY S.; and JOHN AND   : HONORABLE SEAN J. MCLAUGHLIN
 3 MARY ELLEN S., on behalf  :
   of their daughter, LEIGH  :
 4 ANN S, a minor,           :
        Plaintiffs           :
 5                           :
        v.                   : Civil Action No. 04-150E
 6                           :
   GIRARD SCHOOL DISTRICT;   :
 7 ROBERT SNYDER,Individually:
   and in his capacity as    :
 8 Principal of the Rice     :
   Avenue Middle School; and :
 9 GREGORY YARBENET, a       :
   professional employee of  :
10 the Girard School         :
   District,                 :
11      Defendants           : Jury Trial Demanded
12
13
14
15          Deposition of LINFORD LEE MANROSS, taken before
16 and by Sonya Hoffman, Notary Public in and for the
17
18 Commonwealth of Pennsylvania on June 8, 2005,
19 commencing at 1:35 p.m., at the offices of Knox
20 McLaughlin Gornall & Sennett, P.C., 120 West
21 Tenth Street, Erie, PA 16507.
22
23
24
25           Reported by Sonya Hoffman
             Ferguson & Holdnack Reporting, Inc.
```

1

```
 1            A P P E A R A N C E S
 2 For the Plaintiffs:
 3      Edward A. Olds, Esquire
        1007 Mount Royal Boulevard
 4      Pittsburgh, PA 15223
 5 For the Defendants:
 6      Richard A. Lanzillo, Esquire
        Neal R. Devlin, Esquire
 7      Knox McLaughlin Gornall & Sennett, P.C.
        120 West Tenth Street
 8      Erie, PA 16507
 9
10
11            I N D E X
12
13 LINFORD MANROSS
14     Direct Examination by Mr. Olds . . . . . . . . 3
15
16
17
18
19
20
21
22
23
24
25
```

2

```
 1       L I N F O R D   L E E   M A N R O S S, first
 2    having been duly sworn, testified as follows:
 3
 4               DIRECT EXAMINATION
 5 BY MR. OLDS:
 6
 7      Q.   Good afternoon, Mr. Manross.  I'm Ed Olds, we just
 8 met, and I represent Stacy S█████ and Leigh Ann S████████
 9 in a lawsuit against the Girard School District and Robert
10 Snyder.  And we're here to see if you have any information
11 pertinent to that case.
12           Have you had a chance to talk to the School
13 District's lawyers at all about this deposition?
14      A.   A little bit, yes.
15      Q.   When did you meet with them?
16      A.   It's been several months ago.
17      Q.   Okay.  And when you met with them, who was all --
18 who attended the meeting?
19      A.   Mr. Lanzillo and his paralegal, I can't remember
20 her name now.
21      Q.   And did that happen at the School District?
22      A.   Yes, it did.
23      Q.   I don't know if Mr. Lanzillo had a chance to
24 explain to you, but this is a Civil Rights action brought
25 under the United States Constitution.  And as a public
```

3

```
 1 employee, your participation in this proceeding -- this is
 2 like a court proceeding, your participation in this
 3 proceeding is protected by the First Amendment to the United
 4 States Constitution.
 5           So that you -- in a sense, you don't have any
 6 choice but to be here because we noticed your deposition and
 7 the School District agreed to produce you without a
 8 subpoena; but it's as if you're participating in a judicial
 9 proceeding in a court, the only thing is there's no judge
10 here.  And there can't be any retaliation against you for
11 anything you say here or whatever you say, because that
12 would violate your First Amendment rights as a public
13 employee, okay?
14           For the record, would you state your full name and
15 address.
16      A.   My name is Linford Lee Manross.
17      Q.   Okay.
18      A.   My address is 217 Thomas Street, Cambridge
19 Springs, PA 16403.
20      Q.   And you teach at the Girard School District.
21      A.   That's correct.
22      Q.   How many years have you taught there?
23      A.   Of the past 20 years, probably 18 of those.
24      Q.   And the two years you didn't teach there, did you
25 teach somewhere else?
```

4

66a

1   A.   Yes.  I was subbing in different places, yes.
2   Q.   And you teach 8th grade science, right?
3   A.   No.  I teach 7th grade science.
4   Q.   And I take it that you knew Mr. Yarbenet; is that
5 right?
6   A.   That's correct.
7   Q.   Were you -- did you and he socialize outside the
8 school?
9   A.   No.  I live quite a distance away.  I drive 27
10 miles one way, so I would not be up to do that.
11   Q.   And can you tell me where you were when you heard
12 that he was being taken out of the school for molesting
13 young girl students?
14   A.   I was in the school building, I know that, that's
15 been a while back.
16   Q.   Do you remember how you found out about it, that
17 he was being taken out of the school building and being
18 charged with molesting girls?
19   A.   To the best of my recollection, I think it was a
20 word-of-mouth thing and I couldn't say how.
21   Q.   Where was your room relative to his room?
22   A.   My room was next to his and there was a wall
23 separating the two rooms.
24   Q.   Did you have occasion to be in his room
25 frequently?

5

1   A.   I guess what I would see would be personal space,
2 proximity, that I would feel uncomfortable with, things like
3 that.
4   Q.   Tell me what you mean by personal space,
5 proximity.
6   A.   Standing very close, arm around somebody,
7 something like that.
8   Q.   With his arm around female students?
9   A.   Yes.
10   Q.   Where would he be when you would observe him
11 standing with his arm around female students?
12   A.   In the hallway outside his door.
13   Q.   Did you ever see him with his arm around either
14 Stacy or Leigh Ann?
15   A.   I honestly don't think I did.
16   Q.   Was the window to his classroom door covered so
17 you couldn't see in the classroom?
18   A.   There was something on there at one time.
19   Q.   Do you remember what it was?
20   A.   Couldn't tell you that now, it's been quite a
21 while.
22   Q.   Did you ever bring that condition to anyone's
23 attention, the fact that you couldn't see into his
24 classroom?
25   A.   I don't recall having done that, no.

7

1   A.   No.
2   Q.   There was a supply closet -- or there was a supply
3 room or closet next to his room; are you familiar with that?
4   A.   Uh-huh.
5   Q.   Were you ever in that room?
6   A.   On a few occasions.
7   Q.   Did you keep supplies in that room as well?
8   A.   No.
9   Q.   By any chance did you share any facilities with
10 Mr. Yarbenet like a lab or anything like that?
11   A.   Not really.
12   Q.   Had you ever observed -- personally observed
13 Mr. Yarbenet engage in conduct that you thought was
14 improper?
15   A.   No.
16   Q.   And did you ever see him engage in conduct that
17 you thought was questionable?
18       MR. DEVLIN:  Object to form.  You can answer.
19   Q.   In your mind --
20   A.   Pardon me?
21       MR. DEVLIN:  I'm just placing an objection to the
22       form, I do that for the record.  You can answer
23       his question.
24   A.   Yes.
25   Q.   Tell me what that was.

1   Q.   Did you ever -- do you recall whether you ever
2 talked to Robert Snyder or either of the assistant
3 principals, that would be Mr. Hahesy or Mr. McClelland,
4 about your observations of Mr. Yarbenet having his arm
5 around students or standing too close to students?
6   A.   No.
7   Q.   Did you talk about that matter with other faculty?
8   A.   After the fact, yes.
9   Q.   Was there a school rule that prohibited teachers
10 from having physical contact with students?
11   A.   I'm not specifically aware of that; but from my
12 own personal opinion, I would not do that.
13   Q.   How would he have -- describe what you observed
14 specifically in terms of him having his arms around
15 students.
16   A.   What I can recall was him putting his arm around
17 her shoulder in the hallway.
18   Q.   And you observed that on more than one occasion?
19   A.   I don't recall that it was more than one occasion.
20   Q.   So you saw it on one occasion?
21   A.   Uh-huh.
22   Q.   You don't remember who the student was?
23   A.   No.
24   Q.   Was it a female student?
25   A.   To my knowledge, yes.



8

1    Q.    Was it before or after -- was it when Stacy was in
2    the Girard School District or was it prior to that?  When I
3    say Girard School District, was it when Stacy was at the
4    middle school or was it prior to that?
5    A.    I'm not clear on that part, it's been a quite a
6    while back.
7    Q.    Did you talk to him when you saw him in this
8    state?
9    A.    I don't recall because under the circumstances the
10   hallway was filled with a number of students, the classes
11   were changing, I was going down the hall for something, and
12   I don't recall that I did or did not talk to him.
13   Q.    But apparently that situation made an impression
14   on your mind.
15   A.    Uh-huh.
16   Q.    Can you tell me why you think it made an
17   impression on your mind.
18   A.    Because from my perspective, I would feel
19   uncomfortable doing something like that.
20   Q.    Was it an intimate hug?
21   A.    It didn't seem to be, no.
22   Q.    Did you ever enter his classroom when he was alone
23   with one student?
24   A.    There was one occasion, yes.
25   Q.    Tell me about that.

9

1    A.    Yeah.
2    Q.    What made you feel uncomfortable?
3    A.    Just a startled surprise, I guess, on his part.
4    Basically, I wasn't expecting anybody to be in there and I
5    just stopped to grab some lab equipment.
6    Q.    Because the lights were out.
7    A.    Uh-huh.
8    Q.    And you say that you thought that he was startled.
9    A.    I think it was a startled reaction, yes.
10   Q.    Do you remember when this happened, what year?
11   A.    Oh, golly, it's back when he had that tornado
12   generator and that was some time ago.  I couldn't tell you
13   that.
14   Q.    Tell me what the tornado generator was.
15   A.    It was a device to create a tornado vortex using
16   PVC pipe and a fan and I think it was smoke or something.
17   It was roughly four or five feet tall in the back of the
18   room.
19   Q.    And there was also a computer back there.
20   A.    Yeah.  His computer was back on the desk in the
21   back of the room.
22   Q.    Was he touching that student when you walked in?
23   A.    I don't recall that happening.
24   Q.    Was he close to the student?
25   A.    I'm trying to remember, they were both in the back

11

1    A.    I was looking for equipment to set up for
2    something, test tube beakers or something, and I stepped
3    into his classroom, and I can't even tell you who the person
4    was now, they were in the back of his room.
5    Q.    Was it a female?
6    A.    To my knowledge, if I remember, yes.
7    Q.    Were the lights on or off?
8    A.    The lights were off at that time.
9    Q.    They were off?
10   A.    Yes.
11   Q.    And he was in the classroom with that individual?
12   A.    (Witness nods head.)
13   Q.    You have to say yes or no for the court reporter.
14   A.    Yes.
15   Q.    What did you observe on that occasion?
16   A.    Mr. Yarbenet and the student were in the back of
17   the room, I was not clear as to what they were doing.  He
18   had some equipment back there, notably a tornado generator
19   and his computer in the back of the room, and I just stepped
20   in to grab some glassware and run in and out.
21   Q.    Did you talk to him on that occasion?
22   A.    I'm sure I did because I was looking for some
23   equipment.
24   Q.    Did you feel uncomfortable entering into the
25   classroom and finding him alone with a student?

1    of the room.  As far as proximity goes, I don't recall that,
2    because I was in a hurry, I needed some stuff right away,
3    and I grabbed the stuff and took off.
4    Q.    Did you talk about that encounter that you had
5    with him in his room, when there was a student there without
6    lights on, did you talk about that encounter with anyone?
7    A.    No.
8    Q.    Did you ever attend any training on sexual
9    harassment while as a teacher for the Girard School
10   District?
11   A.    We had an in-house class at one time quite a few
12   years ago on a teacher workday.
13   Q.    And do you remember what the topics were, what
14   topics were discussed in that class?
15   A.    It's been quite a while back and it was at the
16   high school.
17   Q.    Do you know who the Title IV officer of the Rice
18   Avenue Middle School was?
19   A.    I'm afraid I don't know that.
20   Q.    Did you think -- when you encountered him alone in
21   his classroom in the dark with a student, did you think that
22   there was something wrong with that?
23   A.    I felt a little surprised, but as I said, I was
24   rushing between classes to grab some equipment and run back
25   out.



12

1  Q.  Do you know whether the student that you observed
2  in the classroom on that situation with him was the same
3  student that he had his arms around in the hallway?
4  A.  I don't think so.
5  Q.  Did you ever have any discussions with Mr. Snyder
6  that involved anything about Gregory Yarbenet?  Did you ever
7  talk to Mr. Snyder about Gregory Yarbenet?
8  A.  I can't recall any situations where we discussed
9  things about Greg.
10  Q.  Did you ever complain to Mr. Snyder about Gregory
11  Yarbenet?
12  A.  No.
13  Q.  Did you ever -- what was your opinion of Gregory
14  Yarbenet as a teacher?
15  A.  I would not rate him as a top-notch teacher.
16  Q.  Why is that?
17  A.  Well, because the methodology that he used in the
18  classroom did not seem to prepare them well for coming into
19  7th grade.
20  Q.  Would you typically socialize with the same group
21  of teachers at school on a daily or weekly basis?  In other
22  words, to make that a simpler question, were there some
23  faculty members that you were friendly with or socialized
24  with or ate lunch with in the 1998 through 2001 period?
25  A.  It kind of works like this, with your schedule you

13

1  A.  I'm not sure about that one.
2  Q.  You indicated that even though you felt that
3  Mr. Yarbenet wasn't a top-notch teacher and that he didn't
4  prepare 6th grade students for 7th grade science, you didn't
5  discuss that fact or matter with Mr. Snyder.
6  A.  No.
7  Q.  What about with either Mr. Hahesy or
8  Mr. McClelland, did you ever discuss that fact with either
9  of them?
10  A.  No.
11  Q.  The time that you observed him, Mr. Yarbenet, in
12  the room with a female student alone, did you discuss that
13  with either Mr. Hahesy or Mr. McClelland?
14  A.  I don't think I did.
15  Q.  Do you recall ever discussing any aspect of
16  Mr. Yarbenet's conduct with either McClelland or Hahesy?
17  A.  No.
18  Q.  Were you ever present when other teachers were
19  discussing Mr. Yarbenet's conduct?
20  A.  After the fact, in hindsight (sic).
21  Q.  Tell me what you recall of the conversations that
22  occurred after the fact.
23  A.  Well, we seemed to look back and say, did we miss
24  something here, what did we see, did we miss something, did
25  we overlook something here.  And I don't recall that anybody

15

1  meet individuals at a certain time about every day and many
2  people you don't see at all for most of the year.
3  Q.  Who did you meet?  Did you have your lunch in the
4  faculty room?
5  A.  Yes.
6  Q.  Who was typically there when you had your lunch?
7  A.  This goes back quite a ways and I'm not sure I can
8  remember all of those people.
9  Q.  Do you remember anyone?
10  A.  It seemed at that time we had a fairly large group
11  of people there.  And I'm trying not to confuse with people
12  that I've had lunch with in the past few years, that's been
13  quite a while back.
14  Q.  Okay.  Do you think Robin Seneta, she's another
15  science teacher; is that right?
16  A.  Yes.
17  Q.  Would you eat lunch with her?
18  A.  No.
19  Q.  What about Debbie Karwoski, do you know if you ate
20  lunch with her?
21  A.  No.  She ate about the same lunchtime, I think,
22  but she usually was in her classroom by herself.
23  Q.  Do you recall if you ate lunch with Sara Chuzie?
24  A.  On occasion, yes, that sounds right.
25  Q.  Mary Werling?

1  came up with anything specific.
2  Q.  Were you aware that Ms. Seneta had encountered
3  Stacy Shaffer and Yarbenet in the closet of his room on a
4  number of occasions?
5  A.  No.
6  Q.  She never told you that?
7  A.  Not that I can recall.
8  Q.  Were you aware that Yarbenet took Stacy out of
9  Mary Werling's class on a weekly basis?
10  A.  No.
11  Q.  Did she ever tell you that?
12  A.  No.
13  Q.  Did you know that Yarbenet released the students
14  from his homeroom class, which was the TV room, did you know
15  that he released them early?
16  A.  Boy, I don't remember that part.
17  Q.  You've talked about two encounters -- or two
18  situations that you observed -- well, one situation where
19  you observed Yarbenet with his arm around a student and
20  that -- I think that you said -- I forget how you described
21  that, but you talked about that situation.  And you also
22  talked about a situation of encountering Yarbenet alone with
23  a student in his classroom in the dark.
24  Did you ever see Yarbenet alone with students on
25  any other occasion?



16

1    A.    After school riding in a red convertible.
2    Q.    Tell me what you remember about seeing Yarbenet
3 with students after school in a red convertible.
4    A.    Leaving the school parking lot with a student in
5 there.
6    Q.    Was it always a female student?
7    A.    The one time I can recall, yes.
8    Q.    Was it Stacy or was it a different female?
9    A.    I'm thinking it was Stacy.
10    Q.    And who were you with when you saw that?
11    A.    I'm telling you, whether I was by myself or
12 carpooling, I don't remember now.
13    Q.    So you were in the parking lot?
14    A.    Yes.
15    Q.    And there might have been other teachers there or
16 not, you can't recall.
17    A.    No.
18    Q.    Did you mention to either Mr. Snyder or Mr. Hahesy
19 or Mr. McClelland the fact that you saw Yarbenet leave the
20 parking lot with a student in his red convertible?
21    A.    I don't recall doing that, no.
22    Q.    Did you talk to anyone else in the administration
23 or any school board members about observations that you had
24 made concerning Gregory Yarbenet?
25    A.    No.

17

1    A.    The administration.
2    Q.    Did your planning period change every year?
3    A.    It was the same for several years and then it
4 became a change. It seemed like it stayed the same for two
5 or three years and then change, stay the same for two or
6 three years and then change.
7    Q.    Did you have the same planning period that
8 Yarbenet had; do you know?
9    A.    I think we might have sometimes, but sometimes
10 not.
11    Q.    Do you recall what your planning period was in '98
12 or '99?
13    A.    Not on a bet.
14    Q.    Were you -- by any chance, were you present in the
15 faculty room or present when a Dave McNally made a comment
16 about Yarbenet?
17    A.    Dave McNally?
18    Q.    Or Mr. McNally. Is there a Mr. McNally.
19    A.    Bill McNally.
20    Q.    Bill McNally. Were you present when he made a
21 comment about Yarbenet?
22    A.    I can't remember that.
23    Q.    Something to the effect that the guy always had a
24 smile on his face.
25    A.    I don't recall any of that. It may have been, I

19

1    Q.    Were you surprised when Yarbenet was arrested?
2    A.    Very much.
3    Q.    Well, after he was arrested, did you think back
4 and say there were signs that I should have saw.
5    A.    I think I went through that process, yes.
6    Q.    And what did you conclude?
7    A.    That I saw nothing overtly that would put a child
8 in danger that I would be required to report. I just saw
9 things that each teacher has their own style and that would
10 not be my style.
11    Q.    Well, aside from the two things that you've
12 talked about -- that we've talked about so far, can you
13 think of other things that you saw that would fit in under
14 this style that it wouldn't be your style; in other words,
15 other things that Yarbenet did?
16    A.    I tend to be a little more standoffish, I guess,
17 keeping that distance and that's just my own perspective
18 (sic). Other than that, I don't know of anything specific.
19 We would rarely see each other, we'd go long periods of time
20 without seeing each other.
21    Q.    How did you -- as a teacher, did you get to select
22 your free period, your planning period?
23    A.    No.
24    Q.    Who scheduled the planning period, to your
25 knowledge?

1 don't recall it.
2    Q.    Well, you don't recall it, right?
3    A.    (Witness shakes head.)
4    Q.    Somehow you learned that Yarbenet was taken out of
5 the school, and at some point -- do you think it was the
6 same day that he was taken out of the school, that you
7 learned it was because he was being accused of molesting a
8 female student?
9    A.    I don't know if it was the same day, but it was
10 very close to that.
11    Q.    And you engaged in conversations about the
12 situation with other faculty members, right?
13    A.    Uh-huh.
14    Q.    Do you specifically recall which faculty members
15 that you might have talked to?
16    A.    No, because it seemed like everybody was talking.
17    Q.    What was everyone saying?
18    A.    Quite shocked. I don't recall specifically, but
19 quite shocked that it happened.
20    Q.    Would it be safe to say that generally there was
21 disbelief at the beginning?
22    A.    Yeah.
23    Q.    And why -- can you like sort of explain why there
24 was that disbelief.
25    A.    I guess because that's one of us and it's almost



20

1  like, what's happening. We were trying to comprehend this
2  thing.
3      Q.   Do you recall whether there was -- were you aware
4  if there was any community sort of consensus about these
5  allegations when they initially surfaced?
6      A.   I do not know.
7      Q.   Because you're really not part of the community,
8  right --
9      A.   Right.
10     Q.   -- you come from Cambridge Springs. After
11 Yarbenet was taken out of the school, did Mr. Snyder ever
12 come talk to you and ask, you know, whether you had seen
13 anything or whether there'd been anything about Yarbenet
14 that made you uncomfortable? This would be after Mr.
15 Yarbenet was taken out of the school.
16     A.   I don't recall that happening.
17     Q.   What about Mr. McClelland, did he have that
18 conversation with you?
19     A.   No.
20     Q.   Did anyone from the administration come and talk
21 to you and sort of like, you know, do a debriefing or
22 postmortem, how did this happen?
23     A.   No.
24     Q.   Did you hear that that kind of process took place
25 with any of the other teachers?

21

1      Q.   Did you have a conversation with him after
2  Yarbenet was arrested about what had gone on in the school?
3      A.   Yes, I did.
4      Q.   What did you tell Mr. Fosberg?
5      A.   He asked me what was going on.
6      Q.   Do you remember what you told him?
7      A.   It seems to me I probably mentioned something
8  about the fact that from what we're hearing in the news that
9  it was a molestation case. I can't recall specifically.
10     Q.   Did you tell him that you knew that teachers had
11 been concerned about Yarbenet's relationships with young
12 girls?
13     A.   I can't recall making that statement.
14     Q.   Did you tell him that you had heard that teachers
15 had gone to Mr. Snyder and complained about the fact that
16 Yarbenet would keep his door closed, the classroom dark, the
17 window on his door covered; did you tell Mr. Fosberg about
18 that?
19     A.   Boy, I don't know. I know I had a conversation
20 with him, it's been a while back, but I don't know that I
21 can say yes on that one.
22     Q.   Did you know whether teachers had gone to
23 Mr. Snyder and complained about Mr. Yarbenet?
24     A.   No.
25     Q.   You don't know?

23

1      A.   Not that I'm aware of, no.
2      Q.   Were there any policies in the School District
3  that changed after Yarbenet was taken out of the school?
4      A.   Not that I'm aware of.
5      Q.   Did anyone from the School District instruct you
6  not to talk to us, you know, either Ms. S████,
7  Mr. S█████████ representatives?
8      A.   No.
9      Q.   Did you receive an e-mail from Mr. McClelland that
10 indicated that you weren't supposed to talk to us?
11     A.   I don't think so, that I can recall.
12     Q.   This document was marked as Deposition Exhibit No.
13 5 in Robin Seneta's deposition, it's an e-mail; do you
14 recall if you received that?
15     A.   I think I did see that one, yes. This is Dr.
16 Maynard when he came on board. Yes, I do think I saw that
17 one.
18     Q.   Did you talk to Mr. McClelland about this e-mail
19 after you received it?
20     A.   No.
21     Q.   Did you talk to Ms. Seneta about the e-mail?
22     A.   I can't recall having a conversation about that.
23     Q.   Okay. Did you ever hear of any -- strike that.
24 Do you know a guy named Wade Fosberg?
25     A.   Yes, I do.

1      A.   I don't recall that, no.
2      Q.   So you don't know if they did or not, or you don't
3  recall?
4      A.   I don't recall if they did or not.
5      Q.   Did anyone -- has anyone from the administration
6  ever talked to you, from the date Yarbenet was taken out of
7  the school which is sometime in March of 2002 until the
8  present, about Yarbenet?
9      A.   No.
10     Q.   Had you ever heard of any other actions on behalf
11 of -- that other faculty members or other staff in the
12 School District had engaged in sexual misconduct with
13 students or -- yes, sexual misconduct with students?
14     A.   Could you repeat that, please.
15     Q.   I'm sorry, that was a bad question. In terms of
16 the entire School District, had you heard of any other
17 incidents involving faculty or staff that suggested sexual
18 misconduct with students?
19     A.   Other faculty members?
20     Q.   Yes.
21     A.   No.
22     Q.   Aside from Yarbenet?
23     A.   (Witness shakes head.)
24     Q.   There was a teacher named Vargo (sic); did you
25 know anything about a teacher Vargo?

24

1    A.   Verga.
2    Q.   Verga. Did you know that that teacher was fired
3 from the School District or forced to leave the School
4 District?
5    A.   Yes.
6    Q.   And how did you know that?
7    A.   Well, we heard word of mouth and then officially.
8    Q.   Did you know anything about what Mr. Verga did?
9    A.   My understanding was it had to do something with
10 things on the computer.
11    Q.   When the -- you recall that -- I think you
12 testified that there were occasions when -- I mean, after
13 Yarbenet was taken out, some of the faculty, you related,
14 got together and talked about, well, could we have stopped
15 this or were there signs that we saw that would have helped
16 us to know what was going on; when you were part of those
17 conversations with the faculty members, did you tell them
18 that you observed Yarbenet alone in his classroom in the
19 dark with a female student?
20    MR. DEVLIN: Object to form. You can answer.
21    A.   I may have. I don't recall at this point in time.
22 We had several conversations, a lot of us were putting in
23 things trying to reflect on what we had seen.
24    Q.   Did any of your other colleagues relate that they
25 had seen him touch students, hug them, put his arms around

25

1 students?
2    A.   Yes.
3    Q.   Do you recall whether any of those students left
4 to go to Yarbenet's classroom, any of your study hall
5 students left to go to Yarbenet's classroom?
6    A.   I'm thinking. Did I have Leigh Ann -- I don't
7 remember, or did I have Stacy, I don't remember that I did
8 or did not. I can't remember.
9    And as far as kids leaving, students leaving,
10 going to his classroom, there were on occasions, yes. It
11 would be the morning study hall and I can't tell you who
12 they were at this point in time. I don't remember if Leigh
13 Ann or Stacy were among those or not.
14    Q.   Why would the students leave the study hall to go
15 to his classroom?
16    A.   They had a written pass from him to be able to go
17 work on catching up on assignments and things like that.
18    Q.   What did the pass form look like?
19    A.   Well, we switched now to an agenda book. I think
20 in those days it was a printed form. I don't think we had
21 the agenda books then.
22    Q.   And the agenda books would be what, they would
23 like a calendar or something?
24    A.   Or a small spiral-bound notebook that has in the
25 back of it several pages that you would fill in for the

27

1 them?
2    A.   I don't recall that specifically, no.
3    Q.   Did you ever talk to Karen Kwiatkowski about
4 Yarbenet?
5    A.   Uh-huh.
6    Q.   When did you talk to her about Yarbenet?
7    A.   It would have been after the fact, after he was
8 taken out.
9    Q.   Tell me what you recall of those conversations
10 that you had with Karen Kwiatkowski.
11    A.   It goes back a ways. I'm sure we discussed things
12 that we thought were questionable. Beyond that, I'm not
13 sure of anything specific. I know I had conversations with
14 her along with other faculty members, but as far as
15 specifics, it would be, generally, in terms of things that,
16 myself, I would not do because to me they would make me feel
17 uncomfortable.
18    Q.   Again, like what kind of things were those?
19    A.   I guess, you know, the friendliness to the
20 students, where I tend to keep a little bit of distance
21 because if you have to back up and get tough, it's kind of
22 hard to do. I kind of keep that professional distance
23 there, things like that, I guess.
24    Q.   Would you ever be the -- would you ever have study
25 halls? Would you ever preside over study periods of

1 passes so you don't have to keep getting small pieces of
2 paper for passes.
3    Q.   And those were books -- the agenda books were
4 items that the students carried around.
5    A.   Right.
6    Q.   Can you tell me why -- you've described two
7 occasions when you saw Yarbenet do something that you
8 wouldn't do, can you tell me why you didn't report those to
9 the administration.
10    A.   What I saw did not appear to me to be crossing the
11 line into something where a student was in danger. As I
12 said, I felt it's not something I would do, but I thought it
13 wasn't out of line.
14    Q.   Where do you get the -- where does the obligation
15 to report or not report arise in terms of crossing the line?
16    A.   I'm sure if something was overt, something with
17 the child's health or safety was in danger. I did not see
18 that in either case.
19    Q.   Would you know what the signs are of a child being
20 molested by a teacher?
21    A.   Not specifically, but they would be perhaps the
22 occasion of acting out, things like that. As far as
23 physical signs, I would not know that I've seen it.
24    Q.   Well, traces -- would you know what signs you
25 might observe from the teacher's conduct, for instance a



28

1  teacher molesting a student; do you have any idea how to
2  determine whether a teacher is molesting a student?
3      A.  No.
4      Q.  And in your 20 years at the School District there
5  was one training on sexual harassment.
6      A.  Uh-huh.
7      Q.  Do you know if that training even dealt with
8  harassment of students by teachers?
9      A.  It seems to me it had to do more with sexual
10  harassment toward your peers as professionals.  I don't
11  recall that it had to do with teachers versus students.
12      Q.  Was there any discussion -- after Yarbenet was
13  taken out of the school, was there any discussion about who
14  his victim might have been?
15      A.  By whom?
16      Q.  By the faculty.  I mean, the faculty sat down --
17  that first day you didn't even know who the victims were; is
18  that right?
19      A.  Correct.
20      Q.  Was there discussion among the faculty about who
21  the victims might have been?
22      A.  Probably was, yeah.
23      Q.  Who did the faculty speculate who the victims
24  were?
25      A.  I'd have to say at this point in time, I'm not

29

1      A.  Boy, I'd see Ann on a very infrequent basis and I
2  can't recall any conversation like that.
3          MR. OLDS:  Okay.  Let's take a little break.
4          (Brief recess taken.)
5          MR. OLDS:  I don't have any other questions.
6          MR. DEVLIN:  We'll read.
7
8          (Deposition concluded at 2:24 p.m.)

31

1  sure, but I believe it was these two girls.
2      Q.  Did you observe that Yarbenet frequently had the
3  lights off in his room?
4      A.  His lights were usually off when he wasn't there,
5  when the class was not in schedule.  So I can't tell either
6  way because I know he was running the camera room and so
7  forth, so.
8      Q.  If there wasn't a class there, the lights would be
9  off?
10      A.  Normally, yeah.
11      Q.  Was there still light in the room from the
12  windows?
13      A.  Yeah.
14      Q.  Do you know if the room was lit, for instance,
15  before school began, before classes commenced?
16      A.  In the morning when it's dark, the teacher would
17  come in and turn the lights on to see in the classroom.
18      Q.  Do you know if he kept the lights off in the
19  classroom in the morning when it was dark?
20      A.  No, I don't think so.
21      Q.  Do you know who Kim Janke is?
22      A.  No.
23      Q.  And do you know who Ann Mathews is?
24      A.  Yes, she's a teacher aide.
25      Q.  Did she ever talk to you about Yarbenet?

73a

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2
 3   STACY S.; and JOHN AND  : HONORABLE SEAN J. MCLAUGHLIN
     MARY ELLEN S., on behalf :
 4   of their daughter, LEIGH :
     ANN S., a minor,         :
 5       Plaintiffs           :
 6                            :
             v.               : Civil Action No. 04-150E
 7                            :
     GIRARD SCHOOL DISTRICT;  :
 8   ROBERT SNYDER,Individually:
     and in his capacity as   :
 9   Principal of the Rice     :
     Rice Avenue School; and  :
10   GREGORY YARBENET, a       :
     professional employee of :
11   the Girard School         :
     District,                 :
12       Defendants           : Jury Trial Demanded
13
14
15          Deposition of WALTER BLUCAS, taken before
16     and by Sonya Hoffman, Notary Public in and for the
17     Commonwealth of Pennsylvania on June 9, 2005,
18     commencing at 11:30 a.m., at the offices of Knox
19     McLaughlin Gornall & Sennett, P.C., 120 West
20     Tenth Street, Erie, PA 16507.
21
22
23
24
25             Reported by Sonya Hoffman
               Ferguson & Holdnack Reporting, Inc.
```

1

```
 1                  A P P E A R A N C E S
 2   For the Plaintiffs:
 3       Edward A. Olds, Esquire
         1007 Mount Royal Boulevard
 4       Pittsburgh, PA 15223
 5   For the Defendants:
 6       Richard A. Lanzillo, Esquire
         Neal R. Devlin, Esquire
 7       Knox McLaughlin Gornall & Sennett, P.C.
         120 West Tenth Street
 8       Erie, PA 16507
 9
10
11                    I N D E X
12
13   WALTER BLUCAS
14       Direct Examination by Mr. Olds . . . . . . . .3
15       Cross-Examination by Mr. Lanzillo. . . . . . 112
         Redirect Examination by Mr. Olds . . . . . . 118
16
                      E X H I B I T S
17
18       Blucas Deposition Exhibit No. 1 . . . . . . . .10
19       Blucas Deposition Exhibit No. 2 . . . . . . . .29
20       Blucas Deposition Exhibit No. 3 . . . . . . . .57
21       Blucas Deposition Exhibit No. 4 . . . . . . . .69
22       Blucas Deposition Exhibit No. 5 . . . . . . . .80
23       Blucas Deposition Exhibit No. 6 . . . . . . . .88
24       Blucas Deposition Exhibit No. 7 . . . . . . . .96
25       Blucas Deposition Exhibit No. 8 . . . . . . . 101
```

2

```
 1   W A L T E R   B L U C A S, first having
 2   been duly sworn, testified as follows:
 3
 4                   DIRECT EXAMINATION
 5   BY MR. OLDS:
 6
 7       Q.   Mr. Blucas, we just met, I'm Ed Olds.  And I
 8   represent Stacy S~~haffer~~ and Leigh Ann S~~imkovich~~ who filed a
 9   lawsuit against the Girard School District because of what
10   happened to them with Mr. Yarbenet.  And I wanted to take
11   your deposition -- we subpoenaed you and I wanted to take
12   your deposition to see what information you have that might
13   be pertinent to that lawsuit, okay?
14       A.   That's fine.  But as I stated to both you and the
15   law firm representing the School District, all of my
16   information -- I'm since retired and three years removed
17   essentially, this summer, from the case, but all of my
18   information is relatively in writing with regard to the
19   case.
20       Q.   Okay.
21       A.   I imagine you have copies of all of those
22   documents.
23       Q.   I don't know what documents I have -- that I might
24   have.  I saw that you brought some documents.  Can you give
25   me a list of what documents you brought or --
```

3

```
 1       A.   I don't have a list.  I'll refer to them if you
 2   have certain questions.
 3       Q.   Well, why don't you just tell me what documents
 4   you brought.
 5       A.   I have the initial letter to Mr. Yarbenet
 6   concerning his immediate and indefinite suspension.  I have
 7   the press release regarding the incident.  I have letters
 8   with regard to our liability insurance carrier for
 9   notification of the case.
10       A.   I have letters to Mr. Yarbenet after consultation
11   with my director of business regarding his salary and
12   benefits for the amount of days he worked.  I have letters
13   with regard to our insurance carrier, with regard to general
14   liability that we notified.  I have handwritten notes to the
15   same insurance carrier.  I have notification of our
16   suspension and pending dismissal of Mr. Yarbenet to the
17   Department of Education, via my labor attorney.
18       A.   I have hand notes of mine in here with the
19   business manager; again, this is in regard to salary and
20   balance of pay and when that would take place with regard to
21   the actual day of start of the indefinite suspension.  And
22   follow-up phone calls to Liz Yarbenet with regard to that
23   same information as well as fringe benefits.
24       Q.   I'm not sure that we have copies of all of those
25   documents.  I notice that there were a couple of letters
```

74a

4

1    Q.   When you were superintendent, did you have any
2  command of those statistics?
3    A.   There would be different statistical information
4  that would come across our desks from a variety of sources,
5  but I don't have a recollection of a specific example that I
6  can give you with regard to any particular act or
7  predominance of what to watch for or numbers or what have
8  you.
9    Q.   Do you recall receiving information from the PSBA
10  about that?  Did that entity disseminate or release
11  information concering --
12    A.   Of a statistical nature?
13    Q.   Or guidelines, how to know what is happening, what
14  to watch for, any kind of information?
15    A.   That would have come from a variety of sources and
16  that would have been distributed to the principals.
17    Q.   What do you recall coming in specifically on that
18  topic, on the topic of teachers molesting students?
19    A.   Specifically?
20    Q.   Yes.
21    A.   I can't give you a specific recall for that one.
22    Q.   Well, do you know if anything came in from any
23  source on how to look for how or how to determine whether
24  it's going on, what signs to look for; do you recall
25  anything coming that you disseminated to principals on that

49

1  nobody knew that.
2       So a change in schedule put her in 8th period and
3  the girl's dad was very grateful because he didn't want her
4  missing English class and she was able to take care of the
5  younger sister, get her on the bus to elementary school, and
6  get to school on time, and complete her studies. Those
7  types of things, a notice in behaviors, a change of
8  students, why, those would be coming from a whole host of
9  commercial companies as well as intermediate curriculum and
10  counseling associations, psychology services, the whole
11  gamut of the PSBA.
12    Q.   Okay.  Concerning Yarbenet, in the 1980s when you
13  were principal and then you became assistant superintendent,
14  how many times might you have encountered him in that
15  decade?
16    A.   As the high school principal, I may have seen him
17  two or three times a year when there would be common
18  inservice programs, but that would be just a walk-through
19  time in the building.
20       As assistant superintendent, when I would go
21  around, I did not have a lot responsibilities with regard to
22  curriculum but I did have some long-range plans.  If I was
23  dealing with a particular issue with K-to-12 science and
24  there would be a swing-through, like we did with the middle
25  school staff and then the elementary staff and then the high

51

1  topic?
2    A.   In all honesty, I can't say that I recall one
3  specific item.  Can I say that there was stuff that probably
4  came in, it probably came more closely to our counseling
5  department and our principals rather than staff.
6    Q.   And the counseling department, what was the -- was
7  there a -- the counselors would report to the principals in
8  the building, right?
9    A.   That's correct.  The counselors were assigned to
10  the buildings and then we have the psychological services
11  available through the intermediate unit.  And they would
12  provide different information to the principals and
13  counselors on a whole host of things to identify.  And those
14  things would be disseminated to faculty members by the
15  principals, by the counselors.
16       If someone says, hey, I think so-and-so is having
17  a problem or there is something going on, there's a range
18  from a whole host of difficulties at home or just a tough
19  relationship.  Or somebody missing an English class
20  periodically and nobody knew what was going on, and finally
21  a teacher took the initiative and checked with the girl and
22  the girl had a responsibility as a senior to take care of
23  her little sister getting on the elementary school bus and
24  having breakfast.  And the mother had passed away two months
25  before, that's why the girl was missing English class and

1  school staff.
2       So I might see him on a more frequent basis in
3  some of the science meetings.  But on a regular basis, I
4  would not say that I would see him.
5    Q.   Do you recall specific encounters with him when
6  you were an assistant principal (sic)?
7    A.   Assistant superintendent?
8    Q.   That's what I meant, assistant superintendent.
9    A.   No.
10    Q.   Do you recall that you were at a meeting and he
11  was at a meeting, you don't have a recollection of that?
12    A.   I'm sure he was at the science meetings.  But do I
13  have a specific recollection of the topics or what we were
14  discussing, no, but I'm sure he was there.
15    Q.   Well, as the assistant superintendent and then as
16  the superintendent, I would -- you must have had some
17  impression of him because I know he was sort of well-known
18  in the community; what did you know about him?
19    A.   I think the press release, which I wrote, pretty
20  much summarizes that, he was an exemplary science teacher.
21  This is a guy that designed the parachutes for re-entry for
22  the NASA space shuttle, turned down $150,000 job probably
23  two years before he finished teaching.  Was he different,
24  yeah, did I like the fact some of the kids called him
25  Yarb, no.  But was he successful in motivating students in

75a

52

1    science, yes.
2        Q.    When you say he was different, how was he
3    different?
4        A.    Not every teacher would go along with somebody
5    saying, hey, Yarb; it should be Mr. Yarbenet, or sir, or
6    whatever.
7        Q.    Did you ever -- were you ever in his classroom?
8    Did you ever observe his teaching?
9        A.    I believe I did as an assistant superintendent to
10   make an observation, or a superintendent. I did do some
11   observations with -- and chaired them with the principals,
12   but I couldn't recall specifics of that.
13          (Brief recess taken.)
14   BY MR. OLDS:
15       Q.    Going back to the policies of the School District,
16   and you've looked at one here, Exhibit No. 1, were there
17   policies concerning teacher conduct in the policy book?
18          MR. LANZILLO:   I think that was Exhibit No. 2.
19       Q.    In other words, did the Board promulgate policies
20   about teacher conduct?
21       A.    Yes.
22       Q.    And where would that have been in terms of that
23   series of policies in terms of the number; do you know what
24   number it would have been?
25       A.    I have no recollection of the series it would be.

53

1    March 27th.
2        A.    That's correct.
3        Q.    Did he tell you -- did he explain to you what the
4    evidence was?
5        A.    No. I just asked him if it was credible and he
6    said it was enough that they were going to pursue their
7    arrest.
8        Q.    And how long did that meeting with Chef Bucho
9    take?
10       A.    Probably about a half hour.
11       Q.    Did you make any notes during that meeting?
12       A.    No, I don't believe I did.
13       Q.    And after the Chief left, what did you do?
14       A.    I believe I was in touch with my School Board
15   president, the building principal to make arrangements to
16   set up a conference for the next morning, and our labor
17   attorney's office.
18          Then I probably made a list of other people I
19   needed to contact in terms of the director of business with
20   regard to our insurance, potential liability claims,
21   potential payroll status if, in fact, I was going to be
22   involved with a suspension with Mr. Yarbenet; protocols, and
23   updating phone calls to the building principals, federation
24   president, and the school solicitor, and our labor counsel.
25       Q.    How late did you work that night?

55

1        Q.    You found out -- tell me how you found out that
2    Gregory Yarbenet was going to be arrested.
3        A.    The Chief of Police came to my office just as
4    indicated in the press release late Wednesday.
5        Q.    Was that in the afternoon or was that in the
6    evening?
7        A.    It was late afternoon. School, I believe, had
8    been dismissed. I was usually there to 4:00, 4:30, but it
9    was late in the afternoon.
10       Q.    And that would be Chief --
11       A.    Chief Dan Bucho.
12       Q.    Dan Bucho.
13       A.    B-U-C-H-O.
14       Q.    And I would assume that you were acquainted with
15   him, being a small community you would know him?
16       A.    I know him extremely well, yes.
17       Q.    Tell me what he told you.
18       A.    He indicated to me that there was some serious
19   allegations and very credible evidence that our science
20   teacher, Mr. Yarbenet, would be arrested and charged for
21   sexual misconduct with students.
22       Q.    Can I see the press release, please.
23       A.    He did not indicate the students' names. I did
24   not know the students until sometime later.
25       Q.    Okay. So this happened late Wednesday,

1        A.    I didn't quit.
2        Q.    Who was the federation president?
3        A.    I believe Debbie Carter or Rick Killian, the
4    president and vice president. I believe it was Debbie
5    Carter at the time.
6        Q.    And Board president was?
7        A.    The Board president would have been Marilyn
8    Vargulich.
9        Q.    Did you conduct all this on the telephone, all
10   this business?
11       A.    Yes.
12       Q.    You mentioned earlier today that you have some
13   letters that you sent to the insurance notifying the
14   insurance; can I see those letters.
15          MR. LANZILLO:   I'd like to review them first for
16          attorney/client privilege, work product.
17          For the record, Mr. Blucas has handed me a
18          series of documents which I have reviewed for
19          protection of attorney/client privilege. I have
20          produced each of the documents to Attorney Olds, I
21          have not withheld any documents.
22       Q.    I had a question about -- let's see. There's a
23   letter here to -- you received a copy -- wait, I guess it's
24   a letter to Mr. Yarbenet, apparently you received a copy of
25   it. The letter is dated May 2, 2002, cover letter to you,

56



Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2

 3    STACY S; and JOHN and      :
      MARY ELLEN S., on behalf   :
 4    of their daughter, LEIGH   :
      ANN S., a minor,           :
 5              Plaintiffs        :
                                 :
 6              vs.              :    Civil Action No. 04-150E
                                 :
 7    GIRARD SCHOOL DISTRICT;     :
      ROBERT SNYDER,             :    HONORABLE SEAN J. MCLAUGHLIN
 8    Individually and in his    :
      capacity as Principal of   :
 9    the Rice Avenue Middle     :
      School; and GREGORY        :
10    YARBENET, a professional   :
      employee of the Girard     :
11    School District,           :
                Defendants        :    Jury Trial Demanded
12

13

14              Deposition of KAREN KWIATKOWSKI, taken before and
        by Carol A. Holdnack, RPR, Notary Public in and for
15      the Commonwealth of Pennsylvania, on Thursday,
        April 21, 2005, commencing at 10:10 a.m., at the
16      Crawford County Courthouse, Meadville, PA.

17

      For the Plaintiffs:
18        Edward A. Olds, Esquire
          Carolyn Spicer Russ, Esquire
19        1007 Mount Royal Boulevard
          Pittsburgh, PA 15223
20

21    For the Defendants:
          Richard A. Lanzillo, Esquire
22        Knox McLaughlin Gornall & Sennett, P.C.
          120 West Tenth Street
23        Erie, PA 16501

24

25              Reported by Carol A. Holdnack, RPR
                Ferguson & Holdnack Reporting, Inc.
```

Page 34

1  conversations?
2      A.  No.
3      Q.  And what you've described, students being present
4  in Mr. Yarbenet's classroom when they should be in the
5  cafeteria, was that a disciplinary issue?
6      A.  I thought so.
7      Q.  Did anyone ever tell you what the students were
8  doing in the classroom?
9      A.  Eating their lunch in there with him instead of in
10  the cafeteria.  It was kind of a -- kind of a safety issue.
11  If a student was supposed to be at lunch, the student was
12  supposed to be at lunch.  If somebody needed that student
13  and you went to the lunchroom looking for them, and they
14  weren't there, you had no idea where they were.  Students
15  were reporting, instead of to the lunchroom, right to his
16  room to eat.  So it was kind of that sort of a situation.
17      Q.  So if you wanted to locate a student that isn't
18  where he or she is supposed to be, what would you have to
19  do, use the intercom?
20      A.  Yes.  And they didn't like to do that because it
21  interrupted classes.
22      Q.  And these instances where you would find students
23  in the classroom of Mr. Yarbenet during lunch, I take it
24  this was multiple students?
25      A.  Yes.

Page 35

1      Q.  Okay.  About how many would be in there?
2      A.  Half a dozen, ten.
3      Q.  Did you ever see a student in the classroom with
4  Mr. Yarbenet eating lunch alone?
5      A.  No.
6      Q.  And, Mrs. Kwiatkowski, you had mentioned earlier
7  that you would enter the classroom to turn the lights on
8  when you would hear students inside.
9      A.  Correct.
10      Q.  Were there multiple students in the room on those
11  occasions?
12      A.  Yes.
13      Q.  Did you ever open the door and turn on the lights
14  at a time when Yarbenet was alone with a student in the
15  classroom?
16      A.  No.
17      Q.  Going back to your statement, Exhibit 1, let me
18  continue where I left off.  You state here, "My job is to
19  patrol the second floor hallway in the morning before a.m.
20  homeroom.  So I see a lot of this."  I guess I -- I'm not
21  exactly sure what the "this" is in that sentence.
22      A.  I think what I meant is that he quite often was in
23  that room in the morning with the lights out and students in
24  there.
25      Q.  Okay.  You say, "I've mentioned it several times

Page 36

1  to Mr. Snyder, Mr. McClelland and Mr." --
2      A.  Hahesy.
3      Q.  -- "Hahesy" --
4      A.  Yes.
5      Q.  -- "when he was here."  Let me start with
6  Mr. Hahesy.  When was Mr. Hahesy at Rice Avenue Middle
7  School; do you remember?
8      A.  I don't recall the dates.
9      Q.  What was his title?
10      A.  Assistant principal.
11      Q.  Was he Mr. McClelland's predecessor?
12      A.  Yes.
13      Q.  And what did you tell Mr. Hahesy about this
14  situation?
15      A.  With him, it was that students were -- because
16  Mr. Hahesy always did lunch duty.  With him it was that the
17  students were eating lunch in there, and he did not want
18  them in there.
19      Q.  Okay.  So you told Mr. Hahesy that you thought it
20  was inappropriate and contrary to the rules for the students
21  to be eating lunch --
22      A.  I didn't say it like that.
23      Q.  Was that the essence of --
24      A.  Yeah, that was the essence.
25      Q.  And what about Mr. McClelland, did you say

Page 37

1  essentially the same thing to him?
2      A.  Yes.  Plus girls being in that room at other times
3  during the day.  With Mr. Hahesy, it was mostly the
4  lunchtime thing.  With Mr. McClelland, it was the girls were
5  in there quite often.
6      Q.  Any particular girls who you noticed were in there
7  quite often?
8      A.  I listed a bunch of them.  As many as I could
9  remember at the end of this.
10      Q.  And I take it the girls who you've listed on the
11  second page of Exhibit 1 were in that classroom at times
12  other than lunch?
13      A.  Correct.
14      Q.  All right.
15      A.  A lot of the kids, girls -- it was always girls --
16  would come out of their study halls and go to his classroom.
17  One particular occasion I can remember going in there, and I
18  don't really remember what I went in there for, to deliver
19  something or to look for a student.  And the whole room was
20  ringed with girls who were not in sixth grade, weren't in
21  his sixth grade class.  I mean, there were seventh graders,
22  eighth graders.
23      Q.  Where were they seated?
24      A.  Standing along the walls, seated on the -- it was
25  like a shelf there for the heaters and coolers by the

10 (Pages 34 to 37)

FERGUSON & HOLDNACK REPORTING, INC.
814-452-4556

41ed2e20-48ad-46ac-a75c-23d5c1a65bab

**Page 46**

1  Q.  Now, in the next paragraph you state, "On one
2  occasion I saw Greg Yarbenet stare pointedly at M▋ A▋
3  S▋▋▋▋ breasts."
4  A.  Correct.
5  Q.  "He was seated at his computer and she was
6  standing in front of him.  They weren't talking.  I don't
7  remember if the lights were out and I turned them on, which
8  I did frequently, or not.  She was in the room alone with
9  him."
10  A.  That's correct.
11  Q.  Okay.  Who is M▋ A▋ S▋▋▋▋?
12  A.  She was a student there.
13  Q.  Do you remember what grade she was in at the time?
14  A.  Eighth grade.  No, seventh grade, I take that
15  back, seventh grade.
16  Q.  So M▋ A▋ S▋▋▋▋ was in Yarbenet's
17  classroom?
18  A.  Yes, she was in his homeroom.
19  Q.  And you say Yarbenet was seated at his computer.
20  Where was his computer located?
21  A.  In the back of the room.  As you enter the door to
22  the left.
23  Q.  Okay.  And was it on a desk?
24  A.  Yes.  A desk or a table.
25  Q.  And he was seated at this time and M▋ A▋

**Page 47**

1  S▋▋▋▋ was standing?
2  A.  In front of him, yes.
3  Q.  In front of him.  And you entered the classroom?
4  A.  Yes.
5  Q.  All right.  And did you walk to them, or where
6  were you standing?
7  A.  In the doorway.
8  Q.  Okay.  And how far is the doorway from the
9  computer desk?
10  A.  Maybe 10, 15 feet.
11  Q.  And how long did you stand there?
12  A.  Until M▋ A▋ was done, and then told her to get
13  out of the room.
14  Q.  Okay.  Did you overhear their conversation?
15  A.  No, I didn't.
16  Q.  Do you have any idea what they were talking about?
17  A.  No, I don't.
18  Q.  So Yarbenet is seated.  He's got a computer in
19  front of him, or somewhere --
20  A.  Um-hum.
21  Q.  -- on the --
22  A.  In -- right in front of him.
23  Q.  All right.  Right in front of him.  And she is
24  standing on the other side of that.  And you could --
25  A.  Yes.

**Page 48**

1  Q.  And it was your perception that he was staring at
2  her breasts?
3  A.  Staring her up and down; starting at her breasts,
4  looking down, back up again.  Never looking at her face.
5  Q.  Did you have any conversation with M▋ A▋
6  S▋▋▋▋ or Gregory Yarbenet at that time?
7  A.  No.  Other than to tell M▋ A▋ to leave the
8  room.
9  Q.  Leave the room.  Yeah, you did say that.
10  A.  Move out.
11  Q.  And I take it from your description of this that
12  M▋ A▋ S▋▋▋▋ and Yarbenet were separated by this desk
13  and this computer.
14  A.  Yes.
15  Q.  You wrote here that, "Leigh Ann S▋▋▋▋ spends
16  a lot of time with Yarbenet."
17  A.  Yes.
18  Q.  What did you mean by that?  Could you be more
19  specific.
20  A.  It just seems like she was always with him.  One
21  thing I did not put on here that I observed.  I observed
22  Yarbenet standing in the hallway near the elevators to go
23  up -- and I didn't put that in there either -- by the
24  elevators, and he had his arm around Leigh Ann's shoulders.
25  And he kissed her on top of the head.

**Page 49**

1  Q.  Okay.
2  A.  Whole bunch of students around at that time.
3  Q.  This is right out in the hallway with all the
4  students around?
5  A.  Yeah.
6  Q.  Okay.  And when you say around her shoulder, was
7  it -- Bob, I'm sorry, but one of these (indicating)?
8  A.  Yes.
9  Q.  Okay.  That does not -- not going to show up on
10  record.
11  MR. OLDS:  That's not going to show up on the
12  record.
13  MR. LANZILLO:  And I wanted her to understand
14  first.  Now, I'll make it clear on the record.
15  Q.  An arm around the shoulder, just to illustrate,
16  like a --
17  A.  Like a hug.
18  Q.  Like a parent would on a child?
19  A.  Yes.
20  Q.  Was he -- was it just the one arm around the
21  shoulder?
22  A.  Yes.
23  Q.  So it wasn't an embrace.
24  A.  No.
25  Q.  All right.

13 (Pages 46 to 49)

Page 50

1      (Discussion held off the record.)
2    Q.  So one arm.  Do you remember which arm it was?
3    A.  Right arm.
4    Q.  And he leaned over and kissed her on top of the
5  head?
6    A.  Correct.
7    Q.  Okay.  And what did Leigh Ann do?
8    A.  Her face just got red.
9    Q.  Okay.  And what happened after that?
10    A.  They kind of disbursed.  He went upstairs to the
11  TV studio.
12    Q.  Okay.
13    A.  He used to take students into the elevator too.
14  Girls.  And that was the other thing I don't think I --
15    Q.  Do you know why you didn't note on your statement
16  about the arm on the shoulder and the kiss on the top of the
17  head?
18    A.  I probably forgot about it.
19    Q.  What was Leigh Ann doing when that occurred?
20    A.  Standing there amongst a bunch of students.  I was
21  kind of shocked to see him do that.  Not because it was
22  Leigh Ann, just because it was anybody.
23    Q.  He was -- would it be fair to say he was a more
24  demonstrative teacher than most?
25    A.  Oh, yes.  He really was.

Page 51

1    Q.  Some people have described him as a hugger-type
2  person.
3    A.  Yes.
4    Q.  All right.
5    A.  Kind of the Pied Piper too.
6    Q.  Okay.  Yeah, students --
7    A.  Loved him.
8    Q.  -- loved him.  Okay.  And did you ever see him hug
9  any other students?
10    A.  That's the only one I ever saw him hug or kiss.
11    Q.  Okay.  And by kiss, you mean on top of the head.
12  You never saw him kiss a student on the lips.
13    A.  No.  Just on top of the head.
14    Q.  Okay.  And you saw him -- and when you say hug,
15  you're talking about the arm on the shoulder.
16    A.  Correct.
17    Q.  All right.  And that was the only time you ever
18  saw him hug a student?
19    A.  Yes.
20    Q.  Did he ever hug you?
21    A.  Sure.
22    Q.  Okay.  How many times did he hug you?
23    A.  I really don't know.
24    Q.  Is he kind of like that -- that aunt that comes to
25  your house, and the next thing you know she's --

Page 52

1    A.  He was a friendly guy.
2    Q.  Yeah.  Okay.
3    A.  Like I said, kind of the Pied Piper.  Wherever
4  Yarb was, there were students.
5    Q.  And did you ever see him hug any other adults,
6  besides yourself, obviously?
7    A.  Catherine Bible.
8    Q.  Okay.  Who is she?
9    A.  She was cafeteria manager.
10    Q.  Did you ever see Yarbenet touch a student on the
11  buttocks?
12    A.  No, I did not.  I heard about it, but I didn't see
13  him do it.
14    Q.  Well, let me ask you about that.  How did you --
15  what did you hear about that?
16    A.  I heard he touched M███ A██ S██████ on the
17  buttocks.
18    Q.  Who told you that?
19    A.  Marcia Mikovich.  And she questioned.  She told me
20  she questioned M██ A██ as to whether Yarbenet had ever
21  touched her, and she said yes, on the buttocks.
22    Q.  Okay.  When did that happen?  When did you have
23  that conversation?
24    A.  With Marcia?
25    Q.  Yeah.

Page 53

1    A.  After Yarbenet was arrested.
2    Q.  I see.  So after his misconduct came to light, you
3  had a conversation with Marcia Mikovich?
4    A.  Yes.
5    Q.  And she expressed to you that after she learned
6  about this, she asked --
7    A.  Right.
8    Q.  -- some students whether he had ever touched them,
9  and --
10    A.  Right.  I told her of the incident of me seeing
11  Yarbenet looking M██ A██ up and down, staring at her
12  breasts.  So she went and asked M██ A██ if he ever.
13    Q.  I see.  I see.  So this is after he's been
14  arrested and taken out of school.
15    A.  Yes.
16    Q.  Okay.  Did you ever see Yarbenet touch a student
17  on the chest or the breasts?
18    A.  No.
19    Q.  How about on the legs, the thighs?
20    A.  No.
21    Q.  Did you ever see Yarbenet touch a student in a
22  manner that you considered to be sexual?
23    A.  The hugging and the kissing on top of the head.
24    Q.  Okay.
25    A.  I thought it was inappropriate.

FERGUSON & HOLDNACK REPORTING, INC.
814-452-4556

*80a*

41ed2e20-48ad-46ac-a75c-23d5c1a65bab

Case 1:04-cv-00150-SJM    Document 30-3    Filed 08/18/2005    Page 31 of 49
Stacy S. v. Girard School District, et al.
Karen Kwiatkowski

Page 74

1    A.  Yes.
2        MR. OLDS:  She didn't look at that.  She was
3    looking at the final one.
4        MR. LANZILLO:  Oh, that's fine.  Hold on a second.
5    Let me match this up.
6    Q.  I'll represent to you, Ed -- you can look at it if
7    you would like.  Paragraph 7 of each document states, "At
8    some point I became aware of behavior of Mr. Yarbenet that
9    disturbed me.  For a period of at least ten years I observed
10   him behaving with female students in a way that I thought
11   was inappropriate."  Do you see that in your affidavit?
12   A.  Yes.
13   Q.  Have we talked about the behavior that you thought
14   was inappropriate?
15   A.  All of his behavior I thought was inappropriate.
16   And we did discuss this.
17   Q.  Yes.  We covered it, though.  There's no
18   inappropriate behavior that we haven't talked about.
19   A.  No.
20       MR. LANZILLO:  And, again, Paragraph 8, Ed, if you
21   want to take a look at it, I'm going to ask her
22   about that.
23       MR. OLDS:  Okay.  That's close to Paragraph 8, so.
24       THE WITNESS:  Okay.
25   Q.  I see that you made a change in the draft.  It

Page 75

1    originally read, "I would often find him, Yarbenet, in
2    there, his classroom."  The original draft was, "with a
3    female student."  You changed that to "female students,"
4    correct?
5        MR. OLDS:  In the -- he said --
6    A.  Yes, I changed it to female students.
7    Q.  All right.  Because you wanted to make sure it was
8    clear that he wasn't in there alone with a female student,
9    you wouldn't find him alone, you would find him in there
10   with multiple students.
11   A.  Right.  I would also find him in there alone.
12   Q.  On how many occasions did you find him alone?
13   A.  I really don't recall.
14   Q.  Who was in there with him?
15   A.  Stacy was in there with him alone.  I don't recall
16   whether Leigh Ann was ever in there with him alone or not.
17   Q.  How many times was Stacy in there alone with him?
18   A.  Oh, I think Stacy was in there every day.
19   Q.  But I'm asking you as far as what you observed.
20   A.  I really don't recall.
21   Q.  Okay.  You never observed any physical contact
22   whatsoever between Yarbenet and Stacy.
23   A.  No, I did not.
24   Q.  All right.
25   A.  The only physical contact I ever observed was with

Page 76

1    him and Leigh Ann, with the arm around the shoulders and the
2    kiss on the top of the head.
3    Q.  Did you ever kiss your own kids on top of the
4    head?
5    A.  Hum-um.
6    Q.  Okay.
7    A.  Usually on the face or the lips.
8    Q.  Could I have the draft back, please.  In the next
9    paragraph, the original draft, stated, "It was --
10       MR. OLDS:  What paragraph are we looking at, 9?
11       MR. LANZILLO:  The original draft supplied by
12   Carolyn had two Paragraph 8s.  That's why --
13       MR. OLDS:  Okay.
14       MR. LANZILLO:  -- I hesitate to refer to it as
15   Paragraph 8.  So it's the one immediately
16   following -- it's the second paragraph of
17   Paragraph 8.
18       THE WITNESS:  Okay.
19       MR. LANZILLO:  Strike that.  It's the second
20   Paragraph 8.
21   Q.  And originally the affidavit came to you.  It
22   said, "It was Mr. Yarbenet's practice to keep dark paper
23   over the window of his classroom."
24   A.  Right, the lower half.
25   Q.  Okay.  You changed that to read the lower half of

Page 77

1    the window of his classroom door.
2    A.  Right.  There was probably an area maybe like this
3    much (indicating), that you could see through.  I wasn't
4    tall enough to see through that.  But maybe that much.
5    Q.  And what covered that lower half of the window?
6    A.  Construction paper.  I don't know that it ever had
7    anything on it.  It was just dark construction paper.
8    Q.  Did you notice whether there were any posters or
9    anything like that?
10   A.  On the window?
11   Q.  Um-hum.
12   A.  Oh, there probably was at different times.
13   Q.  Okay.  You don't recall what was depicted in that?
14   A.  No, I don't.  He was big into space.  It could
15   have been something to do with space.
16   Q.  Okay.
17   A.  I mean, he was big into NASA, I should say.  It
18   might have had something to do with that.
19   Q.  Did you talk to Principal Snyder about the --
20   whatever material was on the lower half of the window of the
21   door?
22   A.  I don't recall if I did or not.
23   Q.  Do you know whether that material was ever
24   removed?
25   A.  After he left.

20 (Pages 74 to 77)

Case 1:04-cv-00150-SJM    Document 30-3    Filed 08/18/2005    Page 32 of 49

Stacy S. v. Girard School District, et al.                                    Candace Shaffer

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2

 3   STACY S; and JOHN and      :
     MARY ELLEN S., on behalf   :
 4   of their daughter, LEIGH   :
     ANN S., a minor,           :
 5            Plaintiffs        :
                                :
 6         vs.                  :   Civil Action No. 04-150E
                                :
 7   GIRARD SCHOOL DISTRICT;    :
     ROBERT SNYDER,             :   HONORABLE SEAN J. MCLAUGHLIN
 8   Individually and in his    :
     capacity as Principal of   :
 9   the Rice Avenue Middle     :
     School; and GREGORY        :
10   YARBENET, a professional   :
     employee of the Girard     :
11   School District,           :
              Defendants        :   Jury Trial Demanded
12

13

14           Deposition of CANDACE S██████, taken before and
     by Carol A. Holdnack, RPR, Notary Public in and for
15   the Commonwealth of Pennsylvania, on Monday,
     March 28, 2005, commencing at 10:00 a.m., at the
16   Crawford County Courthouse, Meadville, PA.

17

     For the Plaintiffs:
18      Edward A. Olds, Esquire
        Carolyn Spicer Russ, Esquire
19      1007 Mount Royal Boulevard
        Pittsburgh, PA 15223
20

21   For the Defendants:
        Richard A. Lanzillo, Esquire
22      Knox McLaughlin Gornall & Sennett, P.C.
        120 West Tenth Street
23      Erie, PA 16501

24

25           Reported by Carol A. Holdnack, RPR
             Ferguson & Holdnack Reporting, Inc.
```

Case 1:04-cv-00150-SJM    Document 30-3    Filed 08/18/2005    Page 33 of 49

Stacy S. v. Girard School District, et al.                              Candace Shaffer

Page 26

1     Q.   And what was the occasion that allowed you to have
2   some interaction with Mr. Yarbenet in January of 1999?
3     A.   He was having a sled riding party for the crew of
4   his TV studio at his home.  And he told me to be sure and
5   bring Stacy because he wanted me to meet his wife.  So I
6   took her to his house.  And there were a bunch of kids there
7   running around.  And I said, you know, you wanted me to meet
8   your wife.  And he said, well, she's not here right now, but
9   I really want you to meet her, you two are going to be the
10  absolute best of friends.  He said, please stay until she
11  comes home.
12       So I stayed, and I stayed, and I stayed, and I
13  stayed.  And he said, I can't think what's keeping her.  But
14  eventually she did show up.  And she was so cold and so on
15  the Board of being rude to me that I made my excuses and
16  left.  Trying to figure out why he thought we were going to
17  be best friends when she would barely acknowledge I was in
18  the house.  It was a very awkward situation.
19    Q.   The sled riding party was sometime in or around
20  January of 1999, correct?
21    A.   That's correct.
22    Q.   All right.
23    A.   It was near the end of January.
24    Q.   Did you have some contact or interaction with
25  Mr. Yarbenet prior to the party itself?

Page 27

1     A.   Just when I drove her to the house.
2     Q.   Okay.
3     A.   I mean, no, it was at the party.
4     Q.   The reason I ask is you said that Yarbenet had
5   told you to be sure to bring Stacy to the sled riding party.
6     A.   It was in a note.  I didn't have contact with him.
7   He had sent an invitation home with the students, I presume.
8   It had a map of his house with directions.  And there was,
9   you know, a notation that he wanted me to meet his wife
10  because we were going to be the best of friends.
11    Q.   Was that in the note itself?
12    A.   Yes.  On the outside of the note.
13    Q.   Were the other students who were involved in the
14  TV studio present for the sled riding party in January '99?
15    A.   Yes.
16    Q.   Do you know about how many students were there?
17    A.   I really don't know.  There may -- I believe there
18  were students in addition to the TV studio participants,
19  because there seemed to be an awful lot of kids there.
20    Q.   Perhaps friends of those kids, or?
21    A.   Probably.  And his son and probably friends of his
22  son as well.
23    Q.   Did you see any other adults at the sled riding
24  party?
25    A.   No.

Page 28

1     Q.   Other than -- well, not to presume here.  Do you
2   know whether the kids had been dropped off by parents,
3   picked up by parents?
4     A.   I would have to assume.  They weren't old enough
5   to drive.  So I would assume unless they were within walking
6   distance, but I don't have actual knowledge of that.
7     Q.   Mr. Yarbenet's son was at the house as well?
8     A.   Yes.
9     Q.   At some point Ms. Yarbenet arrived?
10    A.   Yes.
11    Q.   And how long did you talk with Ms. Yarbenet,
12  Mrs. Yarbenet?
13    A.   An agonizing five to ten minutes.
14    Q.   What was it about that interaction that led you to
15  the conclusion that she was cold?
16    A.   She barely acknowledged me.  I sat down and I
17  started talking to her.  And she just gave me a look.  I
18  couldn't describe it.  Just -- like my interpretation of
19  that look was, what are you doing here, I have no desire to
20  speak to anybody.  I mean, she was just very inhospitable.
21  And I felt very uncomfortable, and I left.
22    Q.   Did you come back later to pick up Stacy?
23    A.   Either me or my husband; I don't remember which.
24    Q.   Okay.  Did you see anything on the part -- any
25  action on the part of Mr. Yarbenet that caused you any

Page 29

1   concerns during that sled riding encounter?
2     A.   No, I was only there at the beginning of the
3   party.  He was talking to me until his wife came in.  And as
4   I said, it was kids running here and there.
5     Q.   When was your next contact or interaction with
6   Mr. Yarbenet?  And I'm defining that phrase broadly.  So if
7   there is an exchange of correspondence, notes or anything,
8   other than face-to-face, one-on-one type contact, I need to
9   know that as well.
10    A.   There may have been -- and I'm not sure of the
11  time frame.  There was possibly a phone call or two.  Where
12  he would call the house, supposedly to get the snowfall,
13  because he reported that to one of the local TV stations.
14  And my understanding is that he called several of the kids
15  from the TV studio to get a reading of the snowfall.  So
16  that was going on during December.  I didn't think of that
17  as contact.
18    Q.   Fair enough.
19    A.   Of '98.
20    Q.   What was the next contact you can recall?
21    A.   The next contact would have been in February when
22  he came to the house to pick up Stacy with other students.
23  He was taking them on a field trip to Channel 12.
24    Q.   Did he drop Stacy off that evening?
25    A.   Yes, he did.  He came in with her as well.

FERGUSON & HOLDNACK REPORTING, INC.
814-452-4556

83a

00bf4882-c576-4f0e-bda8-175559efd04b

Case 1:04-cv-00150-SJM    Document 30-3    Filed 08/18/2005    Page 34 of 49
Stacy S. v. Girard School District, et al.

Candace Shaffer

Page 30

1    Q.   What happened when Yarbenet came in?
2    A.   He came in.  Stacy went directly to her room.  And
3    he just chatted with us about -- I have no idea what.  He
4    just -- you know, small talk.
5    Q.   Nothing that you considered to be of concern or
6    out of the ordinary?
7    A.   No.
8    Q.   Did Stacy tell you anything about that field trip?
9    A.   She had a T-shirt, and I'm not sure if she got
10   that at that field trip, Channel 12 or something to do with
11   the TV studio.  I think that was part of a result of that.
12   Stacy was quiet at home as well as in school, so she didn't
13   have a lot to say about it, no.
14   Q.   Nothing she said stuck out in your mind?
15   A.   No.
16   Q.   When is the next time you had any contact with
17   Mr. Yarbenet?
18   A.   That would have been shortly thereafter when we
19   got a phone call in the middle of an afternoon from some
20   people who live up the street from us saying that
21   Mr. Yarbenet had been in a parachuting accident, and he was
22   asking if we would come.  He first wanted us to call his
23   wife and tell her that he had been in an accident, and then
24   come up to the scene of the accident.
25   Q.   Did you call Mrs. Yarbenet?

Page 31

1    A.   Stacy did.  She was the one who took the phone
2    call.
3    Q.   And did you go to the scene of the accident?
4    A.   We did.
5    Q.   Tell me what happened there.
6    A.   K▪▪ and Stacy and I drove up.  We walked up into
7    the field.  We could see the parachute there.  And there
8    were paramedics, and the couple who had seen him crash were
9    standing there.  And we were standing by them.  I asked if I
10   could leave my daughters with them while I walked over to
11   see how much -- how much he had been hurt.  Because I didn't
12   want them going over there if there were broken bones and
13   one thing or another.
14        I walked over.  They were in a discussion.  He
15   didn't want them to cut off his jacket.  He wanted them to
16   take it off so that they wouldn't damage the jacket.  He
17   reached up and took my hand.  And, you know, was just
18   talking.  He didn't appear to be injured.  There was no
19   blood, no loss of consciousness, that I was aware of.  He
20   was chatting and joking.
21   Q.   Okay.  What was your understanding as to why he
22   had asked for you and Stacy to come to the scene?
23   A.   I asked him that later.  And he said that he knew
24   Liz would not be home and he didn't want to die alone.  And
25   it only occurred to me when I was writing the statement for

Page 32

1    the police that we had no trouble contacting her.  She was
2    home.  So that was one of the first lies I caught him in.
3    But not until it was way too late.
4    Q.   So you approached Yarbenet and you held his hand
5    until the paramedics took him away?
6    A.   No, he took my hand.
7    Q.   Okay.  And did you hold his hand after that?
8    MR. OLDS:  You mean that day, or what?
9    MR. LANZILLO:  Yeah, that day.
10   MR. OLDS:  I didn't understand that question.
11   A.   He held my hand -- you know, until I let go, they
12   were taking his jacket off and one thing and another.  And
13   they were putting him in the Life Flight.  So I have no idea
14   how long he held my hand.  No idea.
15   Q.   After they put him in the Life Flight, what did
16   you do?
17   A.   We went home.
18   Q.   Did you visit him in the hospital?
19   A.   Yes.
20   Q.   On how many occasions?
21   A.   One.
22   Q.   How long was he hospitalized?
23   A.   Several days.  I can't tell you how many.  I don't
24   recall.
25   Q.   And aside from yourself, who else visited

Page 33

1    Mr. Yarbenet in the hospital?
2    A.   Our whole family.  We went together.
3    Q.   So your husband?
4    A.   Um-hum.  And my two daughters and I.
5    Q.   Where was he hospitalized, do you recall?
6    A.   I think it was Hamot, but I'm not sure.
7    Q.   How long did you stay?
8    A.   Probably half an hour.  And I'm guessing.
9    Q.   I understand that Mr. Yarbenet was out of school
10   for a period of time, a few weeks, and then came back
11   part-time.
12   A.   Correct.
13   Q.   Did you visit him at home after the accident?
14   A.   Yes.
15   Q.   And who was with you when you visited him at home?
16   A.   I had talked to him on the phone.  He had called
17   and he was telling me that he was very bored, he was
18   confined to bed, he had nothing to do.  And I asked him if
19   he didn't watch TV or movies.  And he said well, they didn't
20   have cable.  I volunteered to make a videotape from the
21   Discovery Channel of things I thought might interest him.
22        I took it to his house.  I dropped my daughter off
23   at her piano listen.  And I took it to the house.
24   Mrs. Yarbenet answered the door.  And I explained what I had
25   brought.  She gave me a big sigh (indicating), very

FERGUSON & HOLDNACK REPORTING, INC.
814-452-4556

84a

00bf4882-c576-4f0e-bda8-175559efd04b

Page 187

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2

 3    STACY S; and JOHN and      :
      MARY ELLEN S., on behalf   :
 4    of their daughter, LEIGH   :
      ANN S., a minor,           :
 5              Plaintiffs       :
                                 :
 6         vs.                   :    Civil Action No. 04-150E
                                 :
 7    GIRARD SCHOOL DISTRICT;    :
      ROBERT SNYDER,             :    HONORABLE SEAN J. MCLAUGHLIN
 8    Individually and in his    :
      capacity as Principal of   :
 9    the Rice Avenue Middle     :
      School; and GREGORY        :
10    YARBENET, a professional   :
      employee of the Girard     :
11    School District,           :
                Defendants       :    Jury Trial Demanded
12

13

14
                   Deposition of CANDACE S███████, taken before and
15         by Carol A. Holdnack, RPR, Notary Public in and for
           the Commonwealth of Pennsylvania, on Friday,
16         July 22, 2005, commencing at 11:48 a.m., at the
           offices of Knox McLaughlin Gornall & Sennett, P.C.,
17         120 West Tenth Street, Erie, PA 16501.

18

19    For the Plaintiffs:
           Edward A. Olds, Esquire
20         1007 Mount Royal Boulevard
           Pittsburgh, PA 15223
21
      For the Defendants Girard School District and Robert Snyder:
22         Richard A. Lanzillo, Esquire
           Knox McLaughlin Gornall & Sennett, P.C.
23         120 West Tenth Street
           Erie, PA 16501
24
                   Reported by Carol A. Holdnack, RPR
25                 Ferguson & Holdnack Reporting, Inc.
```

Case 1:04-cv-00150-SJM    Document 30-3    Filed 08/18/2005    Page 36 of 49
Stacy S. v. Girard School District, et al.
Shaffer Candace

Page 232

1  are the girlfriends whose mothers he remained close to. He
2  was adamant that we continue contact after he moved to
3  Arizona." Is the "he" in that sentence Yarbenet?
4      A. Yes.
5      Q. Was he telling you he was thinking about moving to
6  Arizona?
7      A. Yes. He told me that they had purchased property
8  and were in the process of building a home. And if you look
9  above it, it said, "Remained close with mothers." And these
10  were notes that I made myself about Yarbenet.
11     Q. These are things you had talked about with
12  Yarbenet.
13     A. Some of them, yes. This -- he told me that he
14  had -- that he had friends around the world, and that he had
15  many, many close friends, and that he had remained close
16  with the mothers of all of his old girlfriends. At the time
17  I was thinking, of course, he meant when he was in high
18  school and college. When I was writing this, I was
19  speculating perhaps he's talking about other girls he had
20  sexually molested. And that he became close with their
21  mothers too, as a way of clouding issues.
22     Q. That was your speculation.
23     A. That's my speculation. The other part, he was
24  adamant we continue contact after he moved to Arizona. He
25  even said he was going find a way to fly me out there so I

Page 233

1  could see the property that they were -- the property that
2  they had bought and the house that they were constructing.
3      Q. On Page 113, last entry, there's a reference to an
4  MB. Who is that?
5      A. Marnie Boyce (phonetic).
6      Q. Who is that?
7      A. She is a learning support or Title 1 -- I think
8  it's Title 1 teacher at the elementary school who was at the
9  middle school at the time Stacy was there.
10     Q. So you speculate -- you thought she may have been
11  spying on you?
12     A. Yes, she was -- she even apologized for being very
13  nosey. She said, I know this is none of my business. And
14  she asked me frequent questions. And then the day that she
15  asked me about this, she -- the look on her face was such
16  shock that I thought, oh, my, I bet I've been talking to the
17  enemy. And maybe not. I may have misjudged her. Maybe she
18  was just surprised that I would have contact with people who
19  weren't supposed to be talking to me.
20     Q. On Page 116 there are redactions.
21     MR. LANZILLO: I was hoping you would bring the
22  original, Ed. I need to know the basis for the
23  redactions.
24     MR. OLDS: Okay. We'll provide you that.
25     MR. LANZILLO: Okay. Is there any way you could

Page 234

1  find -- I mean, I hate to --
2      MR. OLDS: I'm certain that it involved
3  conversations that she had with us.
4      MR. LANZILLO: Okay.
5      MR. OLDS: But we'll give you a privilege --
6      MR. LANZILLO: Privileged log on that?
7      MR. OLDS: Yeah. But I'm certain that that's what
8  it was.
9      THE WITNESS: I agree.
10     Q. On Page 120 there is a reference, "Yarbenet picked
11  up girls to drive them to school in his Corvette. Also took
12  them home." Were those students other than Stacy?
13     A. Yes.
14     Q. Okay. Did you see that?
15     A. No. That was told to me by -- and I'm sorry, but
16  I really honestly don't remember which teacher told me that.
17     Q. Okay. You were aware that Yarbenet gave Stacy
18  rides in his Corvette to and from school.
19     A. He called me and said she had missed the bus one
20  day, could he take her home. And I said, thank you, that
21  would be great. Maybe not those exact words, but I gave him
22  permission to take her home that day. I found out by
23  accident he took her home the next day too, without calling
24  for permission. And I put a stop to that.
25     Q. Did Yarbenet ever ride Stacy in his car on other

Page 235

1  occasions?
2      A. School functions.
3      Q. And you were aware of that, right?
4      A. Yes.
5      Q. Okay. And that was okay with you.
6      A. There were other children there too. He was going
7  to a TV studio field trip.
8      Q. You say here on the next page, 121, "Yarbenet had
9  videotape of Stacy at home."
10     A. Yes.
11     Q. What videotape was that?
12     A. He had a videotape of her at the TV studio. One
13  of -- I guess they videotaped the productions they did. And
14  he was laughing. He said, you've got to see this, you know,
15  you won't believe how angry Stacy gets. Because she's
16  usually so controlled. He turned the tape on. And the desk
17  was fit into a corner. So the kids behind the desk had to
18  get over the desk or move around the corner to get out.
19     The broadcast ended, and she was up over the
20  table. She jumped up and ran over the table and ran out of
21  the room. And he laughed, and he thought that was so funny.
22  He made me watch it three times. He said, I bet you didn't
23  know she could get this upset. And I said, what was the
24  problem. He said, she was having a fight with one of her
25  friends. I know now she was trying to get away from him.

FERGUSON & HOLDNACK REPORTING, INC.
814-452-4556

86a

c03112ff-199e-4028-9161-d2cd6099f819

Case 1:04-cv-00150-SJM    Document 30-3    Filed 08/18/2005    Page 37 of 49
Stacy S. v. Girard School District, et al.
Shaffer Candace

Page 236

1 And why he thought that was funny is beyond me.
2   Q.  Why do you say you know now she was trying to get
3 away from him?
4   A.  Because now I know that -- you know, it wasn't a
5 fight she had with a friend.  She was trying to get away
6 from him.  And he thought that was amusing.  Because he's a
7 sick, sorry --
8   Q.  But I'm confused.  All right.  So he's showing you
9 a videotape.  Where are you looking at it?
10   A.  At his home.  He called me to come to his home.
11 He said he had something he wanted to show me.
12   Q.  Okay.  The fact that he had a videotape of Stacy
13 at his home, that was okay with you?
14   A.  I guess I didn't know that he didn't take these
15 tapes home and review them.  I don't know.
16   Q.  Was he in the video?
17   A.  He was the one doing the videoing.
18   Q.  Okay.
19   A.  He was doing the taping.
20   Q.  Was anyone else in the video?
21   A.  Yes.  There was a boy sitting beside Stacy which
22 blocked her exit.
23   Q.  So Yarbenet is behind the camera videotaping Stacy
24 and a boy sitting behind the table.
25   A.  Yes.

Page 237

1   Q.  At some point she gets up.  And then she goes over
2 the table and runs out.
3   A.  When the broadcast is over, she jumped up on the
4 table, over the table, and out of the room.  She was fleeing
5 the room.
6   Q.  Okay.  So this wasn't something you discovered
7 after the fact.  This is something you were aware of while
8 Stacy was -- still had Yarbenet in school, correct?
9   A.  Yes.
10   Q.  On Page 122, in the middle, there's a reference
11 here to, "An anonymous teacher gave me the name of ▓▓▓▓
12 ▓▓▓▓▓▓."
13   A.  Yes.
14   Q.  Who is the anonymous teacher?
15   A.  You already made me give that answer in my first
16 deposition.
17   Q.  Refresh my recollection, please.
18   A.  I prefer not to.
19   Q.  Well, I'm going to insist that you do.  Tell me
20 who the anonymous teacher is.  I really don't want to play
21 games.
22   A.  I don't either.  It doesn't make any difference.
23 This teacher -- I promised her I would not use her name.
24 And you're making me go back on all these promises, and I
25 truly hate it.

Page 238

1   Q.  Mrs. ▓▓▓▓▓, please, just tell me the name of the
2 teacher so that I can do my job and follow up on what you
3 said.
4   MR. OLDS:  Well, you asked her in the first
5       deposition.
6   A.  You have it already.  I'm not going to say it
7 again.  You have that information.  I answered that under
8 duress the first time.
9   Q.  Mrs. S▓▓▓▓, I didn't have your notes then.  I
10 don't know whether it's the same person.
11   A.  It is.
12   Q.  But, you know, I'm going to go back to the
13 transcript.  We can take an hour for me to find what you're
14 talking about.  And when I pick up the transcript, I'm going
15 to ask you the name, is that the same person.  We could make
16 this a lot faster and a lot easier for all of us if you
17 would just tell me the name so I can follow up --
18   A.  Linda Beam.  Thank you.
19   Q.  Thank you.  The next entry, "A teacher also gave
20 me the name Vi▓▓ P▓▓▓▓▓."
21   A.  And I spelled it incorrectly there.
22   Q.  That's all right.  Who is the teacher there?
23   A.  Marcia Heath.
24   Q.  Okay.
25   A.  And for the record, Linda Beam was not one of the

Page 239

1 ones who told me she was afraid of being fired, but I
2 intended to keep her confidential statement confidential.
3   Q.  Did you ever talk to K▓▓▓▓▓▓▓▓?
4   A.  No.
5   Q.  Ms. Beam, did she tell you where she got the name
6 ▓▓▓▓▓▓▓?
7   A.  I'm not Ms. Beam.
8   Q.  Did Ms. Beam tell you --
9   A.  Yes, she did.
10   Q.  All right.  Where did she tell you she got that
11 name?
12   A.  From her son.
13   Q.  Okay.  Did she tell you when she got that name?
14   A.  Yes.  After the news came of the arrest.  And she
15 was -- she told me how sorry she was.  She had Stacy as a
16 student, and she was very fond of her.  She talked to her
17 son.  And he said, if Stacy is a victim, then this girl was
18 too.
19   Q.  Did you ever talk to K▓▓ B▓▓▓▓▓▓?
20   A.  No.
21   Q.  Did you have any idea how she feels about people
22 bantering her name around like this?
23   A.  No.  The police tried to locate her.  And unless
24 you're giving out her name, that's the only way, because I
25 haven't, except to you.

14 (Pages 236 to 239)

```
 1         IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2
   STACY S.; and JOHN AND    : HONORABLE SEAN J. MCLAUGHLIN
 3 MARY ELLEN S., on behalf  :
   of their daughter, LEIGH  :
 4 ANN S., a minor,          :
          Plaintiffs         :
 5                           :
          v.                 : Civil Action No. 04-150E
 6                           :
   GIRARD SCHOOL DISTRICT;   :
 7 ROBERT SNYDER, Individually;
   and in his capacity as    :
 8 Principal of the Rice     :
   Avenue Middle School; and :
 9 GREGORY YARBENET, a       :
   professional employee of  :
10 the Girard School         :
   District,                 :
11        Defendants         : Jury Trial Demanded

12

13

14

15

16        Deposition of LINDA TUCCI, taken before

17 and by Sonya Hoffman, Notary Public in and for the

18 Commonwealth of Pennsylvania on June 8, 2005,

19 commencing at 11:11 a.m., at the offices of Knox

20 McLaughlin Gornall & Sennett, P.C., 120 West

21 Tenth Street, Erie, PA 16507.

22

23

24

25        Reported by Sonya Hoffman
          Ferguson & Holdnack Reporting, Inc.
```

1

```
 1         A P P E A R A N C E S

 2 For the Plaintiffs:

 3     Edward A. Olds, Esquire
       1007 Mount Royal Boulevard
 4     Pittsburgh, PA 15223

 5 For the Defendants:

 6     Richard A. Lanzillo, Esquire
       Neal R. Devlin, Esquire
 7     Knox McLaughlin Gornall & Sennett, P.C.
       120 West Tenth Street
 8     Erie, PA 16507

 9

10             I N D E X

11

12 LINDA TUCCI

13     Direct Examination by Mr. Olds . . . . . . . . 3

14

15

16

17

18           E X H I B I T S

19

20     Tucci Deposition Exhibit No. 1. . . . . . . . .14

21

22

23

24

25
```

2

---

```
 1        L I N D A   T U C C I, first having

 2     been duly sworn, testified as follows:

 3

 4                  DIRECT EXAMINATION

 5 BY MR. OLDS:

 6

 7     Q.   Ms. Tucci, hi, I'm Ed Olds.

 8     A.   Nice to meet you.

 9     Q.   Nice to meet you.  I represent Stacy S████ and
```

10 Leigh Ann S████████ who, probably as you know, sued the

11 Girard Area School District and Robert Snyder.

12     A.   Uh-huh.

13     Q.   And I'm going to be asking you some questions to

14 see if you have any information about the events that led up

15 to their lawsuit, okay?

16     A.   Okay.

17     Q.   I guess maybe, first of all, I don't know

18 whether -- I assume that you've had a chance to meet with

19 the lawyers for the School District.

20     A.   Yes.

21     Q.   Can you tell me when you met with them?

22     A.   I have not been in school, I've been on

23 sabbatical, so I do not recall what month it was.  It was

24 after -- I want to say December.

25     Q.   In December?

3

---

```
 1     A.   I would say December.

 2     Q.   Okay.

 3     A.   I don't know if I'm correct on that, but I was

 4 still in school.

 5     Q.   I don't know whether they had a chance to explain

 6 to you the nature of this case, but it's a Civil Rights

 7 lawsuit where we've invoked the United States Constitution.

 8 And in a sense, your participation in the lawsuit, because

 9 we've asked you to come to this deposition -- which actually

10 is the same thing as being in court.

11     A.   Okay.

12     Q.   Your participation in this lawsuit is protected by

13 the First Amendment, which means that you can't be subject

14 to retaliation for any testimony that you give here today,

15 whether it be helpful to the School District or helpful to

16 my clients or not helpful to anyone.  You can't be subject

17 to retaliation because of the First Amendment, and I don't

18 know if that was explained to you or not.

19     A.   Huh-uh.

20     Q.   But that's the truth.

21     A.   Okay.

22     Q.   And so I guess -- and one other thing that might

23 be helpful -- well, no, let me just -- I'll ask you some

24 questions and we'll try to get through this, okay?

25     A.   Okay.
```

4

1  day, people would vent, it's just natural.  And I didn't
2  want any of the negative -- negative environment phasing me
3  on how kids were.
4          I don't live in Girard, I've purposely not moved
5  to the community, because, again, I want to know the kids
6  from my own perspective.
7      Q.   So you talked with Mrs. Seneta over a period of
8  time --
9      A.   Uh-huh.
10     Q.   -- did she tell you that she had observed Yarbenet
11 and Stacy in the closet behind her room?
12     A.   No.
13     Q.   She never told you that?
14     A.   She told me that there were kids in that room all
15 the time and that there was a bar -- a chin-up bar, in the
16 room at one point in time.  And I know one time when we were
17 having lunch and there was noise in the back room and I
18 said, what's that.  And she said, oh, he just always lets
19 the kids back there.
20     Q.   But she never told you that she had found Yarbenet
21 and Stacy alone in the back room?
22     A.   I do not believe so.
23     Q.   And so she didn't tell you that she found them
24 numerous times alone in the back room?
25     A.   No.  No.  No.

13

1  faculty room and whatnot, Mrs. K. came to my room -- Mrs.
2  Kwiatowski came to my room and said that --
3      Q.   Karen Kwiatowski?
4      A.   Yes.  That I was needed in the office.  And
5  Mr. Snyder and Mr. McClelland were in the office and they
6  asked me questions.  And so what I wrote here was in
7  response to questions that they asked me.
8      Q.   Okay.  And do you know why they were asking you
9  questions?
10     A.   Yeah, because I knew that Mr. Yarbenet had been
11 arrested.
12     Q.   Right.
13     A.   So then -- I recalled things, you know, that
14 didn't seem important before.
15     Q.   Okay.  Do you know why they -- why they had you
16 come down to the office?
17     A.   No -- well, probably because I was an 8th grade
18 teacher and because Stacy was in my study hall and left
19 often to go to Mr. Yarbenet's room.
20     Q.   Had you told that to Mr. Snyder before?
21     A.   I had told Mr. Snyder, not specifically -- I don't
22 believe specifically about Stacy, but when I came back from
23 the high school as a teacher and we were in the new
24 building, all kids, every study hall, kids would say, can I
25 go to Yarb's room, can I go to Yarb's room, and I would be,

15

1      Q.   Did she ever tell you that she found them in the
2  back room with the lights off?
3      A.   She told me that kids would be in the back room
4  with lights off, that there were -- that there wasn't always
5  lights on back there.  She had items stolen from her back
6  room.  She did tell me about one incident that she heard
7  Yarbenet and Stacy talking about.
8      Q.   What did she tell you?
9      A.   Something about being down by the -- being at a
10 beach and water being sprayed on them.
11     Q.   Okay.
12     A.   But it had nothing to do with the back room.
13     Q.   Do you remember anything else about that
14 conversation, the significance of that conversation?
15     A.   This was after Mr. Yarbenet was arrested, too.
16 No.  Just that they thought it was funny and that she found
17 no humor in it.
18     Q.   Okay.  Do you recall that you prepared a
19 statement?
20     A.   Yes.
21          (Tucci Deposition Exhibit No. 1 marked for
22          identification.)
23     Q.   I'm going to show you that statement and mark that
24 as Exhibit No. 1.  Why did you prepare this statement?
25     A.   After lunch that day, like everybody was in the

1  no.  And I asked Mr. Snyder if I had to send those kids, and
2  he said, not unless they have a pass.  So I know, at least
3  twice, I had asked the office whether kids could just go to
4  Yarb's room because they wanted to go.
5      Q.   Okay.
6      A.   And he told me only if they had a pass.
7      Q.   Okay.  Well, did Stacy have passes to go to
8  Yarbenet's room?
9      A.   Yes.  I believe we were using agenda books, and
10 she would have Mr. Yarbenet's signature.
11     Q.   Which other students had passes from Mr. Yarbenet
12 to go to his class in your 8th grade study period?
13     A.   The same time as her?
14     Q.   Yes.
15     A.   I have not looked at the yearbook, and maybe Stacy
16 would be able to tell you, it was one of the other class
17 officers with blonde hair in the honors
18 algebra class, her name may have been C---- and I don't know
19 the last name.  But I believe that she went with Stacy
20 often.
21     Q.   And did you ever talk to Mr. Snyder about Stacy
22 having passes to go to Yarbenet's class?
23     A.   No, not from my recollection.
24     Q.   Okay.  Well, Stacy was -- did you ever have
25 questions yourself as to why Stacy would have passes to go

16



1  to Yarbenet's class?
2       A.   I asked them and they told me they helped him
3  grade papers and do stuff.
4       Q.   Was this on a daily basis that she would have a
5  pass?
6       A.   Almost. I would believe almost daily.
7       Q.   Did C███ leave almost daily?
8       A.   I -- maybe. I don't know. I don't recall.
9       Q.   You don't recall?
10      A.   I don't recall.
11      Q.   Was there any other teachers who issued passes to
12 students on a daily basis to come to their classroom?
13      A.   Not to my recollection, but I know that I have
14 done that. I had a girl, who during my plan period, every
15 single day, I signed and she came down and helped me do
16 paperwork. But I don't recall -- I mean, I don't know if
17 any other teachers do it. I can speak for myself and I can
18 speak for what happened when I had Mr. Yarbenet's signature.
19      Q.   What year was this that you had a young lady come
20 help you?
21      A.   I did that for a number of years.
22      Q.   So there would be different students every year?
23      A.   Uh-huh. Who would be willing to come down during
24 my plan period and help me.
25      Q.   And you would secure their release out of a study

17

1  she was sitting at the table with papers in front of her.
2  And I don't -- I, still, to this day, have never been in
3  that room, so I don't know how big the room was and if other
4  people were there or not.
5       Q.   You wrote in this statement, quote, "Stacy was the
6  only person in the studio with him," end quote.
7       A.   That I had seen.
8       Q.   That's what you wrote.
9       A.   Okay.
10      Q.   So now you're saying today that you didn't --
11 there might have been other people there, but you just
12 didn't see them; is that what you're saying today?
13      A.   Yes. I have no way of knowing whether there was
14 or not. Stacy was the only person I saw with him.
15      Q.   Okay. And you say you weren't in the room so you
16 don't know how big the room was.
17      A.   Yeah.
18      Q.   Did you hear anyone else in the room?
19      A.   No.
20      Q.   Did anyone else say, hi, Ms. Tucci?
21      A.   No.
22      Q.   And you say, "I must have looked surprised because
23 Mr. Yarbenet said something to the effect that they were
24 getting ready for the morning show." Were you surprised to
25 see the two of them in that room?

19

1  hall or something like that?
2       A.   Yes. And actually Stacy helped me grade papers,
3  too. There would be times when she would stay and help me
4  grade papers.
5       Q.   In your statement you say that Stacy also told me
6  that they attended the same church and that their families
7  were friends.
8       A.   Uh-huh.
9       Q.   When did she tell you that?
10      A.   You know, I don't know that specifically Stacy
11 told me or maybe other people told me. I read that and I'm
12 like not positive if Stacy told me, but it was just -- it
13 was just known that Mr. Yarbenet was a Jehovah's Witness and
14 that Stacy was also.
15      Q.   Okay. And was it known that their families were
16 friends?
17      A.   Yeah. I don't know how I received that
18 information.
19      Q.   Okay. Also your statement says that one day I
20 needed to make sure that some information got on the morning
21 announcements and you went to the TV studio, the door was
22 shut, and Mr. Yarbenet answered the door, and Stacy was the
23 only person in the studio with him.
24      A.   She was the only person I saw. Because when you
25 open up the door, the door opened and the table was here and

1       A.   I don't know if I was surprised or if -- I felt
2  that they were ready to begin the announcements and that I
3  was interrupting the announcements. That maybe they opened
4  the door and it interfered with what the rest of the school
5  was seeing with the announcement because it was just minutes
6  before they broadcasted it to the rest of the school.
7       Q.   And in your statement you said it was about five
8  minutes before the a.m. homeroom.
9       A.   Uh-huh. Because I had gone downstairs and tried
10 to give it to the secretary and the a.m. bell rang for
11 homeroom. And I walked upstairs, so I think that's like
12 five minutes.
13      Q.   So you walked upstairs. Where was the TV studio
14 relative to your classroom?
15      A.   There's my classroom, I had to walk all the way
16 down the hall, and then up the steps to the music area, and
17 it was in the music room.
18      Q.   So it was on the opposite end of the building?
19      A.   Correct. And I had to come from the office, also.
20      Q.   And do you recall whether you got back to your
21 room in time for the a.m. homeroom?
22      A.   I didn't have a homeroom. I didn't have kids for
23 homeroom, so I didn't have the TV on. I don't know.
24      Q.   So getting back to whether you were surprised or
25 they were surprised, were you surprised to see them in that



Case 1:04-cv-00150-SJM     Document 30-3     Filed 08/18/2005     Page 41 of 49

Stacy S. v. Girard School District, et al.                                    Edward Podpora

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2

 3    STACY S; and JOHN and        :
      MARY ELLEN S., on behalf     :
 4    of their daughter, LEIGH     :
      ANN S., a minor,             :
 5            Plaintiffs           :
                                   :
 6            vs.                  :   Civil Action No. 04-150E
                                   :
 7    GIRARD SCHOOL DISTRICT;      :
      ROBERT SNYDER,               :   HONORABLE SEAN J. MCLAUGHLIN
 8    Individually and in his      :
      capacity as Principal of     :
 9    the Rice Avenue Middle       :
      School; and GREGORY          :
10    YARBENET, a professional     :
      employee of the Girard       :
11    School District,             :
              Defendants           :   Jury Trial Demanded
12

13
              Deposition of EDWARD PODPORA, JR., taken before and
14    by Carol A. Holdnack, RPR, Notary Public in and for
      the Commonwealth of Pennsylvania, on Monday,
15    June 27, 2005, commencing at 11:15 a.m., at the
      Girard Police Department, 34 Main Street West,
16    Girard, PA 16417.

17
      For the Plaintiffs:
18        Edward A. Olds, Esquire
          Carolyn Russ, Esquire
19        1007 Mount Royal Boulevard
          Pittsburgh, PA 15223
20
      For the Defendants Girard School District and Robert Snyder:
21        Richard A. Lanzillo, Esquire
          Knox McLaughlin Gornall & Sennett, P.C.
22        120 West Tenth Street
          Erie, PA 16501
23

24
              Reported by Carol A. Holdnack, RPR
25            Ferguson & Holdnack Reporting, Inc.
```

Page 14

1  was a victim or an alleged victim.  She did come on station.
2  When I reported it to the District Attorney's office, they
3  politely just told me, don't dig for them, just the ones
4  that would come forward to investigate.  I was advised not
5  to dig for victims.
6      Q.  Do you recall the name of the person who came into
7  the station?
8      A.  I do.
9      Q.  What is that?
10     A.  Okay.  Her name is H██ B██████?  I don't
11  know how it's spelled.
12     Q.  Okay.
13     A.  She wished not to be included in the report.  She
14  had some very tragic circumstances growing up, and wanted to
15  advise me of information but did not want to take part in
16  the investigation.
17     Q.  Okay.  Do you recall what she advised you?
18     A.  That she was a victim of fondling and
19  inappropriate behavior by Mr. Yarbenet.
20     Q.  Did you talk to her mother, her adopted mother,
21  K██ K██████?
22     A.  Yes, I did.
23     Q.  And was this -- okay.  What did Kelly tell you?
24     A.  She advised that H██ had come to her on, I
25  believe, one or two occasions and advised her of the

Page 15

1  inappropriate behavior by Mr. Yarbenet.  Both Kelly, H██
2  and I believe there was another girl, a friend that
3  accompanied them, went to the guidance counselor at the Rice
4  Avenue Middle School to report the behavior.
5      Q.  That would be Ms. DeMarco?
6      A.  Yes.
7      Q.  Okay.  What did they tell you about that?
8      A.  She advised that when they advised her of it, she
9  just kind of skirted it off and said, he's just a nice guy.
10  And that she believed that Ms. B███████ was lying.
11     Q.  Okay.  So Gayla DeMarco -- Kelly K████ told you
12  that Gayla DeMarco told her that Yarbenet was just a nice
13  guy and that her daughter was lying.
14     A.  That's what I was told, yes.
15     Q.  Okay.  And were there any other people who
16  contacted you, any other victims that contacted you that you
17  can recall?
18     A.  No other victims that contacted me, no.
19     Q.  But H██ B██████ she came in to see you at
20  the station?
21     A.  Correct.
22     Q.  Do you recall how old she was at that time?
23     A.  I believe she was 19 or 20.  She -- young, single
24  mother.
25     Q.  Did you receive any contact from people who

Page 16

1  weren't victims but who offered information about Yarbenet?
2      A.  I had a -- I believe the name is Cindy Scott.
3  Cindy Scott had called to report she had been a chaperone at
4  a school function at the Pleasant Ridge Manor.
5      Q.  And what did she say?
6      A.  She said she noticed Mr. Yarbenet walking around
7  with a young lady, holding hands, arms around each other.
8  She realized that she was a student, but that she felt that
9  the contact was very inappropriate for a man his age and a
10  student as young as she was.  And she also stated that she
11  reported it to Ms. DeMarco also.  And was advised -- not
12  that she was a liar, but that Mr. Yarbenet was just a
13  friendly, likeable guy.
14     Q.  Did you ever talk to Gayla DeMarco?
15     A.  No, I did not.
16     Q.  Is there a -- was she just outside the scope of
17  the investigation, or was this after the District Attorney
18  told you you don't need to do any digging?
19     A.  I had been given a list of young ladies that
20  teachers and hall monitors and so forth felt might be
21  victims or witnesses.  And it was quite lengthy.  I
22  concentrated my efforts on investigating those names.
23     Q.  Yeah.  I was just -- the -- you received a list
24  from other -- from teachers?
25     A.  There's a Mrs. Kwiatkowski.

Page 17

1      Q.  Okay.
2      A.  She gave me a list of young ladies that she felt
3  that Mr. Yarbenet was too friendly with.
4      Q.  Okay.  And how did you -- how were you put in
5  touch with Ms. Kwiatkowski?
6      A.  I believe Sergeant VanDamia at the time had
7  obtained -- he had went to the middle school prior to that
8  and spoke to some of the teachers, and asked them for
9  statements.  And through those statements, the list of names
10  was taken.
11     Q.  Okay.  You also -- at some point you visited our
12  other client, Leigh Ann S██████.  Did you visit her at
13  her home or her family at her home?
14     A.  Correct.  She was one of the young ladies that I
15  was to look into or interview.  Went to the residence and
16  spoke with her and her parents one evening.
17     Q.  It looks like that happened on -- it says in your
18  report -- and I'm looking at 1076.  Your report says on
19  April 10th, 2002 you went to speak to Leigh Ann S██████.
20  And she said that -- Leigh Ann; you have her saying that the
21  Defendant would hug her and say that he loved her, but that
22  was all.  Do you see --
23     A.  Okay.  You're talking the last -- the last half of
24  the last paragraph.
25     Q.  Right, yeah.

FERGUSON & HOLDNACK REPORTING, INC.
814-452-4556

92a

8cd6e4f4-5737-49dc-884b-2a09ea73f1f0

Case 1:04-cv-00150-SJM    Document 30-3    Filed 08/18/2005    Page 43 of 49

Stacy S. v. Girard School District, et al.                    Edward Podpora

Page 18

1    A.  Okay.  At that time she denied inappropriate
2  behavior.  Okay.  And she said he would hug her and say he
3  loved her, that was all.
4    Q.  Okay.  Do you remember how you got her name?
5    A.  I believe that was on one of the statements --
6  from one of the teachers.  I think Mrs. Werling.  I believe
7  it was on one of her statements.  I believe so.  I'm not
8  sure.  But went to the home.  Spoke to her.  At that time
9  she denied any inappropriate behavior.
10    Q.  Did you talk to her?  Did you explain to her
11  parents on that occasion how you got her name and why you
12  were there?
13    A.  I believe I probably did.
14    Q.  And what was her -- do you recall her demeanor on
15  that occasion?
16    A.  Well, being a father, and being a police officer,
17  I did not believe she was telling me the whole truth at that
18  point.  In fact, I came back to the station and opened a
19  file myself, believing that some day I would have her as a
20  victim.
21    Q.  Okay.
22    A.  But I didn't talk to her until later, until her
23  investigation.
24    Q.  Okay.  And then later on, she actually did become
25  a victim, correct?

Page 19

1    A.  Correct.
2    Q.  Okay.  Your report indicates you talked to a guy
3  name J██████ P████.  Did you get his name from Stacy?  That's
4  above, that's on 1076.
5    A.  Yes, I believe so.
6    Q.  Above the --
7    A.  He was a young gentleman that Ms. Shaffer was
8  friends with.
9    Q.  Okay.  And then you spoke to someone by the name
10  of D██████ H███, H-██████  Do you remember how you got
11  her name?
12    A.  I believe she must have discussed this with her
13  father.  I believe she -- they contacted me.  That he wanted
14  his daughter to talk to me.
15    Q.  So she delivered -- she advised you that she
16  delivered letters from Yarbenet to Stacy.
17    A.  Correct.  I guess Mr. Yarbenet had made an
18  announcement in class, you know, if anyone rode a certain
19  bus or what-have-you, that he needed some messages
20  delivered.  And she raised her hand and volunteered.  And I
21  believe it wasn't until later, until it got around the
22  school, what possibly might have been going on when she came
23  forward.  My report specifically says that anyone who would
24  ride Bus 16 home from school.
25    Q.  I take it you probably never interviewed Elizabeth

Page 20

1  Yarbenet, did you, or anyone in the Yarbenet family?
2    A.  No, I did not.
3    Q.  Okay.  At Page 1082 of your report, that's where
4  you start talking about some of the other girls that you
5  interviewed.  And you say that the girls' names had been
6  provided by teachers at the Rice Avenue Middle School as
7  girls they thought the Defendant was close to.  I know that
8  Sergeant VanDamia, or Chief VanDamia now, interviewed
9  teachers at the school.  You talked to Karen Kwiatkowski.
10    A.  Correct.
11    Q.  Did you ever have occasion to talk to any of the
12  other teachers?
13    A.  I would have to really read this.
14    Q.  It doesn't indicate that you did on the report.
15  But I wonder if you did and maybe it didn't get to the
16  report.
17    A.  No, it states -- I remember, it does state in here
18  that Sergeant VanDamia had spoken to them.  And when I went
19  there the day to photograph the room, they were given to me
20  at that time to bring back to the station.  I think on the
21  second victim, I had spoken to Mrs. Werly -- or Werling,
22  because she was a neighbor to the second victim.
23    Q.  And that would be in April of 2002 when the
24  investigation first happened, or in December?
25    A.  No, it would have been the second investigation.

Page 21

1    Q.  When Leigh Ann came in.
2    A.  Correct.
3    Q.  Okay.  So when you went to videotape his room,
4  did -- for instance, you didn't talk to Ms. Seneta or any of
5  the other teachers just in passing?
6    A.  I started at 3:00.  At the time, we had 3:00 to
7  11:00 shifts.  The school was closed.  Most everyone had
8  went home except the janitors.  I believe the janitors
9  escorted me to the rooms at that time.
10    Q.  Okay.  Your statement on the last page of the
11  report, 1083, it indicates that you spoke to -- I guess
12  right at the bottom you say -- this is right at the bottom
13  1082.  "Upon interviewing the young ladies, several reported
14  that they either witnessed inappropriate contact to others
15  by the Defendant or were victims themselves.  Others
16  reported that the Defendant would make inappropriate
17  comments about their bodies.  Some had received numerous
18  cards, letters, and jewelry from the Defendant."
19        Did any of these young ladies tell you that they
20  had talked to anyone at the School District, either Gayla
21  DeMarco; or Mr. Snyder; or the assistant principal, Mr.
22  McClelland?
23    A.  No, I don't believe so.
24    Q.  Okay.  You interviewed A███ H████ and she
25  indicated that Yarbenet had made remarks about the size of

6 (Pages 18 to 21)

93a

8cd6e4f4-5737-49dc-884b-2a09ea73f1f0

Stacy S. v. Girard School District, et al.                    Amy Marie Nuzback

Page 1

```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2

 3     STACY S; and JOHN and      :
       MARY ELLEN S., on behalf   :
 4     of their daughter, LEIGH   :
       ANN S., a minor,           :
 5               Plaintiffs       :
                                  :
 6               vs.              :    Civil Action No. 04-150E
                                  :
 7     GIRARD SCHOOL DISTRICT;    :
       ROBERT SNYDER,             :    HONORABLE SEAN J. MCLAUGHLIN
 8     Individually and in his    :
       capacity as Principal of   :
 9     the Rice Avenue Middle     :
       School; and GREGORY        :
10     YARBENET, a professional   :
       employee of the Girard     :
11     School District,           :
                 Defendants       :    Jury Trial Demanded
12

13

14
               Deposition of AMY MARIE NUZBACK, taken before and
15     by Carol A. Holdnack, RPR, Notary Public in and for
       the Commonwealth of Pennsylvania, on Friday,
16     July 22, 2005, commencing at 10:17 a.m., at the
       offices of Knox McLaughlin Gornall & Sennett, P.C.,
17     120 West Tenth Street, Erie, PA 16501.

18

19     For the Plaintiffs:
           Edward A. Olds, Esquire
20         1007 Mount Royal Boulevard
           Pittsburgh, PA 15223
21
       For the Defendants Girard School District and Robert Snyder:
22         Richard A. Lanzillo, Esquire
           Knox McLaughlin Gornall & Sennett, P.C.
23         120 West Tenth Street
           Erie, PA 16501
24
                   Reported by Carol A. Holdnack, RPR
25                 Ferguson & Holdnack Reporting, Inc.
```

Stacy S. v. Girard School District, et al.                                    Amy Marie Nuzback

Page 2

1                    I N D E X
2
3    AMY MARIE NUZBACK
4        Direct Examination by Mr. Olds . . . . . . . 3
5
6
7
8    EXHIBITS:
9        Nuzback Deposition Exhibit 1 . . . . . . . . 10
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1    A M Y  M A R I E  N U Z B A C K, first
2    having been duly sworn, testified as follows:
3
4              DIRECT EXAMINATION
5    BY MR. OLDS:
6
7    Q.  Good morning, Ms. Nuzback.  How are you?
8    A.  Good morning.  Good, thank you.
9    Q.  I'm Ed Olds.  I represent Stacy S████ and Leigh
10   Ann S███████ who have sued the Girard School District and
11   Robert Snyder arising out of events concerning Gregory
12   Yarbenet.  And I wanted to take your deposition to see if
13   you had any knowledge about those events.  Okay?
14   A.  Yes.
15   Q.  For the record, would you state your full name and
16   your address.
17   A.  My name is Amy Marie Nuzback.  I live at ███
18   ██████████ in Girard, Pennsylvania.
19   Q.  Okay.  And are you employed by the Girard School
20   District?
21   A.  I am.
22   Q.  How long have you been employed?
23   A.  Nine years.
24   Q.  And where -- which grade do you teach?
25   A.  I teach sixth grade language arts.

Page 4

1    Q.  And you've been employed there nine years, so your
2    start date would be about '96/'97?
3    A.  Yes, August of '96.
4    Q.  Okay.  And do you recall whether either Stacy or
5    Leigh Ann was in your room or taught by you?
6    A.  Leigh Ann S██████ was my student in sixth grade
7    reading as well as study hall.
8    Q.  Okay.  Where is your room located in the building?
9    A.  On the north end of the building.
10   Q.  Where?
11   A.  On the second floor.
12   Q.  Second floor?
13   A.  My room number is 215.
14   Q.  Where was Mr. -- I assume that you knew
15   Mr. Yarbenet?
16   A.  Yes.  We were on the same grade level.
17   Q.  And where was his room relative to yours?
18   A.  Down the hall and around the corner, on the same
19   floor.
20   Q.  Did you have -- can you tell me what interaction
21   you had with Mr. Yarbenet.
22   A.  We had grade level meetings together on Friday
23   mornings.  We had the same lunch period, but he typically
24   did not eat lunch in the faculty room.  So, basically, grade
25   level meetings as well as faculty meetings.

Page 5

1    Q.  Did you typically eat lunch in the faculty room?
2    A.  Yes.
3    Q.  Going back to the period from 1998 to, say, 2002,
4    that time period, did you typically eat lunch with the same
5    faculty members?
6    A.  Um-hum.
7    Q.  Who else was in the faculty room?
8    A.  Sandy Donnelly.  She's the person I typically sat
9    with.  Various other sixth grade team members would come and
10   go, but we traditionally ate lunch in the faculty room
11   together.
12   Q.  Okay.  And did you socialize with Yarbenet outside
13   of the school?
14   A.  No.
15   Q.  Did you ever see him in terms of him conducting
16   classes?
17   A.  No, I never observed his classroom.
18   Q.  During the break when the students would go from
19   one class to another, would you be able to observe him from
20   your vantage point at your class?
21   A.  No.
22   Q.  And what did you know about him as a teacher?  I
23   mean, what was your impression of him?
24   A.  Very personable with students.  Friendly.  I knew
25   that he was involved in the morning news program, and

FERGUSON & HOLDNACK REPORTING, INC.
814-452-4556

95a

8b7e648a-f25d-4f81-8f3e-ade3adb9bf63

Stacy S. v. Girard School District, et al.                    Amy Marie Nuzback

Page 6

1  proctored that extracurricular. I knew that he was involved
2  with NASA, and kites, and flying, and things like that.
3      Q.  How did you know that he was involved with NASA?
4      A.  In his classroom there's a mural of the moon. And
5  he had various other models of planes and things like that,
6  that students were excited to learn about.
7      Q.  And did you ever talk to him about his NASA
8  involvement?
9      A.  Not in great detail, no.
10     Q.  In any detail?
11     A.  No.
12     Q.  Did you ever talk to him at all?
13     A.  I imagine, you know, that we had small talk before
14  and after meetings, but no private conversations.
15     Q.  Did you ever -- were you ever part of any faculty
16  conversations or did you ever hear any conversations where
17  faculty members discussed any of Yarbenet's idiosyncrasies?
18         MR. LANZILLO:  Objection to form. You may answer
19      when I object. That's just for the record.
20     A.  Okay. No.
21     Q.  In other words, did you ever hear any gossip about
22  him?
23     A.  No. I traditionally -- I tried to stay out of the
24  gossip. My sixth grade lunch group was very small. As I
25  mentioned, I had one friend who's a sixth grade math

Page 7

1  teacher. We ate together, talked about our children, talked
2  about our own personal lives. I really wasn't too up on
3  gossip.
4      Q.  Did the kids ever talk about Yarbenet?
5      A.  Other than the NASA -- NASA, you know, things that
6  he would bring in and things like that they were excited
7  about, no --
8      Q.  Did you ever hear them talk about him and his
9  having relationships with students?
10     A.  Absolutely not.
11     Q.  Did you ever see him touch a student?
12     A.  No.
13     Q.  Did you ever see him interact with students in the
14  hallway?
15     A.  What do you mean by interact?
16     Q.  Well, interact. I mean, be around students. What
17  did he do when he was around students in the hallway?
18     A.  Nothing out of the ordinary.
19     Q.  But you did observe him interacting with students?
20     A.  Speaking with them, yes.
21     Q.  Okay. Did you have any knowledge about whether
22  students congregated in his classroom?
23     A.  No.
24     Q.  Okay. You had Leigh Ann for study hall in sixth
25  grade language arts?

Page 8

1      A.  At the time it was sixth grade reading, but yes.
2      Q.  Sixth grade reading, okay. And was she a sixth
3  grader when she was in your study hall also?
4      A.  Yes.
5      Q.  Okay. What kind of student was Leigh Ann?
6      A.  Leigh Ann was a straight-A student, very
7  conscientious student.
8      Q.  And did you know whether Leigh Ann was a friend
9  with Yarbenet?
10     A.  I knew that Leigh Ann was on the TV studio team,
11  or whatever it would be called. But, yes, I knew that she
12  helped to present that. I knew this because TV
13  announcements were done on the television every morning, and
14  I observed her giving the news.
15     Q.  Okay. Did you -- did Leigh Ann leave either one
16  of your -- either your reading class or the study hall to go
17  to Yarbenet's room?
18     A.  She left my study hall. It was -- it is School
19  District or building procedure that a student is permitted
20  to leave a study hall with a pass written from the teacher
21  they're going to see. And she had passes from Mr. Yarbenet
22  to go to his room. She had to okay that with me first for
23  attendance purposes. As well as her study hall proctor, I
24  needed to make sure that she didn't have other work to do.
25         Her study hall was, I'm going to say, third period

Page 9

1  but it was early in the day. So she typically did not have
2  other homework to do. Being a straight-A student, she was
3  caught up with her work. So I permitted her to go there.
4  It was my assumption that she was going there to work on the
5  TV studio production for the following day.
6      Q.  And how did that come to be your assumption? What
7  information did you have --
8      A.  I imagine she told me that, as well as the fact
9  that I saw her giving the news each day, and so that was her
10  reason for going there.
11     Q.  Did Mr. Yarbenet ever come down to your room to
12  get Leigh Ann?
13     A.  No.
14     Q.  Now, she would have a hall pass; is that right?
15     A.  We use an agenda book.
16     Q.  Right.
17     A.  So that she would have a notebook that he would
18  have signed a pass. And I would have seen a signature. And
19  then I would have signed it.
20     Q.  Okay.
21     A.  Indicating that she had checked in with me.
22     Q.  And then were you also to keep a log of a hall
23  pass?
24     A.  Right.
25     Q.  Okay. How did you keep that log?

3 (Pages 6 to 9)

Stacy S. v. Girard School District, et al.                                     Amy Marie Nuzback

Page 10

1    A.  I had a notebook.  I have a notebook on top of my
2  file cabinet where students signed in their destination and
3  time and each day.
4    Q.  And did she go to Yarbenet's classroom each day?
5    A.  Very often she went there.  I wouldn't say every
6  day.  But I would say several times a week.
7    Q.  I want to show you a document that's been produced
8  for us.
9       (Nuzback Deposition Exhibit 1 marked for
10        identification.)
11    Q.  Can you look at that and tell me if you've ever
12  seen that document before.
13    A.  Yes, I have.
14    Q.  And what is it?
15    A.  It's our teacher handbook.
16    Q.  And how -- were these given to you at the
17  beginning of each year?
18    A.  Yes.
19    Q.  And tell the circumstances of how that happened.
20    A.  Each teacher is given a copy typically on the
21  first day of school in a packet of materials.
22    Q.  Okay.  Let me ask a question.  You say that Leigh
23  Ann quite often left the classroom to -- and you knew she
24  was going to Yarbenet's class; is that right?
25    A.  Correct.

Page 11

1    Q.  What other students did you release from study
2  hall as routinely as you released Leigh Ann?
3    A.  I'm sure that I can't remember.  But anyone who
4  had a legitimate pass.  Students would come in the room, I
5  would take attendance.  Anyone who had a pass for a
6  legitimate purpose to go somewhere who did not have other
7  work to was permitted to do so.
8    Q.  And -- well, do you recall whether -- you say
9  Leigh Ann went to Yarbenet's class frequently.
10    A.  Yes.
11    Q.  Do you recall whether any other student went as
12  frequently to any other teacher?
13    A.  I do not recall.
14    Q.  What was the -- when Leigh Ann presented this
15  pass, it would be a document signed by -- this agenda book,
16  it would be signed by Yarbenet?
17    A.  Um-hum.
18    Q.  Would Mr. Yarbenet have to say why Leigh Ann
19  should be released to go to his class?
20    A.  No.
21    Q.  The faculty handbook does have a section on hall
22  passes and procedures, right?
23    A.  Um-hum.
24    Q.  Is that right?  Under E, I think.
25    A.  Okay.

Page 12

1    Q.  And the matter under E, which I guess is the -- it
2  looks like it's the third page of this document.  The third
3  page of this document says hall passes and procedures.
4    A.  Um-hum.
5    Q.  What did you understand the purpose of that rule
6  to be, the rule governing hall passes and procedures?
7    A.  For our students' safety, so that we were all
8  aware at any time where a student was, so the office was
9  aware.  So that each teacher was accountable for where the
10  students assigned to them were.
11    Q.  Okay.  It appears that under -- there's a
12  provision here that says when teachers can release a student
13  under 4; is that right?
14    A.  Um-hum.
15    Q.  Classroom teachers, study hall teachers and
16  supervisors may at any time issue on-the-spot passes using
17  discretions for the following areas."  I'm looking at
18  Subtopic E.  It says, "Classroom make-up work from study
19  halls using advanced passes."  What did you understand the
20  language "using advanced passes" to mean?
21    A.  I understood that to mean that a teacher would
22  have to have signed that student's pass.  In other words, if
23  Leigh Ann were to have come to me and said I would like to
24  go to Mr. Yarbenet's classroom and did not have a pass
25  signed from that teacher, I would not give her permission to

Page 13

1  do so.  Because that would indicate that she didn't have
2  other work to do there.
3    Q.  Okay.  But in issuing the pass, Mr. Yarbenet
4  didn't have to explain why he was issuing the pass.
5    A.  Correct.
6    Q.  Do you recall whether he issued passes for any
7  other girls in your study hall?
8    A.  I don't recall.  There's usually a team of
9  students on the TV studio.  And I know that Leigh Ann was
10  one member of that team.  I cannot recall if there were any
11  other members of that studio in my third period study hall
12  that year.
13    Q.  What kinds of announcements did the -- were made
14  on the TV?
15    A.  Morning announcements.  As far as they did
16  weather; they did, I think, the lunch for the day; the
17  Pledge of Allegiance; any other news that would be pertinent
18  to students for the day.
19    Q.  And exactly what did you think Leigh Ann was
20  working on when you released her to go to Yarbenet's
21  classroom?
22    A.  Well, I assumed they were working on the news for
23  the next day.
24    Q.  Did you think that she wrote the script, or what?
25  I mean --

4 (Pages 10 to 13)

Stacy S. v. Girard School District, et al.

Amy Marie Nuzback

Page 14

1     A. There was written material. There were
2 backgrounds, there were backdrops, sometimes props.
3     Q. Do you know if Mr. Yarbenet had a class third
4 period?
5     A. I do not know. I assumed that he didn't because
6 he permitted her to come. And that was -- it was common
7 that sixth graders would have study halls the same time.
8 But not every teacher did. So I assumed that he didn't, but
9 I can't verify that.
10     Q. Okay. So, in other words, generally all the sixth
11 graders had third period study halls.
12     A. It was common. Because of electives like music
13 and art, that wasn't 100 percent of the time. But it was
14 common that teachers would have study halls at similar
15 periods.
16     Q. Do you know whether Mr. Yarbenet had study halls?
17     A. I -- whether he had study halls?
18     Q. Yeah, whether he was in charge of study halls.
19     A. I do not know.
20     Q. Now, did anyone ever ask to see your log? There
21 was a log kept. What happened to that log?
22     A. Well, I -- traditionally, with that log I would
23 keep it until the end of the school year and then dispose of
24 it. I can't recall if anyone took it. I don't think so.
25     Q. Okay.

Page 15

1     A. But I can't recall.
2     Q. You don't have it, right?
3     A. I do not.
4     Q. Did you have Leigh Ann for any classes after she
5 went to the seventh grade?
6     A. No.
7     Q. And you never had Stacy in a class?
8     A. No.
9     Q. Did you know Stacy?
10     A. No.
11     Q. Had you seen her on TV?
12     A. I don't know. Were you part of the news? Yeah,
13 okay. Because she wasn't my student, I may not have
14 recognized her.
15     Q. Okay. I would assume that at some point you
16 learned that Mr. Yarbenet had been either suspended or
17 arrested?
18     A. Um-hum.
19     Q. Is that right?
20     A. Um-hum.
21     Q. How did you find that out?
22     A. I think he was taken from our building, actually.
23     Q. Did you see it?
24     A. I did not.
25     Q. But you heard that he had been taken from the

Page 16

1 building?
2     A. Right.
3     Q. And did you talk about that -- at some point you
4 must have learned why he was taken from the building; is
5 that right?
6     A. Yes.
7         MR. LANZILLO: Objection to form. Go ahead.
8     Q. And can you recall how you learned that?
9     A. No.
10     Q. Did you talk with any faculty members about what
11 Yarbenet had done after he was taken from the building?
12         MR. LANZILLO: Objection to form.
13     A. I'm not --
14         MR. LANZILLO: You can go ahead and answer.
15     A. Okay.
16         MR. LANZILLO: My objections are just for the
17     record.
18     A. Okay. Did I talk with faculty members?
19     Q. In other words, was his situation a subject of
20 discussion?
21     A. Certainly. Certainly, we were aware of the fact
22 that he was taken from our building and suspended.
23     Q. Okay. And tell me what you recall hearing in that
24 faculty discussion.
25         MR. LANZILLO: Objection to form. Go ahead.

Page 17

1     A. What I recall hearing?
2     Q. What did people say? Did you say anything?
3     A. I have -- I had no firsthand information to add to
4 what happened, absolutely not.
5     Q. Did it occur to you that Leigh Ann was a victim?
6     A. No, absolutely not.
7     Q. Did you think, well, gosh, here I've been
8 releasing Leigh Ann to go to Yarbenet's science room during
9 study hall, I wonder if she was a victim? Did that occur?
10         MR. LANZILLO: Objection to form. Go ahead.
11     A. It did not occur to me.
12     Q. While you were at the school, did you ever attend
13 any training or was any training provided that dealt with
14 faculty sexual misconduct?
15     A. We -- I mean, other than teacher handbooks and
16 specific training?
17     Q. Right. On faculty sexual misconduct.
18     A. No.
19     Q. Would you have any idea what behavior to look for
20 in terms of perceiving or having a suspicion that faculty
21 sexual misconduct was occurring?
22     A. I would think so.
23     Q. What would you look for?
24     A. I would look for inappropriate touching,
25 inappropriate language. And I did not observe either one of

5 (Pages 14 to 17)



98a

8b7e648a-f25d-4f81-8f3e-ade3adb9bf63

Stacy S. v. Girard School District, et al.                    Amy Marie Nuzback

Page 18

1  those things.
2      Q.  Did you think it was appropriate that a sixth
3  grade student would spend numerous study halls with a
4  faculty member of the opposite sex in their room?
5      A.  I thought it was appropriate because she was
6  working on a school activity which was produced every day.
7  Thus, the preparation would be needed every day.
8      Q.  Did anyone from the Administration ever talk to
9  you to determine whether you had any knowledge of Yarbenet's
10  activity, his behavior?
11      A.  Personally?
12      Q.  Yes.
13      A.  No.
14      Q.  And when Yarbenet left the building when he was
15  suspended, did you have an idea -- did you learn or did you
16  have an idea who his victim was?
17      A.  No.
18      Q.  Did you ever hear students talking about who the
19  victim might be?
20      A.  No.
21      Q.  Did any of the faculty members that you knew
22  discuss with you who the victim was?
23      A.  No.
24      Q.  No one from -- and you say no one from the
25  Administration talked to you about whether you had any

Page 19

1  information.  Did anyone from the -- I take it that would
2  include that no one from the Administration -- and when I
3  say the Administration, I mean either the superintendent or
4  the principal or vice principal.  No one from the
5  Administration asked you whether you had any suspicions as
6  to whether there were any other victims of Mr. Yarbenet; is
7  that right?
8      A.  I was not singled out and called to a private
9  meeting.  I, as a member of the faculty, certainly would
10  have come forward with information and felt that anyone
11  would have if they had any.  I simply didn't have any.
12          MR. OLDS:  I don't have any other questions.
13          MR. LANZILLO:  I have no questions.  Mrs. Nuzback,
14      you have the right to review the transcript of
15      your deposition that Carol will prepare, for
16      accuracy.  You have that right.  It is not an
17      obligation on your part.  You can either review
18      it, read it and review it, make sure that it's
19      accurate, or you can waive that right.  But you
20      need to let Carol know today how you would like to
21      proceed.
22          THE WITNESS:  Okay.  I would like to review it.
23          (Discussion held off the record.)
24          THE WITNESS:  1121 Lawrence Court,
25      L-A-W-R-E-N-C-E, Girard, PA 16417.

Page 20

1
2          (Deposition concluded at 10:43 a.m.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

6 (Pages 18 to 20)