IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

STACY S.; and JOHN and MARY        )
ELLEN S., on behalf of their       )        Civil Action No. 04-150E
daughter, LEIGH ANN, a minor       )
                                   )
            Plaintiffs,            )        Jury Trial Demanded
                                   )
        v.                         )
                                   )
GIRARD SCHOOL DISTRICT;            )
ROBERT SNYDER, Individually        )
and in his capacity as             )
Principal of the Rice Avenue       )
Middle School; and GREGORY         )
YARBENET, a professional           )
employee of the Girard School      )
District,                          )
                                   )
            Defendants.            )

**PLAINTIFFS' MOTION TO AMEND THE COMPLAINT**
**Redacted pursuant to LR 5.1.1.D**

**TABLE OF CONTENTS PLAINTIFFS' MOTION TO AMEND THE COMPLAINT**

I. INTRODUCTION.......................................Page 4

    A. Municipal Liability of the School District
       and Supervisory Liability of Robert Snyder..Page 4

    B. Violation of Plaintiffs' Rights..............Page 5

    C. Evidence that Staff Reported Yarbenet's
       Inappropriate Behavior to Robert Snyder.....Page 10

    D. Evidence that Parents Reported Yarbenet's
       Inappropriate Behavior to School Officials..Page 16

        1. The Complaint of Parent, Cindy Scott.....Page 16

        2. Second Parent Complaint...................Page 18

    E. Principal Robert Snyder's Fabrication and the
       School District's Cover-Up..................Page 21

    F. Faculty Awareness and Indifference to Yarbenet's
       Misconduct and the Implication of Such Evidence
       to Show Customary Practices.................Page 25

    G. Students' Awareness of yarbenet's Relationship
       with Stacy..................................Page 32

    H. Other Instances of Faculty Sexual Misconduct
       Which Support a Determination of a Policy
       or Custom of Deliberate Indifference........Page 33

II. Legal Standards Concerning Robert Snyder's § 1983
    Liability.......................................Page 34

III. Comprehensive Explanation of the School District's
    Policy and Custom of Deliberate Indifference......Page 41

IV. Timeliness of Motion to Amend and Absence of
    Prejudice.......................................Page 45

This is the Motion of Plaintiffs, who seek leave to file the Amended Complaint which is attached hereto as Exhibit 1.

Plaintiffs seek leave to file an amended complaint. Their original complaint sets forth claims under Title IX of the Education Act as well as 42 U.S.C. §1983. The proposed amended complaint seeks relief only under 42 U.S.C. §1983.

In a telephone conference on June 15, 2005, Defendants' counsel intimated that Defendants Snyder and the School District will raise the question of whether Plaintiffs may maintain this action under both Title IX of the Education Act and 42 U.S.C. §1983. **(V-2)**[1] Defendants had not previously indicated that they would argue that Title IX subsumes the Plaintiffs' §1983 claims. However, based upon that representation, Plaintiffs will elect to file an Amended Complaint which does not advance a Title IX claim.

Hence, Plaintiffs' proposed amended complaint eliminates Plaintiffs' Title IX claim and sets forth causes of action solely under 42 U.S.C. §1983 and the Pennsylvania Constitution. There is authority for permitting plaintiffs who have been sexually abused by a teacher, as the Plaintiffs have been here, to proceed solely under 42 U.S.C. §1983. In *DiSalvio v. Lower Merion High School Dist.* 158 F.Supp.2d 553, E.D.Pa., 2001, the court held that a complaint which sets forth claims under 42 U.S.C. §1983 is not

---

[1]Reference to Exhibits are cited by letter and page number of the individual Exhibit.

preempted by Title IX, and that Plaintiffs who seek to proceed solely under 42 U.S.C. §1983 may do so.

The court in *DiSalvio* did not dismiss claims under 42 U.S.C. §1983 against the defendants, noting that the crucial consideration in the preclusion analysis is "what Congress intended." *Smith v. Robinson*, 468 U.S. 992, 1012, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984) The court in *DiSalvio* acknowledged that the "result [reached by it] would seemingly allow plaintiffs to frustrate the *Sea Clammers* doctrine through artful pleading [but observed, nevertheless, that] the lower courts within this Circuit have regularly allowed plaintiffs not specifically alleging a violation of Title IX to proceed with a §1983 claim in its stead." See *DiSalvio,* supra at 559.

Several district courts have concluded that *Pfeiffer v. Marion Cen. Area Sch. Dist.*, 917 F.2d 779,789 (3d. Cir. 1990) and *Williams v. School District of Bethlehem*, 998 F.2d 168 (3d Cir. 1993) do not preclude a plaintiff from proceeding only under 42 U.S.C. §1983 in a case involving faculty sexual misconduct.  See *Seneway v. Canon McMillan Sch. Dist.*, 969 F.Supp. 325, 330-31 (W.D.Pa.1997) (reasoning that *Stoneking,* 882 F.2d 720, had allowed plaintiff's §1983 claims to proceed because plaintiff did not also bring a Title IX claim); see also *Combs v. School Dist. of Philadelphia*, 1999 WL 1077082, at (E.D.Pa. Nov. 29, 1999) (refusing to apply *Sea Clammers* doctrine because, "while the

4

Complaint does make reference to Title IX, it is clear that Plaintiff has no intention of raising a Title IX claim.  The Complaint states a Section 1983 cause of action, and this court will treat it that way.")

Plaintiffs seek leave to file an amended complaint at this time because they believe that their claim under 42 U.S.C. §1983 is viable.  If given leave to file an amended complaint, Plaintiffs will not proceed under Title IX.  This court has determined in a similar case (*Richard P. et al v. School District of the City of Erie*, C.A. No. 03-390 Erie) that by proceeding under Title IX, Plaintiffs would be foreclosed from pursuing a claim under 42 U.S.C. §1983.  But for the fact that Plaintiffs anticipate that this court would decide in a similar fashion in this case, Plaintiffs would proceed under both Title IX and 42 U.S.C. §1983.

This motion to file an amended complaint should be granted because it is not futile, the Defendants will not be prejudiced by it, and the ends of justice will be served if Plaintiffs are given leave to file the amended complaint.

## I.   INTRODUCTION

### A.   *PLAINTIFFS HAVE SUFFICIENT EVIDENCE TO ESTABLISH MUNICIPAL LIABILITY OF THE SCHOOL DISTRICT AND SUPERVISORY LIABILITY ON THE PART OF ROBERT SNYDER*

Plaintiffs' §1983 claims posit the Girard School District permitted a practice, custom, or policy of deliberate or reckless

indifference to faculty sexual misconduct and thereby facilitated and acquiesced in the injuries to S.A.S. and L.A.S.  The claims also assert that the Defendant Robert Snyder, who was the principal of the middle school where the sexual misconduct occurred, had sufficient knowledge of the high risk of danger to L.A.S. and S.A.S. to make his inaction in the face of what he knew  reckless indifference to the constitutionally impermissible conduct of the teacher who abused S.A.S. and L.A.S.  In order to parry any contention on the Defendants' part that it would be futile for Plaintiffs to amend their Complaint and proceed solely under U.S.C. §1983, Plaintiffs outline herein the evidence that supports their §1983 claim in detail.

### B.    *THE VIOLATION OF PLAINTIFFS' RIGHTS*

The Plaintiffs, S.A.S. and L.A.S., brought this action because they were sexually abused and molested by Gregory Yarbenet, a sixth-grade science teacher employed by the Girard School District.  In 1998, S.A.S. at the age of 13 and then L.A.S., in her turn in 2000, at the age of 12, became Yarbenet's school-time girlfriend.  Yarbenet engaged in a sexual relationship with each of the girls as part of his regular school day routine.  The sexual misconduct occurred in his classroom, where he secured privacy by turning off the lights and covering the glass portion of his door with construction paper, in a storage room adjacent to his classroom, and in an audio-visual

room.  He would hug and grope them, fondling them in a sexually
aggressive manner. Eventually, when S.A.S. was 13, and in 8th
grade, Yarbenet began kissing her on her chest, stomach, arms,
ears, and neck. It was also during this period that Yarbenet
began forcing S.A.S. to hold and rub his penis until he
ejaculated. On June 1, 2000, while ostensibly helping another
teacher prepare for the 8th grade dance, Yarbenet took S.A.S. to
the TV studio, and after kissing and touching Stacy's breasts,
Yarbenet indicated that he wanted S.A.S. to perform oral sex on
him. He forced S.A.S.'s head to his waist level and placed his
penis in her mouth. **(P-10)** L.A.S. suffered aggressive sexual
touching, including repeated touching of her genital area, when
she was 12 and 13. **(See all P.)**

Yarbenet was a popular teacher in the school and well known
in the community.  He manipulated S.A.S., convincing her that his
emotional well-being was dependent on her and that she had saved
him from suicide.  He made S.A.S. and L.A.S. crave his attention
at the same time that he made them afraid of him. He convinced
them that because of his popularity and connections, no one would
believe them if they reported him.  They were unable to reveal
the abuse as long as they were under his influence. **(P-11)**
Yarbenet is currently serving an 11-22 year prison sentence for
his sexual abuse of Plaintiffs. **(See all O.)**

Yarbenet's sexual misconduct directed at the Plaintiffs

7

persisted for over the course of at least three school years, starting in February 1999 when S.A.S. was in seventh grade and continuing throughout her eighth grade year until June 2000 when she finished her schooling at the middle school. Yarbenet then began abusing L.A.S. in the late fall of 2000, during the first semester of her sixth-grade year, and continued abusing her while she was a seventh grader, until S.A.S. revealed the sexual misconduct in March of 2002 to a 10th-grade teacher who became convinced that Stacy was concealing some trauma.

The faculty sexual misconduct here does not involve isolated incidents of sexual abuse but rather a pattern of daily physical abuse. It occurred in the morning before school, throughout the school day, and after school.  School staff repeatedly brought what they considered to be obviously inappropriate conduct involving Yarbenet and S.A.S. and L.A.S. to Principal Robert Snyder's attention. **(Infra, Sec. I.-C)**  Parents also reported observing disturbing and inappropriate behavior involving Yarbenet and S.A.S. to Snyder and the school guidance counselor, Gayla DeMarco. **(Infra, Sec. I.-D)**  Walter Blucas, who was the superintendent, testified that he spoke to  Principal Robert Snyder about S.A.S. and Yarbenet and that Snyder admitted to knowing of a "close" relationship between them. **(A-12)**

Individuals who reported being disturbed by what they saw were falsely assured by Snyder that there was no problem because,

8

according to him, S.A.S.'s parents were aware of and approved of the relationship. **(Infra, Sec. I. C-D)** Therefore, according to Snyder, the School District's "hands were tied." **(C-5)** Snyder's excuses for Yarbenet's actions were not truthful, because he never spoke to S.A.S.'s parents about the reports he received. **(G-3)** Snyder's falsehoods deflected the attention of concerned third parties. They also bolstered the indifference of the faculty to the obvious danger facing S.A.S. and L.A.S., since they gave the impression that District officials had investigated the situation and been assured by S.A.S.'s parents that Yarbenet's constant attention did not present a substantial risk to S.A.S.'s safety.

Hence, middle school faculty members observed Yarbenet alone with S.A.S. and acting in a highly unusual and defensive manner on numerous occasions, yet did nothing. **(Infra, Sec. I.-C)** Moreover, faculty members released S.A.S. and then L.A.S. from the classrooms to which they were assigned on a *daily* basis to Yarbenet. Thus, even when S.A.S. was in eighth grade, and two years removed from taking Yarbenet's sixth-grade science class, her teachers would release her to go to Yarbenet's classroom, daily. **(U 2-4)** On many occasions, Yarbenet would appear at another faculty member's door and ask that S.A.S., and then L.A.S., when it was her turn to be abused, be released into his custody. **(U 2-4)** When the girls would leave their regularly

9

scheduled classes to go to Yarbenet's, they would be molested in the privacy and darkened seclusion of his classroom or the adjacent storage room.  As noted, the pattern of faculty sexual misconduct persisted over the course of three school years.

Superintendent Blucas testified that "you can close the school" as a way to stop faculty sexual misconduct. **(A-17)**  He had no other ideas.  "That's the only thing you could do to make sure it doesn't happen again." **(A-3)**  Blucas opined that expecting teachers to alert the administration to inappropriate behavior between a teacher and student would create a "Stalag 17" environment. **(A-16)** Considering the superintendent's opinion about the futility of preventing sexual misconduct against students, the School District conducted no relevant training on faculty-student sexual misconduct. **(G-14)**  The only training the faculty received focused on Title VII proscriptions. Consequently, the faculty sexual misconduct could occur day-in day-out for years. The failure to heed the signs that S.A.S. was a victim of sexual misconduct led directly to L.A.S. being vulnerable to Yarbenet's sickness. The ultimate question posed by the evidence is whether S.A.S. and L.A.S. could be molested time and time again over three years but for the Defendants' deliberate indifference.  The proposed Amended Complaint will clear the way for the jury to answer the question.  The details

of the evidence supporting Plaintiffs' claims will now be addressed.

### C.  THE EVIDENCE THAT STAFF REPORTED YARBENET'S INAPPROPRIATE BEHAVIOR TO SNYDER

There is evidence that Robert Snyder, the principal, was repeatedly advised that there was something wrong with the way Yarbenet was treating S.A.S. Several individuals have testified that they apprised Snyder of their concern that there was an improper, inappropriate, and dangerous relationship between the Defendant, Yarbenet, and S.A.S. and L.A.S.

For instance, two school aides, Karen Kwiatkowski and Kim Jenke, have testified that they reported what they believed to be disturbing and suspicious conduct on the part of Yarbenet. **(See all B and all C.)**

Kwiatkowski was a hall monitor and teacher's aide, and she frequently observed Yarbenet engaging in what she thought was inappropriate conduct. Kwiatkowski testified that she repeatedly found Yarbenet alone with S.A.S. and then L.A.S.[2] She testified that she knew something was wrong and reported her observation to Principal Snyder, Assistant Principal Gregg McClelland, and Assistant Principal Michael Hahesy. "I told them a lot of times that I thought what he was doing was inappropriate. Kind of had

---

[2]The sexual misconduct occurred, in part, because Yarbenet was permitted to be alone with S.A.S., and then L.A.S., at various times during the day, day in day out.

11

a gut feeling about him.  That his association with girls and the number of times that he was associated and what he was doing was wrong. Was not right." **(B-15)** Kwiatkowski also said, "Each time I would see him do something inappropriate I would tell my supervisor.  If it wasn't Bob, it was Mr. McClelland. If it wasn't Mr. McClelland, it was Mr. Hahesy. You know, it's not that I observed all these things and told nobody." **(B-16)**

Kwiatkowski confirmed she told Snyder about seeing Yarbenet and S.A.S. alone in Yarbenet's room:

Q    I think that you testified that you did observe
     S.A.S. alone in the room.

A    Yes.  I can picture her sitting at Yarbenet's
     desk, and I think each time that's where I saw
     her, at his desk.

Q    And these would be times when she was alone there?

A    Yes.  Or Yarbenet was maybe around back in his
     storeroom/storage area.

Q    But when I say alone, there weren't other
     students.

A    No, no other students, just S.A.S.  And I would
     always question her as to what she was doing
     there.

Q    Did you ever tell Mr. Snyder about those
     occasions?

A    Yes, I did.

Q    And do you recall what he said?

A    He said he would check into it.  **(B-30 and B-31)**

Kwiatkowski also testified that she jokingly remarked to Snyder, on one occasion, when they were watching Yarbenet and S.A.S. walk home together after school, "There goes Yarb with his girlfriend." **(B-13)** She added, "I even made that comment to Bob one time when we were standing there watching. And he says, um-hum." **(B-13 and B-14)**

Kwiatkowski also testified that she observed Yarbenet with "his arm around L.A.S.'s shoulders. And he kissed her on top of the head" **(B-10)** in the hallway. She noticed that L.A.S.'s "face just got red." **(B-12)** Kwiatkowski said she "was kind of shocked to see him do that." **(B-12)** Kwiatkowski stated that she told Snyder about this, "the same day it happened, whatever day it was." **(B-22)** "Right after it happened. Right after I went back down to the office....Told him. I just saw Yarbenet with his arm around L.A.S. and kissing her on the top of the head." **(B-20)** Snyder would simply assure Kwiatkowski on these occasions that he would look into it. However, he never did.

Kwiatkowski also reported Yarbenet's harassment of another girl, ███████. She told Snyder that she saw Yarbenet "look ███████ up and down."

> I said to him, now I know something is going on with
> Yarbenet, I just saw him look ███████ ... up and down,
> staring at her breasts, looking at her physical
> attributes...Looking at her body, I guess I said to
> him. **(B-23)**

Once again, Snyder did nothing.

13

Another aide, Kim Jenke, testified that she "observed some things that made me feel uncomfortable at the time." **(C-2)** Jenke stated that her "biggest concern was when everyone else would leave the video studio, and Greg and S.A.S., which I did not know her name at the time, would be in the studio alone and the door would either be closed completely or ajar a small amount." **(C-2)** She observed this situation "several times." **(C-2)** She knew they were alone, because she "actually saw them coming out alone at one point." **(C-2)** She also was concerned because she would see "him [Yarbenet] several times watching her walk down the halls, going up staircases. And just always seemed to be watching." **(C-2)** Jenke was disturbed about the way Yarbenet looked at S.A.S. Jenke stated that "it's just a sick feeling that I got. And it was just –- it's not really something that you can describe... It was my feeling that I got in the pit of my stomach knowing that there was something amiss." **(C-3)** Jenke testified that she spoke to the other aides about this **(C-3)** and "all of us felt uncomfortable with his look. He just had a demeanor about him that made us all uncomfortable." **(C-3)**

Jenke affirmed that "I went to Mr. Snyder about it." **(C-3)** She related that when she spoke to Snyder, she told him that "I had seen S.A.S. and Greg come out of [the TV studio]... it was weird, a teacher should not be doing that.  And then I told him

14

about observing how Greg would watch her, and how it made me feel. And he told me to write it all down." **(C-3,5)**

Jenke did reduce her observations to writing as Snyder requested, but the matter went no further. The School District will not produce Jenke's written complaint. Snyder feigns not to remember that Jenke ever told him about her concerns or wrote a paper.[3] **(G-15)**

After writing her observations and giving the report to Snyder, Jenke felt relieved and that it was out of her hands. **(C-5)** However, some time later, Jenke saw S.A.S. and Yarbenet at a Wal-Mart. "It was just the two of them." **(C-5)** She says that she went "to Mr. Snyder again." **(C-5)** According to Jenke, Snyder told her "that he had talked with the mother. And that she had told him that Greg was mentoring S.A.S., and that she was well aware of their relationship and did not have a problem with it... And he said the School District -- their hands were tied if the mother did not have a problem with it." **(C-5)**

Jenke said that "this went on for the two years that I remember being in this homeroom... it did continue." **(C-5)** Jenke also stated:

> When I talked to Bob Snyder later on, he did tell me
> that they did go to church together.[4]  Because I did

---

[3]Jenke cannot find the statement, either. (**C-5**)

[4]The assertion that S.A.S. attended Yarbenet's church, Jehovah's Witness, was not true either.  It was a belief

> express to him that this was a big concern of mine... I
> was not comfortable with it at all.  And that's when he
> told me that it was out of School District's hands
> because the parents had said he's mentoring her, they
> go to church together, and that they're good friends.
> **(C-6)**

Thus, according to Jenke, Snyder deflected her concerns by

assuring her that S.A.S.'s family approved of what was going on.

As will be discussed below **(infra, Sec. I.-E)**, Snyder never

talked to S.A.S.'s parents.  His explanation to Jenke was a sop.

It could be inferred that Snyder deliberately steered persons who

were concerned about what they saw, away from the horrible events

which were occurring.  By ignoring the report of misconduct and

failing to conduct even a minimal investigation, Snyder

deliberately allowed the misconduct to continue.  A jury could

conclude that the injury to S.A.S. and L.A.S. flowed from

Snyder's deliberate indifference to the risk of faculty sexual

misconduct.


### D.  *KNOWN COMPLAINTS OF PARENTS WHO REPORTED SUSPICIOUS CONDUCT TO SNYDER OR OTHER SCHOOL OFFICIALS*

It appears that two parents observed and reported disturbing

and inappropriate behavior on Yarbenet's part while chaperoning a

field trip.[5]  Yarbenet and S.A.S. spent the entire day together

_____

shared by others, showing the pervasiveness of the cover-up
meant to explain Yarbenet's closeness to S.A.S. **(C-6)**

[5]Cindy Scott has testified that she only had conversations
with the guidance counselor, Gayla DeMarco.  **(D-5)**  Apparently,
another parent was also disturbed enough by Yarbenet's conduct on

16

and acted as though they were flirting or that they were boyfriend and girlfriend.  S.A.S. participated in the field trip as a student council member.  Yarbenet was apparently a chaperone.

### _____    1.  **The Complaint of Cindy Scott**

One of the parent/chaperones, Cindy Scott, reported the inappropriate conduct, at lunch, to the middle school guidance counselor, Gayla DeMarco, who also was a chaperone on the field trip.  (**D-5**)

Scott remembers that she saw something that "concerned me to the point that I felt I needed to talk to somebody about it.  I felt that [Yarbenet and S.A.S.'s] behavior -- his behavior with her, their behavior together was not appropriate for a student and a teacher... they sat together on the bus.  I kind of kept an eye, because kind of had a -- you know, a red flag.  And so I kept an eye during the day." **(D-3)**  She said that she first observed the disturbing behavior on the way to the nursing home. Scott said "it wasn't just that they were sitting in the same seat. It was more than that... It was not your normal student/teacher talking interaction. It was more of, like I said, a flirting-type thing.  Just a close -- that was beyond what it

_____

the trip to telephone the vice principal, Greg McClelland.
**(Infra, I.-D.2)**  McClelland did not recall the name of the parent who spoke to him by phone.  Therefore, the assertion that two parents were disturbed enough to report the conduct.

17

should be." **(D-4)**  Scott didn't recall "any physical touching"
but she did note "a lot of closeness in their talking, and almost
like a flirting back and forth, I guess you would say. And they
were together most of the day." **(D-3)** Scott "just didn't feel it
was appropriate behavior." **(D-3)**

Scott was disturbed enough by the conduct to talk about it
with Gayla DeMarco, the guidance counselor, at lunch.  DeMarco,
another chaperone, had a ready justification, because she
informed Scott that "Mr. Yarbenet was a family friend, and
...they knew each other outside of school... That might explain
their closeness, that they were friends, friends of the family
and he was not a traditional teacher." **(D-5)**[6]  DeMarco's facile
rationalizations did not convince Scott, however. "I again said
to her, I just feel that there is more than a healthy
interaction. And I remember saying, I would not want one of my
daughters to be that friendly with a man even it was a family
friend." **(D-6)**

Gayla DeMarco admits that she knew Cindy Scott, but denies
having any recollection of "Ms. Scott bringing [to her] attention
conduct involving Mr. Yarbenet and S.A.S. that she thought was

---

[6]That DeMarco's rationalization mirrored Snyder's permits
the inference of widespread knowledge on the part of School
District officials and employees of the questionableness of
Yarbenet's relationship with S.A.S.

inappropriate." **(E-3)**[7]   As is the case of Snyder's amnesia

concerning Jenke's report to him, DeMarco asserted she had no

recollection of Scott pointing out Yarbenet's disturbing conduct.

However, Scott's evidence suggests a pattern of deflecting

concerns of third parties.   In other words, DeMarco gave the same

rationale or explanation for Yarbenet's inappropriate behavior to

Scott as Snyder had to Jenke.  The existence of a pattern of

school officials attempting to throw concerned third parties off

scent is suggestive of both knowledge of the risk of harm and a

deliberate indifference to the consequences of that risk.


              2.  **The Second Parent Complaint**

     Vice President McClelland took a separate call from another

parent who was at the "Pleasant Ridge Manor in the spring... [of]

2001, it was a field trip, some of our students had went down

there."[8]  McClelland reported that the parent felt uneasy seeing

Yarbenet and [S.A.S.] sitting away from the students at a picnic

table during lunch that day... she just felt uneasy because they

---

[7] Another parent, ████████████████ has provided an affidavit
that she met with Gayla DeMarco in an attempt to report
Yarbenet's abuse of a foster child who lived with her, and whom
she later adopted.  Counselor Gayla DeMarco denied recalling that
████████████████ came to her to report that Gregory Yarbenet was
sexually abusing the foster child.  **(E-3)**

[8] Cindy Scott denies talking to McClelland **(D-8)**, and
McClelland could not recall which parent spoke to him.
Therefore, it appears there were two different individuals who
were concerned enough about the conduct to report the conduct to
school officials.

were sitting side by side and talking very close and she thought that it was strange to see." **(F-3)**   McClelland clarified that the parent was upset "because [S.A.S. and Yarbenet] were sitting side by side, ... she thought it was strange that he was sitting that close. **(F-4)**

Unlike the instance of Ms. Jenke's report, when he did no investigation, Snyder acknowledged that on this occasion, he at least "met [with Yarbenet] after the Pleasant Ridge field trip... [because] McClelland had a report that Greg and S.A.S.... like sat separate from the group at lunchtime on the field trip... So we talked to Greg about that too." **(G-6)** Snyder apparently knew from the report that Yarbenet and S.A.S. "were always together during the day." **(G-7)**  Snyder recalled, generally, that Yarbenet explained the bizarre and inappropriate behavior by suggesting that "S.A.S. and her family had helped him when he had had his depression and that they were just very close family friends and they were just sitting together." **(G-8)**

McClelland had a clear, more specific recollection of the meeting. He stated that Snyder said "we need to get Mr. Yarbenet down here and have a meeting right away, and we did." **(F-3)** At the meeting, "Mr. Snyder explained to him that [McClelland] had received a phone call about the class trip. ...I believe he asked me to tell Mr. Yarbenet what the lady had said and he wanted Mr. Yarbenet's explanation of what happened."  **(F-3)** McClelland

20

testified that Yarbenet said that "he and the Shaffer family were friends outside of school and S.A.S. was like a -- **he considered her a confidant. She helped him get over the death of his first wife, she listened to him as he spoke about it, and that's what he was doing that day."** **(F-3)** (emphasis added)

McClelland reiterated that Yarbenet stated "basically that S.A.S. was **his close friend, and she just listened to him when he was going through a grieving process about his wife.**" **(F-3)** (emphasis added)

When asked if he thought that Yarbenet's story seemed preposterous, McClelland admitted, "I wouldn't have done that. I wouldn't have had a young student be a confidant to me, no." McClelland also acknowledged that the explanation for the conduct was "definitely different." **(F-3)** McClelland opined that it was strange that Yarbenet would "talk about a 12 or 13 year old girl being his confidant for psychological problems." **(F-4)** Snyder apparently had no problem believing Yarbenet, however.

McClelland also said that Snyder "told Mr. Yarbenet... he should be careful because the people that don't know or you know, S.A.S., it does not look good and he should not put himself in that position." **(F-4)** Snyder admitted he did not talk to anyone else about the incident aside from Yarbenet. **(G-8)** McClelland acknowledged that he didn't call S.A.S.'s mother or father and Snyder did not tell him to do it." **(F-4)**

Therefore, the only investigation conducted by Snyder in response to concerns that his conduct was inappropriate involved allowing Yarbenet to offer an outlandish explanation for his closeness to a student who was young enough to be his granddaughter.  Snyder accepted Yarbenet's explanation that he was only using S.A.S. to get over the grieving process of his long dead first wife.  Once again, concerned parties were misled. Nothing was done except to warn Yarbenet to not be so transparent about his offending behavior.

### E.   *SNYDER'S UNTRUTHFULNESS  AND THE SCHOOL DISTRICT'S COVER-UP*

Snyder claims he had no clue of improper conduct.  However, the superintendent, Walter Blucas, testified that Snyder was cognizant of a "close relationship" between Yarbenet and S.A.S. Snyder told him, "they have a close relationship and mom and dad are alright with it."

> Q    So Mr. Snyder told you that he was aware that there was a close relationship between Yarbenet and S.A.S. and that he had talked to the parents about it; is that right?
>
> A    And that the parents were okay with it.  **(A-13)**

Snyder, therefore, cannot now claim that he was unaware of the existence of a disturbing and unusual relationship between Yarbenet and S.A.S.  But he did nothing to investigate whether

22

S.A.S. was in danger by virtue of that relationship, in the face of repeated expression of concern by third parties.  As noted, when Kim Jenke reported her belief that Yarbenet's relationship with S.A.S. was improper, she was told "the school district hands were tied" because S.A.S.'s parents approved of the relationship. DeMarco, the school's guidance counselor, fed the same line to Mrs. Scott, when Mrs. Scott became upset about the way Yarbenet was acting with S.A.S. When the superintendent was questioned about Snyder's response to Jenke's concern that "Yarbenet and S.A.S. were alone in the studio with the door closed," he asserted that Snyder's response was "totally appropriate" -- because he assumed that Snyder's response involved "addressing a concern to the parents." **(A-11)**  In other words, according to Blucas, Snyder even assuaged his concerns by assuring him that the "close" relationship, which made so many uncomfortable, was okay because S.A.S.'s parents approved.

But Snyder never talked to S.A.S.'s parents.  When asked whether he ever talked to Mrs. S. to see whether it was okay with her for Yarbenet to be alone with S.A.S.," he acknowledged that he had not. **(G-3)** He never talked to S.A.S.'s father, either.

Q     Did you ever talk to S.A.S.'s father?

A     No.

Q     Did you ever talk to L.A.S.'s mother or father
      about whether it was appropriate for her and
      Yarbenet to be alone?

A     No.  **(G-3,4)**

23

In another segment of his deposition, Snyder acknowledged that "I have not met with S.A.S.'s parents." **(G-8)**

The implication of his untruthfulness to those individuals who brought their concerns about S.A.S.'s safety to his attention is obviously profound. Blucas' rhetorical remark -- "How would he know that [that S.A.S.'s parents approved of the close relationship] if he hadn't talked to them?" **(A-12)** -- frames the stark question. Why would Snyder not be truthful about what he knew, when third parties expressed concern that S.A.S. was in danger. Snyder's resort to cover-up to sidetrack the concerns could certainly support an inference that he actually knew of the danger, but was deliberately indifferent to it. In fact, one could infer that Snyder, like Yarbenet, wished to conceal the risk of danger.

When asked to consider the hypothetical, Blucas had this to say:

> Q    What if he didn't talk to the parents, would your
>      answer change if, in fact, he didn't talk to the
>      parents?
>
> A    That's not the case, he talked to the parents.
>
> Q    Well, the case is that he told Ms. Jenke that he
>      talked to the parents, it hasn't been established
>      that he talked to the parents. And so my question
>      is:  What if he did not, in fact, talk to the
>      parents?
>
> A    I believe he did talk to the parents because he
>      told me the same response...  I remember talking

> to Mr. Snyder about it casually...and he said,
> yeah, they have a close relationship and mom and
> dad are alright with it." **(A-11,12)**

Blucas couldn't focus on the question, because if it is accepted
that Snyder was deliberately trying to put people off by
minimizing their concerns, he was, in essence, a participant in
Yarbenet's misconduct.

A jury could infer from the fact that Snyder repeatedly
provided false information to persons who were concerned about
S.A.S.'s victimization by Yarbenet, that he knew or should have
known that something was wrong, but nevertheless felt compelled
to deter others from uncovering Yarbenet's misconduct.  The
consequence of Snyder's false assurances was not only to continue
the risk to S.A.S.'s safety.  Such false assurances would likely
deter others from their vigilance, as well.  He convinced them
that their concerns did not have any foundation.

When Snyder misled Kim Jenke, he did so by falsely
explaining that S.A.S.'s parents were aware of the close
relationship and condoned it.  This cover-up would also greatly
lessen the chances that a teacher, possibly in a position to
rescue one of these girls, would investigate the matter any
further.  Because of Snyder's complicity the possibility that Kim
Jenke or others would continue to press their concerns was
minimized.  When Snyder explained to her that the School
District's "hands were tied if the mother did not have a problem
with it," **(C-5)** Snyder was suggesting some type of legal or

rule-based restriction on further investigation. Without further explanation, such a statement from a high-ranking school official would give the impression that members of the faculty and staff were somehow limited (their "hands were tied") as to what could be done. As will be discussed below in the portion of this motion which addresses the legal import of the evidence, such conduct would support supervisory liability under 42 U.S.C. Section 1983.

### F.   FACULTY AWARENESS OF AND INDIFFERENCE TO YARBENET'S MISCONDUCT AND THE IMPLICATION OF SUCH EVIDENCE TO SHOW CUSTOMARY PRACTICES

The evidence gathered to date also shows that there was widespread knowledge throughout the school that there was some kind of extraordinary relationship between Yarbenet and S.A.S. Several faculty members have acknowledged that they came upon Yarbenet and S.A.S. in situations which were highly questionable. They each said they would not act in that fashion with their students, yet they claim they did not report Yarbenet to Snyder. This reaction can be seen as evidence of a policy or custom of deliberate indifference.

For instance, teacher Robin Seneta testified that she saw Yarbenet alone one-on-one with S.A.S. numerous times **(H-4)** These occasions would be "any time of the day, before homeroom, sometimes after school. ...She often would be coming from her...study hall in his classroom while he had class."  She would

see him one-on-one "sometimes in his classroom, sometimes in the back room, sometimes in the hallway." **(H-5)**

Seneta testified that after encountering S.A.S. and Yarbenet alone, Yarbenet would spontaneously try to justify the situation by stating "they were friends outside of school." **(H-6)** In other words, after Seneta would barge in on Yarbenet's trysts with S.A.S., he "would approach [her] shortly after." **(H-26)** "He would tell me how close their family was with her family. He would tell me that they do things with the families together on the weekends. He had mentioned that they went -- several things. I can't remember a specific trip they went on -- not a trip." **(H-6)** "It would be something that he would volunteer." **(H-6)** Seneta admitted that she wasn't social friends with Yarbenet but it never occurred to her to "wonder why is he telling [her] this?" **(H-7)**

Seneta also testified that she observed Yarbenet and S.A.S. "in the back room alone together" over "maybe year and a half." **(H-9)**[9] Seneta also noted that there were times when she would enter the storage room when the door wouldn't open easily. **(H-12)**

_____

[9]There was a storage room, approximately 10' x 12', between Yarbenet's classroom and Seneta's classroom. Yarbenet would take S.A.S. into this room and molest her. Seneta repeatedly discovered Yarbenet alone with 13 year old S.A.S. in the room, yet never felt a need to do anything about the behavior. Seneta has no explanation for why she would not report the extremely significant behavior.

Seneta stated in a statement that she wrote for the police that she considered the relationship between Yarbenet and S.A.S. to be

> an inappropriate teacher-student relationship... By this I meant that I found it odd on several occasions to find them conferring, or meeting behind closed doors before or after school in the room that connects both his and my room.  I also discussed the fact that although I did find them in these uncomfortable situations, that I never witnessed or believed that there was any physical inappropriateness involved.  Mr. Yarbenet always seemed to justify these actions by explaining that the families were close and that they were good friends. **(H-15,16)**

Seneta considered it inappropriate because he "would put himself in a situation [she] wouldn't."  She admitted that it was odd for them to be in the storage room. **(H-18)**  Seneta said that when she came upon them, they would be "standing side-by-side."  Seneta admitted that she felt uncomfortable when she walked in on them. **(H-24,25)**  In spite of repeatedly walking in on Yarbenet and S.A.S. in a storage room, Seneta apparently felt no compulsion to save S.A.S., and according to her, never reported her observations, until she was questioned by the police.

Another science teacher, Linford Manross, also admitted that he entered Yarbenet's classroom when Yarbenet was alone with a female student.  It was S.A.S.

> I was looking for equipment to set up for something, test tube beakers or something, I stepped into his classroom, and I can't even tell you who the person was now, they were in the back of his room.

Manross admitted it was a female, that the lights in the classroom were off, that "Mr. Yarbenet and the student were in

28

the back of the room, I was not clear as to what they were doing... I just stepped in to grab some glassware, run in and out."  When asked if he felt Yarbenet was uncomfortable, he said "Yeah...Just a startled surprise, I guess, on his part. Basically, I wasn't expecting anyone to be in there and I just stopped to grab some equipment."  Manross didn't think anyone was in there because the lights were off.  He said that he thought Yarbenet was startled, "I think it was a startled reaction, yes." **(I-3)** Manross also stated that at one point, he saw Yarbenet "standing very close with his arm around somebody [female student]." **(I-2)** This was in the hallway outside of Yarbenet's door. Manross felt no need to report anything because he "saw nothing overtly that would put a child in danger that I would be required to report. I just saw things that each teacher has their own styles and that would not be my style." **(I-5)**

Mary Werling is another teacher who was aware of misconduct. Werling testified that she saw Yarbenet with his arm around S.A.S.'s shoulder. **(Q-5)** Werling was also, apparently, a facilitator in Yarbenet's abuse of S.A.S.  When S.A.S. was in eighth grade, Werling allowed Yarbenet to take her out of her classroom every Wednesday. Werling was clearly suspicious, because she testified that she would ask Yarbenet, "Why does she have to work over there [in his classroom] on the computer. He would say, well, she's got it all on the disk and/or she's got it

on the hard drive, and I don't know what excuse he gave, but it was something that -- I don't know that much about computers, so it was something that I believed." **(Q-4)** Nevertheless, she continued to deliver S.A.S. to Yarbenet.

Werling wanted to check on S.A.S. "to make sure she was working on her topic because she wasn't making a lot of progress on it." **(Q-3)** However, every time that Werling went to retrieve S.A.S., she would be frustrated because "when I would go to try to check on S.A.S., I couldn't get in [Yarbenet's] door." **(Q-3)**

Q    So the door would be locked?

A    Yes.

Q    The window would be covered?

A    Yes.

Q    Would you knock on the door?

A    Yes.

Q    And nothing would happen?

A    Nothing. Nothing. And so, I think if she's upstairs in that TV studio, I can't leave my class and go up there, but I could run across the hall, which I wasn't even supposed to be doing, so I couldn't spend any time trying to find out where she was. **(Q-3,4)**

The fact that L.A.S. was likely also a victim of Yarbenet had not gone unnoticed by other faculty members. Mary Werling, who was interviewed by the police immediately after Yarbenet's suspension, suggested that they contact L.A.S. and her family,

since the tracks of Yarbenet's conduct had been so obvious.[10] **(Q-6)** The fact that Mary Werling was able to identify Yarbenet's next victim, after S.A.S. left to go to the high school, suggests that Yarbenet's conduct was brazen and open enough that it was obvious to those who cared to see it. Yet it was never reported or stopped.

Karen Kwiatkowski also testified that at least one teacher confided a story about:

> ...Yarbenet and S.A.S. at the eighth grade dance, and how he was very involved with the group that was preparing for that eighth grade dance. And she had never seen that before. And he was always with S.A.S., and was there helping to decorate.
>
> And at one point in time, one evening when they were decorating the cafeteria for that dance, took S.A.S. and went up to the TV studio with her. And she was very suspicious about that having occurred, whether -- you know that the fact that he had taken her up there to the TV studio alone. And Yarbenet said it was to get her book bag and her books so she that she could go home. **(B-36,37)**

The teacher, Linda Tucci, wrote a report for Snyder after S.A.S.'s disclosure and confirmed she was aware that S.A.S. and Yarbenet had left the dance early and were alone in a deserted part of the school. **(R-2)**

---

[10] The police did visit L.A.S. in March of 2002. Even though Yarbenet had been suspended and was gone from the school, L.A.S. was unable to admit to them that she had been a victim. It took her another 8 months of holding what had happened to her inside. She did not reveal Yarbenet's abuse of her until December 2002.

The incident at the dance is crucial. While Yarbenet and S.A.S. were in the TV studio, away from the other students, Yarbenet was forcing 13-year-old S.A.S. to perform oral sex.

Apparently, none of the teachers took any action in spite of their awareness of Snyder's inappropriate conduct. A jury could find an indifference that was deliberate and which was a product of the School District's custom and practice of providing no training on faculty sexual misconduct and being indifferent to the risk that faculty sexual misconduct posed. No teacher was able to say they received training about the dangers of faculty sexual misconduct.


### G.   STUDENTS' AWARENESS OF YARBENET'S RELATIONSHIP WITH S.A.S.

Additionally, there was widespread knowledge among the students that there was something going on between S.A.S. and Yarbenet.

The middle school students who attended Rice Avenue Middle school in 2000 and 2001 were quite cognizant of  the fact that Yarbenet's relationship with S.A.S. was not simply that of a mentoring teacher and student.  Those students a year behind S.A.S. report that S.A.S., in 7th grade at the time, would casually enter Yarbenet's room during their 6th grade science class.  She and Yarbenet would repair back to the storage room, while students made jokes about what "Yarb and his girlfriend"

were doing. Her yearbook after her seventh-grade year is riddled
with comments about her being Yarb's girlfriend and spending time
with Yarb and even a comment addressed to "Mrs. Yarb."[11] **(See N-
1-3)** Other 8th grade students noticed the obvious fact of S.A.S.
routinely leaving class with Yarbenet. Hence, the knowledge of
the improper relationship between S.A.S. and Yarbenet was
widespread among students at the school.

### H.   OTHER INSTANCES OF FACULTY SEXUAL MISCONDUCT

There is evidence of a practice or custom of failing to take
reports of Yarbenet's sexual misconduct seriously. At least one
parent of a student accompanied her daughter to report Yarbenet's
sexual misconduct to the guidance counselor, Gayla DeMarco,
before Yarbenet molested S.A.S. and L.A.S. Parent ████████
states in an affidavit that when she discovered that Yarbenet was
engaging in sexual misconduct with her foster child, she and the
girl reported the misconduct to De Marco. In their very brief
meeting, De Marco claimed that the girl was "nothing but a liar"
and an attention-seeker. **(See all of M.)** DeMarco denies that the
conversation ever occurred.  Similar to DeMarco's inability to
recall her conversation with Cindy Scott, the ████████ meeting
is another instance of De Marco failing to recall reports of
Yarbenet's misconduct.

---

[11] Yarbenet was referred to as "Yarb" or "Yarbie" by his students.

There was at least one other instance of ignored faculty sexual misconduct which occurred at the same time that S.A.S. was being molested. Sixth-grade students at the middle school repeatedly observed a teacher, Anthony Verga, viewing pornographic material on a computer during classes. **(See all of J.)** Students who reported this to DeMarco were told to keep it to themselves. They spoke to Snyder, and he told them not to make a big deal out of it. When one of the parents finally found out that her daughter had seen a teacher looking at pornography at school and had been told not to tell anyone, she went first to Snyder, who assured her that there was not a problem, then to the Superintendent, Walter Blucas, who dismissed her concern, and then to the school board. **(See all of S.)** Other parents likewise went to the school board, and only when the media became involved did the School District take steps to remove the teacher.

In short, there is evidence of a custom and practice of ignoring faculty sexual misconduct. All of this evidence supports Plaintiffs' §1983 claim.


## II. *THE LEGAL STANDARDS INSOFAR AS SNYDER'S §1983 LIABILITY IS CONCERNED*

It seems evident that the evidence recited above should convince the court that it would not be futile for the Plaintiffs to file an amended complaint asserting a cause of action under 42 U.S.C. Section 1983. The evidence suggests that a jury could

find supervisory liability on Snyder's part because he not only ignored reports of wrongdoing, he actually deflected those who made reports with false assurances that there was nothing for them to be concerned about.

In *Stoneking II*, the court found a cause of action based upon the supervisory defendant "adopting and maintaining a practice, custom, or policy of reckless indifference to instances of known or suspected sexual abuse of students by teachers, in concealing complaints of abuse, and in discouraging students complaining about such conduct...." *Id. at* 724,725. The court asserted that this theory was "not respondeat superior in another guise, but an assertion of liability against the individual defendants based on theories recognized in line of Supreme Court cases." *Id.* at 725.

The present factual matrix is not unlike that which led to the holding of *Commonwealth v. Porter* 659 F.2d 306,309 (3d Cir. 1981), a decision which the *Stoneking* majority relied upon.  In *Porter,* the charges were that a chief of police "received complaints about the conduct of [an] officer but took no steps to suspend, transfer or otherwise limit the officer's activities; publicly condoned the act of the officer; and attempted to intimidate persons who complained about his conduct." *Id.* at 729. The ultimate holding of *Stoneking II* relative to the question of qualified immunity was that it "was clearly established law

35

that... officials may not with impunity maintain a custom, practice, or usage that communicated condonation or authorization of assaultive behavior. *Id.* at 730.   Here the case is that Snyder consistently ignored warning signs of Yarbenet's misconduct.

In this respect, the holding of the  case of *Baynard v. Malone*, 268 F.3d 229 (4th Cir. 2001) is instructive.  In *Baynard*, a principal received a warning from a student who claimed that he had been sexually assaulted 15 years earlier. The student warned the principal that the teacher "was a pedophile and advised her to watch out for certain behavior by [the teacher] such as spending extra time with students." *Id.* at 233. On one occasion, after that warning, the school librarian entered the offending teacher's classroom and saw a student sitting on the teacher's lap.  A short while later, another teacher told the principal that a neighbor had informed her that the teacher abused children.

Only after this last report did the principal inform an assistant superintendent, Beckhoff, of the charges of faculty sexual misconduct. Beckhoff conducted an investigation and concluded that the teacher was a threat to students and attempted to report the teacher to the Child Protective Services in the police department.  Since the student who advised the principal of the sexual assault 15 years earlier was not interested in prosecution, the police dropped the case. Eventually the teacher

36

was fired.

The student seen on the lap of the teacher by the librarian filed a lawsuit against the school district and principal. The court found that the principal had actual or constructive knowledge of a risk to the abusive teacher's students. It found that the principal knew that one student "claimed to have been abused by" the teacher (*Id.* at 235), that the librarian had observed the plaintiff "sitting on Lawson's lap in a manner Newman believed to be inappropriate; that [the teacher] was very physical with his students often putting his arm around them in the hall; and that [the teacher] frequently took students on camping trips at which no other adults were present..." *Id.* The court found that based upon these facts a "reasonable jury could conclude from the evidence presented that the conduct of which [the principal] was aware provided her with at least constructive knowledge of an unreasonable risk of constitutional injury to [the teacher's] students." *Id.* at 235.

The Fourth Circuit also examined the principal's challenge that his actions "although inadequate to prevent or stop the abuse of" the plaintiff, did not "evince deliberate indifference to the risk of constitutional injury to [the teacher's] students." *Id. at 236.* Noting that "deliberate indifference is a very high standard," the court found that "a supervisory official who responds reasonably to a known risk is not deliberately

indifferent even if the harm is not averted."  Nevertheless, based upon this standard, the court concluded that:

> a rational jury could conclude that [the principal] was
> deliberately indifferent to the risk that [the teacher]
> was abusing his students, particularly [the plaintiff].
> Even if [the principal's] response to the initial
> report from Leckie in the Spring of 1990 was
> reasonable, a factfinder could reasonably infer that
> Malone's failure to respond to mounting evidence of
> potential misconduct by Lawson exhibited deliberate
> indifference.  In particular, [the principal's]
> desultory efforts at 'monitoring' [the teacher] support
> the verdict. *Id. at 235.*

A similar conclusion was reached by Judge Lee in the case of *Seneway v. Canon McMillan School District*, 969 F.Supp. 325 (W.D.Pa 1997).  Citing *Stoneking,* 882 F.2d at 725, Judge Lee found the basis for deliberate indifference in the fact that there were:

> numerous allegations that individual defendants had
> knowledge of instances of Neuman's inappropriate
> behavior with minor female students before the time at
> which the plaintiff was allegedly abused.  There are
> also various allegations that no effective action,
> disciplinary or otherwise, was taken by these three
> defendants, that they concealed from the parents of
> other female students and various public officials,
> including the police department, the various reports
> and accusations made against Neuman, and that they
> failed to properly and vigorously investigate various
> reports of sexual abuse of female students prior to
> plaintiff's complaints.  *Seneway*, 331,332.

Particularly important to the present case is the principle that "deliberate indifference" can be established by circumstantial evidence.  In *Beers-Capitol v Whetzel*, 256 F.3d 120 (3d Cir. 2001), the court addressed the question of how circumstantial proof will support a finding of deliberate

38

indifference.  As *Beers-Capitol* pointed out, an official can be
liable for deliberate indifference for harm inflicted by others
if the official "knows of and disregards an excessive risk to
[the plaintiff's] health or safety."  Citing the case of *Farmer v*
*Brennan*, 511 U.S. *Id.* at 131, the circuit emphasized that "a
defendant's knowledge of risk can be proved indirectly by
circumstantial evidence.  '[A] factfinder may conclude that a
prison official knew of a substantial risk from the very fact
that the risk was obvious.'"  *Id*. In the Eighth Amendment context,
the court noted that "a plaintiff could make out a deliberate
indifference case by showing that prison officials simply were
aware of a general risk to inmates in the plaintiff's situation."
There is significant inferential value to Snyder's response to
the instances of misconduct brought to his attention.  His facile
efforts to deflect the concerns of third parties, coupled with
his failure to conduct even a perfunctory investigation of
Yarbenet's conduct could be viewed as strong circumstantial
evidence of his knowing something was wrong, but deliberately
deciding to cover-up the dangerous behavior with a reckless
disregard for the consequences. [12]

---

[12]    A defendant "acts recklessly" if his conduct "'evinces
disregard of or indifference to consequences under the
circumstances involving danger to life or safety to others,
although no harm was intended' or a state of mind that either
'pays no regard to its probability or possible injuries
consequences, or which, though foreseeing such consequences,
persist in spite of such knowledge.'" *Simmons v City of*
*Philadelphia*, 947 F.2d 1042,1089-90 (3d Cir. 1991) Slovner C.J.,

The evidence shows that Snyder knew that there was a "close relationship" between 13-year-old S.A.S. and 55-year-old Gregory Yarbenet.  He was told by a number of people that they had observed conduct which they thought improper and that made them uncomfortable. On at least one occasion, Snyder admitted to conducting an investigation of a report and learning that 55-year-old Yarbenet considered S.A.S. his close friend and confidante and looked to him for therapy, or counseling, relative to the death of his first wife (who had died some ten years earlier). At that time, Snyder told Yarbenet to "be careful" because "it did not look good" to people who did not know him. **(F3,4)**

The most telling aspect of Snyder's conduct, however, is the fact that he was not truthful to individuals who reported suspicious conduct. Snyder repeatedly told individuals that Yarbenet was close with S.A.S.'s family and that her parents approved of the relationship between Yarbenet and S.A.S., even though he had never spoken to her parents.  This factual matrix would support a deliberate indifference claim against Yarbenet.

A jury could infer from Snyder's failure to be truthful to individuals who reported Yarbenet, and the extent of his knowledge, that he was deliberately indifferent to the plight of S.A.S., and then, later, L.A.S.  The widespread awareness on the

concurring) cert denied 503 US 985, 112 S.Ct. 1617 71, 118 L.Ed.2d 391 (1992)(citations omitted)

part of teachers and students that there was some kind of
relationship between S.A.S. and Yarbenet belies Snyder's
purported obliviousness.  Equally telling is the fact that Snyder
denies being told by Kim Jenke that there was a problem involving
Yarbenet and S.A.S.  Snyder has also "lost" and cannot recall the
written report which Jenke wrote outlining her concerns about
Yarbenet.  Similarly, Snyder does not recall the numerous
conversations between Karen Kwiatkowski and him concerning the
inappropriateness of Yarbenet's conduct relative to his female
students.  The evidence will show that Snyder facilitated
Yarbenet's conduct by discouraging reports about Yarbenet by
spreading, in essence, a cover-up story about the fact that
S.A.S.'s parents approved Yarbenet's relationship with S.A.S.

### III. *THE SCHOOL DISTRICT'S POLICY AND CUSTOM OF DELIBERATE INDIFFERENCE*

The evidence will also support a claim of municipal
liability on the part of the school district based upon the
school district's deliberate indifference to Yarbenet's conduct.

In *Monnel v. New York Department of Social Services*, 436
U.S. 658, 98 S.Ct. 2018, 56 L.Ed. 2d 611 (1978), the Supreme
Court held that a municipality could be liable for constitutional
deprivations if the deprivations occurred pursuant to a
government custom, policy, or usage.  In *Stoneking v. Bradford
Area School District*, 882 F.2d 720,725 (3d Cir. 1989), the Third

41

Circuit held that the "[l]iability of municipal policymakers for
policies or customs chosen or recklessly maintained is not
dependent upon the existence of a 'special relationship' between
the municipal officials and the individuals harmed." In *Stoneking
II*, the Third Circuit recognizes school officials could be liable
for recklessly establishing policy, procedure, or custom of
condoning sexual abuse of students by teachers and, further, that
the school officials may not escape liability arising from their
policy, procedure, or custom maintained in deliberate
indifference to the actions taken by their subordinates.
*Stoneking II*, 882 F.2d at 725.

     The evidence outlined above shows that a number of faculty
members and staff either knew something was wrong with Yarbenet's
relationship with S.A.S. or that they should have known that
S.A.S. and L.A.S. faced grave danger.  How could faculty
repeatedly observe Yarbenet closeted alone with S.A.S. in a
storage room or darkened classroom without being concerned enough
to at least question the behavior? The staff knew or should have
known of an excessive risk to the safety and health of the
Plaintiffs, yet there was no policy about how to handle that
potential for harm.

     As further sign that the School District did not wish to
deal with the danger of molestation of students, the staff
received *no* training on sexual abuse of students by staff, nor
was there any focus on preventing sexual abuse by faculty or

staff. The only sexual harassment policy in existence at the
school was one which looked like an antiquated EEOC
interpretation of what constituted sexual harassment in the
workplace. **(See all of T.)**

The superintendent was asked about the connection between
training and teachers walking in on S.A.S. and Yarbenet alone:

> Q    We have a situation where Ms. Seneta walks into a
>      darkened room and sees Yarbenet and S.A.S. and
>      apparently doesn't think anything of it, do you
>      think training that maybe would provide ... act as
>      a deterrent to a person like Yarbenet to know that
>      other faculty members are ... being advised to
>      keep [their] eyes open?

He responded: "It's a situation of do you want to have a school
or do you want to have Stalag 17. Now, that's what you're looking
at." **(A-16)**  The superintendent testified that the only way he
knew to stop sexual abuse of students was to close down the
school. **(A-3)** When questioned about steps that might make it
harder to commit sexual abuse at school, he raised the specter of
a "stalag." **(A-16)**

Blucas also thought that when Snyder discovered that
Yarbenet was "using a 13-year-old child as a counselor" that
Snyder's response should have been to review the "checklist items
that are associated with a teacher's job description and
teacher's evaluation form in terms of exercising prudent
judgment. If there was a concern by a principal, they could put a
check in the category and follow it up with an anecdotal note or

written response." **(A-7,8)** In other words, Blucas regarded the possibility of abuse as a matter which might come up at the time of a teacher's evaluation, not as a matter of ensuring a student's safety from sexual misconduct.

The one person who was in a position to evaluate the many signs of a problem was Robert Snyder, the principal. Snyder ignored obvious signals, testifying that his only duty in preventing sexual abuse was to follow up on any complaints that a student might bring to him:

> Q    Can you think of any signs that you would look
>      for, any signs or signals that might disclose that
>      a staff member is harassing a student, sexually
>      harassing a student?
>
> A    I would look for reports from the student.
>
> Q    And can you think of anything else?
>
> A    No.

**(G-2)**

The evidence recited above could support an jury's conclusion that S.A.S. and L.A.S. were injured by a municipal policy.  A policy can be established when the plaintiff shows that "officials at the policy making or supervising making or supervisory level: (1) had actual constructive knowledge that [the employee] had violent propensities and was a threat to students; (2) followed policy or custom or tolerating or ignoring the risk [the employee in question] or other violent teachers posed; and (3) exhibited indifference to the safety of students

44

who were likely to be harmed by violent teachers." *Kurilla v
Calahan*, 68 F.Supp. 2d 556,566 (Middle District Pa 1999)
Certainly, the evidence recited above shows that it would not be
futile for Plaintiffs to proceed with their amended complaint
asserting a claim under 42 U.S.C. Section 1983.

Another instructive case is *P.H. v. The School District of
Kansas City, Missouri*, 265 F.3d 653 (8th Cir. 2001).  In that
case, the Eighth Circuit found that a school district may be
found liable for

> governmental custom of failing to receive,
> investigate and act upon complaints of sexual
> misconduct of its employees' if the [plaintiff]
> proved the existence of an official custom of such
> conduct and if that custom caused [the plaintiff]
> constitutional harm. ... [cite omitted] To
> establish the custom of failure to receive,
> investigate, or act on complaints of
> constitutional violations... the plaintiff must
> prove (1) a continuing, widespread, persistent
> pattern of misconduct by the government employee,
> (2) deliberate indifference to or tacit
> authorization of the conduct by the policy-making
> officials after the officials have notice of the
> conduct, and (3) a resulting injury on the part of
> the plaintiff." *Id.* at 658.

Applying similar logic should convince the court that
Plaintiff's motion to amend is not futile, and should be
granted.


## IV.  *TIMELINESS OF MOTION TO AMEND AND ABSENCE OF PREJUDICE*

The proposed amendment should also be granted since,

under Rule 15 (a) of the Federal Rules of Civil Procedure leave to amend should be freely given. Under the liberal standards established in *Foman v. Davis*, 371 U.S. 178, 182 (1962) leave should only be denied if the amendment is motivated by bad faith, if allowing the amendment would result in undue prejudice to the opposing party, or if the amendment is futile: "If the underlying facts or circumstances relied upon by a plaintiff may be the proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Id.*

This motion is not untimely, nor made with bad faith. The plaintiffs' complaint set forth claims under Title IX and 42 U.S.C. Section 1983. Plaintiffs conducted discovery under both theories. It was not until the June 15 conference that Defendants indicated that they would raise the *Sea Clammer's* defense. Plaintiffs' moved quickly after that to propose to amend the complaint, but had to await final deposition transcripts, including the transcripts of Kim Jenke and Cindy Scott, to finalize the motion. The transcripts were not received until July 18, and this motion was initially filed July 22.

Plaintiffs have maintained their cause of action under 42 U.S.C. §1983 since the inception of the case. The discovery to date has involved discovery of pattern and practices concerning the School District's treatment of

46

faculty sexual misconduct.  The Defendants have therefore
been put on notice of Plaintiffs' desire to maintain a claim
under 42 U.S.C. §1983 and will not suffer any injury or
legal prejudice as a result of Plaintiffs filing an Amended
Complaint which makes no reference to a cause of action
under Title IX of the Education Act.  For these reasons, the
Plaintiffs request this Court enter an Order permitting
Plaintiffs to file the attached Amended Complaint.

                              Respectfully submitted,

                              s/ Edward A. Olds
                              Edward A. Olds, Esquire
                              Pa. I.D. No. 23601
                              Carolyn Spicer Russ, Esquire
                              Pa. I.D. No. 36232
                              Richard Matesic, Esquire
                              Pa. I.D. No. 72211
                              Attorneys for Plaintiffs
                              1007 Mount Royal Boulevard
                              Pittsburgh, Pa 15223

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

STACY S.; and JOHN and MARY          )
ELLEN S., on behalf of their         )Civil Action No. 04-150E
daughter, LEIGH ANN, a minor         )
                                     )
          Plaintiff,                 )      Jury Trial Demanded
                                     )
          v.                         )
                                     )
GIRARD SCHOOL DISTRICT;              )
ROBERT SNYDER, Individually          )
and in his capacity as               )
Principal of the Rice Avenue         )
Middle School; and GREGORY           )
YARBENET, a professional             )
employee of the Girard School        )
District,                            )
          Defendants.                )

## ORDER OF COURT

IN ERIE, this the _____ day of _____, 2005,

upon consideration of the foregoing, it is hereby Ordered

that Plaintiffs are permitted to file the Amended Complaint.

Defendant shall have 20 days to respond.


                              _____

                              U.S. District Court Judge


48

## CERTIFICATE OF SERVICE

I hereby certify that on July 22, 2005, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Richard A. Lanzillo, Esquire
KNOX McLAUGHLIN GORNALL & SENNETT, P.C.
120 West Tenth Street
Erie, PA 16501

and I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participant:

Edward J. Betza, Esquire
150 East Eighth Street
Erie, PA 16501

s/Edward A. Olds, Esquire
_____