# TABLE OF CONTENTS

Exhibits in Support of
Motion to Amend

A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Deposition of **Walter Blucas**, June 9, 2005
A-1 -- A-17

B . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Deposition of **Karen Kwiatkowski**, April 21, 2005
B-1 -- B-38

C . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Deposition of **Kimberly Jenke**, June 28, 2005
C-1 -- C-6

D . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Deposition of **Cynthia Scott**, June 28, 2005
D-1 -- D8

E . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Deposition of **Gayla DeMarco**, May 26, 2005
E-1 -- E-3

F . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Deposition of **Gregg McClelland**, May 26, 2005
F-1 -- F-4

G . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Deposition of **Robert Snyder**, April 8, 2005
G-1 -- G-15

H . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Deposition of **Robin Seneta**, March 24, 2005
H-1 -- H-26

I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Deposition of **Linford Lee Manross**, June 8, 2005
I-1 -- I-6

J . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Affidavit of ██████ G████
J-1 -- J-3

K . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Signed Statement of **Robin Seneta**
K-1 --K-2

L . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Affidavit of **Greg Senyo**
L-1 -- L-4

M . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Affidavit of **Kelly K█████**
M-1 -- M-4

N . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Excerpts from St██y S.'s 7th Grade Yearbook
N-1 -- N-3

O . . . . . . . . . . . . . . . . . . . . . . . . . Case Print from **Commonwealth of PA v. Gregory Yarbenet**
O-1 -- O-7

P . . . .**Preliminary Transcript from Commonwealth of PA v. Gregory Yarbenet**, May 29, 2002
P-1 -- P-13

Q . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Deposition of **Mary Werling**, March 24, 2005
Q-1 -- Q-6

R . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Deposition of **Linda Tucci**, June 8, 2005
R-1 - R-2

S . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Affidavit of **Wendy Gilson**
S-1 -- S-4

T . . . . . . . . . . . . . . . . . . . . . . Girard School District **Combined Sexual Harassment Policies**
T-1 -- T-8

U . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Deposition of S███████ (Vol. 1), March 15, 2005
U-1 -- U-5

V . . . . . . . . . . . .**Telephone Discussion with the Honorable Sean J. McLaughlin**, June 15, 2005
V-1 -- V-2

1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

2

3   STACY S.; and JOHN AND       : HONORABLE SEAN J. MCLAUGHLIN
    MARY ELLEN S., on behalf     :
4   of their daughter, LEIGH     :
    ANN S., a minor,             :
5        Plaintiffs              :
                                 :
6             v.                 : Civil Action No. 04-150E
                                 :
7   GIRARD SCHOOL DISTRICT;      :
    ROBERT SNYDER,Individually:
8   and in his capacity as       :
    Principal of the Rice        :
9   Rice Avenue School; and      :
    GREGORY YARBENET; a          :
10  professional employee of     :
    the Girard School            :
11  District,                    :
         Defendants             : Jury Trial Demanded

12

13

14

15          Deposition of WALTER BLUCAS, taken before

16   and by Sonya Hoffman, Notary Public in and for the

17   Commonwealth of Pennsylvania on June 9, 2005,

18   commencing at 11:30 a.m., at the offices of Knox

19   McLaughlin Gornall & Sennett, P.C., 120 West

20   Tenth Street, Erie, PA 16507.

21

22

23

24

25          Reported by Sonya Hoffman
         Ferguson & Holdnack Reporting, Inc.

A-1  1

1    information of materials that they would have confiscated,

2    the computers, the police reports, and I believe you have

3    all that stuff.

4        Q.    Did you decide that it would be appropriate for

5    the School District to investigate how this happened, how it

6    happened that a teacher was able to molest middle school

7    girls on a daily basis over a span of three and half years?

8    Did you decide it was important for the School District to

9    know that?

10       A.    I'm not sure I understand your question.  The

11   investigation was being handled by the police, any

12   information they chose to share with me certainly would --

13   you know, I would work with.

14       Q.    But the question is, did you, as the highest

15   official of the School District, decide that it was

16   important for you to know how it could happen that a teacher

17   could molest young girl students on a daily basis over three

18   and a half years?

19           MR. LANZILLO:  Objection to form.

20       Q.    Were you interested in how it could happen?

21       A.    Interested in a degree to say you're going to

22   prevent it 100 percent of taking some kind of action, it's

23   not going to happen in a school setting.

24       Q.    Even --

25       A.    Like anywhere in our society, if somebody wants to

A-2    67

1    molest somebody, it's going to happen. It could happen in

2    this, in this restroom down here. I'm not sure what you're

3    looking for. Was I concerned, yeah. I think the press

4    release said that, we're shocked, we're stunned, we're

5    surprised, and saddened by the whole scenario.

6        Q.   What did you do to make sure it didn't happen

7    again?

8        A.   Close school, that's the only thing you could do

9    to make sure it wasn't going to happen again.

10       Q.   Okay.

11       A.   I'm not trying to be smart with you, I'm just

12   telling you it could happen anywhere, anytime, anyplace in

13   this world.

14       Q.   Well --

15       A.   If you have a magic cure for that, you're in the

16   wrong business.

17       Q.   Let me -- I don't have a magic cure. But I guess

18   my question is:  There's been testimony in this case that

19   Yarbenet consistently kept the lights off in his room, was

20   there any school rule or policy that you know of that

21   instructed teachers not to keep the lights off in their

22   room?

23           MR. LANZILLO:  Objection to form.

24       A.   Specific policy that says you can't keep the

25   lights on or off, no. There would be different emergency

A-3                                                    68

1    scenarios with fire drills, emergency evacuations,

2    lockdowns.   There was a whole range of things that came out

3    there later in the last couple of years that were installed,

4    including safety cameras, videotapes.

5            But in the nature of what I knew of his teaching,

6    I think he made a lot of use of a -- what's the word I'm

7    looking for, translucent or a type of overhead projector

8    with overlays or mapping in his teaching.   So that would not

9    be unusual in a science classroom where they might be

10   using -- turning the lights off to view things on the

11   opaque -- or overhead projector.

12           (Blucas Deposition Exhibit No. 4 marked for

13            identification.)

14       Q.   Let's mark this as Exhibit No. 4.   We've marked

15   the police report; have you ever seen the police report

16   before?   Have you ever seen this document before, the police

17   report, Exhibit No. 4?

18       A.   I think I've seen some sections of it.   I can't

19   say I've seen it in it's entirety and I don't really recall

20   when I saw it.   I know it was substantially later.

21       Q.   I asked you whether -- well, is it your opinion

22   that there's nothing that can be done that can prevent a

23   teacher who wants to molest a student, prevent that from

24   happening?

25       A.   Yeah, you can close the school.

A-4     69

1     Q.   Short of that, you can't think of anything else?

2     A.   I can't give you a plan that's 100-percent

3 foolproof.  If I could, I wouldn't be retired, I'd have

4 developed it someplace that -- you just can't make that

5 guarantee, you know that.

6     Q.   How about 50-percent foolproof?

7     MR. LANZILLO:  Objection to form.

8     Q.   Is there some level of steps that the School

9 District should take to ensure -- or to attempt to ensure

10 that teachers don't molest their students?

11     A.   I'm not sure I can answer that question to give

12 any credibility to a sense of doing it.  You're going to

13 pool all your resources and put a camera in every nook and

14 cranny, and monitor things that you're pulling money from

15 everything else, you're shutting everything else down, this

16 is all you have.  Is that school, that's not what school's

17 about.

18     Q.   Okay.  Well, do you know that the allegations in

19 this case are that the abuse in this case happened on a

20 daily basis -- a daily basis over a three-year period?

21     A.   No, I do not know that.

22     Q.   Do you think it's possible that a teacher could be

23 molesting a student over a year-and-a-half period and that

24 not come to the attention of, for instance, other students

25 in the school?

A-5   70

1     Q.   And do you know whether -- to your knowledge, did

2   Chief Bucho ever meet separately with Mr. Snyder in a

3   meeting when you weren't there?

4     A.   I'm sure that he did.

5     Q.   Okay.

6     A.   I don't think I would have been present all the

7   time.  He was the building principal and I'm sure the Chief

8   and the Sergeant would have followed up with him.

9     Q.   Did you ever learn that Mr. McClelland and

10  Mr. Snyder fielded a call from somebody who was concerned

11  about the way Yarbenet and Stacy had acted on a field trip?

12        MR. LANZILLO:  Objection to form.

13    A.   No.

14    Q.   I'm going to refer you to Mr. McClelland's

15  deposition, there's several pages. I want you to read and I

16  want to ask you some questions about it.

17        I asked Mr. McClelland whether he recalled any

18  meetings involving him and Mr. Snyder, I'm going to refer

19  your attention to my question at the bottom of -- at Line 24

20  on Page 16 and ask you to read through Line 21 on Page 20.

21    A.   (Witness complies.)  Okay.

22    Q.   Actually, could you -- I want you to read a little

23  bit further; read all the way to Line 23 -- excuse me, Line

24  6 on Page 22.

25    A.   (Witness complies.)  Okay.

A-6        84

1        Q.    Have you had a chance to read that?

2        A.    Yes.

3        Q.    Would you have expected Mr. Snyder to do something

4    other than that which Mr. McClelland reports that he did in

5    connection with this incident?

6              MR. LANZILLO:    Objection to form.    You can answer.

7        A.    What specifically are you referring to in his

8    response?

9        Q.    Well, I guess, it's reported that -- it's reported

10   by Mr. McClelland that Yarbenet said that he considered

11   Stacy Shaffer, a 13-year-old student of his, a confidante;

12   would you have expected Mr. Snyder to do something about

13   that information?

14       A.    I would have had an expectation that he followed

15   up with the teacher in terms of the extent to what that

16   entailed.

17       Q.    Mr. McClelland said that Mr. Yarbenet said that

18   Stacy, quote, "Helped him get over the death of his first

19   wife.  She listened to him as he spoke about it and that's

20   what he was doing that day," end quote.

21             If it comes to a principal's attention that a

22   teacher is using a 13-year-old child as a counselor, what's

23   the principal supposed to do about that?

24             MR. LANZILLO:    Objection to form.    Go ahead.

25       A.    There's a whole host of checklist items that are

A-7    85

1      Q.    Have you had a chance to read that?

2      A.    Yes.

3      Q.    Would you have expected Mr. Snyder to do something

4   other than that which Mr. McClelland reports that he did in

5   connection with this incident?

6           MR. LANZILLO:  Objection to form.  You can answer.

7      A.    What specifically are you referring to in his

8   response?

9      Q.    Well, I guess, it's reported that -- it's reported

10  by Mr. McClelland that Yarbenet said that he considered

11  Stacy ⬛⬛⬛⬛, a 13-year-old student of his, a confidante;

12  would you have expected Mr. Snyder to do something about

13  that information?

14     A.    I would have had an expectation that he followed

15  up with the teacher in terms of the extent to what that

16  entailed.

17     Q.    Mr. McClelland said that Mr. Yarbenet said that

18  Stacy, quote, "Helped him get over the death of his first

19  wife.  She listened to him as he spoke about it and that's

20  what he was doing that day," end quote.

21          If it comes to a principal's attention that a

22  teacher is using a 13-year-old child as a counselor, what's

23  the principal supposed to do about that?

24          MR. LANZILLO:  Objection to form.  Go ahead.

25     A.    There's a whole host of checklist items that are

A-7     85

1    associated with a teacher's job description and a teacher

2    evaluation form in terms else of exercising prudent

3    judgment.   If there was a concern by a principal, they could

4    put a check in that category and follow it up with an

5    annectodal note or a written response.

6         Q.    You indicated earlier that when it came to your

7    attention that people complained about the conduct of

8    teachers that part of your investigation would be having

9    discussions with the parents and sometimes the students.

10        A.    Try and get all the parties involved and resolve

11   it at the lowest level possible.   But, you know, if you're

12   going to get interpretation and facts of a particular

13   incident then you try and talk to as many people as you can

14   that have actually seen the incident or witnessed what did

15   transpire.

16        Q.    Okay.  Was it appropriate -- Mr. McClelland

17   reports that Mr. Snyder told Mr. Yarbenet -- and I'm looking

18   at Page 21 of the deposition, he said, "Mr. Snyder, just,

19   you know, he told Mr. Yarbenet, you know, he should be

20   careful because the people that don't know him or, you know,

21   Stacy, it does not look good, and he should not put himself

22   in that situation."

23            Is that the advice that you gave teachers, just be

24   more careful?

25            MR. LANZILLO:   Objection to form.   It

A-8    86

1       mischaracterizes the testimony.

2       A.    The advice that a principal might give a teacher

3    would vary depending on the number of incidents that took

4    place and the nature of the situation and the facts that

5    stood out.  And that could range from a whole host, from

6    verbal instructions or directions to written reprimands to

7    formal evaluation or written documentation for personnel

8    file.

9            So that question is open to the degree that a

10   whole range of activities and options would exist for a

11   principal based on the information that they ascertained in

12   their review.

13      Q.    In this specific situation, would you have

14   expected Mr. Snyder to make a report to the parents that he

15   had received a report of inappropriate conduct on the part

16   of a teacher involving their daughter?

17           MR. LANZILLO:  Objection to form.

18      Q.    Should he have called Stacy's parents when he

19   received this complaint?

20      A.    Did he receive -- he did not receive a complaint

21   from the parent?

22      Q.    No.  Should he have called the parents and told

23   them that he had received a complaint about Mr. Snyder --

24   excuse me, about Mr. Yarbenet using Stacy as a confidante

25   about -- and explaining -- talking to Stacy about his

A-9       87

1    grieving process with his first wife's death?

2            MR. LANZILLO:  Objection to form.

3        A.    That would be a judgment call that he would have

4    to make.

5        Q.    So there's no policy at the School District that

6    would require him to advise the parents of that situation?

7        A.    I do not believe so.

8            (Blucas Deposition Exhibit No. 6 marked for

9            identification.)

10        Q.    Let's mark this as Exhibit No. 6.  This is a

11    statement that we received from Ms. Janke in connection with

12    this case; do you recall who Kim Janke was?

13        A.    Just barely.

14        Q.    Could you read that statement.

15        A.    Out loud?

16        Q.    No.  You just read it to yourself, I just have a

17    question.

18        A.    (Witness complies.)

19        Q.    Can I see that for a second.  Now, this is a

20    statement, it's not a fact, but if Ms. Janke, in fact, put

21    her concerns that, quote, "Yarbenet and Stacy were alone in

22    the studio with the door closed," end quote, in writing and

23    gave that to Mr. Snyder, what was Mr. Snyder supposed to do

24    with that writing according to the School District's

25    policies and rules?

A-10    88

1    A.    I don't believe there's a policy or rules with

2  regard to what he was supposed to with it.    I think his

3  response, and apparently addressing a concern to the

4  parents, and their response to him that they were totally

5  comfortable with it, was totally appropriate and followed

6  through on what would be reasonable and prudent action on

7  his part.

8    Q.    What if he didn't talk to the parents, would your

9  answer change if, in fact, he didn't talk to the parents?

10    A.    That's not the case, he talked to the parents.

11    Q.    Well, the case is that he told Ms. Janke that he

12  talked to the parents, it hasn't been established that he

13  talked to the parents.    And so my question is:    What if he

14  did not not, in fact, talk to the parents?

15    A.    I believe he did talk to the parents because he

16  told me the same response.

17    Q.    When did he tell you that he talked to the parents

18  about Yarbenet's conduct with Stacy?

19    A.    At some point in time when I noticed driving home

20  that the car was there, he had a Corvette.

21    Q.    So you talked to Mr. Snyder because you made the

22  observation that Yarbenet's Corvette was parked at the

23  Shaffer's residence?

24    A.    Yes, but I always saw Mr. and Mrs. Shaffer there

25  at the same time.    It was not that frequent that I would see

A-11  89

1    A.    I don't believe there's a policy or rules with
2    regard to what he was supposed to with it.    I think his
3    response, and apparently addressing a concern to the
4    parents, and their response to him that they were totally
5    comfortable with it, was totally appropriate and followed
6    through on what would be reasonable and prudent action on
7    his part.
8    Q.    What if he didn't talk to the parents, would your
9    answer change if, in fact, he didn't talk to the parents?
10    A.    That's not the case, he talked to the parents.
11    Q.    Well, the case is that he told Ms. Janke that he
12    talked to the parents, it hasn't been established that he
13    talked to the parents.    And so my question is:    What if he
14    did not not, in fact, talk to the parents?
15    A.    I believe he did talk to the parents because he
16    told me the same response.
17    Q.    When did he tell you that he talked to the parents
18    about Yarbenet's conduct with Stacy?
19    A.    At some point in time when I noticed driving home
20    that the car was there, he had a Corvette.
21    Q.    So you talked to Mr. Snyder because you made the
22    observation that Yarbenet's Corvette was parked at the
23    ██████████ residence?
24    A.    Yes, but I always saw Mr. and Mrs. ██████████ there
25    at the same time.    It was not that frequent that I would see

A-11 89

1  them because my time schedule's different, but when I did

2  see it, mom or dad was usually was with -- you know,

3  accompanied them.

4       Q.   So you talked to Mr. -- but you recall you

5  mentioned the issue --

6       A.   I remember talking to Mr. Snyder about it casually

7  and just saying I see the car there, and he said, yeah, they

8  have a close relationship and mom and dad are all right with

9  it.

10      Q.   Did he tell you that he talked to the parents

11 about that close relationship -- well, let me back up a

12 second.

13      A.   How would he know that if he hadn't talked to

14 them?

15      Q.   Well, let me back up a second.

16      A.   Did I ask him, when did you call and verify this,

17 no.

18      Q.   Mr. Snyder told you that he knew that Stacy and

19 Yarbenet had a close relationship; is that right?

20      A.   He told me that the parents were aware of it

21 and -- were aware of it.

22      Q.   That wasn't my question.  Did you --

23      A.   I understand what your questions was, I'm giving

24 you the answer that I gave.

25      Q.   Did he tell you -- first of all, did he premise --

A-12   90

1    your answer was that the parents were aware of it, and my

2    question is, what is "it", a close relationship between

3    Yarbenet and Stacy; is that what "it" is?

4        A.    That's correct.

5        Q.    So Mr. Snyder told you that he was aware that

6    there was a close relationship between Yarbenet and Stacy

7    and that he had talked to the parents about it; is that

8    right?

9        A.    And that the parents were okay with it.

10       Q.    Okay.  And he talked to you about that in response

11   to your question of observing the car there, or did he just

12   bring up that topic himself?

13       A.    I think it was in response to just a passing

14   thing, you know, seeing the vehicle there.  He said, yeah,

15   I'm aware of it, the parents are aware of it, and they're

16   okay with it.

17       Q.    He might have got the information that there was a

18   close relationship -- strike that.

19            Based upon the testimony of Mr. McClelland that

20   you've had a chance to read here today, Mr. Yarbenet

21   apparently told Mr. Snyder that there was a close

22   relationship between him and Stacy, at least in the sense

23   that she was his, quote, confidante, end quote; apparently

24   that's what Mr. McClelland recalls; is that right?

25            MR. LANZILLO:  Objection to form.

A-13                                                            91

1    A.   If that's what's in his deposition, then that's

2  what he said.  I can't verify it or not.

3    Q.   You read it, so it's in his deposition, right?

4    A.   It's in his deposition.

5    Q.   Did you ever talk to Mr. Snyder about Mr. Yarbenet

6  and Stacy on any other occasion before Mr. Yarbenet's arrest

7  other than this one sort of conversation in passing that

8  you've just referred to?

9    A.   I don't believe so.

10    Q.   Do you think that there -- we talked a little bit

11  about your sense of -- and this is my word, you don't have

12  to agree with it, your sense of futility about trying to

13  deal with sexual molestation; do you think that periodic

14  staff -- periodic training of staff might be helpful in

15  terms of preventing sexual molestation?

16          MR. LANZILLO:  Objection to the initial premise of

17          the question, the characterization.  Go ahead and

18          answer the question.

19          MR. OLDS:  That's a fair objection.

20    A.   Being in the education business, all education is

21  supposed to be helpful, so the answer is yes.  Do you want a

22  qualifier?

23    Q.   Sure.

24    A.   It's not a 100-percent guarantee that it's not

25  going to happen, no.

A-14

92

1     Q.   So it's not 100 percent guaranteed, but do you

2  think that maybe if the topic -- if there was focus on that

3  topic that it might act, perhaps, as a deterrent to a

4  teacher who might have those propensities, the propensity to

5  victimize his students?

6        MR. LANZILLO:  Objection to form.

7     A.   I think the focus is always there and I think

8  people are aware of that as cause for dismissal with their

9  annual evaluation forms.

10     Q.   But it was --

11     A.   Information that goes to every new employee and

12  they certainly knew my demeanor with regard to any

13  inappropriate type of behavior.

14     Q.   But there was no communication on a regular basis

15  to the older staff.

16     A.   Yes.  On a yearly basis they did receive

17  notification.  The Union received notification on a more

18  regular basis.

19     Q.   Okay.  What information did the Union receive?

20     A.   They would have had copies of every notification

21  that went out to the staff.  They would have had copies of

22  any policy reviews in regard to any of those particular

23  areas, as well as any unsatisfactory evaluation for any

24  teacher's misconduct or inappropriate behavior, letters of

25  reprimand of all doings.

A-15  93

1    Q.    We have a situation where Ms. Seneta walks into a

2    darkened room and sees Yarbenet and Stacy and apparently

3    doesn't think anything of it, do you thing training that

4    maybe would provide -- could be provided to teachers such as

5    Ms. Seneta, you know, keep your eye open for suspicious

6    situations involving teachers might act as a deterrent,

7    maybe not affect her, but act as a deterrent to a personal

8    like Yarbenet to know that other faculty members are

9    supposed to -- are being advised to keep your eyes open?

10        MR. LANZILLO:    Real big objection to the form of

11            the question.

12    Q.    You can answer it.

13    A.    It's pure speculation.    It's a situation of do you

14    want to have a school or do want to have Stalag 17.    Now,

15    that's what you're looking at.

16    Q.    Okay.    Well, you understand that this conduct,

17    it's not -- the conduct that this case involves isn't

18    something that happened on one occasion, that it happened on

19    a daily basis for three years --

20        MR. LANZILLO:    Objection to form.

21    Q.    -- between the two Plaintiffs.

22    A.    I don't know that for sure.

23    Q.    Well, that's their testimony.    And if --

24    A.    I don't know that.

25    Q.    If something is happening on a daily basis for

A-16    94

1    A.    Our properties abut each other, yes.

2    Q.    Had you ever seen Yarbenet's car at her house?

3    A.    Yes.

4    Q.    Did you ever talk to him when he was visiting her?

5    A.    No.    Our properties abut, but I really do not have

6  a neighborhood relationship where I take pie over there or

7  go back and forth.    I pretty much had my own job and my own

8  property.    Other than the occasional wave on the tractor

9  mowing grass to her dad, that's about the only dealings I

10 would have with them.    Also, her mother as an employee, or

11 an IEP with their other daughter would have been about the

12 only relationship I had with the ▮▮▮▮▮▮▮▮.

13    Q.    When you talked with Marilyn Vargulich did she

14 tell you that she had received information that Yarbenet had

15 improper relationships with students?

16        MR. LANZILLO:    Objection to form.

17    Q.    You can answer that question.    And I guess maybe

18 I'll -- you talked to Marilyn Vargulich the 27th, in that

19 conversation did she tell you that she had information that

20 Yarbenet had improper relationships with students?

21    A.    I don't honestly recall.

22    Q.    Did you ever learn of the nature of the

23 allegations against Yarbenet?

24    A.    From Chief Bucho?

25    Q.    Yes.

A-17