1               IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3   STACY S; and JOHN and        :
    MARY ELLEN S., on behalf     :
4   of their daughter, LEIGH     :
    ANN S., a minor,             :
5            Plaintiffs          :
                                 :
6            vs.                 :    Civil Action No. 04-150E
                                 :
7   GIRARD SCHOOL DISTRICT;      :
    ROBERT SNYDER,               :    HONORABLE SEAN J. MCLAUGHLIN
8   Individually and in his      :
    capacity as Principal of     :
9   the Rice Avenue Middle       :
    School; and GREGORY          :
10  YARBENET, a professional     :
    employee of the Girard       :
11  School District,             :
             Defendants          :    Jury Trial Demanded

12

13

14

15           Deposition of CYNTHIA SCOTT, taken before and
         by Carol A. Holdnack, RPR, Notary Public in and for
16       the Commonwealth of Pennsylvania, on Tuesday,
         June 28, 2005, commencing at 2:38 p.m., at the
17       offices of Knox McLaughlin Gornall & Sennett, P.C.,
         120 West Tenth Street, Erie, PA 16501.

18

19  For the Plaintiffs:
         Edward A. Olds, Esquire
20       1007 Mount Royal Boulevard
         Pittsburgh, PA 15223

21

22  For the Defendants Girard School District and Robert Snyder:
         Richard A. Lanzillo, Esquire
         Knox McLaughlin Gornall & Sennett, P.C.
23       120 West Tenth Street
         Erie, PA 16501

24

25           Reported by Carol A. Holdnack, RPR
              Ferguson & Holdnack Reporting, Inc.

D-1

1

1    know, so I think it was all day.

2        Q.    Okay.   And do you recall approximately how many

3    students were on the trip?

4        A.    I really don't.

5        Q.    Do you recall whether it was just the student

6    council kids or whether it was other classes or groups?

7        A.    I really don't know.

8        Q.    Ch████y was on the trip and St████ was on the trip?

9        A.    Um-hum.

10       Q.    St██████████, of course.

11       A.    Um-hum.

12       Q.    And do you recall any other students who might

13   have been on the trip?

14       A.    I mean, just -- I know -- I know Ch████y had a

15   friend, that they actually helped organize the event.   And

16   that was S████ H████.

17       Q.    Okay.

18       A.    But I don't remember anybody else.

19       Q.    Did the bus leave from Rice Avenue Middle School?

20   Can't recall.

21       A.    I think so.   I don't know.

22       Q.    And that's Pleasant Ridge Manor on Route 20 in

23   Girard?

24       A.    Yes.

25       Q.    Now, during that excursion, I understand that you

D-2    6

Case 1:04-cv-00150-SJM    Document 32-6

1    observed some interaction between Yarbenet and Ms. ▆▆▆▆

2    that caused you concern.  Could you tell me what that was.

3         A.    Well, I can tell you what I remember now.  I mean,

4    it's been six or seven years.

5         Q.    I understand.

6         A.    I remember now that it -- whatever I saw concerned

7    me to the point that I felt that I needed to talk to

8    somebody about it.  I felt that their behavior -- his

9    behavior with her, their behavior together, was not

10   appropriate for a student and a teacher.  A lot of -- like

11   they sat together on the bus.  I kind of kept an eye,

12   because kind of had a -- you know, a red flag.  And so I

13   kept an eye during the day.

14            I don't really remember any physical touching, you

15   know.  But a lot of closeness in their talking, and almost

16   like a flirting back and forth, I guess you would say.  And

17   they were together most of the day, that I saw.  I mean, I

18   wasn't with them all day.  But whenever I would notice, and

19   they were -- I just didn't feel it was appropriate behavior.

20        Q.    Okay.  And I take it you saw them sitting

21   together -- was it on the bus, or when they arrived, or

22   both?

23        A.    No, it was on the -- now, this is what I remember.

24   But I remember them -- I don't remember the ride home.  It

25   was the -- it was actually the way there that concerned -- I

D-3

1    mean, right off the bat, I noticed something.

2        Q.    And do you recall whether they sat together on the

3    way home?

4        A.    I don't.

5        Q.    Okay.  But what you saw is a student sitting next

6    to a teacher, that was a red flag.  And that prompted you to

7    watch them more carefully during the day?

8        A.    Yeah.  It wasn't just that they were sitting in

9    the same seat.  It was more than that.

10       Q.    Okay.  No, I understand.

11       A.    Because, if I remember correctly, the bus was

12   pretty full.  So, I mean, it wouldn't have been unusual for

13   a teacher to be sitting with a student.

14       Q.    Okay.  Do you recall anything else about their

15   interaction that caused you concern, other than they were

16   sitting together?  They seemed, what, too close?  Was

17   that --

18       A.    It's hard to explain.  It just was not your normal

19   student/teacher talking interaction.  It was more of, like I

20   said, a flirting-type thing.  Just a close -- that was

21   beyond what it should be.

22       Q.    Do you recall any --

23       A.    I don't know how to explain it.

24       Q.    Do you recall any physical contact at all between

25   the two?

D-4        8

Case 1:04-cv-00150-SJM    Document 2...

1      A.   I don't, to be honest with you.  I don't remember
2   any physical touching.
3      Q.   Were you able to overhear any of the conversation
4   between the two?
5      A.   No, not that I remember.
6      Q.   You had indicated that what you did observe
7   prompted you to want to discuss it with someone.  Did you,
8   in fact, discuss it with someone?
9      A.   Yes, I did.
10     Q.   With whom did you discuss the matter?
11     A.   Gayla DeMarco.
12     Q.   When did you discuss this with Ms. DeMarco?
13     A.   During lunch there at Pleasant Ridge.
14     Q.   Did you sit together, I take it, at lunch?
15     A.   I'm not sure if -- I think we did.  But I know I
16  went up to her, if I didn't sit with her, during the
17  lunchtime.  And I, you know, expressed to her what I had
18  seen, and that I didn't feel -- I felt something was not
19  right.
20     Q.   What did Ms. DeMarco say in response, if anything?
21     A.   She told me that Mr. Yarbenet was a family friend,
22  and that they knew each other outside of school.  And that
23  he -- you know, so that might explain their closeness, that
24  they were friends, friends of the family.  And that he was
25  not a traditional teacher.  That might not be the exact

D-5

9

1  word, but something to that. That he was very close with

2  his students. And, you know, I said, I realize that, being

3  that I had kids that went through there, and I knew that he

4  was. But I again said to her, I just feel that this is more

5  than a healthy interaction. And I remember saying, I would

6  not want one of my daughters to be that friendly with a man

7  even if it was a family friend.

8      Q.   Okay. Do you recall anything else from that

9  conversation with Ms. DeMarco?

10      A.   I really don't.

11      Q.   Did you ever have any discussions with

12  Mrs. ▮▮▮▮▮▮▮ concerning what you had observed that day?

13      A.   No, not at that time. She called me -- and this

14  is -- I'm trying to remember this. Somebody -- and I don't

15  even remember who -- when all of this came out into the

16  open, had told her -- I had mentioned it to someone. And I

17  can't remember now who it even was. But they told her that

18  I had a concern way back when. And she called me and asked

19  me if I would be willing to give a statement.

20      Q.   Okay.

21      A.   And I did, to the police, at that time. But

22  that's the only time I've ever -- that I remember ever

23  talking to her.

24           (Scott Deposition Exhibit 1 marked for

25              identification.)

D-6

1      Q.    And I can make a photocopy of this.  This is
2    just -- want to note that.  Let me show you what we will
3    mark as Exhibit 1 to your deposition.  And just ask you,
4    Ms. Scott, is that the statement to which you just referred?
5      A.    I don't have my glasses on, but.
6      Q.    I have the same problem.
7            MR. OLDS:  Do you need us to read?
8      A.    No, it's good.  That sounds like it.
9      Q.    Okay.  Do you know approximately when you provided
10   this statement?
11     A.    I really don't.
12     Q.    Okay.  And to whom did you provide this statement?
13   Did you give this to Mrs. ███████ or to the police directly?
14     A.    No, it was the police officer.  But I don't know
15   who it was.
16     Q.    Okay.
17     A.    I don't even remember if it was over the phone or
18   in person.  I don't remember.
19     Q.    Now, I don't know whether his testimony was
20   mistaken or -- but let me just ask you, see if this jogs any
21   recollection.  There was some testimony by -- I believe it
22   was Mr. ███████, that while he was home his wife had gotten
23   a call.  And there were some indication that it might have
24   been from you.  And this is well before the controversy
25   broke.  Do you have any recollection of speaking with

D-7    11

Case 1:04-cv-00150-SJM    Document 20    - - - -

1    Mrs. ▮▮▮▮ on the telephone about anything?

2        A.    No, I really don't.

3        Q.    Do you know Mrs. ▮▮▮▮ at all?

4        A.    No.

5        Q.    Okay.

6        A.    I mean, I know who she is, but I don't know her at

7    all. I don't remember ever talking to her. Only the time

8    when she called me. Maybe I forget. But I doubt that I

9    would forget that.

10        Q.    Okay. Did you ever discuss your feelings or what

11    you observed on this particular field trip with anyone

12    associated with the School District other than Ms. DeMarco?

13        A.    No, not to my -- I don't remember ever talking to

14    anybody about her.

15        Q.    Okay. What about Bob Snyder; have you ever talked

16    to Bob Snyder?

17        A.    No.

18        Q.    Or Greg McClelland? Wally Blucas, the

19    superintendent?

20        A.    Hum-um.

21        MR. OLDS: It's best if you say no, as opposed to

22        hum-um.

23        A.    Okay. She can't write that too good.

24        Q.    In response to that litany of names I just threw

25    at you, was your response -- what was your response to each

D-8    12

Case 1:04-cv-00150-SJM    Document 26    Filed ...

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2
 3   STACY S.; and JOHN AND   : HONORABLE SEAN J. McLAUGHLIN
     MARY ELLEN S., on behalf :
 4   of their daughter, LEIGH :
     ANN S., a minor,         :
 5   Plaintiffs               :
 6       v.                   : Civil Action No. 04-150E
 7   GIRARD SCHOOL DISTRICT;   :
     ROBERT SNYDER, Individually:
 8   and in his capacity as    :
     Principal of the Rice     :
 9   Avenue Middle School; and :
     GREGORY YARBENET, a       :
10   professional employee of  :
     the Girard School         :
11   District,                 :
     Defendant                 : Jury Trial Demanded
12
13
14
15        Deposition of GAYLA DEMARCO, taken before
16   and by Sonya Hoffman, Notary Public in and for the
17   Commonwealth of Pennsylvania on May 26, 2005,
18   commencing at 10:00 a.m., at the offices of Knox
19   McLaughlin Gornall & Sennett, P.C., 120 West
20   Tenth Street, Erie, PA 16507.
21
22
23
24
25        Reported by Sonya Hoffman
          Ferguson & Holdnack Reporting, Inc.
```

1

**Page 2**

```
 1        A P P E A R A N C E S
 2   For the Plaintiffs:
 3        Edward A. Olds, Esquire
          1007 Mount Royal Boulevard
 4        Pittsburgh, PA 15223
 5   For the Defendents:
 6        Richard A. Lanzillo, Esquire
          Neil R. Devlin, Esquire
 7        Knox McLaughlin Gornall & Sennett, P.C.
          120 West Tenth Street
 8        Erie, PA 16507
 9
10
11        I N D E X
12
13   GAYLA DEMARCO
14        Direct Examination by Mr. Olds . . . . . . . . 3
15
16
17        E X H I B I T S
18
19   DeMarco Deposition Exhibit No. 1 . . . . . . . .13
20   DeMarco Deposition Exhibit No. 2 . . . . . . . .25
21   DeMarco Deposition Exhibit No. 3 . . . . . . . .25
22   DeMarco Deposition Exhibit No. 4 . . . . . . . .30
23
24
25
```

2

**Page 3**

```
 1   G A Y L A   D E M A R C O, first having
 2        been duly sworn, testified as follows:
 3
 4        DIRECT EXAMINATION
 5   BY MR. OLDS:
 6
 7        Q.   Good morning, Ms. DeMarco, how are you?
 8        A.   I'm fine. Thank you.
 9        Q.   I'm Ed Olds and I represent Stacy ████ and
10   Leigh Ann ████████. As you probably know, they have sued
11   the School District concerning what happened to them
12   resulting from Mr. Yarbenet's sexual -- his sexual assault.
13        And we're going to take your deposition to see
14   what your knowledge is of the facts relevant to that case,
15   okay?
16        A.   Yes.
17        Q.   And I guess the -- I assume that you've had a
18   chance to talk to counsel about this deposition.
19        A.   Yes, I have.
20        Q.   Do you understand that you're represented by this
21   law firm or are you here unrepresented?
22        A.   I'm represented.
23        Q.   And who is your lawyer?
24        A.   Mr. Lanzillo.
25        Q.   And have you hired Mr. Lanzillo?
```

3

**Page 4**

```
 1        A.   No, I have not.
 2        Q.   Have you ever entered into a fee agreement with
 3   him?
 4        A.   No.
 5        Q.   Can you tell me why you think he's your lawyer?
 6        A.   He's -- I'm an employee of the Girard School
 7   District and he is our solicitor.
 8        Q.   You're not a management employee, are you; are you
 9   in management?
10        A.   No, I'm not.
11        MR. DEVLIN:  Objection to form.
12        Q.   Are you in the Teacher's Union?
13        A.   Yes.
14        Q.   Okay.  So you have -- aside from the fact that
15   Mr. Lanzillo represents the School District, you haven't
16   entered a separate agreement with him to represent you; is
17   that correct?
18        A.   Would you explain your question.
19        Q.   Have you contacted Mr. Lanzillo to represent you
20   in connection with this case?
21        A.   No.
22        Q.   Okay.  And so at your request, I think, your
23   sister is sitting in this deposition?
24        A.   Yes.
25        Q.   And I don't mind accommodating those kind of
```

4

E-1

1      Q.    Did any police officer in terms of investigating
2   the criminal charges against Mr. Yarbenet meet with you?
3      A.    No.
4      Q.    And you don't recall that Kelly ▓▓▓▓▓ came to
5   you and told you that Gregory Yarbenet was sexually
6   molesting her daughter?
7      A.    No, I do not recall.
8      Q.    Okay.
9      A.    As I said earlier, I do not know of this person or
10  her daughter, therefore, I don't recall the situation at
11  all.
12     Q.    Of course, if she came to you, that wouldn't be
13  something that you would forget; would it?
14     A.    I have a responsibility and I take my job very
15  seriously. If a parent -- a student had come to me with
16  that kind of information, I would have immediately gone to
17  my supervisor as I did the morning that Leigh Ann ▓▓▓▓▓▓▓
18  had shared that information with me.
19     Q.    Of course, Leigh Ann came to you after Gregory
20  Yarbenet was in jail or after he had been removed from the
21  School District?
22     A.    Yes.
23     Q.    And after the criminal charges against him had
24  been filed, after he'd been arrested, right?
25     A.    Yes.

21

1      Q.    Now, did you get back to the faculty lounge very
2   frequently?
3      A.    No.
4      Q.    Would teachers come to your office during the
5   course of the day to discuss issues that they had to deal
6   with?
7      A.    Yes.
8      Q.    Okay. On a given day, how many? I mean, would
9   you -- on a normal day would you expect you would have
10  interactions with teachers more than 10 times?
11     A.    No.
12     Q.    Now, you indicated that you recall meeting with
13  S▓▓▓▓'s mother at IEP meetings.
14     A.    Yes.
15     Q.    Who else attended those IEP meetings?
16     A.    The gifted teacher, Mary Werling.
17     Q.    Who else?
18     A.    And the parent.
19     Q.    Do you recall that Gregory Yarbenet attended an
20  IEP meeting regarding S▓▓▓ once?
21     A.    No, I do not recall.
22     Q.    You searched -- apparently, someone searched, did
23  you produce these records, the document that's been marked
24  as Exhibit No. 1?
25     A.    That had been done through my office and then a

23

1      Q.    And so in your April meeting with Mr. Lanzillo,
2   you told Mr. Lanzillo that you didn't recall Kelly ▓▓▓▓
3      A.    That's correct.
4      Q.    In terms of the faculty members that you might --
5   going back to the time period 1998 to 2002, did you
6   socialize with any other faculty members outside the school?
7      A.    In terms of Christmas parties, end-of-the-year
8   picnic, yes.
9      Q.    Did you socialize with faculty members in the
10  school, for instance, eat lunch with the same faculty --
11  same group of faculty members or anything like that?
12     A.    Not very often, no.
13     Q.    Okay. Would you -- so you would eat lunch in your
14  office or something?
15     A.    That's correct, when I would take a lunch.
16     Q.    Would you be in the -- when the teachers
17  congregated, would it be at the teacher's lounge?
18     A.    Yes.
19     Q.    Where was that located?
20     A.    At the opposite end of the main office in the
21  building.
22     Q.    So that was in the main office complex, but not
23  close to where your office was?
24     A.    No. The faculty lounge is at the opposite end of
25  the building from where I am in my office.

22

1   copy was given to Mr. Lanzillo.
2      Q.    Okay. And did you search for the records
3   involving any other students?
4      A.    S▓▓▓▓▓▓▓
5      Q.    And after you talked to Mr. Lanzillo about Kelly
6   ▓▓▓▓▓▓ and her daughter, ▓▓▓▓▓▓▓▓▓ did you search
7   the records for any information about her or them?
8      A.    It is my understanding that the District had done
9   that.
10     Q.    Okay.
11     A.    And could not find any records on that student, as
12  being a student in our building.
13     Q.    So the student -- did you know that ▓▓▓▓ was a
14  foster child?
15     A.    I do not know the student, therefore, I would not
16  now that she's a foster child.
17     Q.    Okay. Do you recall whether you ever had any
18  dealings with -- strike that. When you would have the IEP
19  meetings with Stacy and Ms. Werling -- excuse me, S▓▓▓'s
20  mother, Ms. Werling, and you, who chaired those meetings?
21     A.    I would.
22   ·  Q.    Now, were those meetings open to other faculty
23  members? Could anyone come into those meetings?
24     A.    At the time if another teacher wanted to I suppose
25  we could have invited them, yes.

24

E-2

1  A. Yes.

2  Q. School day?

3  A. Yes.

4  Q. Was it an all-day trip?

5  A. We left sometime in the morning and we got back

6  certainly before dismissal time.

7  Q. Do you know Cindy Scott or Cynthia Scott?

8  A. Yes.

9  Q. And Ms. Scott would have a student in your school,

10  or had a student in your school?

11  A. She had daughters go through my building, yes.

12  Q. Do you recall whether she attended that field trip

13  as a chaperone?

14  A. I do not recall.

15  Q. And you don't recall her talking to you, pointing

16  out to you conduct involving Mr. Yarbenet and S█████ on that

17  occasion?

18  A. Would you please rephrase your question.

19  Q. Do you have any recollection of Ms. Scott bringing

20  to your attention conduct involving Mr. Yarbenet and S████

21  that she thought was inappropriate?

22  A. Absolutely not. I would have reported anything

23  that came to my attention.

24  Q. Let's suppose that you did report it, but that you

25  don't recall reporting it now, okay? Let's just suppose

29

1  Q. Okay. Have you had a chance to read it?

2  A. Yes.

3  Q. After reading it, did it refresh your recollection

4  at all about the interactions you had with Ms. Scott that

5  day on this trip to Pleasant Ridge Manor?

6  A. This does not juggle my memory whatsoever. I do

7  not recall this incident whatsoever.

8  Q. Do you have any -- what are your responsibilities,

9  if any, insofar as either making observations about or

10  collecting data or information about teacher conduct that

11  might be inappropriate relative to students?

12  A. I'm not so sure I understand your question. What

13  are you saying as inappropriate? As she's stating here,

14  giggling -- would you please rephrase that.

15  Q. Well, my question was, do you have any obligation,

16  either statutory or arising out of any teacher handbooks

17  concerning either the collection of information about

18  inappropriate teacher/student conduct or making observations

19  about such conduct?

20  MR. DEVLIN:  You're asking just in general.

21  MR. OLDS:  I'm asking if she has any duties in

22  that area.

23  A. I would be required by law, if I felt there were

24  any inappropriate behavior, to contact authorities.

25  Q. And do you understand that's statutory law? Or

31

1  that.

2  If you had reported it, would you have made or

3  entered information on the computer similar to the

4  information about L█████ A███, which was marked as Exhibit No.

5  1?

6  MR. DEVLIN:  I'm going to object to the form, you

7  can answer the question.

8  THE WITNESS:  Pardon me?

9  MR. DEVLIN:  I'm just objecting to the form of the

10  question, my basis for the objection calls for

11  speculation. You can answer the question.

12  A. I just needed clarification. I apologize.

13  Supposing that I had reported this?

14  Q. Yes.

15  A. I certainly would have documented it.

16  (DeMarco Deposition Exhibit No. 4 marked for

17  identification.)

18  Q. I'm going to mark this as Exhibit No. 4. I don't

19  know if you've ever seen this document, but it's a document

20  that we provided to counsel for the School District, and

21  it's a statement signed by Cynthia Scott. Have you ever

22  seen this document, Ms. DeMarco?

23  A. No, I have not.

24  Q. Why don't you take a little time and read it.

25  A. (Witness complies.)

30

1  you say you're required by law, do you know what law that

2  is?

3  A. No, I do not know the meaning of the law.

4  Q. Is there a -- is there a teacher handbook at the

5  Girard Area School District?

6  A. Yes.

7  Q. What kind of information is contained in the

8  teacher handbook?

9  A. The school rules, expectations of the faculty,

10  general information about our responsibilities in the

11  building.

12  Q. Okay. You looked at Ms. Scott's statement and in

13  the context of my question about what your duties were

14  relative to collecting data concerning teachers, and you

15  looked at that and you looked at her statement; do you think

16  that her statement does not describe inappropriate conduct?

17  A. Well, I think this is rather objective. I think

18  this is just an opinion based on what she's perceiving.

19  Teacher's might have been giggling with other students. I

20  mean, I don't --

21  Q. He writes, "Yarbenet's attention was devoted

22  solely to Stacy the entire day," do you think that's

23  appropriate conduct for a teacher?

24  A. No, it would not be.

25  Q. But you do not recall her pointing that out to

32

E-3

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

STACY S.; and JOHN AND      : HONORABLE SEAN J. MCLAUGHLIN
MARY ELLEN S., on behalf    :
of their daughter, LEIGH    :
ANN S., a minor,            :
    Plaintiffs              :
                            :
    v.                      : Civil Action No. 04-150E
                            :
GIRARD SCHOOL DISTRICT;     :
ROBERT SNYDER, individually;:
and in his capacity as a    :
Principal of the Rice       :
Avenue Middle School; and   :
GREGORY YARBENET, a         :
professional employee of    :
the Girard School           :
District,                   :
    Defendant              : Jury Trial Demanded


        Deposition of GREGG MCCLELLAND, taken before
and by Sonya Hoffman, Notary Public in and for the
Commonwealth of Pennsylvania on May 26, 2005,
commencing at 1:09 p.m., at the offices of Knox
McLaughlin Gornall & Sennett, P.C., 120 West
Tenth Street, Erie, PA 16507.


            Reported by Sonya Hoffman
            Ferguson & Holdnack Reporting, Inc.

1

A P P E A R A N C E S

For the Plaintiffs:

    Edward A. Olds, Esquire
    1007 Mount Royal Boulevard
    Pittsburgh, PA 15223

For the Defendants:

    Richard A. Lanzillo, Esquire
    Neil R. Devlin, Esquire
    Knox McLaughlin Gornall & Sennett, P.C.
    120 West Tenth Street
    Erie, PA 16507

        I N D E X

GREGG MCCLELLAND

    Direct Examination by Mr. Olds . . . . . . . . . 3

        E X H I B I T S

McClelland Deposition Exhibit No. 1. . . . . . .23
McClelland Deposition Exhibit No. 2. . . . . . .33
McClelland Deposition Exhibit No. 3. . . . . . .36
McClelland Deposition Exhibit No. 4. . . . . . .39
McClelland Deposition Exhibit No. 5. . . . . . .43

2

GREGG MCCLELLAND, first having
been duly sworn, testified as follows:

            DIRECT EXAMINATION

BY MR. OLDS:

    Q.   Mr. McClelland, I want to apologize for keeping
you waiting here. Sorry we got hung up and I want to
apologize. I really hate to wait myself, so if you're
irritated, I can understand it, and accept my apology and
I'll try not to have that happen again, okay?

    A.   Okay.

    Q.   You're employed with the Girard School District
now; is that right?

    A.   That's correct.

    Q.   And what is your current position?

    A.   High school principal.

    Q.   How long have you worked for Girard?

    A.   Since January of '99.

    Q.   Okay. Where did you work before that?

    A.   At St. Mary's School District. I was a high
school guidance counselor for one and a half years and the
middle school guidance counselor for four years.

    Q.   And what's your educational background?

    A.   Bachelor's degree from Edinboro University in

3

history. Master's degree in student personnel services and
then a guidance certificate from Edinboro. And then
secondary administration certificate from Edinboro. And
superintendent's certificate from Westminister College.

    Q.   And what kind of courses or what kind of work do
you have to do to get those administrative certificates, the
secondary certificate and the superintendent certificate?

    A.   There's courses about physical plant, learning
about taking care of buildings, high schools. Financial
classes, how to do budgets, administrative courses.

    Q.   Before you worked for St. Mary's, were you working
in the educational field?

    A.   No. I was in the United States Navy.

    Q.   And what was your -- tell me a little bit about
your time in the service. What were you ranks and what did
you do?

    A.   I was an E-4 Petty Officer, Third Class. And I
was a Galla linguist.

    Q.   What kind of linguist?

    A.   It's a language spoken in the Phillipines.

    Q.   And how long were you in the Navy?

    A.   For four years and nine months.

    Q.   And are you from -- were you born in this area?

    A.   In Platea, which is about five miles from Girard.

    Q.   And St. Mary's, where is that located?

4

F-1

1    Q.    Did you ever observe the lights not being on in
2  his room?
3    A.    When class was going on, once in a while he may be
4  showing a film or the TV was on if they were watching a
5  video about a science topic.
6    Q.    Would you interact with Mr. Yarbenet on a daily
7  basis?
8    A.    Not on a daily basis, no.
9    Q.    On a weekly basis?
10    A.    Weekly, yes.
11    Q.    And when you interacted with him, would it just be
12  because you happened to encounter him in the hallway or — I
13  mean, tell me the occasion.
14    A.    That would usually be the occasion.  If I was
15  doing hall duty when classes were changing and I'd walk by
16  and he was out in the hall supervising, I would say hello to
17  him.
18    Q.    When were teachers assigned hall duty?  I mean,
19  how did that — was that a rotating thing, the hall duty?
20    A.    No.  We just asked them if they could periodically
21  step out into the hall when classes were changing, but there
22  was no set schedule for them to be out there.
23    Q.    What were your impressions of Yarbenet outside the
24  classroom?  In other words, when you observed him with
25  students outside the academic setting, what were your

13

1  didn't, that tells me that she was a good student and she
2  didn't get in trouble discipline-wise.  And that was — when
3  I met with — excuse me, when I met with students, that's
4  usually when it was, was because of disciplinary reasons.
5    Q.    Do you recall whether you ever saw her alone with
6  Yarbenet?
7    A.    No.
8    Q.    What about Leigh Ann, did you ever see her alone
9  with Yarbenet?
10    A.    No.
11    Q.    Did you ever see her in his room when no other
12  students were there, just her?
13    A.    No.
14    Q.    When you came to the School District and you met
15  with Mr. Snyder, was there ever an occasion where you and he
16  discussed the different faculty members, their
17  personalities, their strong points, their weak points, that
18  he sort of highlighted those kinds of issues for you?
19    A.    Not that I recall.
20    Q.    Do you remember Greg Senyo?
21    A.    Yes, I do.
22    Q.    Did Greg Senyo talk to you about lights
23  unscrewed in the closet behind Yarbenet's room?
24    A.    No.
25    Q.    You say that he didn't?

15

1  impressions of him?
2    A.    Well-liked.  I just thought he was goofy, that's
3  why the middle school kids liked him.  They would come to
4  him in the hall and say hello, things like that.  He was
5  popular with the kids.
6    Q.    What did he do that makes you characterize him as
7  goofy?
8    A.    Maybe changing his voice when he talked to some of
9  the kids, you know, it makes them laugh, puts them at ease.
10  He was animated when he would talk at times with them.
11    Q.    Was he oftentimes surrounded by girls when you saw
12  him in the hallway?
13    A.    Not always.  I saw him with boys and girls.
14    Q.    Okay.  Were there occasions when you saw him
15  surrounded by girls, however?
16    A.    Maybe one or two that I can recall.
17    Q.    Do you remember Stacy _____?
18    A.    No, I don't.
19    Q.    Do you think you ever saw Stacy?
20    A.    Yes.  I would have seen her in the school.
21    Q.    But you don't remember her?
22    A.    No.
23    Q.    You never had any like one-on-one meetings with
24  her?
25    A.    Not that I recall.  She would have been — if I

14

1    A.    No.
2    Q.    Do you remember Karen Kwiatkowski?
3    A.    KK, yes, I do.
4    Q.    Did she talk to you about her concerns about
5  Yarbenet?
6    A.    Not that I recall.
7    Q.    So you don't recall ever having a conversation
8  with her where she told you that she felt that Yarbenet had
9  an inappropriate relationship with Stacy?
10    A.    No.
11    Q.    How about with Leigh Ann?
12    A.    No.
13    Q.    Did you ever meet with Yarbenet concerning any
14  complaints that you had received about him?
15    A.    Yes, I did.
16    Q.    Okay.  On how many occasions did you meet with
17  Yarbenet?
18    A.    I know one for sure, and two at the most.
19    Q.    Now, were these meetings, did they just involve
20  you and Yarbenet or was Mr. Snyder there?
21    A.    Mr. Snyder was there.
22    Q.    So there were three people at the meeting?
23    A.    Correct.
24    Q.    Now, you say you remember one for sure; what was
25  the topic of that meeting?

16

F-2

```
 1        A.   I received a phone call, and I don't recall the
 2   lady's name, she was an adult that had went -- or was at
 3   Pleasant Ridge Manor in the spring, I believe, it was 2001,
 4   it was a field trip, some of our students had went down
 5   there.
 6             And she wanted to report that she felt uneasy
 7   seeing Mr. Yarbenet and Ms. [redacted] sitting away from the
 8   rest of the students at a picnic table during lunch that
 9   day.  She said that she did not see him touch her or do
10   anything inappropriate, but they were -- she just felt
11   uneasy because they were sitting side by side and talking
12   very close, and she just thought that it was strange to see.
13        Q.   Did you ask the woman to identify herself?
14        A.   At that point she did.  Like I said, I don't
15   recall.  I went over and I reported it to Mr. Snyder.
16        Q.   Okay.  We had identified -- let me see if I can
17   find it.  Do you recall anything else that this lady told
18   you other than what you've related today?
19        A.   No.  To the best of my recollection, that was it.
20        Q.   And did she tell you that what she had observed
21   had made her upset?
22        A.   Yes.
23        Q.   And did she say that they were acting like
24   boyfriend and girlfriend?
25        A.   I couldn't recall if that's her exact words, but
```

17

```
 1   it made her feel uneasy that they were sitting side by side.
 2        Q.   Who was the sexual harassment officer at the
 3   school at that time?
 4        A.   That would have been myself.
 5        Q.   Can you tell me what training you had concerning
 6   sexual harassment?
 7        A.   Really, none.
 8        Q.   Okay.  So the lady called you; do you know why the
 9   lady called you?
10        A.   No, I don't.
11        Q.   Was it Cynthia Scott?
12        A.   I -- honestly, I can't recall.
13        Q.   And so you went and talked to Mr. Snyder about it.
14        A.   Correct.
15        Q.   Tell me what Mr. Snyder said to you.
16        A.   He said we need to get Mr. Yarbenet down and have
17   a meeting right away, and we did.
18        Q.   And I suppose that you related to Mr. Snyder the
19   content of the conversation that you had with the lady?
20        A.   Correct.
21        Q.   And did you meet with Mr. Yarbenet that same day?
22        A.   I can't recall if it was that afternoon or the
23   next morning.
24        Q.   But it was -- the lady had specifically mentioned
25   the student that she was concerned about was Stacy [redacted]?
```

18

```
 1        A.   Correct.
 2        Q.   Did Mr. Snyder say anything about St[redacted] when you
 3   told him that, you know, someone called me about -- and said
 4   that Yarbenet and St[redacted] were sitting apart and sitting on
 5   the same side of the table and it made the lady feel sort of
 6   nervous, and Mr. Snyder indicate that he knew St[redacted] or knew
 7   of her?
 8        A.   He would have -- you know, being a student, he
 9   knew most of the students in the school, but I don't what he
10   'said.
11        Q.   But you didn't know her; did you?
12        A.   To recall her now, no.  But back in school, like I
13   said, I really had no interaction with her.
14        Q.   Would it be possible that you might -- not -- that
15   you might not even know -- associate her face with her name?
16        A.   Correct.
17        Q.   So tell me what you recall about the meeting with
18   Mr. Yarbenet.
19        A.   Mr. Snyder explained to him that I had received a
20   phone call about the class trip.  And then he asked me to --
21   I believe he asked me to tell Mr. Yarbenet what the lady had
22   said and he wanted Mr. Yarbenet's explanation of what
23   happened.
24        Q.   And what did Mr. Yarbenet say?
25        A.   He said that he and the [redacted] family were
```

19

```
 1   friends outside of school and that St[redacted] was like a -- he
 2   considered her a confidant.  She helped him get over the
 3   death of his first wife, she listened to him as he spoke
 4   about it, and that's what he was doing that day.
 5        Q.   Did that seem like a preposterous story to you?
 6        A.   It -- I wouldn't have done that.  I wouldn't have
 7   had a young student be a confidant to me, no.
 8        Q.   I mean, did that raise any flags in your head that
 9   the teacher on any level was having an inappropriate
10   relationship with this student?
11        A.   It was definitely different, yes.
12        Q.   Teachers don't necessarily have a right to impose
13   their psychological traumas and burdens on students; do
14   they?
15        A.   They shouldn't, no.
16   ,    Q.   Did Mr. Yarbenet say anything else that day?
17        A.   No.  He -- well, he just said there was nothing
18   inappropriate going on and basically that St[redacted] was his
19   close friend, and she just listened to him when he was going
20   through the grieving process about his wife.  And that's
21   about the best I can recall him saying.
22        Q.   Did you understand when his wife died?
23        A.   That happened before I came to Girard.
24        Q.   Did you ever meet his new wife?
25        A.   Yes, I did.
```

20

F-3

**Page 21**

1  Q.  And did he have a son?

2  A.  Yes.

3  Q.  Who was the mother of his son, the new wife or the

4  old wife?

5  A.  I'm not positive. I thought it was the second

6  wife, but I'm not sure though.

7  Q.  So the first wife must have died some time ago

8  because the son was 11 or 12 at that time, right?

9  A.  At that time, I believe he was in 6th grade — or

10  he ended up — when I — when he left, when Mr. Yarbenet

11  left, I believe his son would have been in about 7th grade,

12  somewhere in there.

13  Q.  After Mr. — you confront Mr. Yarbenet with the

14  statement made by the lady who called you and Mr. Yarbenet

15  gives his defense, what's going on, what was said after

16  that? Did anyone else talk at the meeting?

17  A.  Mr. Snyder just — he told Mr. Yarbenet, you know,

18  he should be careful because to people that don't know him

19  or, you know, Stacy, it does not look good and he should not

20  put himself in that position.

21  Q.  So Mr. Snyder told him to be careful?

22  A.  Yeah, the best that I can recall. And he was not

23  to be, you know, in that position anymore.

24  Q.  Was there any suggestion that you call Stacy's

25  mother and tell Stacy's mother what the lady had said to

**Page 22**

1  you?

2  A.  I don't recall if he told me to do that or not.

3  Q.  You didn't call Stacy's mother; did you?

4  A.  Not that I recall, no.

5  Q.  You didn't call Stacy's father?

6  A.  No.

7  Q.  And it was your impression, and I take it from

8  this meeting, that what Ms. Scott was saying was that she

9  was telling you that she had perceived the activities

10  between Yarbenet and Stacy, he was too close to her. I

11  mean, it wasn't what a teacher would — it wasn't conduct

12  that you would think a teacher would engage in; is that

13  right?

14      MR. DEVLIN:  Object to the form, it assumes

15  facts —

16      MR. OLDS:  Just let him answer the question.

17  Q.  Is that right, Mr. McClelland?

18  A.  Because they were sitting side by side it made her

19  feel uneasy.

20  Q.  But that Yarbenet was doing something that a

21  teacher shouldn't be doing, that's what upset her; is that

22  right?

23  A.  She thought it was strange that he was sitting

24  that close.

25  Q.  And you thought it was strange that he talked

**Page 23**

1  about a 12-or-13-year-old girl being his confidant for his

2  psychological problems; is that right?

3  A.  True.

4  Q.  By any chance, after that meeting, did you have

5  any conversations with any teachers to see if the teachers

6  had observed anything inappropriate concerning Yarbenet's

7  relationship with Stacy?

8  A.  Not that I recall, no.

9       (McClelland Deposition Exhibit No. 1 marked for

10       identification.)

11  Q.  I'm going to mark this as Exhibit No. 1.

12  Mr. McClelland, you've probably never seen this, this is the

13  police report that was generated in this case as a result of

14  the police investigation. Maybe I shouldn't assume that

15  you've never seen it, but have you ever seen it before?

16  A.  I don't believe so, no.

17  Q.  Can you look at the document — you can look at —

18  take your time looking through this, if you want, I'm going

19  to direct — I'm going to ask you some questions from

20  information that's on 1080, it's stamped here at the bottom,

21  1080; but you can take as much time as you want looking

22  through the document.

23  A.  (Witness reviews document.)

24  Q.  Have you had a chance to look at that?

25  A.  (Witness nods head.)

**Page 24**

1  Q.  I wanted to, I guess in particular, refer you to

2  the part where Ms. Seneta was interviewed. I think you said

3  that — I forget whether you said that you knew Mr. Seneta

4  before you came here.

5  A.  It was — it's not her husband.

6  Q.  It's a different Seneta?

7  A.  Yeah. She's married to this — Mr. Seneta that

8  was a teacher at the school, she's married to, I believe,

9  it's his cousin.

10  Q.  I guess my question is: Did Ms. Seneta ever have

11  any conversations with you in which she reported to you that

12  she had seen things that made her uncomfortable?

13  A.  Not that I recall with her having a conversation

14  with me, no.

15  Q.  Okay. You indicated, I guess, that after the

16  meeting with Yarbenet, you didn't call Stacy's mother or

17  father, right?

18  A.  Correct.

19  Q.  And you didn't investigate, you didn't talk to any

20  other teachers or any other professionals to see if they had

21  observed anything inappropriate with Yarbenet; is that

22  right?

23  A.  As best as I can recall, correct.

24  Q.  You said that you might have been involved in

25  another conversation with Yarbenet and Snyder, remember

F-4

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2

 3   STACY S; and JOHN and    :
     MARY ELLEN S., on behalf :
 4   of their daughter, LEIGH :
     ANN S., a minor,         :
 5             Plaintiffs     :
                              :
 6            vs.             :    Civil Action No. 04-150E
                              :
 7   GIRARD SCHOOL DISTRICT;  :
     ROBERT SNYDER,           :    HONORABLE SEAN J. MCLAUGHLIN
 8   Individually and in his  :
     capacity as Principal of :
 9   the Rice Avenue Middle   :
     School; and GREGORY      :
10   YARBENET, a professional :
     employee of the Girard   :
11   School District,         :
               Defendants     :    Jury Trial Demanded
12

13

14          Deposition of ROBERT SNYDER, taken before and
        by Carol A. Holdnack, RPR, Notary Public in and for
15      the Commonwealth of Pennsylvania, on Friday,
        April 8, 2005, commencing at 10:00 a.m., at the
16      offices of Knox McLaughlin Gornall & Sennett, P.C.,
        120 West Tenth Street, Erie, PA 16501.
17

18   For the Plaintiffs:
          Edward A. Olds, Esquire
19        Carolyn Spicer Russ, Esquire
          1007 Mount Royal Boulevard
20        Pittsburgh, PA 15223

21

22   For the Defendants:
          Richard A. Lanzillo, Esquire
23        Knox McLaughlin Gornall & Sennett, P.C.
          120 West Tenth Street
24        Erie, PA 16501

25          Reported by Carol A. Holdnack, RPR
             Ferguson & Holdnack Reporting, Inc.
```

G-1

1    ever talk to Mr. Newson about anything pertaining to Gregory

2    Yarbenet after it was disclosed that he was molesting these

3    students?

4        A.    No.

5        Q.    Did you ever talk to him at all about Gregory

6    Yarbenet molesting students?

7        A.    No.

8        Q.    Would you have any idea what to look for in terms

9    of detecting signs that a faculty member on your staff is a

10   pedophile?

11           MR. LANZILLO:  Objection to form.  Go ahead.

12       A.    Not specifically a pedophile.

13       Q.    Can you think of any signs that you would look

14   for, any signs or signals that might disclose that a staff

15   member is harassing a student, sexually harassing a student?

16           MR. LANZILLO:  Objection to form.  Go ahead.

17       A.    I would look for reports from the student.

18       Q.    And can you think of anything else?

19       A.    No.

20       Q.    Now, how did you find out that Gregory Yarbenet

21   was accused of molesting S████ ████████?

22       A.    Our superintendent of schools, Mr. Blucas,

23   informed me.

24       Q.    And how did he inform you?

25       A.    He came into my office that morning and said that

G-2                                                          11

1      A.    Driving on Rice Avenue.

2      Q.    And did it occur to you that there might be

3  something wrong with that situation?

4      A.    No.

5      Q.    Why not?

6      A.    Because I had seen Mrs. ████████ pick up

7  Mr. Yarbenet at Rice Avenue Middle School previous to that.

8  And I -- Mr. Yarbenet had told me that he was getting rides

9  home from Mrs. ████████ at Elk Valley, and that he would walk

10 there.

11     Q.    When did he tell you that?

12     A.    I cannot put a date on it.

13     Q.    Then was he walking -- did he tell you that he was

14 walking with S████?

15     A.    No, he said that he was walking to Elk Valley to

16 get a ride with Mrs. ████████.

17     Q.    You never talked to Mrs. ████████ to see whether it

18 was okay with her for Yarbenet to be alone with S████, did

19 you?

20     A.    No.

21     Q.    Did you ever talk to S████'s father?

22     A.    No.

23     Q.    Did you ever talk to L████ A██'s mother or father

24 about whether it was appropriate for her to be with Yarbenet

25 alone?

G-3        27

1      A.    No.

2      Q.    Now, the police report -- did you ever see

3   Yarbenet with S****y in the hallways?

4      A.    Not that I recall.

5      Q.    What about with Le**h A**, did you ever see

6   Yarbenet talking and walking with Le**h A** in the hallways?

7      A.    Not that I recall.

8      Q.    Did you ever see him with students in the

9   hallways?

10     A.    Yes.

11     Q.    What was his demeanor?

12           MR. LANZILLO:  When?

13     Q.    When you saw him with students in the hallways.

14     A.    Well, generally, I would see him in the hallway

15   with students during class change.  And all the teachers are

16   to be out in the hall at that time.  So they're just

17   monitoring at that time.

18     Q.    Okay.  You never saw him walking with students in

19   the hallways; is that right?  Walking with girl students in

20   the hallways, you never saw that?

21     A.    No.

22     Q.    And you never saw him -- did you ever see him hug

23   girl students?

24     A.    Not that I recall, no.

25     Q.    Was it a violation of any policy that you know of

G-4

1    day off with silliness and jokes and that, then that was a

2    disruption to the homeroom and would get the student body

3    riled up at the beginning of the day in an inappropriate

4    way, and that it was unacceptable.

5         Q.    Was that the tenor of the second conversation as

6    well?

7         A.    Yes.

8         Q.    And the result was that you suspended the TV for a

9    period of time?

10        A.    Correct.

11        Q.    Now, there were a couple other instances that you

12   can recall when you talked with him?

13        A.    I talked with him about the bar across the

14   cabinet.

15        Q.    What else?

16        A.    We talked about him -- or with him about -- on a

17   school picture day, he had his school picture taken.  And he

18   put on a -- like a clown afro wig for it.  And when the

19   pictures came back, those same staff pictures were used for

20   staff ID cards that year.  That was when we were starting

21   that.  And I told him that that was unacceptable, that could

22   not be used.  And he had to have his picture retaken on the

23   retake day so that he would have an appropriate staff photo

24   ID.

25        Q.    What other occasions do you recall talking to him?

G-5

Case 1:04-cv-00150-SJM   Document 20

1    A.   There was a time when -- I don't even remember.

2 It was about the student resource center. I'm drawing a

3 blank on what that is. I remember going to speak with him

4 about it. It was the library then. It was shortly after

5 the renovated school had opened. And his room was right

6 next to there. I honestly -- I don't remember what that was

7 about.

8         Let's see. Mr. McClelland and I met with him

9 after the Pleasant Ridge field trip. And that is when, from

10 the field trip, Mr. McClelland had a report that Greg and

11 S█████y -- and I don't remember the exact information because

12 it came secondhand to me. But like sat separate from the

13 group at lunchtime on a field trip. I think it was student

14 council field trip to Pleasant Ridge Manor. So we talked to

15 Greg about that too.

16         And I talked to him -- what I had also -- I

17 already talked about was -- or had mentioned earlier, when I

18 talked to him about the lights being off. That's all I'm

19 recalling at this time.

20    Q.   Okay.  The Pleasant Ridge field trip, you say that

21 information -- there was information received third hand?

22    A.   Well, Mr. McClelland came to me with the

23 information. As I recall, because we met with Greg in the

24 morning. And as I recall it, I was at a conference at the

25 intermediate unit or something that day and I was out of the

G.-6          72

1  building.  And so the next day when I came into -- you know,

2  when school started, Mr. McClelland told me that he had this

3  information about them sitting together at lunch by

4  themselves, kind of removed from the group.

5        And so the first thing in the morning after

6  teachers get there, they have common plan time before

7  homeroom starts.  So we called Greg down then and spoke to

8  him about that.

9        Q.   What did Greg tell you?  What was the

10  information -- can you recall anything other than the fact

11  that they had sat apart, S■■■■ and Snyder had sat apart at

12  lunchtime.

13        A.   No, S■■■■ and Yarbenet.

14        Q.   Yarbenet, I'm sorry.  Had sat apart.

15        A.   That they sat apart from the group.  That they

16  were -- S■■■■ was in their group, in his group.  They were

17  always together during the day.  That's pretty much --

18        Q.   Do you remember who the chaperones for that trip

19  were?

20        A.   The only one I would know for sure is Donna

21  Turton, now Donna Turton-Cole, because she was the student

22  council adviser.

23        Q.   Did Gregg McClelland tell you where he got the

24  information that he shared with you that prompted the

25  meeting?

G-7     73

1    A.    I honestly don't remember that.  I don't.

2    Q.    Was it from a parent by the name of Cynthia Scott?

3    A.    I don't remember that.

4    Q.    And did you talk, then, about that incident?  Did

5    you talk to anyone aside from Yarbenet?

6    A.    No.

7    Q.    And what did you tell Yarbenet?

8    A.    What do you mean, what did I --

9    Q.    Well, what was the conversation between you?

10   A.    I asked him what was up with this, what went on

11   here.  And he explained that he and S━━━ and her family

12   were close friends, that they had gone through a lot

13   together.  That S━━━ and her family had helped him when he

14   had had his depression incidents.  And that they were just

15   very close family friends.  And they were just sitting

16   together.  And I remember him saying, you know, others could

17   have joined us, but we sat at the table and nobody did,

18   nobody else joined us.

19   Q.    Did you know -- on how many occasions had you met

20   with S━━━y's parents?

21   A.    I have not met with S━━━y's parents.

22   Q.    Yarbenet told you that S━━━y had helped him

23   through his depression?

24   A.    S━━━y and her family.

25   Q.    Did he mention S━━━?

G-8    74

1    A.    S████ and her family, yes.

2    Q.    And did it strike you as odd that a 50 -- what was

3  he, about 55 years old then?

4    A.    I don't remember.

5    Q.    55-year-old man would say that a 13-year-old girl

6  had helped him through his depression?

7            MR. LANZILLO:  Objection to form.  It misstates

8            the prior testimony.

9    A.    Again, he had said that S████ and her family had

10  helped him.  And it did not strike me as odd because I had

11  seen Mrs. ████████ picking him up in the parking lot at the

12  middle school before.  And I had seen envelopes going back

13  and forth in interoffice mail between Mr. Yarbenet and

14  Mrs. ████████.  And so in hearing that, it was a plausible

15  explanation.

16    Q.    Well, I hear your answer saying that you had seen

17  Mr. Yarbenet with S████y's mother and had seen letters going

18  back and forth between Mr. Yarbenet and S████y's mother.  But

19  I didn't hear you say why you thought it was a plausible

20  explanation that a 13-year-old girl would help a

21  50-plus-year-old man through his depression.  So what made

22  that plausible to you?

23    A.    I didn't say that a 13-year-old girl helped him

24  through his depression.

25    Q.    Well, he told you that, right?

G-9

1          MR. LANZILLO:  Let the witness answer.

2      A.    I said that he said S████ and her family.

3      Q.    And I'm asking you, did you find it plausible that

4  a 13-year-old girl would help a 50-plus-year-old man through

5  depression?

6          MR. LANZILLO:  Objection.  Asked and answered.

7          You can try to change his answer as many times as

8          you want, Ed.

9      A.    My understanding of what your question was, was it

10  plausible, what the explanation he gave, was it plausible as

11  to why he was sitting at a table alone with S████.  And to

12  that, his explanation to me was plausible, yes.  At no time

13  did I ever infer or take from what he said or anything that

14  S████ alone was the one who helped him through his

15  depression.

16      Q.    Now, might this have been the occasion when he

17  talked to you about his depression, or did he have a

18  conversation with you about his depression on some other

19  occasion?

20      A.    Well, I know it was at least referenced here,

21  because he talked about the ██████ family helping him in

22  that.  But I know that in another discussion it had come up

23  previously.

24      Q.    And going back to that discussion --

25      A.    Which discussion?

G-10    76

1    Q.    The first discussion, the other discussion --

2    A.    Okay.

3    Q.    -- where he talked about his depression.

4    A.    Um-hum.

5    Q.    What did he tell you then about his depression?

6    A.    He said he was experiencing depression, that he
7    hadn't gotten over the death of his first wife.  He was
8    still experiencing grief over that.  And that that, in turn,
9    was causing some marital strife between him and his second
10   wife.

11   Q.    Did he indicate to you in that conversation that
12   he was considering suicide?

13   A.    I don't recall.

14   Q.    Did he ever indicate to you that he was
15   considering or had considered suicide?

16   A.    Somewhere along the way, and in which discussion I
17   don't recall.  But somewhere along the way, he did reference
18   it, that he had previously thought about suicide.

19   Q.    Did he say anything about S████y in connection with
20   that suicidal thought?

21   A.    No.

22   Q.    Now, going back to this second thing about the
23   Pleasant Ridge incident.

24   A.    Okay.

25   Q.    We'll just call it Pleasant Ridge incident.  Okay?

G-11    77

1    A.    Um-hum.

2    Q.    What was it -- what did Mr. McClelland tell you

3    that -- about the incident, that you thought it was

4    important enough to meet with Yarbenet about the incident?

5    Well, let me just put it this way.  Why did you think it was

6    important enough to talk to Yarbenet about that incident?

7    A.    Because I wanted to find out what the situation

8    was.  You know, student council is there as a group.  Why

9    were they isolated.

10    Q.    Did Mr. McClelland tell you that he had

11    information that S____ and Yarbenet acted like

12    boyfriend/girlfriend on that student council trip?

13    A.    No, I don't remember that.

14    Q.    Did he tell you that he had information that they

15    had acted inappropriately on that student council trip?

16    A.    No.

17    Q.    Do you recall a conversation with Yarbenet

18    where -- that involved him being on the bus or tying up the

19    buses after the end of school?

20    A.    No.

21    Q.    Do you recall a conversation with Yarbenet where

22    he was on the bus with S____ ____ and the buses couldn't

23    leave on time?

24    A.    No.

25    Q.    Do you recall a conversation that you had with

G-12    78

1   Mr. Yarbenet where you told him he was not to go on those

2   buses?

3       A.   No.

4       Q.   Did you ever see him on the bus, or at dismissal

5   time get on the bus, when S████████ was on the bus, on a

6   bus that S██████████ was on?

7       A.   No, I have absolutely no recollection of that.

8           MR. LANZILLO:   Just for the record, Ed, my

9       understanding is, looking at those, that they're

10      actually separate letters.  I don't want you to be

11      under the mistaken impression that's a single

12      letter.

13          MR. OLDS:   Okay.  Well, I only see one letter

14      here.  So maybe -- why don't we get copies of it

15      so we can talk about it, okay.

16          THE WITNESS:   Can I look at it real quick, so I'll

17      recognize it.

18          MR. OLDS:   Sure.  We're going to get copies.

19          THE WITNESS:   Okay.

20          MR. LANZILLO:   Maybe it is just one.

21          DR. MAYNARD:   I think we asked for one copy of the

22      first letter.

23          MR. LANZILLO:   Could you have Ann fax that.  There

24      was another letter that came in?

25          DR. MAYNARD:   Um-hum.

G-13 79

1      Q.   And when did you get your master's?

2      A.   1988.

3      Q.   And when did you get your administrative

4   certificate?

5      A.   1990.

6      Q.   And how about the superintendent certificate?

7      A.   I believe 2002.

8      Q.   And what did you -- what kind of classes did you

9   have to take to get the administrative certificate?

10     A.   You take school finance, human resources, school

11  plant, collective bargaining, curriculum development.

12     Q.   Okay.

13     A.   That's pretty much it, because they accepted my

14  credits from my master's, so it was just beyond my master's

15  to get the additional certification.

16     Q.   And then you started working at Girard School

17  District in 1988?

18     A.   No, 1984.

19     Q.   1984.  As a teacher?

20     A.   Yes.

21     Q.   What did you teach?

22     A.   I taught sixth, seven and eighth grade math.

23     Q.   Where?

24     A.   Rice Avenue Middle School.

25     Q.   And then you became a counselor in --

G-14

4

1    A.   No.

2    Q.   Tell me, beginning in 1984 when you started --

3  when you started at Girard Area School District, what --

4  what training the School District provided, that you

5  attended, that dealt with sexual harassment.

6    A.   I know that there was a training when a new

7  harassment policy went in, in the mid 1990s.  The

8  superintendent's office arranged an in-service program for

9  all School District staff on sexual harassment.

10    Q.   And who conducted that program?

11    A.   It was a consultant out of Cleveland.  I don't

12  remember her name.

13    Q.   And what other training did you attend concerning

14  sexual harassment?

15    A.   I believe that is all.

16    Q.   And what -- and did the School District ever

17  provide any training on pedophilia, to your knowledge?

18    A.   No.

19    Q.   Do you remember the topics that were discussed in

20  that in-service training about sexual harassment?

21    A.   It had mostly to do with how to handle complaint

22  processes.

23    Q.   Was there any instruction given as to signs or

24  signals that staff might look for to see if it was

25  occurring, at that seminar?

G - 15

9

D E P O S I T I O N

of ROBIN SENETA, taken pursuant to the Federal Rules of
Civil Procedure, by and before Candance L. Messich, a
Court Reporter and Notary Public in and for the
Commonwealth of Pennsylvania, at the offices of
KNOX, McLAUGHLIN, GORNALL & SENNETT, 120 West 10th
Street, Erie, Pennsylvania, 16501, on Thursday,
March 24, 2005, commencing at 11:50 a.m.


Also Present:

S█████ █████████

L█████ A███ ███████████

Robert Snyder

Dean Maynard


H-1

# MAXINE JACOBY & ASSOCIATES
ALLEGHENY BUILDING    SUITE 720
429 FORBES AVENUE    PITTSBURGH, PA. 15219
(412)  765-3133        FAX  (412)  765-2704

```
1        rules concerning faculty members touching
2        students?
3    A   No specific written rule.
4    Q   Did you touch students?
5    A   I don't.
6    Q   I think you indicated that you were not often
7        in Mr. Yarbenet's classroom?
8    A   No.
9    Q   Did Mr. Yarbenet make you nervous?
10   A   No.
11   Q   Did you ever see or observe Mr. Yarbenet do
12       something that you thought -- and I'm talking
13       relative to a student, and I'm not asking for
14       a generalized norm or anything like that, I'm
15       trying to get your impressions -- did you
16       ever see him do anything that you thought was
17       improper or unprofessional or inappropriate
18       relative to students?
19           MR. LANZILLO:  Objection to form.
20           THE WITNESS:  That's very vague.
21       Could you be more specific?
22           MR. OLDS:  Well, sure.
23   Q   Did you ever see him do anything -- can you
24       recall seeing him do something that you
25       thought, well, I would never do that?
```

H-2

18

1          MR. LANZILLO:  Objection to form.

2          THE WITNESS:  Yes.

3     Q    Tell me what kind of things you saw of that

4          nature.

5     A    Walk home with students, drive students home,

6          put themselves in a one-on-one situation with

7          any student in a classroom without anyone

8          else there.

9     Q    You observed him one-on-one with

10         S██████ █████████, is that right?

11    A    Yes.

12    Q    On more than one occasion?

13    A    Yes.

14    Q    Did you ever see him walk home with her?

15    A    Not to my specific recollection.

16    Q    Did you ever see him drive her home?

17    A    I saw her in his car.

18    Q    You saw him walk home with students.  Do you

19         recall which students he walked home with?

20    A    Many.

21    Q    Were they always female?

22    A    No.

23    Q    No?

24    A    No.

25    Q    How many times do you think -- did you ever

MAXINE JACOBY & ASSOCIATES          H-3

19

| | | |
|---|---|---|
| 1 | | see him one-on-one with L█████ A███ ████████? |
| 2 | A | No. |
| 3 | Q | How many times do you think that you saw him |
| 4 | | one-on-one with S████ ████████? |
| 5 | A | I can't answer that. |
| 6 | Q | Would it be numerous times? |
| 7 | A | Yes, that's fair. |
| 8 | Q | And what parts of the day or on what |
| 9 | | occasions might you see that? |
| 10 | A | Any time of the day, before homeroom, |
| 11 | | sometimes after school. She did TV studio |
| 12 | | with him, the morning news. She often would |
| 13 | | be coming from her, I assume, study hall in |
| 14 | | his classroom while he had class. |
| 15 | Q | But you saw her one-on-one with him. Does |
| 16 | | that mean that his class wasn't in the room? |
| 17 | A | Not always. |
| 18 | Q | You indicated that you would see her |
| 19 | | one-on-one with him in the morning before |
| 20 | | homeroom, is that right? |
| 21 | A | Yes. |
| 22 | Q | The TV studio, was that near his science |
| 23 | | room? |
| 24 | A | No. |
| 25 | Q | So that was a different part of the building? |

MAXINE JACOBY & ASSOCIATES            H-4

1   A   Yes.

2   Q   Before homeroom, where would you see them

3       together one-on-one?

4   A   Sometimes in his classroom, sometimes in the

5       back room, sometimes in the hallway.

6   Q   And how was it -- well, tell me, if you can,

7       did you see him numerous times with her in

8       the back room?

9   A   Several.

10  Q   What were they doing?  How did you happen to

11      be in the back room when they were in the

12      back room?

13  A   Walked back to put something away, to look

14      for something.  I kept movies back there,

15      things like that.  It's a storage facility

16      for both of our classrooms.

17  Q   When you would walk in, what would you

18      observe?

19  A   Talking.

20  Q   Well, how close were they?

21  A   Side by side.

22  Q   Did you ever see him with his hands on her?

23  A   No.

24  Q   Did you ever see him hug her?

25          MR. LANZILLO:  In the storage room

H-5

| | | |
|---|---|---|
| 1 | | or at any time? |
| 2 | | MR. OLDS: Or anywhere. |
| 3 | | MR. LANZILLO: Okay. |
| 4 | | THE WITNESS: Probably. |
| 5 | Q | Tell me what you thought about them being |
| 6 | | together one-on-one in the storage room. |
| 7 | A | They were friends outside of school. |
| 8 | Q | And how did you know that? |
| 9 | A | He would tell me that. |
| 10 | Q | So you talked to him about your observations |
| 11 | | of seeing him one-on-one with her? |
| 12 | A | He talked to me about it. |
| 13 | Q | So would that be when you walked in on them |
| 14 | | or would that be on other occasions? |
| 15 | A | Usually possibly after I saw them together. |
| 16 | Q | And this would be something that he would |
| 17 | | volunteer to you? |
| 18 | A | Yes. |
| 19 | Q | And tell me what he would say to you. |
| 20 | A | He would tell me how close their family was |
| 21 | | with her family. He would tell me that they |
| 22 | | do things with the families together on the |
| 23 | | weekends. He had mentioned that they went -- |
| 24 | | several things. I can remember a specific |
| 25 | | trip they went on one -- not a trip. I |

H-6

1        shouldn't say trip.  No trip.  Local places

2        that they would go on weekends.

3  Q   You indicated that you weren't social friends

4        with him, is that right?

5  A   Correct.

6  Q   When he would come and tell you these kinds

7        of things, would it make you wonder why is he

8        telling me this?

9  A   No.

10  Q   And so you never wondered why he would be

11       sharing that information with you?

12  A   No.

13  Q   Did you ever talk to Mr. Snyder about your

14       observations of seeing them one-on-one?

15  A   Of seeing --

16  Q   S▓▓▓▓ and Yarbenet together in the storage

17       room or in his classroom alone.

18  A   No.

19  Q   You never mentioned that to Mr. Snyder?

20  A   No.

21  Q   Did you ever talk to Mr. Snyder at all about

22       Gregory Yarbenet?

23  A   Yes.

24  Q   Tell me what you talked to him about.

25  A   That there were students in the back room,

H-7

1      many students often, loud, and that

2      Mr. Yarbenet had put a bar across the

3      cabinets that he adhered down with metal

4      things, and that students would be hanging

5      from that and just spend time in the back

6      room, many students, many times.  I had

7      things back there that were worth value, and

8      I didn't want them back there unsupervised.

9    Q    How many times do you think that you talked

10         to Mr. Snyder about that?

11   A    Once or twice.

12   Q    Did the school district sponsor any

13         in-service or training on pedophilia?

14   A    No.

15   Q    In your experience learning how to become a

16         teacher, you know, in your education, did you

17         learn anything about the profile of a

18         pedophile?

19   A    Not off the top of my head.

20   Q    Do you know anything about pedophiles?

21   A    I do.

22   Q    What do you know about pedophiles?

23   A    That they prey on small children, young

24         children.

25   Q    But you don't know anything about the signs

MAXINE JACOBY & ASSOCIATES          H-8

1    that maybe you should look out for, for

2    instance, as a teacher to know whether

3    there's a pedophile on the staff?

4    A    Specific signs?  Do you want me to list

5    specific signs?

6    Q    Well, do you know any?

7    A    That you would probably see them touching

8    inappropriately, that they would try to

9    coerce students to build trust in them, try

10   to coerce students into inappropriate

11   situations.

12   Q    And how many years did you observe Yarbenet

13   and S███ ████████ in the back room alone

14   together?  What period of time did that span?

15   A    Maybe year and a half.

16   Q    Was S████ in your -- you taught 8th grade

17   science?

18   A    Yes.

19   Q    And so was she a student in your science

20   class?

21   A    Yes.

22   Q    How was she as a student?

23   A    Good.

24   Q    Did Yarbenet ever come into your classroom

25   while she was there and take her out of your

H-9

1      classroom?

2    A    I honestly can't remember.  I wouldn't let

3         him take students from the classroom if he

4         wanted any of them.  I had issues with that.

5    Q    What were your issues with that?

6    A    It was my classroom time.

7    Q    Did he frequently try to take students out of

8         your classroom?

9    A    I don't know if he did.

10   Q    By any chance, do you recall what period you

11        had S██████?

12   A    No.

13   Q    And you don't recall whether she ever gave

14        you a pass or asked you to be excused so she

15        could be with Yarbenet?

16   A    Many students did that.

17   Q    And you wouldn't let that happen?

18   A    No.

19   Q    When you would see S████y in his classroom --

20        and I think you differentiated that sometimes

21        she would be one-on-one with him in the

22        storage room, right?

23   A    Yes.

24   Q    And then sometimes she would be one-on-one

25        with him in his classroom, is that correct?

MAXINE JACOBY & ASSOCIATES          H-10

```
1              saw in that car?

2    A    No.

3    Q    When you walked into his room to use the room

4         as a shortcut, did you ever walk in when the

5         lights were off?

6    A    Well, yes.  He might not have even been there

7         sometimes if I got there before him, you

8         know.

9    Q    What about when he was there with S██████y, did

10        you ever observe him in the room with the

11        lights off?

12   A    Not with the lights off.

13   Q    The door between his room and the hallway,

14        was it ever covered with material so that it

15        wasn't transparent, the glass?

16   A    Yes.

17   Q    What kind of things did you see covering the

18        door?

19   A    Posters.

20   Q    Do you ever recall a time when your entrance

21        either into the storage area or his classroom

22        was obstructed?

23   A    Obstructed how?

24   Q    In other words, did you ever push on the

25        door -- did you open the door into your
```

H-11

1    classroom or open the door into the storage

2    room?

3    A    Probably.

4    Q    Which one?

5    A    I mean, opening it into the storage room.

6    Q    Did you ever approach the storage room door

7    and find that it was obstructed so that it

8    didn't open easily?

9    A    Didn't open?

10    Q    Easily.

11    A    Probably.

12    Q    Did you find out why it hadn't opened easily?

13    A    Sometimes our doors when they open kind of

14    lock each other (indicating).

15        MR. LANZILLO:  The witness is

16    motioning with her hands indicating, I

17    believe, that the doors run into each other

18    and collide.

19        THE WITNESS:  Yes.

20    Q    So if the door to his classroom were open,

21    you might not be able to open the door from

22    your classroom into the storage room easily

23    without having contact between the two doors?

24    A    Right.

25    Q    On those occasions, did you ever experience

H-12

Case 1:04-cv-00150-SJM    Document 26    Filed 07/22/2005

31

1       that situation when S████ was in the storage

2       room with Yarbenet?

3   A   Not that I recall.

4   Q   And I think that you indicated that you never

5       saw L████ A██ in that storage room with

6       Yarbenet?

7   A   Never.

8   Q   Did you ever see her one-on-one in his

9       classroom?

10   A   I didn't know who L████ A██ was until after

11       all this. I wouldn't have recognized her

12       from any other student.

13   Q   Well, did you ever see him one-on-one with

14       any other girls besides Stacy?

15   A   I guess yes. I would have to say yes.

16   Q   Who are the other girls?

17   A   Nobody specific that I can remember, just the

18       students.

19   Q   One-on-one, though, alone?

20   A   At the desk talking about something or

21       walking through the hall from class to class,

22       yes.

23             MR. OLDS: Just make this part

24       confidential here.

25             (Whereupon, the transcript is

MAXINE JACOBY & ASSOCIATES

H-13

43

1       superintendent, Mr. Snyder, various questions

2       regarding Mr. Yarbenet.

3  Q  So that was the first that you learned that

4       he had been arrested, when you had that

5       meeting with Mr. Snyder?

6  A  Yes.

7  Q  There were two police officers there?

8  A  Yes.

9  Q  Were you given the chance to like call up

10      your union representative or anything like

11      that?

12  A  No.

13  Q  And so who conducted -- who all was present

14      there?  Was it Mr. Snyder?

15  A  Mr. Blucas, Mr. Bucho and somebody else,

16      another police officer.  I can't recall who

17      it was.

18  Q  And have you ever seen the police officer's

19      report of the statement that you gave?

20  A  Yes.  No, I haven't seen it.

21  Q  Did you provide a written statement?

22  A  I did.

23           MR. OLDS:  Maybe we can mark that

24      as an exhibit, since we did it generically,

25      why don't we just call this Exhibit 2.

MAXINE JACOBY & ASSOCIATES

H-14

44

1              (Whereupon, Deposition Exhibit No.

2  2 was marked for identification.)

3              MR. LANZILLO:  Ed, what are you

4  going to do, just all of your exhibits number

5  sequentially from deponent to deponent?

6              MR. OLDS:  Well, today I will just

7  because I'm going to refer to Exhibit 1 with

8  all of them.  Just so it's not confusing.

9  Q  Is this a statement that you wrote?

10  A  It is.

11  Q  One thing that you say in this statement that

12  you wrote for the police, and I guess I'm

13  about the fourth sentence down, you say, "I

14  stated that Mr. Yarbenet had (what I

15  considered to be) an inappropriate

16  teacher-student relationship with her.  By

17  this I meant that I found it odd on several

18  occasions to find them conferring or meeting

19  behind closed doors before or after school in

20  the room that connects both his and my room.

21  I also discussed the fact that although I did

22  find them in these uncomfortable situations,

23  that I had never witnessed or believed that

24  there was any physical inappropriateness

25  involved.  Mr. Yarbenet always seemed to

MAXINE JACOBY & ASSOCIATES    H-15

45

```
 1            justify these actions by explaining that the
 2            families were close and that they were good
 3            friends," end quote.
 4                         And so you wrote that, is that
 5            right?
 6     A      I did.
 7     Q      And when you wrote this, you indicated to the
 8            police that you thought it was an
 9            inappropriate teacher-student relationship?
10     A      In my definition.
11     Q      And what is that definition?
12     A      That he would put himself in a situation that
13            I wouldn't.
14     Q      And you say you found it odd to find them
15            conferring or meeting behind closed doors
16            before or after school in the room that
17            connects both his and my room.  Is there like
18            a table in that storage room or --
19     A      No.
20     Q      So they would just be in that room?
21     A      Standing, talking.
22     Q      So you did find that odd that they would be
23            in that room as opposed to maybe his
24            classroom, is that right?
25                         I mean, that was odd for them to be
```

H-17

1  in that room? You wrote it was odd. You

2  say, "I found it odd on several occasions to

3  find them conferring or meeting behind closed

4  doors before or after school in the room that

5  connects both his and my room." So you

6  thought it was odd when you wrote this,

7  right?

8  A  Odd.

9  Q  And did you think that it was odd when you

10  observed it?

11      I mean, you thought it was odd when

12  you wrote it. You didn't observe it when you

13  wrote this document, Exhibit 2, you had

14  observed it earlier, right?

15  A  Correct.

16  Q  So did you find it out odd when you had

17  observed it?

18  A  That's fair.

19      MR. OLDS: Let me mark this as

20  Exhibit 3.

21      (Whereupon, Deposition Exhibit No.

22  3 was marked for identification.)

23  Q  This is a supplemental police report. This

24  is a report that the police officer wrote,

25  and I guess my first question would be have

A-18

Case 1:04-cv-00150-SJM    Document 28    Filed

47

| | | |
|---|---|---|
| 1 | | you ever seen this document before? |
| 2 | A | I haven't read it. |
| 3 | Q | But have you seen it? |
| 4 | A | I saw it. |
| 5 | Q | When did you see it? |
| 6 | A | On Monday. |
| 7 | Q | But you didn't read it or you haven't had |
| 8 | | occasion to read it since then? |
| 9 | A | No. |
| 10 | Q | Aside from seeing this report on Monday, did |
| 11 | | you look at any -- were you shown any other |
| 12 | | documents on Monday? |
| 13 | A | No. |
| 14 | Q | So just this one? |
| 15 | A | I wasn't shown this. |
| 16 | Q | So you just saw it in the sense that, for |
| 17 | | instance, it was held up and you could see |
| 18 | | the sheet of paper? |
| 19 | A | Yes. |
| 20 | Q | And was this the only document in that |
| 21 | | fashion that you saw or were shown when you |
| 22 | | met with Mr. Lanzillo? |
| 23 | A | Yes. |
| 24 | Q | I would just have a couple questions here. |
| 25 | | Your statement appears approximately maybe |

MAXINE JACOBY & ASSOCIATES    H-19

48

1      halfway down or two-thirds of the way down

2      where it says --

3                MR. LANZILLO:   Let me enter an

4      objection.  This is not a statement.  It is a

5      report.

6    Q   The report of your statement, and it begins

7      at 1005, Ms. Robin Seneta was interviewed.

8      Do you see that on that sheet of paper?

9    A   I do.  I do.

10   Q   Let me just read this, and then I can ask you

11     some questions, and this is obviously what

12     the police officer is writing.  He didn't ask

13     you to sign this statement.  The police

14     officer wrote that you indicated that

15     Yarbenet was in the room separating the two

16     with the victim often.  Do you think that you

17     said that to the police officer who took this

18     report?

19   A   I doubt I said often.

20   Q   But you did say you saw them together alone

21     on numerous occasions here today?

22   A   Several occasions.

23   Q   In the room several occasions.  On numerous

24     occasions you saw them alone, is that what

25     you said?

MAXINE JACOBY & ASSOCIATES      H-20

1    A    I saw them together.

2    Q    Alone together?  The two of them alone

3         together?

4              MR. LANZILLO:  Are you asking what

5         she said today?

6              MR. OLDS:  Yes.

7              MR. LANZILLO:  Objection.  The

8         testimony will speak for itself.

9    Q    Do you recall saying that you observed them

10       on numerous occasions alone together,

11       one-on-one together?

12    A   I saw them together.

13    Q   On numerous occasions, is that right?

14    A   I don't think I put a certain number to it.

15    Q   Well, the record will speak for itself.

16       You're quoted as saying --

17            MR. LANZILLO:  Objection.  She's

18       not quoted at all.

19    Q   The report says that you said, and I'm

20       quoting the report, the two were very close.

21       Close in that they were close together, end

22       quote.  Now, the report says that.  Did you

23       make some statement such as that to the

24       police officer when he interviewed you?

25    A   I said that they were close friends of the

H-21

50

```
 1              family, that they had a close friendship.
 2    Q    So the language they were close together, you
 3         weren't talking about a physical -- do you
 4         recall whether you talked about seeing them
 5         physically close or close together when you
 6         --
 7    A    I recall them asking me if I ever thought
 8         they were physically close, and I did not see
 9         them in any physically close situation.
10    Q    So in this report, you would say that the
11         officer got it wrong when he wrote that you
12         said, quote, the two were very close.  Close
13         in that they were close together, end quote.
14         So today under oath, what you're doing is
15         you're saying that you did not make that
16         statement to the officer?
17    A    I am saying that I said that they were close.
18    Q    Were you talking about physically --
19    A    No.
20    Q    That you saw them physically close together?
21    A    No.
22    Q    But you did see them physically close
23         together on many times, didn't you?
24    A    I saw them standing side by side.  Whether
25         that's defined as physically close, I --
```

MAXINE JACOBY & ASSOCIATES

H-22

51

```
 1    Q    We'll let the testimony stand that you saw
 2         them standing side by side, and someone could
 3         make a decision whether that's close or not.
 4    A    Okay.
 5                   MR. LANZILLO:  We should also let
 6         the witness finish her answers, too.
 7                   MR. OLDS:  Okay.
 8    Q    The police officer reports you as saying,
 9         quote, Seneta indicated that when she entered
10         she felt as if she were interrupting
11         something, end quote.  Did you say something
12        .to that effect to the police officer?
13    A    Interrupting conversation.
14    Q    So when he writes interrupting something,
15         what you said was interrupting conversation,
16         is that right?
17    A    Correct.
18    Q    That's what your recollection is today?
19    A    Yes.
20    Q    Did you feel that you were interrupting
21         something when you entered into the room,
22         into the storage room and you would find the
23         two of them before school alone?
24                   MR. LANZILLO:  Objection to form.
25         Conversation is something.  If you're asking
```

MAXINE JACOBY & ASSOCIATES              H-23

52

1   her if it's something else --

2              MR. OLDS:  Hey, you know what, you

3   can object to form.  Make your objection.

4   Please don't make an argument on the record.

5   Don't tell her how to answer the question.

6              MR. LANZILLO:  I'm not, but

7   objection to form.

8              MR. OLDS:  Make your objection, and

9   then let her answer the question.

10              THE WITNESS:  Could you repeat the

11   question?

12              MR. OLDS:  Sure.

13   Q   When you entered the room, the storage room

14       and found them there alone in the morning, no

15       one else there, did you feel that you were

16       interrupting something?

17              MR. LANZILLO:  Objection to form.

18   Vague and ambiguous.

19              THE WITNESS:  I was interrupting

20       their conversation.

21   Q   Did you feel uncomfortable when you entered

22       that room and found them alone together?  Did

23       you feel uncomfortable when you entered that

24       room and found them in there?

25   A   Because I had walked in on their

MAXINE JACOBY & ASSOCIATES                H-24

53

1      conversation, yes.

2    Q   And what we're talking about is the

3        conversation of a 57-year-old man and a

4        12-year-old girl, is that right?  That's the

5        conversation that we're talking about?

6    A   Yes.

7    Q   He was in his 50s, right?

8    A   I guess.  I don't know.  He didn't have a

9        birthday.

10   Q   He quotes you as saying she felt that they

11       had an inappropriate student-teacher

12       relationship, and you wrote that yourself, so

13       that quote is right, is that correct?

14   A   Say that again.

15   Q   He quotes you as saying that, quote, they had

16       an inappropriate student-teacher

17       relationship, end quote.  He got your

18       statement right when he wrote that, is that

19       correct?

20   A   Partially.

21            MR. LANZILLO:  Objection to form.

22   Nothing in this report is quoted.  I will

23   agree with you that the words inappropriate

24   relationship appear in both documents.

25            MR. OLDS:  Good.


MAXINE JACOBY & ASSOCIATES        H-25

54

1   Q    And he reports, the police officer who made

2        this report, states that you, quote --

3             MR. LANZILLO:  You're quoting the

4        record?

5             MR. OLDS:  I'm quoting his record.

6             MR. LANZILLO:  That's fine.

7   Q    He says that you, quote, observed this

8        activity every morning before homeroom, end

9        quote.  Did you tell him that you observed it

10       every morning?

11  A    No.

12  Q    He says that you told him, the police

13       officer, that when you, quote, entered the

14       room, Yarbenet would always try to justify

15       what they were doing, end quote.  Did you

16       make that statement to the officer that

17       Yarbenet would always try to justify what

18       they were doing?

19  A    Not when I entered the room.

20  Q    So it would be a different time when he would

21       justify what he was doing, he would approach

22       you at a different time and try to explain

23       his conduct?

24  A    He would approach me shortly after.

25  Q    And as you look back on it, that didn't make


MAXINE JACOBY & ASSOCIATES

H-26