**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

STACY S.; and JOHN AND        : HONORABLE SEAN J. MCLAUGHLIN
MARY ELLEN S., on behalf      :
of their daughter, LEIGH      :
ANN S., a minor,              :
        Plaintiffs            :
                              :
        v.                    : Civil Action No. 04-150E
                              :
GIRARD SCHOOL DISTRICT;       :
ROBERT SNYDER, Individually;  :
and in his capacity as        :
Principal of the Rice         :
Avenue Middle School; and :
GREGORY YARBENET, a           :
professional employee of :
the Girard School             :
District,                     :
        Defendants            : Jury Trial Demanded

Deposition of LINFORD LEE MANROSS, taken before
and by Sonya Hoffman, Notary Public in and for the
Commonwealth of Pennsylvania on June 8, 2005,
commencing at 1:35 p.m., at the offices of Knox
McLaughlin Gornall & Sennett, P.C., 120 West
Tenth Street, Erie, PA 16507.

Reported by Sonya Hoffman
Ferguson & Holdnack Reporting, Inc.

---

**Page 2**

A P P E A R A N C E S

For the Plaintiffs:

        Edward A. Olds, Esquire
        1007 Mount Royal Boulevard
        Pittsburgh, PA 15223

For the Defendants:

        Richard A. Lanzillo, Esquire
        Neal R. Devlin, Esquire
        Knox McLaughlin Gornall & Sennett, P.C.
        120 West Tenth Street
        Erie, PA 16507

I N D E X

LINFORD MANROSS

    Direct Examination by Mr. Olds . . . . . . . . 3

---

**Page 3**

L I N F O R D   L E E   M A N R O S S, first
having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. OLDS:

    Q.    Good afternoon, Mr. Manross. I'm Ed Olds, we just
met, and I represent Stacy S█████ and Leigh Ann S████████
in a lawsuit against the Girard School District and Robert
Snyder. And we're here to see if you have any information
pertinent to that case.

          Have you had a chance to talk to the School
District's lawyers at all about this deposition?

    A.    A little bit, yes.

    Q.    When did you meet with them?

    A.    It's been several months ago.

    Q.    Okay. And when you met with them, who was all --
who attended the meeting?

    A.    Mr. Lanzillo and his paralegal, I can't remember
her name now.

    Q.    And did that happen at the School District?

    A.    Yes, it did.

    Q.    I don't know if Mr. Lanzillo had a chance to
explain to you, but this is a Civil Rights action brought
under the United States Constitution. And as a public

---

**Page 4**

employee, your participation in this proceeding -- this is
like a court proceeding, your participation in this
proceeding is protected by the First Amendment to the United
States Constitution.

          So that you -- in a sense, you don't have any
choice but to be here because we noticed your deposition and
the School District agreed to produce you without a
subpoena; but it's as if you're participating in a judicial
proceeding in a court, the only thing is there's no judge
here. And there can't be any retaliation against you for
anything you say here or whatever you say, because that
would violate your First Amendment rights as a public
employee, okay?

          For the record, would you state your full name and
address.

    A.    My name is Linford Lee Manross.

    Q.    Okay.

    A.    My address is 217 Thomas Street, Cambridge
Springs, PA 16403.

    Q.    And you teach at the Girard School District.

    A.    That's correct.

    Q.    How many years have you taught there?

    A.    Of the past 20 years, probably 18 of those.

    Q.    And the two years you didn't teach there, did you
teach somewhere else?

I-1

1  A. Yes. I was subbing in different places, yes.
2  Q. And you teach 8th grade science, right?
3  A. No. I teach 7th grade science.
4  Q. And I take it that you knew Mr. Yarbenet; is that
5  right?
6  A. That's correct.
7  Q. Were you -- did you and he socialize outside the
8  school?
9  A. No. I live quite a distance away. I drive 27
10  miles one way, so I would not be up to do that.
11  Q. And can you tell me where you were when you heard
12  that he was being taken out of the school for molesting
13  young girl students?
14  A. I was in the school building, I know that, that's
15  been a while back.
16  Q. Do you remember how you found out about it, that
17  he was being taken out of the school building and being
18  charged with molesting girls?
19  A. To the best of my recollection, I think it was a
20  word-of-mouth thing and I couldn't say how.
21  Q. Where was your room relative to his room?
22  A. My room was next to his and there was a wall
23  separating the two rooms.
24  Q. Did you have occasion to be in his room
25  frequently?

5

1  A. No.
2  Q. There was a supply closet -- or there was a supply
3  room or closet next to his room; are you familiar with that?
4  A. Uh-huh.
5  Q. Were you ever in that room?
6  A. On a few occasions.
7  Q. Did you keep supplies in that room as well?
8  A. No.
9  Q. By any chance did you share any facilities with
10  Mr. Yarbenet like a lab or anything like that?
11  A. Not really.
12  Q. Had you ever observed -- personally observed
13  Mr. Yarbenet engage in conduct that you thought was
14  improper?
15  A. No.
16  Q. And did you ever see him engage in conduct that
17  you thought was questionable?
18  MR. DEVLIN: Object to form. You can answer.
19  Q. In your mind --
20  A. Pardon me?
21  MR. DEVLIN: I'm just placing an objection to the
22  form, I do that for the record. You can answer
23  his question.
24  A. Yes.
25  Q. Tell me what that was.

6

1  A. I guess what I would see would be personal space,
2  proximity, that I would feel uncomfortable with, things like
3  that.
4  Q. Tell me what you mean by personal space,
5  proximity.
6  A. Standing very close, arm around somebody,
7  something like that.
8  Q. With his arm around female students?
9  A. Yes.
10  Q. Where would he be when you would observe him
11  standing with his arm around female students?
12  A. In the hallway outside his door.
13  Q. Did you ever see him with his arm around either
14  Stacy or Leigh Ann?
15  A. I honestly don't think I did.
16  Q. Was the window to his classroom door covered so
17  you couldn't see in the classroom?
18  A. There was something on there at one time.
19  Q. Do you remember what it was?
20  A. Couldn't tell you that now, it's been quite a
21  while.
22  Q. Did you ever bring that condition to anyone's
23  attention, the fact that you couldn't see into his
24  classroom?
25  A. I don't recall having done that, no.

7

1  Q. Did you ever -- do you recall whether you ever
2  talked to Robert Snyder or either of the assistant
3  principals, that would be Mr. Hahesy or Mr. McClelland,
4  about your observations of Mr. Yarbenet having his arm
5  around students or standing too close to students?
6  A. No.
7  Q. Did you talk about that matter with other faculty?
8  A. After the fact, yes.
9  Q. Was there a school rule that prohibited teachers
10  from having physical contact with students?
11  A. I'm not specifically aware of that, but from my
12  own personal opinion, I would not do that.
13  Q. How would he have -- describe what you observed
14  specifically in terms of him having his arms around
15  students.
16  A. What I can recall was him putting his arm around
17  her shoulder in the hallway.
18  Q. And you observed that on more than one occasion?
19  A. I don't recall that it was more than one occasion.
20  Q. So you saw it on one occasion?
21  A. Uh-huh.
22  Q. You don't remember who the student was?
23  A. No.
24  Q. Was it a female student?
25  A. To my knowledge, yes.

I-2

8

1   Q.   Was it before or after -- was it when Sandy was in
2   the Girard School District or was it prior to that?  When I
3   say Girard School District, was it when Sandy was at the
4   middle school or was it prior to that?
5       A.   I'm not clear on that part, it's been a quite a
6   while back.
7       Q.   Did you talk to him when you saw him in this
8   state?
9       A.   I don't recall because under the circumstances the
10  hallway was filled with a number of students, the classes
11  were changing, I was going down the hall for something, and
12  I don't recall that I did or did not talk to him.
13      Q.   But apparently that situation made an impression
14  on your mind.
15      A.   Uh-huh.
16      Q.   Can you tell me why you think it made an
17  impression on your mind.
18      A.   Because from my perspective, I would feel
19  uncomfortable doing something like that.
20      Q.   Was it an intimate hug?
21      A.   It didn't seem to be, no.
22      Q.   Did you ever enter his classroom when he was alone
23  with one student?
24      A.   There was one occasion, yes.
25      Q.   Tell me about that.

9

1       A.   I was looking for equipment to set up for
2   something, test tube beakers or something, and I stepped
3   into his classroom, and I can't even tell you who the person
4   was now, they were in the back of his room.
5       Q.   Was it a female?
6       A.   To my knowledge, if I remember, yes.
7       Q.   Were the lights on or off?
8       A.   The lights were off at that time.
9       Q.   They were off?
10      A.   Yes.
11      Q.   And he was in the classroom with that individual?
12      A.   (Witness nods head.)
13      Q.   You have to say yes or no for the court reporter.
14      A.   Yes.
15      Q.   What did you observe on that occasion?
16      A.   Mr. Yarbenet and the student were in the back of
17  the room, I was not clear as to what they were doing.  He
18  had some equipment back there, notably a tornado generator
19  and his computer in the back of the room, and I just stepped
20  in to grab some glassware and run in and out.
21      Q.   Did you talk to him on that occasion?
22      A.   I'm sure I did because I was looking for some
23  equipment.
24      Q.   Did you feel uncomfortable entering into the
25  classroom and finding him alone with a student?

10

1       A.   Yeah.
2       Q.   What made you feel uncomfortable?
3       A.   Just a startled surprise, I guess, on his part.
4   Basically, I wasn't expecting anybody to be in there and I
5   just stopped to grab some lab equipment.
6       Q.   Because the lights were out.
7       A.   Uh-huh.
8       Q.   And you say that you thought that he was startled.
9       A.   I think it was a startled reaction, yes.
10      Q.   Do you remember when this happened, what year?
11      A.   Oh, golly, it's back when he had that tornado
12  generator and that was some time ago.  I couldn't tell you
13  that.
14      Q.   Tell me what the tornado generator was.
15      A.   It was a device to create a tornado vortex using
16  PVC pipe and a fan and I think it was smoke or something.
17  It was roughly four or five feet tall in the back of the
18  room.
19      Q.   And there was also a computer back there.
20      A.   Yeah.  His computer was back on the desk in the
21  back of the room.
22      Q.   Was he touching that student when you walked in?
23      A.   I don't recall that happening.
24      Q.   Was he close to the student?
25      A.   I'm trying to remember, they were both in the back

11

1   of the room.  As far as proximity goes, I don't recall that,
2   because I was in a hurry, I needed some stuff right away,
3   and I grabbed the stuff and took off.
4       Q.   Did you talk about that encounter that you had
5   with him in his room, when there was a student there without
6   lights on, did you talk about that encounter with anyone?
7       A.   No.
8       Q.   Did you ever attend any training on sexual
9   harassment while as a teacher for the Girard School
10  District?
11      A.   We had an in-house class at one time quite a few
12  years ago on a teacher workday.
13      Q.   And do you remember what the topics were, what
14  topics were discussed in that class?
15      A.   It's been quite a while back and it was at the
16  high school.
17      Q.   Do you know who the Title IV officer of the Rice
18  Avenue Middle School was?
19      A.   I'm afraid I don't know that.
20      Q.   Did you think -- when you encountered him alone in
21  his classroom in the dark with a student, did you think that
22  there was something wrong with that?
23      A.   I felt a little surprised, but as I said, I was
24  rushing between classes to grab some equipment and run back
25  out.

I-3    12

1     Q.  Do you know whether the student that you observed
2 in the classroom on that situation with him was the same
3 student that he had his arms around in the hallway?
4     A.  I don't think so.
5     Q.  Did you ever have any discussions with Mr. Snyder
6 that involved anything about Gregory Yarbenet? Did you ever
7 talk to Mr. Snyder about Gregory Yarbenet?
8     A.  I can't recall any situations where we discussed
9 things about Greg.
10     Q.  Did you ever complain to Mr. Snyder about Gregory
11 Yarbenet?
12     A.  No.
13     Q.  Did you ever -- what was your opinion of Gregory
14 Yarbenet as a teacher?
15     A.  I would not rate him as a top-notch teacher.
16     Q.  Why is that?
17     A.  Well, because the methodology that he used in the
18 classroom did not seem to prepare them well for coming into
19 7th grade.
20     Q.  Would you typically socialize with the same group
21 of teachers at school on a daily or weekly basis? In other
22 words, to make that a simpler question, were there some
23 faculty members that you were friendly with or socialized
24 with or ate lunch with in the 1998 through 2001 period?
25     A.  It kind of works like this, with your schedule you

13

1     A.  I'm not sure about that one.
2     Q.  You indicated that even though you felt that
3 Mr. Yarbenet wasn't a top-notch teacher and that he didn't
4 prepare 6th grade students for 7th grade science, you didn't
5 discuss that fact or matter with Mr. Snyder.
6     A.  No.
7     Q.  What about with either Mr. Hahesy or
8 Mr. McClelland, did you ever discuss that fact with either
9 of them?
10     A.  No.
11     Q.  The time that you observed him, Mr. Yarbenet, in
12 the room with a female student alone, did you discuss that
13 with either Mr. Hahesy or Mr. McClelland?
14     A.  I don't think I did.
15     Q.  Do you recall ever discussing any aspect of
16 Mr. Yarbenet's conduct with either McClelland or Hahesy?
17     A.  No.
18     Q.  Were you ever present when other teachers were
19 discussing Mr. Yarbenet's conduct?
20     A.  After the fact, in hindsight (sic).
21     Q.  Tell me what you recall of the conversations that
22 occurred after the fact.
23     A.  Well, we seemed to look back and say, we miss
24 something here, what did we see, did we miss something, did
25 we overlook something here. And I don't recall that anybody

15

1 meet individuals at a certain time about every day and many
2 people you don't see at all for most of the year.
3     Q.  Who did you meet? Did you have your lunch in the
4 faculty room?
5     A.  Yes.
6     Q.  Who was typically there when you had your lunch?
7     A.  This goes back quite a ways and I'm not sure I can
8 remember all of those people.
9     Q.  Do you remember anyone?
10     A.  It seemed at that time we had a fairly large group
11 of people there. And I'm trying not to confuse with people
12 that I've had lunch with in the past few years, that's been
13 quite a while back.
14     Q.  Okay. Do you think Robin Seneta, she's another
15 science teacher; is that right?
16     A.  Yes.
17     Q.  Would you eat lunch with her?
18     A.  No.
19     Q.  What about Debbie Karwoski, do you know if you ate
20 lunch with her?
21     A.  No. She ate about the same lunchtime, I think,
22 but she usually was in her classroom by herself.
23     Q.  Do you recall if you ate lunch with Sara Chuzie?
24     A.  On occasion, yes, that sounds right.
25     Q.  Mary Werling?

14

1 came up with anything specific.
2     Q.  Were you aware that Ms. Seneta had encountered
3 S████ █████ and Yarbenet in the closet of his room on a
4 number of occasions?
5     A.  No.
6     Q.  She never told you that?
7     A.  Not that I can recall.
8     Q.  Were you aware that Yarbenet took S████ out of
9 Mary Werling's class on a weekly basis?
10     A.  No.
11     Q.  Did she ever tell you that?
12     A.  No.
13     Q.  Did you know that Yarbenet released the students
14 from his homeroom class, which was the TV room, did you know
15 that he released them early?
16     A.  Boy, I don't remember that part.
17     Q.  You've talked about two encounters -- or two
18 situations that you observed -- well, one situation where
19 you observed Yarbenet with his arm around a student and
20 that -- I think that you said -- I forget how you described
21 that, but you talked about that situation. And you also
22 talked about a situation of encountering Yarbenet alone with
23 a student in his classroom in the dark.
24     Did you ever see Yarbenet alone with students on
25 any other occasion?

16

I-4

**Page 17**

1  A.  After school riding in a red convertible.
2  Q.  Tell me what you remember about seeing Yarbenet
3  with students after school in a red convertible.
4  A.  Leaving the school parking lot with a student in
5  there.
6  Q.  Was it always a female student?
7  A.  The one time I can recall, yes.
8  Q.  Was it Stacy or was it a different female?
9  A.  I'm thinking it was Stacy.
10  Q.  And who were you with when you saw that?
11  A.  I'm telling you, whether I was by myself or
12  carpooling, I don't remember now.
13  Q.  So you were in the parking lot?
14  A.  Yes.
15  Q.  And there might have been other teachers there or
16  not, you can't recall.
17  A.  No.
18  Q.  Did you mention to either Mr. Snyder or Mr. Hahesy
19  or Mr. McClelland the fact that you saw Yarbenet leave the
20  parking lot with a student in his red convertible?
21  A.  I don't recall doing that, no.
22  Q.  Did you talk to anyone else in the administration
23  or any school board members about observations that you had
24  made concerning Gregory Yarbenet?
25  A.  No.

**Page 19**

1  A.  The administration.
2  Q.  Did your planning period change every year?
3  A.  It was the same for several years and then it
4  became a change. It seemed like it stayed the same for two
5  or three years and then change, stay the same for two or
6  three years and then change.
7  Q.  Did you have the same planning period that
8  Yarbenet had; do you know?
9  A.  I think we might have sometimes, but sometimes
10  not.
11  Q.  Do you recall what your planning period was in '98
12  or '99?
13  A.  Not on a bet.
14  Q.  Were you -- by any chance, were you present in the
15  faculty room or present when a Dave McNally made a comment
16  about Yarbenet?
17  A.  Dave McNally?
18  Q.  Or Mr. McNally. Is there a Mr. McNally.
19  A.  Bill McNally.
20  Q.  Bill McNally. Were you present when he made a
21  comment about Yarbenet?
22  A.  I can't remember that.
23  Q.  Something to the effect that the guy always had a
24  smile on his face.
25  A.  I don't recall any of that. It may have been, I

**Page 18**

1  Q.  Were you surprised when Yarbenet was arrested?
2  A.  Very much.
3  Q.  Well, after he was arrested, did you think back
4  and say there were signs that I should have saw.
5  A.  I think I went through that process, yes.
6  Q.  And what did you conclude?
7  A.  That I saw nothing overtly that would put a child
8  in danger that I would be required to report. I just saw
9  things that each teacher has their own style and that would
10  not be my style.
11  Q.  Well, aside from the two things that you've
12  talked about -- that we've talked about so far, can you
13  think of other things that you saw that would fit in under
14  this style that it wouldn't be your style; in other words,
15  other things that Yarbenet did?
16  A.  I tend to be a little more standoffish, I guess,
17  keeping my distance and that's just my own perspective
18  (sic). Other than that, I don't know of anything specific.
19  We would rarely see each other, we'd go long periods of time
20  without seeing each other.
21  Q.  How did you -- as a teacher, did you get to select
22  your free period, your planning period?
23  A.  No.
24  Q.  Who scheduled the planning period, to your
25  knowledge?

**Page 20**

1  don't recall it.
2  Q.  Well, you don't recall it, right?
3  A.  (Witness shakes head.)
4  Q.  Somehow you learned that Yarbenet was taken out of
5  the school, and at some point -- do you think it was the
6  same day that he was taken out of the school, that you
7  learned it was because he was being accused of molesting a
8  female student?
9  A.  I don't know if it was the same day, but it was
10  very close to that.
11  Q.  And you engaged in conversations about the
12  situation with other faculty members, right?
13  A.  Uh-huh.
14  Q.  Do you specifically recall which faculty members
15  that you might have talked to?
16  A.  No, because it seemed like everybody was talking.
17  Q.  What was everyone saying?
18  A.  Quite shocked. I don't recall specifically, but
19  quite shocked that it happened.
20  Q.  Would it be safe to say that generally there was
21  disbelief at the beginning?
22  A.  Yeah.
23  Q.  And why -- can you like sort of explain why there
24  was that disbelief.
25  A.  I guess because that's one of us and it's almost

I-5

1 like, what's happening. We were trying to comprehend this
2 thing.
3    Q.   Do you recall whether there was – were you aware
4 if there was any community sort of consensus about these
5 allegations when they initially surfaced?
6    A.   I do not know.
7    Q.   Because you're really not part of the community,
8 right –
9    A.   Right.
10    Q.   – you come from Cambridge Springs. After
11 Yarbenet was taken out of the school, did Mr. Snyder ever
12 come talk to you and ask, you know, whether you had seen
13 anything or whether there'd been anything about Yarbenet
14 that made you uncomfortable?  This would be after Mr.
15 Yarbenet was taken out of the school.
16    A.   I don't recall that happening.
17    Q.   What about Mr. McClelland, did he have that
18 conversation with you?
19    A.   No.
20    Q.   Did anyone from the administration come and talk
21 to you and sort of like, you know, do a debriefing or
22 postmortem, how did this happen?
23    A.   No.
24    Q.   Did you hear that that kind of process took place
25 with any of the other teachers?

21

1    A.   Not that I'm aware of, no.
2    Q.   Were there any policies in the School District
3 that changed after Yarbenet was taken out of the school?
4    A.   Not that I'm aware of.
5    Q.   Did anyone from the School District instruct you
6 not to talk to us, you know, either Ms. ~~Snavery~~
7 Mr. ~~————~~ representatives?
8    A.   No.
9    Q.   Did you receive an e-mail from Mr. McClelland that
10 indicated that you weren't supposed to talk to us?
11    A.   I don't think so, that I can recall.
12    Q.   This document was marked as Deposition Exhibit No.12
13 5 in Robin Seneta's deposition, it's an e-mail; do you
14 recall if you received that?
15    A.   I think I did see that one, yes.  This is Dr.
16 Maynard when he came on board.  Yes, I do think I saw that
17 one.
18    Q.   Did you talk to Mr. McClelland about this e-mail
19 after you received it?
20    A.   No.
21    Q.   Did you talk to Ms. Seneta about the e-mail?
22    A.   I can't recall having a conversation about that.
23    Q.   Okay.  Did you ever hear of any – strike that.
24 Do you know a guy named Wade Fosberg?
25    A.   Yes, I do.

22

1    Q.   Did you have a conversation with him after
2 Yarbenet was arrested about what had gone on in the school?
3    A.   Yes, I did.
4    Q.   What did you tell Mr. Fosberg?
5    A.   He asked me what was going on.
6    Q.   Do you remember what you told him?
7    A.   It seems to me I probably mentioned something
8 about the fact that from what we're hearing in the news that
9 it was a molestation case.  I can't recall specifically.
10    Q.   Did you tell him that you knew that teachers had
11 been concerned about Yarbenet's relationships with young
12 girls?
13    A.   I can't recall making that statement.
14    Q.   Did you tell him that you had heard that teachers
15 had gone to Mr. Snyder and complained about the fact that
16 Yarbenet would keep his door closed, the classroom dark, the
17 window on his door covered; did you tell Mr. Fosberg about
18 that?
19    A.   Boy, I don't know.  I know I had a conversation
20 with him, it's been a while back, but I don't know that I
21 can say yes on that one.
22    Q.   Did you know whether teachers had gone to
23 Mr. Snyder and complained about Mr. Yarbenet?
24    A.   No.
25    Q.   You don't know?

23

1    A.   I don't recall that, no.
2    Q.   So you don't know if they did or not, or you don't
3 recall?
4    A.   I don't recall if they did or not.
5    Q.   Did anyone – has anyone from the administration
6 ever talked to you, from the date Yarbenet was taken out of
7 the school which is sometime in March of 2002 until the
8 present, about Yarbenet?
9    A.   No.
10    Q.   Had you ever heard of any other actions on behalf
11 of – that other faculty members or other staff in the
12 School District had engaged in sexual misconduct with
13 students or – yes, sexual misconduct with students?
14    A.   Could you repeat that, please.
15    Q.   I'm sorry, that was a bad question.  In terms of
16 the entire School District, had you heard of any other
17 incidents involving faculty or staff that suggested sexual
18 misconduct with students?
19    A.   Other faculty members?
20    Q.   Yes.
21    A.   No.
22    Q.   Aside from Yarbenet?
23    A.   (Witness shakes head.)
24    Q.   There was a teacher named Vargo (sic); did you
25 know anything about a teacher Vargo?

I-6

24

## AFFIDAVIT OF E██████ G██████

1.     My name is E██████ G██████. I reside at ████████████, Cranesville, Pennsylvania 16410. I was born ████████ 1986, and am eighteen years old. I will be attending Liberty College in Virginia in the fall.

2.     In the 1998-1999 school year I was in sixth grade at Rice Avenue Middle School in Girard.

3.     Sometime during that school year I heard a rumor that my English teacher, Mr. Verga, was looking at pornography on his computer in his classroom. Many times when students entered his room, he would put an assignment on the board that we were to work on in class, and he would be on the computer while we worked. His desk was next to the pencil sharpener, and if we needed to sharpen our pencils, it was impossible not to see what he was looking at.

4.     One day another student and I saw him looking at pictures of naked women. We went to the guidance counselor's office and left a note in her box that she called the "safe zone," where students could leave a message about something confidential. We told her in the note that we saw naked women on Mr. Verga's computer.

5.     The guidance counselor, Mrs. De Marco, called us to her office. She said she had talked to Mr. Snyder about it. She said it was probably just artwork and we shouldn't make a big deal out of it.

6.     Then Mr. Snyder called us to his office several days later for a meeting with him and Mrs. De Marco. They said they had looked into it, and it was either artwork or Mr. Verga was testing the new computer security system. They said we needed not to make a big deal out of it. They made me feel stupid for saying anything.

J-1

7.    Either at the first meeting with Mrs. De Marco or at the meeting with her and Mr. Snyder, she said we should keep this a secret and not tell anybody.

8.    I didn't tell anybody else about it until my friend, H████ S█████, told her mother that I had been told not to tell, and her mother told my mother.

9.    During that same school year, I had Mr. Yarbenet for science. He didn't spend much time teaching. We watched a lot of movies and spent a lot of time talking.

10.    The girl S████, who brought this lawsuit, was a year older, in seventh grade. Every single day, or at least it seemed like every day, S███ would come to science class. She would get a pass every day. Sometimes she would sit in his chair, and sometimes they would talk about plans for her to go to his house after school, and sometimes they would go together to the storeroom next to his classroom.

11.    Students were jealous of all the attention Mr. Yarbenet gave S███. People would gossip and laugh about their relationship while they were in the storeroom. My impression is that the whole school knew about them. If you said "Yarb's girlfriend," everybody knew who you meant.

12.    I saw them together a lot, not just in my science class, but also they would be in his room alone during class breaks, and I would see him giving her rides after school in his car. They were always very close, so close they touched, and he would be flirting with her.

J-2

Date: 7/21/2005

Witness:

Elizabeth Gilson

Carolyn Spicer Russ, Esquire
Pa. ID 36232

1007 Mount Royal Blvd.
Pittsburgh PA 15223

J-3

## FORM OF ACKNOWLEDGMENT BY
## AN ATTORNEY AT LAW

Commonwealth of Pennsylvania

County of _Allegheny_

On this, the _21st_ day of _July_____, 2005, before me _Joann Matoka_, the undersigned officer, personally appeared _Carolyn Spicer Russ_, known to me (or satisfactorily proven) to be a member of the bar of the highest court of said state, Supreme Court ID Number _36232_, and a subscribing witness to the within instrument, and certified that she was personally present when ~~Elizabeth M. Gilmore~~, whose name is subscribed to the within instrument executed the same; and that said person acknowledged that he executed the same for the purposes therein contained.

   In witness whereof, I hereunto set my hand and official seal.

_Joann Matoka_
Notary Public

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Joann Matoka, Notary Public
Shaler Twp., Allegheny County
My Commission Expires Feb. 2, 2008
Member, Pennsylvania Association Of Notaries

# Signed Statement of

# Robin Seneta

## Requested by:
## Police Chief Bucho
## Sergeant Vandamia
## Mr. Walter Blucas
## Mr. Bob Snyder

## On
## March 28th, 2002

K-1

I have been asked to write this statement in regards to the complaint that has been filed against 6th grade Science Teacher Greg Yarbenet. I was approached by Sergeant Vandamia, Police Chief Bucho, Mr. Walter Blucas and Mr. Bob Snyder on March 28th, 2002 at 10:00. At that time I was questioned about the relationships that existed between Mr. Yarbenet and his students-one in particular S████ █████. I stated that Mr. Yarbenet had (what I considered to be) an inappropriate teacher-student relationship with her. By this I meant that I found it odd on several occasions to find them conferring, or meeting behind closed doors before or after school in the room that connects both his and my room. I also discussed the fact that although I did find them in these uncomfortable situations, that I had never witnessed or believed that there was any physical inappropriateness involved. Mr. Yarbenet always seemed to justify these actions by explaining that the families were close and that they were good friends. When questioned as to whether I had ever heard any conversations that caught my attention one particular episode came to mind. Some time in the fall I entered my back room to find Mr. Yarbenet and S████ there laughing. I attempted to mind my own business but then the conversation was directed towards me explaining an event that occurred between them the weekend before. Although I do not remember the specifics of the conversation I do recall there was mention of them spending time together that weekend at a creek where Yarb had gotten her white t-shirt wet by splashing her with water.

*Robin Seneta*

0000001000

K-2

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STACY S.; and JOHN and MARY ELLEN S., on behalf of their daughter, LEIGH ANN S., a minor | ) ) ) | Civil Action No. 04-150E |
| Plaintiff, | ) ) ) | Jury Trial Demanded |
| v. | ) ) | |
| GIRARD SCHOOL DISTRICT; ROBERT SNYDER, Individually and in his capacity as Principal of the Rice Avenue Middle School; and GREGORY YARBENET, a professional employee of the Girard School District, Defendants. | ) ) ) ) ) ) ) ) ) | |

## AFFIDAVIT OF GREG SENYO

Greg Senyo, being duly sworn, deposes and states and follows:

1. I am an adult individual. I reside at ▓▓▓▓▓▓▓▓▓▓, Russell, PA 16347. I was the building manager for the Girard School District from July 1996 to September 2003. As supervisor of the Girard School District maintenance crew, I supervised custodial and maintenance staff in their activities at the Rice Avenue Middle School.

2. One of my responsibilities was insuring that the School District grounds, equipment, and activities complied with local, state, and national safety rules. The School District buildings were regulated by various bodies, and from time-to-time, the Erie County Health Department would inspect the building.

L-1

0000001061

3.  Because of my job duties, which included insuring the building's compliance with safety rules, I had several encounters with the Defendant, Gregory Yarbenet. These encounters occurred because Yarbenet persistently darkened a storage room next to his classroom.

4.  Erie Health Department rules provided that rooms had to have a certain luminosity in order to comply with Health Department standards.

5.  There was a small work room next to Gregory Yarbenet's classroom shared with Robin Seneta, Room 211.

6.  That room was subject to the Health Department regulation regarding lighting. The room separated Yarbenet's classroom, Room 209, from the classroom of the other science teacher, Room 211.

7.  The custodial workers who reported to me repeatedly found that the flourescent lights did not work in the storage room next to Yarbenet's classroom. When they would get out a stepladder to fix the lights, they would find that the lights had not burned out, or in any other way malfunctioned, but that the lights had been unscrewed.

2

L-2

0000001062

8.  I spoke with Yarbenet about this.  He admitted he  was the person who unscrewed the lights.  By unscrewing the lights, he made it impossible to turn on the lights as one entered the room.

9.  The effect of what Yarbenet did was to prevent someone who entered the room to turn on the lights.  It was not a matter of turning off the light.  It was a matter of any authorized person being able to turn on the lights at all.

10.  The effect of Yarbenet's unscrewing the light caused the room to be totally dark, and caused it to be impossible to turn on the lights in the room.

11.  The custodial workers reported that Yarbenet had repeatedly unscrewed the flourescent light bulbs in the room to keep it dark.  This caused the room to be in violation of Heath Department regulations.

12.  I brought this matter to the attention of Assistant Principal Greg McClelland on several occasions.  Each time my reports encountered the room with the lights unscrewed, they would screw in the lights.

3

L-3

0000001063

13. On at least one occasion, I reported the matter to Principal Robert Snyder, as well.

14. When I made my reports to the administrators, they just ignored me. I pointed out the safety violations and they did not care.

Date: 9-9-04

Greg Senyo

Sworn to and subscribed before me this 9TH day of September , 2004.

Robert A. Wilson
Notary Public

```
Notarial Seal
Robert A. Wilson, Notary Public
Conewango Twp., Warren County
My Commission Expires Mar. 7, 2005
Member, Pennsylvania Association of Notaries
```

4

L-4

0000001064

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

STACY S.; and JOHN and MARY ELLEN     )
S. on behalf of their daughter, LEIGH ANN S.,     )
a minor,     )
    )
           Plaintiffs,     )
    )
        vs.     )    C.A. No. 04-150E
    )
GIRARD SCHOOL DISTRICT;     )    Honorable Sean J. McLaughlin
ROBERT SNYDER, Individually and in his     )
capacity as Principal of the Rice Avenue Middle     )    JURY TRIAL DEMANDED
School; and GREGORY YARBENET, a     )
professional employee of the Girard School     )
District,     )
    )
           Defendants.     )

<u>AFFIDAVIT OF KELLI ███████</u>

Kelli ███████ being duly sworn, deposes and states as follows:

1.      I am an adult individual who resides at ███████████, Girard,

Pennsylvania.

2.      In the mid-1990s I took a child into my home. I became her legal foster

mother and eventually adopted her. She is now 20 years old, having been born ███████

███ 1984.

M-1

Case 1:04-cv-00150-SJM     Document 2-

3.     During the 1996-97 school year, when she was twelve years old, this girl confided to me that her teacher, Gregory Yarbenet, at the Rice Avenue Middle School in Girard, had been sexually intimate with her, and she told me that they had had sexual intercourse.

4.     When the girl told me this, we immediately went to see the guidance counselor at the middle school, Mrs. Gayla De Marco. The girl told Mrs. De Marco that Yarbenet was touching her and was quite specific about the fact that they had had intercourse. Mrs. De Marco said to me, "I know you are new at this, [this girl] has a way of telling stories because she wants attention." Mrs. De Marco said that no one else had come to her and said anything similar. When I tried to pursue the matter, Mrs. De Marco said that the girl was a "nothing but a liar."

5.     Our meeting with Mrs. De Marco lasted less than five minutes. Mrs. De Marco indicated no interest in pursuing the matter further or any intention to report our conversation to anyone else.

6.     As soon as Yarbenet was arrested and the matter became public, the girl, who is now my adopted daughter, and I went to the police and told them what had happened. We explained that my daughter prefers not to have her name be used as part of legal proceedings against Yarbenet, but that I was willing to tell what happened without using her name.

M-2

Case 1:04-cv-00150-SJM    Document 20

Date: 6-28-05                              Kelli M ▓▓▓▓▓

                                          /Kelli ▓▓▓▓▓

Sworn to and subscribed

before me this _____ day of

_____, 2005.




_____

Notary Public




M-3

Case 1:04-cv-00150-SJM    Document 25    Filed...

FORM OF ACKNOWLEDGMENT BY
AN ATTORNEY AT LAW

Commonwealth of Pennsylvania

County of _ALLEGHENY_

On this, the _29th_ day of _June_, 200_5_, before me
Joann Matoka, the undersigned officer, personally appeared
_Carolyn Spicer Russ_, known to me (or satisfactorily proven)
to be a member of the bar of the highest court of said state,
Supreme Court ID Number _36232_, and a subscribing witness to
the within instrument, and certified that _s_he was personally
present when _Kelli_ ███████, whose name _is_,
subscribed to the within instrument executed the same; and that
said person_ acknowledged that _s_he_ executed the same for the
purposes therein contained.

In witness whereof, I hereunto set my name and official seal.

_Joann Matoka_
Notary Public

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Joann Matoka, Notary Public
Shaler Twp., Allegheny County
My Commission Expires Feb. 2, 2008
Member, Pennsylvania Association Of Notaries

M-4

Case 1:04-cv-00150-SJM   Document 2...

# Yearbook pages from Stacy S.'s
# 7th Grade Yearbook

N-1



N-2



2002 - 01434 YARBENET GREGORY J

```
***************************** GENERAL INFORMATION *****************************
Clerk s Filing Date..    6/03/2002
         And Time.....       9:28
Case Type/Action.....     1   1  CRIMINAL            COMPLAINT
Docket No. Fin Auth..    CR - 0000095 - 02
OTN.................     H4923914
Final issuing Auth...    2480    MACKENDRICK CHRIS   ID# 00000
Municipality Code...       23    GIRARD BORO
Social Security No...    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

Primary Address 1....    4560 N CREEK ROAD
         Address 2....
City, State, Zipcode.    GIRARD, PA  16417

Alternate Address 1..
         Address 2..
City, State, Zipcode.      00000

Date of Birth........    3/15/1947
Sex.................:    M   (M=Male/F=Female/U=Unknown)
Race................     W   WHITE/CAUCASIAN
Operator License No..    13427204                 State....... PA
Affiant 1...........     403 ED PODPORA           State Police  N
Affiant 2...........     PA0251100 GIRARD PD

Date of Arrest.......    4/08/2002
Mag. Complaint Filed.    4/08/2002
Prelim. Arrign. Date.    4/08/2002                365 Day Date  4/08/2003
Date Waived to Court.    5/29/2002                P/A Time.... 15:35
Prelim. Hearing Date.    5/29/2002

District Attorney....
Defndt Atty/Type 1...    181 B FRIEDMAN PHILIP B, ESQ   ID# 27554   PRIV
Defndt Atty/Type 2...

Date Bail Set........    0/00/0000
Bail Code Desc.......         TEN PERCENT
Surety..............
Bail Set Amount......       75,000.00
Committed Date.......    4/08/2002
In Jail / Fugitive...    N  (Y=In Jail/ N=Not In Jail/ F=Fugitive)
FBI Id Number........
State Id Number......    0000000000
Auto Registration....                             State.....
Public Comments......    RAMS
                         407
Reference Number.....
Court Stenographer...

Height..............               Weight...............
Eye Color...........               Hair Color...........
Physical Features

Office Comments......
```

O-1

Case 1:04-cv-00150-SJM    Document 32-7    Filed 07/22/2005    Page 25 of 49

2002 - 01434 YARBENET GREGORY J

Init. Issuing Auth...  00000
Docket No. Init Auth.   - 0000000 -

Pre-Sentence Invest..  B      PRE-SENTENCE-COUNTY
Trial Commenced Date.  3/04/2003
Trial Judge.........   97   BOZZA JOHN A   ID# 30190
Sentence/ARD Date....  4/11/2003
Effect. Date of Snt..  5/08/2001
Superior Court #.....

Filed/Reopened  Description           Disposition    Disposition Code
   6/03/2002   INITIAL FILING         3/04/2003      D   GUILTY PLEA


********************* ALIAS OR CO-DEFENDANT INFORMATION *********************
             Alias or Co-Defendant Name        Type       Case #


*************************** CHARGE INFORMATION ***************************
     Date    Chrg  Cnt Section    Sub    Grd Desc

   6/01/00 A   001 CC3123    A7    F1  IDSI PERSON LESS THAN 16 YRS AGE
Disposition Date........ 4/11/2003
Disposition Description. PLED GUILTY AS CHARGED
Final Plea.............. 101 GUILTY PLEA                          HDCT
Prison................. 501 DIAGNOSTIC CLASSIFICATION CENTER
Fines and Costs........ 522 COSTS-TOTAL AMOUNT ONLY...$

   6/02/00 B   002 CC3123    A7    F1  IDSI PERSON LESS THAN 16 YRS AGE
Disposition Date........ 4/11/2003
Disposition Description. NOLLE PROSSED
Dismissal.............. 201 NOLLE PROSSED                         HDCT

   2/01/99 C   003 CC3126    A8    M2  IND ASSLT PERSON LESS 16 YRS AGE
Disposition Date........ 4/11/2003
Disposition Description. PLED GUILTY AS CHARGED
Final Plea.............. 101 GUILTY PLEA                          HDCT
Fines and Costs........ 522 COSTS-TOTAL AMOUNT ONLY...$
Misc................... 533 OTHER (SPECIFY)

   2/01/99 D   004 CC3126    A8    M2  IND ASSLT PERSON LESS 16 YRS AGE
Disposition Date........ 4/11/2003
Disposition Description. NOLLE PROSSED
Dismissal.............. 201 NOLLE PROSSED                         HDCT

   2/01/99 E   005 CC3126    A8    M2  IND ASSLT PERSON LESS 16 YRS AGE
Disposition Date........ 4/11/2003
Disposition Description. PLED GUILTY AS CHARGED
Final Plea.............. 101 GUILTY PLEA                          HDCT
Fines and Costs........ 522 COSTS-TOTAL AMOUNT ONLY...$

   2/01/99 F   006 CC3126    A8    M2  IND ASSLT PERSON LESS 16 YRS AGE
Disposition Date........ 4/11/2003
Disposition Description. NOLLE PROSSED
Dismissal.............. 201 NOLLE PROSSED                         HDCT

   2/01/99 G   007 CC3126    A8    M2  IND ASSLT PERSON LESS 16 YRS AGE

C-2

2002 - 01434 YARBENET GREGORY J

```
Disposition Date........... 4/11/2003
Disposition Description. PLED GUILTY AS CHARGED                      HDCT
Final Plea.............. 101 GUILTY PLEA
Fines and Costs........ 522 COSTS-TOTAL AMOUNT ONLY...$

   2/01/99 H    008 CC3126    A8    M2   IND ASSLT PERSON LESS 16 YRS AGE
Disposition Date........ 4/11/2003
Disposition Description. NOLLE PROSSED                               HDCT
Dismissal.............. 201 NOLLE PROSSED

   6/01/99 I    009 CC6301    A1    M1   CORRUPTION OF MINORS
Disposition Date........ 4/11/2003
Disposition Description. PLED GUILTY AS CHARGED                      HDCT
Final Plea.............. 101 GUILTY PLEA
Prison................. 501 DIAGNOSTIC CLASSIFICATION CENTER
Fines and Costs........ 522 COSTS-TOTAL AMOUNT ONLY...$

   6/01/99 J    010 CC6301    A1    M1   CORRUPTION OF MINORS
Disposition Date........ 4/11/2003
Disposition Description. NOLLE PROSSED                               HDCT
Dismissal.............. 201 NOLLE PROSSED

   6/01/99 K    011 CC6301    A1    M1   CORRUPTION OF MINORS
Disposition Date........ 4/11/2003
Disposition Description. PLED GUILTY AS CHARGED                      HDCT
Final Plea.............. 101 GUILTY PLEA
Prison................. 501 DIAGNOSTIC CLASSIFICATION CENTER
Fines and Costs........ 522 COSTS-TOTAL AMOUNT ONLY...$

   6/01/99 L    012 CC6301    A1    M1   CORRUPTION OF MINORS
Disposition Date........ 4/11/2003
Disposition Description. NOLLE PROSSED                               HDCT
Dismissal.............. 201 NOLLE PROSSED

   6/01/99 M    013 CC6301    A1    M1   CORRUPTION OF MINORS
Disposition Date........ 4/11/2003
Disposition Description. PLED GUILTY AS CHARGED                      HDCT
Dismissal.............. 201 NOLLE PROSSED

   6/01/99 N    014 CC6301    A1    M1   CORRUPTION OF MINORS
Disposition Date........ 4/11/2003
Disposition Description. NOLLE PROSSED                               HDCT
Final Plea.............. 101 GUILTY PLEA
Prison................. 501 DIAGNOSTIC CLASSIFICATION CENTER
Fines and Costs........ 522 COSTS-TOTAL AMOUNT ONLY...$

   2/01/99 O    015 CC4304    A    F3   ENDANGERING WELFARE OF CHILDREN
Disposition Date......... 4/11/2003
Disposition Description. NOLLE PROSSED                               HDCT
Dismissal.............. 201 NOLLE PROSSED

  12/01/99 P    016 CC4304    A    F3   ENDANGERING WELFARE OF CHILDREN
Disposition Date........ 4/11/2003
Disposition Description. NOLLE PROSSED                               HDCT
Dismissal.............. 201 NOLLE PROSSED
```

* * * * * * * * * * * * * * * * * * * * * * * * DOCKET ENTRY INFORMATION * * * * * * * * * * * * * * * * * * * * * * * *

O-3

2002 - 01434 YARBENET GREGORY J

Case Type..: CRIMINAL              Case Action..: COMPLAINT

- - - - - - - - - - - - FIRST ENTRY - - - - - - - - - - - - - - -

4/09/01 BOND OF $75,000 10% POSTED BY ELIZABETH YARBENET
--------------------------------------------------------------------
6/03/02 CRIMINAL COMPLAINT FILE FROM D.J. OFFICE.
--------------------------------------------------------------------
7/16/02 WAIVER OF ARRAIGNMENT FILED
--------------------------------------------------------------------
7/26/02 INFORMATION FILED
--------------------------------------------------------------------
8/21/02 MOTION TO EXTEND TIME IN WHICH TO FILE PRETRIAL MOTIONS FILED BY
        ATTORNEY PHILIP FRIEDMAN (COPY)
--------------------------------------------------------------------
8/12/02 MOTION TO EXTEND TIME IN WHICH TO FILE PRE-TRIAL MOTIONS FILED BY
        ATTORNEY PHILIP FRIEDMAN
--------------------------------------------------------------------
8/26/02 ORDER OF COURT DATED 8-22-2002-IT IS ORDERED THAT DEFENDANT'S
        MOTION IS HEREBY GRANTED AND THE DEFENDANT SHALL FILE HIS MOTION
        FOR DISCOVERY AND OMNIBUS MOTION BY SEPTEMBER 13, 2002. JUDGE JOHN
        BOZZA
--------------------------------------------------------------------
9/13/02 OMNIBUS PRETRIAL MOTION FILED BY ATTORNEY PHILIP FRIEDMAN
--------------------------------------------------------------------
9/16/02 RULE TO SHOW CAUSE DATED: SEPTEMBER 13, 2002
        RULE RETURNABLE DATED: OCTOBER 3, 2002 AT 2:30 PM. JUDGE JOHN
        BOZZA
--------------------------------------------------------------------
10/17/02 TRIAL SUBPOENA  FILED AND MAILED BY FIRST CLASS MAIL ON OCTOBER
         17, 2002
--------------------------------------------------------------------
10/17/02 ORDER DATED 10-10-2002-UPON CONSIDERATION OF MOTION TO SUPPRESS,
         IT IS ORDERED THAT THE MOTION IS DENIED. JUDGE JOHN BOZZA (NOTICE
         SENT TO DA AND ATTORNEY FRIEDMAN ON 10-18-2002)
--------------------------------------------------------------------
10/17/02 APPLICATION FOR CONTINUANCE WITH WAIVER OF PROMPT OR SPEEDY TRIAL
         FILED BY ATTORNEY PHILIP FRIEDMAN
--------------------------------------------------------------------
10/17/02 ORDER DATED 10-16-2002IT IS ORDERED THAT THE CASE IS CONTINUED
         UNTIL THE NEXT TERM OF CRIMINAL COURT. JUDGE JOHN BOZZA
--------------------------------------------------------------------
12/13/02 TRIAL SUBPOENA  FILED AND MAILED BY FIRST CLASS MAIL ON DECEMBER
         13, 2002
--------------------------------------------------------------------
12/13/02 JOINT MOTION FOR CONTINUANCE FILED BY ATTORNEY PHILIP FRIEDMAN AND
         COMMONWEALTH ATTORNEY DAMON HOPKINS
--------------------------------------------------------------------
12/13/02 ORDER DATED 12-12-2002-IT IS ORDERED THAT THE CASE IS CONTINUED
         UNTIL THE NEST TERM OF CRIMINAL COURT. JUDGE JOHN BOZZA
--------------------------------------------------------------------
2/13/03 TRIAL SUBPOENA FILED AND MAILED BY FIRST CLASS MAIL ON FEBRUARY
        13, 2003
--------------------------------------------------------------------
3/04/03 DEFENDANT APPEARS IN COURT WITH HIS COUNSEL PHIL FRIEDMAN,ESQ
        BEFORE JUDGE ERNEST J. DISANTIS
        APPEARANCE SIGNED AND FILED
        DEF STATEMENT OF RIGHTS SIGNED AND FILED

O -4

2002 - 01434 YARBENET GREGORY J

THE DEF PLED GUILTY AS CHARGED ON CTS. 1,3,5,7,9,11 & 13; CTS.2,4,
6,8,10,12,14,15 & 16 ARE NOLLE PROSSED
SENTENCED IS DEFERRED UNTIL APRIL 4, 2003 AT 1:30 P.M. BEFORE JUDGE
JOHN A. BOZZA
MEGAN'S LAW APPLIES
CT. REPORTER - M. SAWKA
------------------------------------------------------------------------

4/11/03 DEFENDANT'S ACKNOWLEDGMENT OF POST-SENTENCING RIGHTS SIGNED AND
FILED. JOHN A. BOZZA, JUDGE
CT. REPORTER - L. LATVA
------------------------------------------------------------------------

4/11/03 SENTENCE CT.1: COSTS; 5 YRS TO 10 YRS STATE BUREAU OF CORRECTIONS
TO BE SERVED EFFECTIVE APRIL 10,2003 (EFF DATE OF SENTENCE
INCLUDES A CREDIT OF 2 DAYS FO RTIME SPENT IN THE ECJ) CT 3:
COSTS;MERGES WITH COUNT 1  CT 5: COSTS; 1 YR TO 2 YRS CONSECUTIVE
TO CT 1 CT 7: COST; 1 YR TO 2 YRS CONCURRENT TO CT 5
CT 9:COSTS; 2 YRS TO 5 YRS CONCURRENT TO COUNTS 11 & 13
CT 11: COSTS; 2 YRS TO 5 YRS CONSECUTIVE TO CT 7
CT 13: COSTS; 2 YRS TO 5 YRS CONSECUTIVE TO CT 9
250.00 DNA SAMPLE
RESTITUTION - 3008.00  BOZZA JOHN A
------------------------------------------------------------------------

4/11/03 GUIDELINES FILED
------------------------------------------------------------------------

4/14/03 FILE TAGGED FOR ELECTRONIC TRANSFER OF AOPC THIRD SHEET
------------------------------------------------------------------------

4/17/03 CASH BAIL IN THE AMOUNT OF $7500.00      CHECK NUMBER 3565 RETURNED
ELIZABETH YARBENET
------------------------------------------------------------------------

5/07/03 ORDER DATED 5-6-2003-UPON RECEIPT OF DEFENDANT'S NOTICE OF APPEAL,
IT IS ORDERED THAT DEFENDANT COMPLY WITH RULE 1925 B AND FILE A
CONCISE STATEMENT OF MATTERS COMPLAINED OF ON APPEAL WITHIN 14
DAYS OF THIS ORDER. JUDGE JOHN A. BOZZA (NOTICE SENT TO DA AND
ATTORNEY FRIEDMAN ON 5-8-2003)
------------------------------------------------------------------------

5/05/03 NOTICE OF APPEAL (ORDER DATED 4-11-2003)PROOF OF SERVICE AND
$60.00 FILING FEE FILED BY P FRIEDMAN ESQ
------------------------------------------------------------------------

5/16/03 PA.R.A.P. 1925 (B) STATEMENT FILED BY ATTORNEY PHILIP FRIEDMAN
------------------------------------------------------------------------

6/06/03 TRANSCRIPT OF PROCEEDINGS SUPPRESSION HEARING ON 10-3-2002 BEFORE
THE HONORABLE JOHN BOZZA FILED BY COURT REPORTER ANDREA MUSCARELLA
------------------------------------------------------------------------

6/26/03 TRANSCRIPT OF PROCEEDINGS SENTENCING ON 4-11-2003 BEFOR THE
HONORABLE JOHN BOZZA FILED BY COURT REPORTER LINDA LATVA
------------------------------------------------------------------------

6/30/03 TRANSCRIPT OF PROCEEDINGS PLEA ON 3-4-2003 BEFORE THE HONORABLE
ERNEST DISANTIS ON 3-4-2003 FILED BY COURT REPORTER MONICA SAWKA
------------------------------------------------------------------------

5/21/03 DOCKETED NOTICE OF APPEAL/SUPERIOR COURT # 886 WDA 2003
------------------------------------------------------------------------

7/07/03 MEMORANDUM SIGNED AND FILED JUDGE BOZZA
------------------------------------------------------------------------

7/18/03 ALL PAPERS SENT TO SUPERIOR COURT
------------------------------------------------------------------------

8/19/04 PETITION FOR ALLOWANCE OF APPEAL TO SUPREME COURT NO 886 WDA 2003
FILED ON 8-16-2004

O-5

2002 - 01434 YARBENET GREGORY J

------------------------------------------------------------

2/10/05 ORDER DATED 2-9-2005-IT IS ORDERED THAT THE DEFENDANT IS SCHEDULED
        TO COME BEFORE THE COURT ON MARCH 9, 2005 AT 1:30 PM FOR
        RE-SENTENCING. JUDGE JOHN A. BOZZA (NOTICE SENT TO ADA SAMBROAK
        AND ATTORNEY FRIEDMAN ON 2-10-2005)

------------------------------------------------------------

2/10/05 ORDER DATED 2-9-2005-TRANSPORT ORDER. JUDGE JOHN BOZZA

------------------------------------------------------------

2/14/05 DISPOSITION FOR ALLOWANCE OF APPEAL FILED FROM SUPREME COURT NO
        436 WAL 2004 DENIED OB 1-24-2005 PATRICIAL NICOLA CHIEF CLERK
        SUPREME COURT OF PA

------------------------------------------------------------

2/14/05 ALL PAPERS RETURNED FROM SUPERIOR COURT SHOWING THE FOLLOWING
        JUDGMENT OF THE COURT OF COMMON PLEAS OF ERIE COUNTY BE AND THE
        SAME IS HEREBY JUDGMENT OF SENTENCE VACATED. CASE REMANDED FOR
        RESENTENCING. JURISDICTION RELINQUISHED

------------------------------------------------------------

2/15/05 ORDER DATED 2-15-2005-UPON CONSIDERATION OF THE REQUEST OF COUNSEL
        FOR DEFENDANT THAT THE RE-SENTENCING SCHEDULED FOR MARCH 9 BE
        RESCHEDULED, IT IS ORDERED THAT A RE-SENTENCING IS NOW SCHEDULED
        ON MARCH 11, 2005 AT 9:00 AM. JUDGE JOHN A. BOZZA (NOTICE SENT TO
        DA AND ATTORNEY FRIEDMAN ON 2-16-2005)

------------------------------------------------------------

3/11/05 DEFENDANT'S ACKNOWLEDGMENT OF POST-SENTENCING RIGHTS SIGNED AND
        FILED

------------------------------------------------------------

3/11/05 RE-SENTENCING
        COST; CT 1: STATE BUREAU OF CORRECTIONS 5 YEARS TO 10 YEARS
        EFFECTIVE 3/11/05 WITH 703 DAYS CREDIT TO BE APPLIED
        CT 3; MERGES WITH CT 1  CT 5: MERGES WITH CT 9  CT 7: MERGES WITH
        CT 9
        CT 9: STATE BUREAU OF CORRECTIONS 2 YEARS TO 4 YEARS CONSECUTIVE
        TO CT 1 OF THIS DOCKET
        CT 11: STATE BUREAU OF CORRECTIONS 2 YEARS TO 4 YEARS CONSECUTIVE
        TO CT 9 OF THIS DOCKET
        CT 13: STATE BUREAU OF CORRECTIONS 2 YEARS TO 4 YEARS  CONSECUTIVE
        TO CT 11 OF THIS DOCKET
        $250. DNA SAMPLE  RESTITUTION $3008.00
        BOZZA JOHN A

------------------------------------------------------------

3/11/05 GUIDELINES FILED

------------------------------------------------------------

3/16/05 FILE TAGGED FOR ELECTRONIC TRANSFER OF AOPC THIRD SHEET

------------------------------------------------------------

3/16/05 POST-SENTENCING MOTION FILED BY ATTORNEY PHILIP FRIEDMAN

------------------------------------------------------------

3/18/05 RULE TO SHOW CAUSE DATED:  MARCH 18, 2005
        RULE RETURNABLE DATED: MARCH 30, 2005 AT 10:15 AM. JUDGE BOZZA

- - - - - - - - - - - - - LAST ENTRY - - - - - - - - - - -


*********************** COSTS & FINES INFORMATION ***********************
Case Type..: CRIMINAL
Case Action: COMPLAINT

| Description | Costs/Fines | Pd To Date | Amount Due | In Escrow | Last Pymt |
| --- | --- | --- | --- | --- | --- |
| AUTOMATION FEE | 5.00 | .00 | 5.00 | .00 | 0/00/0000 |

O-6

2002 - 01434 YARBENET GREGORY J

```
   STACY SHAFFER      3,008.67      315.43     2,693.24       15.33   4/05/2005
   COURT FEE             24.90         .00        24.90         .00   0/00/0000
   USER FEE              10.00         .00        10.00         .00   0/00/0000
   CLERKS FEE            90.00         .00        90.00         .00   0/00/0000
   TRANSCRIPTS           55.50         .00        55.50         .00   0/00/0000
   TRANSCRIPTS           42.55         .00        42.55         .00   0/00/0000
   OFF F.E. ACT158        5.00         .00         5.00         .00   0/00/0000
   STATE COST             8.94         .00         8.94         .00   0/00/0000
   H.B. 627 COST          7.66         .00         7.66         .00   0/00/0000
   CVC COSTS             15.00       15.00          .00         .00   3/31/2005
   CCC / VWS COST        25.00         .34        24.66         .00   3/31/2005
   DVC COSTS             10.00         .00        10.00         .00   0/00/0000
   JCS/ATJ FEE           10.00         .00        10.00         .00   0/00/0000
   CONT SER SURG          5.00         .00         5.00         .00   0/00/0000
   DNA COSTS ACT14      250.00         .00       250.00         .00   0/00/0000
                    ----------   ----------   ----------   ----------  ----------
Cost/Fines Total     3,573.22      330.77     3,242.45       15.33   4/05/2005
Cash Bonds Total          .00         .00          .00         .00
```

--- End of Listing ---

O-7

1   COMMONWEALTH OF                   :
    PENNSYLVANIA                      :
2                                     :
                                      :
3       v.                            :        PRELIMINARY HEARING
                                      :
    GREGORY YARBENET                  :
4

5

6

7

8           Preliminary Hearing in the above-captioned

9   matter held on Wednesday, May 29, 2002, commencing

10  at 1:00 p.m., before District Justice Christopher

11  MacKendrick, 6880 Route 215, P.O. Box 53, East

12  Springfield, PA 16411.

13

14

15

16

17  For the Commonwealth:

18      Damon C. Hopkins, Esquire
        Office of the District Attorney
19      Erie County Courthouse
        Erie, PA 16501
20
    For the Defendant:
21
        Philip B. Friedman, Esquire
22      Ambrose Friedman & Weichler
        319 West 8th Street
23      Erie, PA 16502

24
                    Reported by Janis L. Ferguson, RPR
25                    Ferguson & Holdnack Reporting

P-1

1

1     A.   Yes.

2     Q.   But you never talked to them about it.

3     A.   No.

4     Q.   Who was dropped off last?

5     A.   I was.

6     Q.   Everybody else was dropped off before you.

7     A.   Yes.

8     Q.   What happened after everybody else was dropped

9 off?

10    A.   Once the last girl was dropped off, he stopped at

11 a stop sign on Ethel and Daggett, and he leaned over and

12 asked me if he could steal a kiss.

13    Q.   Steal a kiss.

14    A.   That's what he said.  "May I please steal a kiss."

15    Q.   What did you say?

16    A.   I didn't say anything.

17    Q.   What happened then?

18    A.   He pulled me into him and began to kiss me.

19    Q.   Kiss you how?  Kissed you on the cheek?

20    A.   No.  On the lips.

21    Q.   On the lips.  The kind of kiss you give your mom

22 at the end of the night?

23    A.   No.

24    Q.   No.  What kind of kiss was it, then?

25    A.   Deep, with tongue, and he was feeling up and down

P-2   20

1    my back and sides towards my breasts.

2        Q.    Did he actually touch your breasts?

3        A.    Yes.  Above clothing and coat.

4        Q.    So over your clothing and your coat.

5        A.    Yes.

6        Q.    Did you kiss him back?

7        A.    No.

8        Q.    Did you do anything with your hands?

9        A.    No.

10       Q.    Did you try and stop him?

11       A.    No.

12       Q.    Did you say anything to him?

13       A.    No.

14       Q.    How old were you on February 4th of 1999?

15       A.    I was 13.  I'm having a hard time with numbers

16   today.  I'm really, really nervous.

17       Q.    When is your birthday?

18       A.    ████████, 1985.

19       Q.    ████/85.

20       A.    Yes.

21       Q.    So in 1998, you would have been 13.

22       A.    Yes.

23       Q.    So 1999, February --

24       A.    I was still 13 at the time.

25       Q.    So you were still 13.

P-3

1    A.   Yes.

2    Q.   What else happened?  Anything?

3    A.   He -- once he began driving again, he told me how

4   it affected him and how much he loved me, how it sent him

5   soaring, I believe.  And he said that's why he never became

6   an astronaut, because he didn't have to go into space to

7   actually get the feeling.  He could do that just from

8   kissing me.

9    Q.   And that's the first time he ever kissed you?

10    A.   Yes.

11    Q.   And he told you all of that afterwards?

12    A.   Yes.

13    Q.   We're still talking about Mr. Yarbenet?

14    A.   Yes.

15    Q.   Sitting over there (indicating).

16    A.   Yes.  And then he stopped again on the way to my

17   house.

18    Q.   Where did he stop that time?

19    A.   At a mailbox near Shady Lane.

20    Q.   Did he tell you why he was stopping there?

21    A.   No.

22    Q.   Did he tell you he was going to stop?

23    A.   No.

24    Q.   What happened when he stopped?

25    A.   He began, again, the same thing as before.

P-4

22

Case 1:04-cv-00150-SJM    Document 25    ...

1   Q.   Kissing you again?

2   A.   Yes.

3   Q.   Did you kiss him back?

4   A.   Yes.

5   Q.   Did you like the attention you were getting from

6   him?

7   A.   Extremely.  My father was rather -- he didn't give

8   me much attention at all.  I had the hardest time even

9   getting him to say hi to me, and I was really reveling in

10  this.

11  Q.   Did you think there was anything wrong with this?

12  A.   I knew there was something wrong with this.

13  Q.   But you liked the attention.

14  A.   Yes.

15  Q.   What started happening after this?

16  A.   After this, the next day at school and for the

17  rest of the time I spent at Rice Avenue, he would dismiss

18  the other people in the TV studio, keep me behind, and he

19  would do the same sorts of things and some more in the TV

20  studio when he would lock the door when they left.

21  Q.   Let me stop you.  When is the first time you

22  remember something happening in the TV studio?

23  A.   The day after the field trip.

24  Q.   So it would have been February 5th.

25  A.   Yes.

P-5

23

1    A.    Yes.

2    Q.    And you said this was above your clothing?

3    A.    Yes.  And below.

4    Q.    And below.

5    A.    Yes.

6    Q.    How would he get below your clothing?

7    A.    Put his hands under.

8    Q.    Your clothes were still on, but his hands were

9    underneath.

10   A.    Yes.

11   Q.    You say he touched your chest?

12   A.    Yes.

13   Q.    He touched your buttocks?

14   A.    Yes.

15   Q.    Your back?

16   A.    Uh-huh.

17   Q.    How about your stomach?

18   A.    Yes.

19   Q.    And he'd kiss you while he was doing this?

20   A.    Yes.

21   Q.    And you'd kiss him back, or not?

22   A.    Yes.

23   Q.    Yes.  Did you ever tell anybody when this all

24   started?

25   A.    No.

P-6

29

Case 1:04-cv-00150-SJM    Document 20    Filed

1          Q.    During the first semester -- I'm sorry, the last

2    semester of seventh grade, in that time, up until summer,

3    did he ever force you to touch him anywhere else?

4          A.    I can't remember which year it was.  I think so.

5    I believe it was seventh grade.

6          Q.    You think it was seventh grade?

7          A.    (Witness nods head.)

8          Q.    Are you sure?

9          A.    Yes.

10         Q.    Where did he have you touch him during that

11   semester?

12         A.    His stomach and his private area.

13         Q.    You touched his private area?

14         A.    Above clothing.

15         Q.    Meaning what?

16         A.    Meaning below the waist.

17         Q.    Front or back?

18         A.    Front.

19         Q.    But only above the clothing.

20         A.    Yes.

21         Q.    And that was while he was kissing you.

22         A.    Yes.

23         Q.    And you were kissing him back.

24         A.    Yes.

25         Q.    Was there anything else in that semester -- you

P-7

33

1      A.   On occasion, we would actually clean things up and

2   organize them.

3      Q.   So not every time you left third period you went

4   off and kissed him and touched him and had him touch you.

5      A.   Third period, yes.   Pretty much every time.

6   Because even if we were cleaning, he would do it anyway.

7      Q.   So even if you did something that was supposed to

8   be done, cleaning or working on something, there would

9   always be a time that he would kiss you and touch you.

10     A.   Yes.

11     Q.   Did he always touch you in the same places?

12     A.   Yes.   Pretty much.

13     Q.   Was there any other place that he ever touched you

14   that semester?

15     A.   My legs and, you know, feet, arms, shoulders.

16   Just nothing important.

17     Q.   But no other private places.

18     A.   Right.

19     Q.   What happened at the end of the year?   Did you go

20   off to summer vacation?

21     A.   Yes.

22     Q.   How was that?

23     A.   He would stop by often, visiting us.   In February

24   of this year, he had an accident with his power parachute

25   near my house.   He had crashed it.

P-8    37

1    Q.    Well, what happened that started below that?

2    Below the clothing, I take it.

3    A.    Yes.

4    Q.    How did it happen that you were touching him below

5    the clothing?

6    A.    He would have me unzip his jeans or pants and put

7    my hands in.  And some days he would just take my hand and

8    put it in underneath his jeans and underwear from the top.

9    Q.    What did your hand touch?

10    A.    His penis.

11    Q.    Do you know whether it was erect or not?

12    A.    Yes.  It often was.

13    Q.    It often was.  Was it always?

14    A.    No.

15    Q.    Did anything ever happen further with that --

16    A.    Yes.

17    Q.    -- as far as you touching?  What?

18    A.    At the end of my eighth grade year, he asked me

19    twice to perform oral sex on him.

20    Q.    We'll come back to that.  Still with you touching

21    him, did anything else happen?

22    A.    No.

23    Q.    Do you know what ejaculate means?

24    A.    Yes.

25    Q.    Did he ever ejaculate?

P9    49

```
1      A.   Yes.
2      Q.   Now, you said it was dark in the room; is that
3  right?
4      A.   Yes.
5      Q.   You said that he nibbled on your ear.  Is that
6  correct?
7      A.   Yes.
8      Q.   Which ear did he nibble on?
9      A.   The right one.
10     Q.   Did he say anything to you?
11     A.   No.
12     Q.   Did you say anything to him?
13     A.   No.
14     Q.   Did you ever tell any of the other kids that that
15  had happened?
16     A.   I told the friend I had brought, Ch▇▇▇▇▇▇
17  S▇▇▇▇▇.
18     Q.   Did you tell her that day?
19     A.   Yes.
20     Q.   What did she say?
21     A.   She didn't believe me.  She came home with me, and
22  I told her, and she was really frightened, but she didn't
23  believe me.
24     Q.   Did you tell anyone else?
25     A.   No.
```

P-10                                                78

1      A.   No.

2      Q.   He stopped at a stop sign, correct?

3      A.   Yes.

4      Q.   And he leans over and kisses you; is that correct?

5      A.   Yes.

6      Q.   Does he say anything?

7      A.   Not after.

8      Q.   So he stops and then drives away?

9      A.   Other cars were coming up, and I told him that he

10   had better go, because, you know, they are just kind of

11   sitting there waiting for him.

12     Q.   Did he touch you anywhere?

13     A.   My back, front.  But all over the coat.

14     Q.   He does this all at the stop sign.

15     A.   Yes.

16     Q.   With both hands?

17     A.   I don't recall.

18     Q.   He doesn't touch you under your clothing, correct?

19     A.   Correct.

20     Q.   Now, you said that he also stopped at another

21   intersection near your home.  Is that correct?

22     A.   Not at an intersection.  He pulled over by a

23   mailbox near the intersection.

24     Q.   That was on Shady Lane?

25     A.   Near there.

P-11

1     Q.   When is the next time you had contact with him?

2     A.   He had been at my house when my mother wasn't

3  there.

4     Q.   When was that?

5     A.   During that summer.  I'm not sure when.  It was

6  pretty early, because he went on a trip somewhere.

7     Q.   Early summer.

8     A.   Right.

9     Q.   Of 2000.  And what happened on that occasion?

10    A.   He came in the house and kissed me for a couple

11  minutes, and we went outside.

12    Q.   Anybody else at home?

13    A.   My sister.

14    Q.   How old was your sister at that time?

15    A.   She was -- how long ago was --

16    Q.   In 2000.  How old is your sister now?

17    A.   She's 11.

18         (Discussion held off the record.)

19    Q.   Now, you said you kissed inside for a couple

20  minutes, then you went outside, correct?

21    A.   Right.

22    Q.   Any contact after that day?

23    A.   I don't think so.

24    Q.   Is that the last time you had any contact at all

25  with Mr. Yarbenet?

P-12  112

1  your head?

2      A.    At his waist level.

3      Q.    And what was there?

4      A.    At that point he took his penis out.

5      Q.    Were his pants unzipped or unbuttoned before that?

6      A.    Yes.

7      Q.    They were.  Had you touched his penis that day?

8      A.    Yes.

9      Q.    And did anything else happen then?

10     A.    He then put it in my mouth.

11     Q.    Put his penis in your mouth?

12     A.    Yes.

13     Q.    Was it erect?

14     A.    Yes.

15     Q.    How long did you have his penis in your mouth?

16     A.    For a minute or so.

17     Q.    Did anything happen?

18     A.    No.

19     Q.    How did it stop?

20     A.    I couldn't take it.  I got up and left.

21     Q.    Did you say anything to him?

22     A.    No.

23     Q.    Where did you go to?

24     A.    I went to the basement where I had been painting.

25     Q.    Did you see him again that day?

P-13    55

Case 1:04-cv-00150-SJM    Document 32

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNYSLVANIA

| | |
|---|---|
| STACY S., and JOHN and MARY ELLEN S. on behalf of their daughter, LEIGH ANN S., a minor, | CIVIL ACTION C.A. No. 04-150 ERIE |
|           Plaintiffs, | Deposition of: MARY WERLING |
| vs. | Deposition date: March 24, 2005 |
| GIRARD SCHOOL DISTRICT; ROBERT SNYDER, Individually and in his capacity as Principal of the Rice Avenue Middle School; and GREGORY YARBENTE, a professional employee of the Girard School District, | Reported by: Candance L. Messich COUNSEL OF RECORD: For the Plaintiffs: Edward Olds, Esquire Carolyn Russ, Esquire 1007 Mt. Royal Boulevard Pittsburgh, PA  15223 |
|           Defendants. | For the Defendants: Richard Lanzillo, Esquire KNOX, McLAUGHLIN, GORNALL & SENNETT 120 West 10th Street Erie, PA  16501 |

ORIGINAL—TRANSCRIPT

## MAXINE JACOBY & ASSOCIATES    Q-1

ALLEGHENY BUILDING    SUITE 720
429 FORBES AVENUE    PITTSBURGH, PA. 15219

(412)  765-3133    FAX  (412)  765-2704

D E P O S I T I O N

of MARY WERLING, taken pursuant to the Federal Rules of
Civil Procedure, by and before Candance L. Messich, a
Court Reporter and Notary Public in and for the
Commonwealth of Pennsylvania, at the offices of
KNOX, McLAUGHLIN, GORNALL & SENNETT, 120 West 10th
Street, Erie, Pennsylvania, 16501, on Thursday,
March 24, 2005, commencing at 1:40 p.m.


Also Present:

S▮▮▮▮ ▮▮▮▮▮▮▮▮

L▮▮▮▮ A▮▮▮ ▮▮▮▮▮▮▮▮▮

Robert Snyder

Dean Maynard


**MAXINE JACOBY & ASSOCIATES** (Q-2

ALLEGHENY BUILDING    SUITE 720
429 FORBES AVENUE    PITTSBURGH, PA. 15219

(412) 765-3133        FAX (412) 765-2704

Case 1:04-cv-00150-SJM   Document —

34

```
 1          annoying.
 2     Q    Was there always a Code 10?
 3     A    No.
 4     Q    So that was just -- Code 10s are a practice,
 5          right?
 6     A    Yes, but we were supposed to be having our
 7          doors locked in case there would be an
 8          emergency.
 9     Q    Okay.  So when you talked about the doors
10          always being locked, what you're trying to do
11          is describe your understanding of a new
12          district policy that required doors to be
13          locked?  Is that what you were trying to do?
14     A    No, I was describing my frustration that when
15          I would go to try to check on Stacy I
16          couldn't get in the door.
17     Q    At Yarbenet's?
18     A    Yes.
19     Q    So why would you go to check on her?
20     A    Because I tried to make sure that she was
21          working on her topic because she wasn't
22          making a lot of progress on it.
23     Q    So the door would be locked?
24     A    Yes.
25     Q    The window would be covered?
```

MAXINE JACOBY & ASSOCIATES        Q-3

Case 1:04-cv-00150-SJM    Document 25    —————

35

```
 1    A    Yes.

 2    Q    Would you knock on the door?

 3    A    Yes.

 4    Q    And what would happen?

 5    A    Nothing.  Nothing.  And so I think if she's

 6         upstairs in that TV studio, I can't leave my

 7         class and go up there, but I could run across

 8         the hall, which I wasn't even supposed to be

 9         doing, so I couldn't spend any time trying to

10         find out where she was.

11    Q    Did you tell anyone about this?

12    A    Just Stacey, and then I would yell at

13         Yarbenet.

14    Q    Tell me what you would say to Yarbenet.

15    A    Well, why does she have to work over there on

16         the computer, and he would say, well, she's

17         got it all on disk and/or she's go it on the

18         hard drive, and I don't know what excuse he

19         gave, but it was something that -- I don't

20         know that much about computers, so it was

21         something that I believed.

22    Q    So you believed him?

23    A    Yes, I did.  See, I also had kids who would

24         go down to the computer lab on the first

25         floor sometimes and work on computers if we
```

Q-4

24

```
 1              help them, but she was there.

 2    Q    Well, did you think that there was something

 3         wrong with the way Yarbenet and S██████

 4         interacted?

 5    A    I didn't see any conduct that wasn't

 6         teacher-student, just the arm around the

 7         shoulder.

 8    Q    Did you see Yarbenet put his arm around

 9         S████'s shoulder?

10    A    Well, like I said before, the hand on the

11         shoulder thing I did see.

12    Q    With S████?

13    A    Yes.

14    Q    Well, did he put his arm around her shoulder

15         also?  Did you see that?

16    A    Well, to put his hand on her shoulder, that's

17         what I meant.

18    Q    Are you suggesting that he would put his

19         right hand on her right shoulder?

20    A    I'm thinking like the right hand on the right

21         shoulder or the left hand on the left

22         shoulder.

23    Q    So if he maneuvered himself, he would end up

24         embracing her in a way?

25              MR. LANZILLO:  Objection to form.
```

MAXINE JACOBY & ASSOCIATES 

41

1        invited some Jehovah Witnesses in for a

2        discussion, and at that time he had accepted

3        that faith.

4   Q    Did he talk about that faith with you?

5   A    If so, it was regarding pledging the flag,

6        that he did not have his class pledge the

7        flag, and that was another annoyance to

8        everyone.

9   Q    After talked to the police, did you talk to

10       L█████ A██'s mother?

11  A    No, I didn't.  They said that they would

12       contact her, and I should not talk about

13       anything.

14  Q    Eventually did you talk to her?

15  A    L█████ A██'s mother and I are friends, so we

16       go back and forth to each other's houses, and

17       we may have -- it was so much involved with

18       the police that we didn't have much to say

19       about that, other than we just didn't like

20       Yarbenet.  So we talked about him, but not

21       much more than that.

22  Q    Did you ever hear that any teacher had gone

23       to Snyder to talk about Yarbenet and the way

24       he related to female students?

25  A    I don't recall.

MAXINE JACOBY & ASSOCIATES    Q-6