**Page 1**

```
 1          IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2
   STACY S.; and JOHN AND    : HONORABLE SEAN J. MCLAUGHLIN
 3 MARY ELLEN S., on behalf  :
   of their daughter, LEIGH  :
 4 ANN S., a minor,          :
         Plaintiffs          :
 5                           :
 6        v.                 : Civil Action No. 04-150E
                             :
 7 GIRARD SCHOOL DISTRICT;   :
   ROBERT SNYDER, Individually:
 8 and in his capacity as    :
   Principal of the Rice     :
 9 Avenue Middle School; and :
   GREGORY YAREMBET, a       :
10 professional employee of  :
   the Girard School         :
11 District,                 :
         Defendants          : Jury Trial Demanded
12
13
14
15
16      Deposition of LINDA TUCCI, taken before
17 and by Sonya Hoffman, Notary Public in and for the
18 Commonwealth of Pennsylvania on June 8, 2005,
19 commencing at 11:11 a.m., at the offices of Knox
20 McLaughlin Gornall & Sennett, P.C., 120 West
21 Tenth Street, Erie, PA 16507.
22
23
24
25        Reported by Sonya Hoffman
        Ferguson & Holdnack Reporting, Inc.
```

1

**Page 2**

```
 1        A P P E A R A N C E S
 2 For the Plaintiffs:
 3      Edward A. Olds, Esquire
        1007 Mount Royal Boulevard
 4      Pittsburgh, PA 15223
 5 For the Defendants:
 6      Richard A. Lanzillo, Esquire
        Neal R. Devlin, Esquire
 7      Knox McLaughlin Gornall & Sennett, P.C.
        120 West Tenth Street
 8      Erie, PA 16507
 9
10        I N D E X
11
12 LINDA TUCCI
13    Direct Examination by Mr. Olds . . . . . . . . . 3
14
15
16
17
18        E X H I B I T S
19
20 Tucci Deposition Exhibit No. 1. . . . . . . . . .14
21
22
23
24
25
```

2

**Page 3**

```
 1        L I N D A   T U C C I, first having
 2 been duly sworn, testified as follows:
 3
 4        DIRECT EXAMINATION
 5 BY MR. OLDS:
 6
 7   Q.  Ms. Tucci, hi, I'm Ed Olds.
 8   A.  Nice to meet you.
 9   Q.  Nice to meet you.  I represent Stacy ██████ and
10 Leigh Ann ██████████ who, probably as you know, sued the
11 Girard Area School District and Robert Snyder.
12   A.  Uh-huh.
13   Q.  And I'm going to be asking you some questions to
14 see if you have any information about the events that led up
15 to their lawsuit, okay?
16   A.  Okay.
17   Q.  I guess maybe, first of all, I don't know
18 whether -- I assume that you've had a chance to meet with
19 the lawyers for the School District.
20   A.  Yes.
21   Q.  Can you tell me when you met with them?
22   A.  I have not been in school, I've been on
23 sabbatical, so I do not recall what month it was.  It was
24 after -- I want to say December.
25   Q.  In December?
```

3

**Page 4**

```
 1   A.  I would say December.
 2   Q.  Okay.
 3   A.  I don't know if I'm correct on that, but I was
 4 still in school.
 5   Q.  I don't know whether they had a chance to explain
 6 to you the nature of this case, but it's a Civil Rights
 7 lawsuit where we've invoked the United States Constitution.
 8 And in a sense, your participation in the lawsuit, because
 9 we've asked you to come to this deposition -- which actually
10 is the same thing as being in court.
11   A.  Okay.
12   Q.  Your participation in this lawsuit is protected by
13 the First Amendment, which means that you can't be subject
14 to retaliation for any testimony that you give here today,
15 whether it be helpful to the School District or helpful to
16 my clients or not helpful to anyone.  You can't be subject
17 to retaliation because of the First Amendment, and I don't
18 know if that was explained to you or not.
19   A.  Huh-uh.
20   Q.  But that's the truth.
21   A.  Okay.
22   Q.  And so I guess -- and one other thing that might
23 be helpful -- well, no, let me just -- I'll ask you some
24 questions and we'll try to get through this, okay?
25   A.  Okay.
```

R-1

4

1 hugging kids. You know, sometimes if – I cannot recall a
2 specific time, but I could imagine that, you know, kids
3 would say, oh, can I have your picture, and everybody stand
4 with your arms around each other, or something to that
5 effect.
6 Q. Okay.
7 A. His room was way down, so I didn't see him.
8 Q. Okay. In the statement you wrote on March 28th
9 you talk about S___ going up the movie studio.
10 A. Uh-huh.
11 Q. You said, "I saw S___ and Mr. Yarbenet going up
12 the music room stairs to the movie studio." So that must
13 have caught your attention, right?
14 A. Yes, it did, because I would – if I just saw them
15 going up to an area – anybody going up to an area that was
16 restricted, I wouldn't have allowed it to happen. But I
17 asked somebody, what are they doing, and they said, they're
18 going to get her books. And Mrs. Yarbenet was there.
19 And Mr. Yarbenet did not drive to school most –
20 ever, and so I believed that they were giving S___ a ride
21 home.
22 Q. Okay. So who did you ask that they're going up –
23 who did you talk to about the situation?
24 A. There were probably – at that time there was at
25 least 20 people, 25 people helping, and I was in the hallway

25

1 area and I could see them walking up the steps – but
2 Mrs. Yarbenet was right there.
3 And I asked a child, what are they doing. I don't
4 recall who, just whoever was in the area. And they said,
5 her stuff is up in the movie studio. And so she had to get
6 it and they were giving her a ride home.
7 Q. How long were they up there?
8 A. I do not know because I was supervising all of the
9 other children.
10 Q. Did you ever have any – did you report that
11 incident when it happened to Mr. Snyder?
12 A. No, I did not. No. Mr. Yarbenet was not really
13 chaperoning at that time, but he was helping, you know, as a
14 teacher. So I had no reason – I assumed that the movie
15 studio was her homeroom and that's where her belongings
16 were, so.
17 Q. Tell me what other young girls Yarbenet wrote
18 passes for to get out of your study hall.
19 A. Just Carly whatever. That year, Carly whatever
20 her last name is.
21 Q. What about other years?
22 A. I can't recall.
23 Q. Do you recall him doing it in other years?
24 A. I recall boys and girls going to Mr. Yarbenet's
25 room.

26

1 Q. Do you recall which girls he wrote passes for to
2 come to his room?
3 A. No.
4 Q. Do you recall any girls going to his room
5 repeatedly from your study hall?
6 A. No, not that I'm aware of. Yearly, there would be
7 kids who – he seemed – there would be several kids who
8 would go more often than others.
9 Q. Do you remember who they were?
10 A. No. I remember asking, why do you want to go, and
11 they said, oh, because it's fun.
12 Q. Were they girls?
13 A. No – well, when I asked why, it was a boy, his
14 first name is Justin and I can't think of his last name.
15 And I said, why do you guys always want to go down there, he
16 goes, because it's fun and your room is boring.
17 Q. There were girls, however, that you released to go
18 down there?
19 A. I would assume so, yeah.
20 Q. I mean, in your mind, do you think that S___ was
21 his first victim? Do you think there were other victims
22 that preceded S___?
23 A. I hope not. I never really thought about it and I
24 pray not.
25 Q. What classes did you have for L___ A___? What

27

1 classes was L___ A___ in of yours?
2 A. Math class. I'm not positive if she was in my
3 study hall or not.
4 Q. Do you recall whether you ever saw her with
5 Yarbenet?
6 A. I never saw her with Yarbenet. I didn't know who
7 L___ A___ was until she was in my class in 8th grade.
8 Q. Yarbenet was gone then?
9 A. Yes, I believe.
10 Q. Did you have much contact with Mr. Manross?
11 A. Early – I have carpooled with Mr. Manross before.
12 But at that – I don't think that I carpooled with
13 Mr. Manross beyond 1995, maybe.
14 Q. Okay. Do you have any official functions that you
15 and he participate in together?
16 A. No.
17 Q. At the school, you know, like –
18 A. His classroom is three doors down from mine and
19 because he is from Cambridge Springs and I went to Cambridge
20 Springs – and he was actually a teacher in the building
21 when I was there, I would say hi to him and talk to him and
22 I know his children.
23 Q. Oh, okay. Did Ms. Seneta ever complain to you
24 about anything concerning Yarbenet?
25 A. Yes.

R-2    28

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

STACY S. et al.,                          )       Civil Action No. 04-150E
                                          )
              Plaintiffs,                 )       HON. SEAN J. McLAUGHLIN
                                          )
       v.                                 )
                                          )
GIRARD SCHOOL DISTRICT,                   )
et al.,                                   )
                                          )
              Defendants.                 )

## AFFIDAVIT OF WENDY GILSON

Wendy Gilson, being duly sworn, deposes and states as follows:

1.      I live at ███████████, Cranesville, Pennsylvania 16410.

2.      In the 1998-1999 school year, my daughter, E██████, was in sixth grade
at Rice Avenue Middle School.

3.      A neighbor called to tell me that a month or so previously my daughter
had seen a teacher, Mr. Anthony Verga, looking at pictures of naked women on his
computer at school, and she had been told not to tell anybody.

4.      I questioned E██████ about this, and she told me that she had seen Mr.
Verga looking at naked women on his computer and that she had told the guidance
counselor, Mrs. De Marco, and Mrs. De Marco told her to keep this between the two of
them and that E██████ should not tell anyone else.

5.      Upon hearing E██████'s story, I met with the principal, Bob Snyder, and
Mrs. De Marco and told them what E██████ had told me.

S-1  

6.     Mr. Snyder told me in that meeting that he had talked to Mr. Verga about what he was watching on his computer. Mr. Snyder said that what E█████ had seen was either an accidental, one-time thing or it was art. Mrs. De Marco admitted at that meeting that she had told my daughter she should not spread this around but denied telling her that she should not tell anyone. I asked Mr. Snyder whether the school could check Verga's computer and he said no. I felt that Mr. Snyder and Mrs. De Marco were trying to give the impression that they had taken care of what was an accident.

7.     I was not satisfied with their explanation, so I called the superintendent, Wally Blucas. He was not polite in our conversation and in fact was rude to me. The conversation was so short that I can't even remember what was said, other than that he said Verga's action was a "one-time thing."

8.     Consequently, after having talked to both Mr. Snyder and Mr. Blucas about this, I went to a school board meeting in early 1999 and signed up to speak. I asked why the school was letting my daughter be exposed to pornography on a teacher's computer.

9.     My daughter gave me a list of other students who had seen Verga looking at pornography. I invited the parents of these students to my house. Everyone at my house that night had different accounts of what their children had told them about Verga's computer use. Some children said they had seen him looking at pornographic pictures of women, some had seen pictures of women with women, and some had seen men with men.

S-2     [handwritten initials]

10.    Several parents, including me, went to the next school board meeting to express our concern about Mr. Verga watching pornography on his computer in his sixth grade classroom. At that board meeting, one of the board members called us Bible-thumping witch hunters. He accused us of using Nazi tactics.

11.    Eventually I learned that Anthony Verga was allowed to resign.

12.    A man whose name and title I don't remember called to tell me that Mr. Verga was losing his teaching license. He said that when Mr. Verga's computer was checked by the school district, they found that he had accessed pornographic sites more than 300 times.

13.    My daughters E█████h and A██████a (twins) both had Gregory Yarbenet for science that same year, 1999-2000.

14.    When Yarbenet was arrested my children told me that they were not surprised or shocked. They said it was common knowledge among the students at the school that S████ and Yarbenet were acting like boyfriend and girlfriend. My daughters told me that the kids would often joke, "Here comes Yarbenet and his girlfriend."

15.    My children also told me that when they were in Mr. Yarbenet's science class S███y would come in and she and Yarbenet would go into the storeroom next to his classroom. The girls told me that the kids would giggle and joke about what was going on in the storeroom. I asked my children whether they ever reported it, and they said why would you report something that everybody knew.

S - 3

Date: _____7- 21-05_____        _Wendy Gilson_
                                     Wendy Gilson

Witness:                             _Carolyn Spicer Russ_
                                     Carolyn Spicer Russ, Esquire
                                     Pa. ID 36232

                                     1007 Mount Royal Blvd.
                                     Pittsburgh PA 15223

S-4

FORM OF ACKNOWLEDGMENT BY
AN ATTORNEY AT LAW

Commonwealth of Pennsylvania

County of _Allegheny_

On this, the _21st_ day of _July_____, 2005, before me
_JoAnn Matoka_, the undersigned officer, personally appeared
_Carolyn Spicer Russ_____, known to me (or satisfactorily proven)
to be a member of the bar of the highest court of said state,
Supreme Court ID Number _36232_____, and a subscribing witness
to the within instrument, and certified that she was personally
present when _Wendy Gilson___, whose name is subscribed to the
within instrument executed the same; and that said person
acknowledged that he executed the same for the purposes therein
contained.

In witness whereof, I hereunto set my hand and official seal.

_Joann Matoka_____
Notary Public

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Joann Matoka, Notary Public
Shaler Twp., Allegheny County
My Commission Expires Feb. 2, 2008
Member, Pennsylvania Association Of Notaries

SECTION: PUPILS

TITLE:         SEXUAL/UNLAWFUL
               HARASSMENT

# GIRARD
# SCHOOL DISTRICT

ADOPTED:   April 27, 1992

REVISED:    May 21, 2001

## 248. SEXUAL/UNLAWFUL HARASSMENT

1. Purpose
   Sec. 703 of Title
   VII of civil Rights
   Act of 1964; Sec.
   5(a) PHRC Act;
   Title IX of the
   1972 Education
   Amendment

2. Definitions
   OCR Guidelines
   on Sexual
   Harassment,
   Fed. Reg. Vol. 62,
   #49; PHRC
   Guidelines; PA
   Bulletin Vol. II,
   #5 Policy Memo
   OCR USDE
   March 1997

It is the policy of the Girard School District to maintain a learning and working environment that is free from sexual harassment. The District strictly prohibits, and will not tolerate, sexual harassment of or by any student. This policy applies to conduct during and relating to school and school-sponsored activities.

Any student in the District who engages in conduct which constitutes sexual harassment shall be subject to discipline, up to and including expulsion. Any student in the District who is subjected to sexual harassment by a District employee, another student, or a third party, shall have the right to file a complaint under this policy.

**Sexual harassment** is a form of discrimination prohibited by Titles IX and VII of the Civil Rights Act of 1964. The following types of conduct constitute sexual harassment:

1. A school employee explicitly or implicitly conditions a student's participation in an education program or activity or bases an educational decision on the student's submission to unwelcome sexual advances, requests for sexual favors, or other verbal, non-verbal, or physical conduct of a sexual nature.

2. Sexually harassing conduct (which can include unwelcome sexual advances, requests for sexual favors, and other verbal, non-verbal or physical conduct of a sexual nature) by an employee, by another student, or by a third party that is sufficiently severe, persistent, or pervasive to limit a student's ability to participate in or benefit from an education program or activity, or to create a hostile or abusive educational environment.

Sexual harassment as defined above may include, but is not limited to, the following:

Verbal harassment or abuse, pressure for sexual activity, repeated remarks to a person with sexual or demeaning implications, obscene or sexually-oriented jokes, inappropriate gestures or body language, unwelcomed touching, or suggesting or demanding sexual involvement accompanied by implied or explicit threats concerning one's grades, involvement in activities, or other aspects of one's education.

T-1

Case 1:04-cv-00150-SJM    Document 29

248. SEXUAL/UNLAWFUL HARASSMENT - Pg. 3

## Procedures

The District, under the direction of the Title IX Coordinator, or Superintendent, will investigate and resolve complaints involving sexual harassment of students. Any student who believes that s/he has been subjected to sexual harassment shall report all incidents of such conduct verbally or in writing to any counselor, or administrator, or the District's Title IX Coordinator. In the event a verbal or written complaint is made to a counselor or administrator, the Title IX Coordinator will be notified immediately.

All reports of violation of this policy will be managed with strict confidence. Disclosures will be made only to the extent necessary to thoroughly investigate the report and resolve the problem.

After a prompt and thorough investigation has been completed, a review of the results will be made. Any employee who is found to have violated this policy will be subject to discipline, up to and including termination. Any student who is found to have violated this policy will be subject to disciplinary action, up to and including expulsion.

## Retaliation Prohibited

The School District prohibits retaliatory behavior against any complainant or any participant in the complaint process. The initiation of a complaint of sexual harassment will not reflect negatively on the student who initiates the complaint nor will it effect the student's academic standing, rights or privileges.

## Notifications

A copy of this Sexual/Unlawful Harassment Policy shall be included in the student handbooks each school year.

T-2

No. 248

SECTION:   PUPILS

TITLE:     PREVENTION OF
           SEXUAL HARASSMENT

ADOPTED:   April 27, 1992

REVISED:   October 24, 1994

# Girard School District

## 248.  PREVENTION OF SEXUAL HARASSMENTS

### 1. Authority

All Girard School District students, employes and volunteers have a responsibility for maintaining high standards of conduct and ethical behavior. Student, employe or volunteer conduct which violates these standards is prohibited. Any reference to employes in this policy shall include any volunteer acting under the supervision of a district employe.

### 2. Definition

Harassment on the basis of sex is a violation of Section 703 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Section 2000e-2. The Equal Employment Opportunity Commission Guidelines on Discrimination Because of Sex (29 CFR 1604.11) define sexual harassment as deliberate unsolicited and unwelcome verbal comments, gestures, or physical contact of a sexual nature. For purposes of this policy, the Girard School District specifically adopts this definition of sexual harassment, inclusive of any future amendments. Appendix A is attached for reference.

### 3. Guidelines

Recent court decisions demonstrate that neither the Girard School District nor any other employer can tolerate or condone sexual harassment or intimidation. The Girard School District is committed to ensuring that the school district is free of sexual harassment and other unlawful discriminatory practices.

Any student/employe who sexually harasses any student/employe will be subject to appropriate disciplinary action including reprimand, suspension, expulsion or discharge. Supervisors who either condone or fail to act to correct sexual harassment brought to their attention also may be subject to disciplinary action. Sexual harassment is viewed in the Girard School District as immorality which could result in termination of a contract. Sexual harassment of a

Page 1 of 6

EXHIBIT 

T-3



248. PREVENTION OF SEXUAL HARASSMENT - Pg. 2

student/employe also reflects on the quality of ser-
vice of a professional/non-instructional employe
which could result in an unsatisfactory rating on any
rating form adopted by the district at the time of
the harassment, suspension with/without pay, and/or
dismissal.

Students/employes are encouraged to report imme-
diately any instances of sexual harassment.  Such
complaints should be directed initially to the build-
ing Sexual Harassment Officer (male or female or
both) who will examine and resolve promptly, impar-
tially and confidentially all complaints.  The names
of the building Sexual Harassment Officers will be
available to the complainant through the building
principal or administrative secretary.

All conferences and resolutions from any step
shall be documented in writing and submitted to each
party and placed in personnel files within five (5)
days of the conference.  At the conclusion of any
complaint, all records will be sealed and impounded
in a file, separate from the personnel/pupil file, to
be maintained in the office of the Superintendent.
Release from impounding from the file in the Superin-
tendent's office may be made only upon formal action
of the Girard School District Board of Directors or a
court order.

Step One

Any student/employe who believes that s/he has
been subjected to sexual harassment should report all
incidents of such conduct to the building Sexual
Harassment Officer.

The building Sexual Harassment Officer will
promptly investigate the complaint, interview both
parties to provide complainant and accused with the
opportunity to discuss the charges made, explore
personal feelings with confidentiality and impartiali-
ty, interview other employes or students who may have
knowledge with regard to the incident, and evaluate
complaints which might be irresponsible, unfounded or
involved misperceptions of fact or intent.  Written
statements may be obtained from individuals with
knowledge of relevant information.  A check of the
personnel/pupil file will be made to determine evi-
dence of prior friction between parties and to access
records.  The Sexual Harassment Officer will attempt

Page 2 of 6

T-4



248. PREVENTION OF SEXUAL HARASSMENT - Pg. 3

to remedy the situation while reaching a mutual agreement.

## Step Two

If the complaint is not resolved to the satisfaction of either party in Step One, the complainant and the accused will each submit a detailed written statement of account to the Superintendent. Upon receipt of such written statement, the Superintendent will inform both parties of an administrative conference. Such notice shall be made to each party at least three (3) working days before the date of the conference.

During such administrative conference conducted by the Superintendent, the complainant and the accused will have the right to be represented by competent counsel of their choice and at their expense.

Whenever the principal, Superintendent or the Sexual Harassment Officer is the complainant or the accused, the administrative conference may be bypassed, and charges brought directly to the Board of School Directors; or a Board member appointed by the President of the Board may be asked to conduct the conference.

Should the administrative conference be resolved in favor of the accused, no further action will be necessary.

If the conference is resolved against the accused, disciplinary action which may include warnings, reprimands, transfers, demotion, suspension, expulsion, dismissal, and unsatisfactory rating or any combination of these will be taken in accordance with district policy.

If the student or employe is dissatisfied with the decision at Step Two, s/he may request, in writing, a hearing before the Board within ten (10) days.

## Step Three

Board hearings will be conducted according to the following procedures:

Page 3 of 6

T-5



248. PREVENTION OF SEXUAL HARASSMENT - Pg. 4

Board hearings will be conducted in public session unless the employe and/or student requests a private hearing. Board hearings will be conducted in accordance with the provisions of the School Code of Pennsylvania and other applicable state and federal laws, including the right to notification at least ten (10) days prior to the hearing.

Should the Board hearing be resolved in favor of the accused, no further action will be necessary.

If the hearing is resolved against the accused, disciplinary action which may include warnings, reprimands, transfers, demotion, suspension, expulsion, dismissal, an unsatisfactory rating or any combination of these will be taken in accordance with district policy.

The procedures and provisions contained in these policies are not intended to supersede or circumvent any legal sections outlined in the Pennsylvania School Code, state or federal statues.

T-6

Case 1:04-cv-00150-SJM    Document 20    Filed ...

248. PREVENTION OF SEXUAL HARASSMENT – Pg. 5

Appendix "A"

**Sexual Harassment**

A.. Harassment on the basis of sex is a violation of Sec. 703 of Title VII. (The principles involved here continue to apply to race, color, religion or national origin). Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

B. In determining whether alleged conduct constitutes sexual harassment, the Commission will look at the record as a whole and at the totality of the circumstances, such as the nature of the sexual advances and the context in which the alleged incidents occurred. The determination of the legality of a particular action will be made from the facts, on a case by case basis.

C. Applying general Title VII principles, an employer, employment agency, joint apprenticeship committee or labor organization (hereinafter collectively referred to as "employer") is responsible for its acts and those of its agents and supervisory employes with respect to sexual harassment regardless of whether the specific acts complained of were authorized or even forbidden by the employer and regardless of whether the employer knew or should have known of their occurrence. The Commission will examine the circumstances of the particular employment relationship and the job functions performed by the individual in determining whether an individual acts in either a supervisory or agency capacity.

D. With respect to conduct between fellow employes, an employer is responsible for acts of sexual harassment in the workplace where the employer (or its agents or supervisory employes) knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action.

E. An employer may also be responsible for the acts of nonemployes, with respect to sexual harassment of employes in the workplace, where the employer (or its agents or supervisory employes) knows or should have known of the conduct and fails to take immediate and and appropriate corrective action. In reviewing these cases the Commission will consider the extent of the employer's control and other legal responsibility which the employer may have with respect to the conduct of such nonemployes.

T-7

248. PREVENTION OF SEXUAL HARASSMENT - Pg. 6

F.  Prevention is the best tool for the elimination of sexual harass-
    ment.  An employer should take all steps necessary to prevent sexu-
    al harassment from occurring such as affirmatively raising the
    subject, expressing strong disapproval, developing appropriate
    sanctions, informing employes of their right to raise and how to
    raise the issue of harassment under Title VII, and developing meth-
    ods to sensitize all concerned.

G.  Other related practices:  Where employment opportunities or bene-
    fits are granted because of an individual's submission to the em-
    ployer's sexual advances or requests for sexual favors, the employ-
    er may be held liable for unlawful sex discrimination against other
    persons who were qualified for but denied that employment opportuni-
    ty or benefit.

    (Title VII, P.L. 88-352, 78 Stat. 253 (42 U.S.C. 2000 et seq.)

T-8

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2

 3   STACY S; and JOHN and     :
     MARY ELLEN S., on behalf  :
 4   of their daughter, LEIGH  :
     ANN S., a minor,          :
 5            Plaintiffs        :
                               :
 6        vs.                  :   Civil Action No. 04-150E
                               :
 7   GIRARD SCHOOL DISTRICT;   :
     ROBERT SNYDER,            :   HONORABLE SEAN J. MCLAUGHLIN
 8   Individually and in his   :
     capacity as Principal of  :
 9   the Rice Avenue Middle    :
     School; and GREGORY       :
10   YARBENET, a professional  :
     employee of the Girard    :
11   School District,          :
              Defendants       :   Jury Trial Demanded
12

13                        VOLUME I

14        Deposition of STACY ████████, taken before and
     by Carol A. Holdnack, RPR, Notary Public in and for
15   the Commonwealth of Pennsylvania, on Tuesday,
     March 15, 2005, commencing at 10:15 a.m., at the
16   offices of Knox McLaughlin Gornall & Sennett, P.C.,
     120 West Tenth Street, Erie, PA 16501.
17

18   For the Plaintiffs:
          Edward A. Olds, Esquire
19        Carolyn Spicer Russ, Esquire
          1007 Mount Royal Boulevard
20        Pittsburgh, PA 15223

21
     For the Defendants:
22        Richard A. Lanzillo, Esquire
          Knox McLaughlin Gornall & Sennett, P.C.
23        120 West Tenth Street
          Erie, PA 16501
24

25             Reported by Carol A. Holdnack, RPR
               Ferguson & Holdnack Reporting, Inc.
```

U-1

1

1        A.    Agens.

2        Q.    -- "Agens and her sister were also there."  This

3    is at the same --

4        A.    Party.

5        Q.    -- party.  Okay.  "Leah is a couple years ahead of

6    me, and" --

7        A.    "I'm not sure how much older her sister is."

8        Q.    Why don't you go ahead and just read the next

9    couple paragraphs, since you're better at your handwriting

10   than I am.

11       A.    "But both were very friendly towards him, and

12   Mr. Yarbenet and her sister spoke in his computer room alone

13   for a while --

14       Q.    And let me just caution one thing.  People read

15   faster than they speak, and it's hard for Carol.  So you're

16   going to want to slow yourself down a little bit.

17       A.    "In my seventh grade year, I had student council

18   with Ms. Turton during third period.  Every morning, Mr.

19   Yarbenet would write me a pass, a hall pass, to his room for

20   that period.  I would give it to her and go often with

21   another student.  If I did not show up before class was half

22   over, either because I didn't give her the pass or because

23   she wouldn't let me leave, he would nearly always come and

24   talk to her.  And when he did, she always let me leave.  She

25   knew he had been having problems and heard that I was

U-2  108

1  counseling him. So she had no objections, and even
2  suggested it on occasion. Often there were lots of kids
3  here at this time, so for the most part nothing happened.
4  He would have me stand with him at his desk and would rub
5  his legs up and down -- rub his hand up and down my legs.
6  Only on occasion at this time would we go to the TV studio."
7      Q.  Let me stop you there, S████, and ask you a couple
8  of things. Mrs. Turton was your student council teacher?
9      A.  Right.
10     Q.  All right. And Mr. Yarbenet would regularly write
11 you a hall pass that would allow you to leave student
12 council and come to his room?
13     A.  Right.
14     Q.  And do you know what -- for what purpose
15 Mr. Yarbenet would seek to have you dismissed to his room?
16 Was it to work in the TV studio?
17     A.  That's what he claimed.
18     Q.  Okay. Is that what he told Mrs. Turton?
19     A.  Yes.
20         MR. OLDS: Well, do you know what -- did you hear
21         what he told Ms. Turton? I know it's your
22         deposition, but that's sort of -- there wasn't a
23         foundation for that question.
24     A.  When he would give me a pass and ask me to give it
25 to her and leave, I was to tell her that I would be cleaning

U-3    109

1    the TV studio.  When he would have to come talk to her, they

2    would whisper out of my earshot.  And I didn't hear what he

3    said, but he told me that that was what he had told her.

4        Q.    I see.  Was this every day?

5        A.    It was very nearly every day.

6        Q.    Okay.  And you referenced here that you would go

7    to his class often with another student?

8        A.    Right.

9        Q.    Who was the other student?

10        A.    One of the officers at the time.  It might have

11    been A████y E██████ again.

12        Q.    One of the officers of student council?

13        A.    Right.

14        Q.    And you believe it was A████y E████h?

15        A.    Right.

16        Q.    And would she also receive a pass from Mr.

17    Yarbenet?

18        A.    Mine was to include her.

19        Q.    I see.  So it was a single pass for both of you?

20        A.    Right.

21        Q.    And you would typically leave Mrs. Turton's

22    classroom together and then go to the studio or his

23    classroom together?

24        A.    Sometimes.  Often we would meet there because she

25    wouldn't be allowed to go when I was.  But she would be

1   allowed later on in the class period.

2       Q.    And do you know why it was that she would be

3   released from Mrs. Turton's class sometimes later than you

4   would be?

5       A.    Because he requested that I go.  And Ashley could

6   come if she wanted.

7       Q.    Okay.  But you said sometimes she wouldn't be

8   allowed to leave.  Do you know why she would not be allowed

9   to leave at times when you would be allowed to leave?  Did

10  she have -- in other words, did she have other

11  responsibilities in student council?

12      A.    She was supposed to be a secretary, but she really

13  didn't have responsibilities that she needed to be there

14  for.

15      Q.    Okay.

16      A.    Most of the time it was a study hall.

17      Q.    You say here that "She", meaning Mrs. Turton, I

18  understand, "knew he," meaning Mr. Yarbenet, "had been

19  having problems and heard I was, quote, counseling him."

20  How did you learn that information?  In other words, how do

21  you know what Ms. Turton knew?

22      A.    Because I was there one day when he told her that

23  I had saved his life by not letting him commit suicide over

24  Christmas break.

25      Q.    And the word "counseling", where did that come

U-5    111

1                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3    STACY S; and JOHN and          :
     MARY ELLEN S.; on behalf       :
4    of their daughter, LEIGH       :
     ANN S., a minor,               :
5              Plaintiffs           :

6              vs.                  :    Civil Action No.  04-150E
                                    :
7    GIRARD SCHOOL DISTRICT;        :
     ROBERT SNYDER,                 :    HONORABLE SEAN J. MCLAUGHLIN
8    Individually and in his        :
     capacity as Principal of       :
9    the Rice Avenue Middle         :
     School; and GREGORY            :
10   YARBENET, a professional       :
     employee of the Girard         :
11   School District,               :
               Defendants          :    Jury Trial Demanded
12

13

14        Telephone discussion with the Honorable Sean J.
     McLaughlin held on Wednesday, June 15, 2005, at the offices
15   of Knox McLaughlin Gornall & Sennett, 120 West Tenth Street,
     Erie, PA 16501.
16

17   For the Plaintiffs:
          Edward A. Olds, Esquire
18        1007 Mount Royal Boulevard
          Pittsburgh, PA 15223
19

     For the Defendants Girard School District and Robert Snyder:
20        Richard A. Lanzillo, Esquire
          Knox McLaughlin Gornall & Sennett, P.C.
21        120 West Tenth Street
          Erie, PA 16501
22

23

24

25             Reported by Carol A. Holdnack, RPR
               Ferguson & Holdnack Reporting, Inc.

V-1                                                              1

1    THE COURT: Are you telling me -- I guess you are

2    telling me that you don't -- that you are of the

3    opinion that -- first of all, is this a 1983 and

4    Title 9 case?

5    MR. LANZILLO: It is for now. I mean, yes, it has

6    been asserted as such. Obviously, I'm going to be

7    challenging the 1983 claim under the SeaClammers

8    Doctrine. Also, I'm going to be attacking the

9    Title 9 claim under the actual knowledge standard.

10   And, frankly, obviously, I'm familiar with Chet

11   Kent. It's my belief that there's really nothing

12   that Chet Kent can say to change the dynamic of

13   this case. However, if his --

14   THE COURT: How could it possibly -- I mean, any

15   expert opinion he would render, it seems -- I

16   mean, how does he even enter into the mix on

17   summary judgment?

18   MR. LANZILLO: Well, I don't think that he does.

19   But if his affidavit is going to be -- obviously,

20   you know, Ed and I have not jointly analyzed the

21   case, and he may see it from a different

22   perspective. To the extent that Chet Kent may

23   enter into the mix, I certainly would want to have

24   the ability to depose him concerning the

25   foundational elements of his opinion, and attack

V-2